# EXHIBIT 1

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

MDL No. <u>1:22-P-122</u>

---

**In re:  THE LITIGATION PRACTICE
GROUP, PC, CREDIT REPAIR
ORGANIZATIONS ACT LITIGATION**

---

<u>MOTION OF DEFENDANT THE LITIGATION PRACTICE GROUP, PC TO
TRANSFER ACTIONS TO THE SOUTHERN DISTRICT OF OHIO PURSUANT TO 28
U.S.C. § 1407 FOR COORDINATED OR CONSOLIDATED PRETRIAL
PROCEEDINGS</u>

The Litigation Practice Group, PC ("LPG"), pursuant to 28 U.S.C. § 1407(a) and Rule 6.2 of the Rules of Procedure of the United States Judicial Panel on Multidistrict Litigation, respectfully requests that this Panel issue an order for transfer and consolidation for the eleven (11) civil actions listed in the Schedule of Actions (the "Actions") filed concurrently herewith.

LPG is a named defendant in ten litigation matters – and a potential defendant in the eleventh matter.  Ten of the eleven pending lawsuits involve allegations arising under the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.*  One matter involves a state law claim under a similar state statute, the Kansas Credit Services Organization Act ("KCSOA"), K.S.A. 50-1116, *et seq.*  Two of the eleven Actions are class actions, containing class definitions which substantially overlap.

 For the reasons set forth in the accompanying Memorandum in Support, LPG respectfully submits that it is appropriate and necessary for the Panel to issue an order transferring and consolidating the Actions listed in the accompanying Schedule of Actions, as well as all subsequently filed related actions, to the Southern District of Ohio for coordinated or consolidated pretrial proceedings.

The cases that LPG seeks to coordinate and consolidate include (but may not be limited to) the following:

(1)   *Gloria Eaton, individually and on behalf of all others similarly situated, v. The Litigation Practice Group, PC,* Case No. 1:22-cv-00917-VMC (N.D. Georgia March 4, 2022); ("*Eaton*");

(2)   *Carolyn Beech, on behalf of herself and the class members described below, v. The Litigation Practice Group, PC*, Case No. 1:22-cv-00057-HSO-RHWR, (S.D. Mississippi March 17, 2022) ("*Beech*");

(3)   *Debra Price v. The Litigation Practice Group, PC, Daniel March, Marque Carey, Randall Clark, Michael Robinson, Jayde Trinh, Howard Gutman*, Case No. 3:22-cv-00707-KM (M.D. Pennsylvania May 13, 2022) ("*Price*");[1]

(4)   *Kenneth Topp v. The Litigation Practice Group, PC,* Case No. 6:22-cv-00814 (W.D. Texas July 26, 2022) ("*Beech*");

(5)   *Darcy D. Williamson, Trustee v. Litigation Practice Group PC,* Case No. 22-40216, Adversary No. 22-07015 (Bankruptcy Court, D. Kansas October 3, 2022);

(6)   *James Hammett v. Debt Resolution Direct, LLC, d/b/a Debt Advisors of America Company (involving allegations against The Litigation Practice Group. P.C.),* Case No. 1:22-cv-04249-SDG (N.D. Georgia October 25, 2022) ("*Hammett*");

(7)   *Beverly A. Graham v. The Litigation Practice Group. P.C.*, Case No. 2:22-cv-07915-MAR (C.D. California, October 31, 2022) ("*Graham*");

(8)   *Johnny W. Rizo v. The Litigation Practice Group. P.C.*, Case No. 2:22-cv-01959-DAD-DB (E.D. California, October 31, 2022) ("*Rizo*");

(9)   *Teresa Klaus v. The Litigation Practice Group. P.C.*, Case No. 3:22-cv-02094-JGC (N.D. Ohio November 18, 2022);

(10)   *Kathlene Scarlett v. The Litigation Practice Group. P.C.*, Case No. 2:22-cv-04106-EAS-KAJ (S.D. Ohio November 18, 2022); and

(11)   *Geneva and Myranda Sheffield v. The Litigation Practice Group. P.C.*, Case No. 3:22-cv-02093-JZ (N.D. Ohio November 18, 2022).

---

[1] In a case of legal maneuvering, *Price* moved to dismiss her Complaint on December 2, 2022, to try and avoid a transfer of her case. After being notified of LPG's intent to move for a transfer and consolidation, *Price* moved to dismiss shortly thereafter. With the understanding that *Price* likely intends to re-file her complaint, LPG is considering opposing the motion for dismissal.

2

Transfer for pretrial consolidation or coordination is proper and necessary for the following reasons:

1.      LPG is a law firm, organized under California law as a Professional Corporation. LPG's attorney-client relationships with its clients (including the plaintiffs in the Actions) are protected by the attorney-client privilege and/or the attorney work product doctrine.  Because the attorney-client privilege is at issue in the class actions, LPG is at risk of being subjected to inconsistent pretrial rulings concerning the scope of LPG's attorney-client privilege.  This alone is cause for consolidating the Actions into a single district court for consolidated proceedings.

2.      Ten of the eleven Actions allege violations of CROA, and the allegations are nearly identical in each case.  One action alleges violations under a similar state statute.  Ten of the Actions allege that LPG violated CROA when it allegedly received payment for the performance of its services before such services were fully performed.  Five Actions state that LPG violated CROA when it allegedly made untrue statements and did not provide a written statement of rights.  (See *Price*, *Topp*, *Hammett*, *Rizo*, and *Graham*).  Two of the Actions allege that LPG violated CROA when it misrepresented its services.  (See *Price* and *Eaton*).  Five of the Actions allege LPG violated CROA when it failed to provide written disclosures and/or that it did not include certain information in such disclosures.  (See *Beech, Topp, Hammett, Rizo, and Graham*).  Four Actions allege that LPG violated CROA when the documents it provided did not include a cancellation clause. (See *Beech, Topp, Hammett*, and *Graham*).  Three of the Actions allege that LPG violated CROA when it attempted to obtain a waiver of rights from the consumer. (See *Topp, Rizo*, and *Graham*).  One action alleges violations under the Kansas Credit Services Organization Act ("KCSOA"), K.S.A. 50-1116, *et seq*.  Based on these alleged violations, plaintiffs seek injunctive relief, actual damages, punitive damages, and attorney fees and costs.

3

*Eaton* and *Beech* seek relief for putative nationwide class actions. *Eaton* seeks an ancillary class incentive award.

    3.    As demonstrated, ten of the Actions make substantially similar – if not identical – claims regarding alleged violations of CROA. Each of the eleven Actions arises out of similar facts.

    4.    Discovery in the Actions will substantially overlap, focusing on LPG's practices and procedures, including but not limited to its relationships with clients, which is protected by the attorney-client privilege. Discovery in each Action will involve many of the same documents and witnesses because each Action arises from the same or similar facts for purposes of determining whether the Actions warrant transfer under Section 1407.

    5.    The inherent risk of inconsistent discovery rulings concerning the extent and scope of LPG's attorney-client relationship – and the attorney-client privilege attendant thereto – is justification alone for coordinating and consolidating the Actions.

    6.    Plaintiffs in *Beech* seek certification of nationwide classes as follows:

> Class A consists of all persons who, on or after a date five years prior to the filing of this action entered into contracts with Defendant LPG, which contracts were not cancelled within three business days, that provide for monthly payments before services are fully performed.

*Beech* Complaint at ¶47.

> Class B consists of all persons who, on or after a date five years prior to the filing of this action entered into contracts with Defendant LPG, which contracts were not cancelled within three business days, and who were not provided with the written statement described in 15 U.S.C. §1679c(a).

*Beech* Complaint at ¶48.

> Class C consists of all persons who, on or after a date five years prior to the filing of this action entered into contracts with Defendant

4

LPG, which contracts were not cancelled within three business days, and who were not provided with both (a) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows "You may cancel this contract without any penalty or obligation at any time before midnight of the 3rd business day after the date on which you singed the contract. See the attached notice of cancellation form for an explanation of this right" and (b) a separate notice of cancellation form.

*Beech* Complaint at ¶49.

7.  Plaintiffs in *Eaton* seek certification of nationwide classes:

**Class 1 (Debt Adjustment Class)**: All persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendant on or after July 1, 2003 and from whom Defendant accepted, directly or indirectly, any charge, fee, contribution, or combination thereof, in violation of the Georgia Debt Adjustment Act.

**Class 2 (CROA Class)**: All persons who, while residing in the state of Georgia, received credit repair services from Defendant on or after five (5) years from the filing of this Complaint through the current time.

**Class 3 (FBPA Class)**: All persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendant on or after on or after four (4) years from the filing of this Complaint through the current time and from whom Defendant accepted, directly or indirectly, any charge, fee, contribution, or combination thereof, in violation of the Georgia Debt Adjustment Act, which also constitutes a violation of the Georgia Fair Business Practices Act.

**Class 4 (Money Had and Received Class)**: All persons who, while residing in the state of Georgia, paid money to Defendant on or after on or after four (4) years from the filing of this Complaint through the current time for Defendant's commission of the tort of money had and received.

**Class 5 (Restitution Class)**: All persons who, while residing in the state of Georgia, paid money to Defendant on or after four (4) years from the filing of this Complaint through the current time for services promised under an illegal contract, and such persons seek restitution from Defendant.

5

> **Sub-Classes 6-10 (Elder Abuse):** Within each of the five separate proposed classes exists an additional and distinct subclass for purposes of Count Six for all members over the age of 60 .

*Eaton* Complaint at ¶ 159.

8.     Thus, the proposed CROA subclasses in *Beech* will substantially, if not completely, overlap with the proposed CROA class in *Eaton*.  The same discovery that will be relevant in the two putative nationwide class actions will be relevant to the other Actions as well.

9.     Accordingly, transferring these Actions to one district will ensure the just and efficient conduct of the litigation and is necessary to avoid overlapping classes, duplicative discovery obligations, and the possibility of conflicting pre-trial rulings.  The risk and prejudice of inconsistent rulings on the issue of attorney-client privilege is significant.  For example, the possibility exists that two different District Courts will issue vastly different rulings concerning the scope of the attorney-client privilege maintained by LPG.

10.    As for the transferee court, LPG requests that the Panel centralize the MDL proceedings in the Southern District of Ohio, as this Court is the most appropriate transferee district.  The Southern District of Ohio has presided over twenty (20) MDL proceedings to date. The Honorable Judge Edmund A. Sargus of that court is now presiding over the *Scarlett* case. Currently, the Southern District of Ohio presides over three (3) MDL proceedings, of which Judge Sargus presides over two (2).  *See In re E.I. du Pone de Nemours and Company C-8 Personal Injury Litigation,* MDL No. 2433; *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesh Products Liability Litigation*, MDL No. 2846).[2]   Judge Sargus was also

---

[2]    See    https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-September-15-2022.pdf (*last visited November 22, 2022).*

responsible for, and oversaw, another MDL action that was terminated in 2008.[3]  The Southern District of Ohio has the resources to accept the transfer and consolidation of the Actions.  Further, Judge Sargus has the experience necessary to see through another MDL.

11.     Alternatively, the Northern District of Ohio is likewise a suitable transferee district.  The Northern District of Ohio has presided over 33 terminated MDL proceedings and is currently overseeing three (3) MDL actions.  The Honorable Jack Zouhary of that Court is now presiding over the *Sheffield* case and the Honorable James G. Carr is now presiding over the *Klaus* case.  Neither Judge is overseeing a currently pending MDL.  Both judges have MDL experience, however, in that Judge Zouhary has overseen one (1) MDL[4] and Judge Carr has overseen two (2) MDL proceedings.[5]

12.     Moreover, geographically speaking, transferring the Actions to the Southern District of Ohio (Columbus, Ohio) would serve as a convenient, centralized location for the parties and witnesses.  Ohio is also the location of LPG's nationwide counsel.  Counsel for three sets of plaintiffs in the Actions also are located in Columbus, Ohio.

13.     This motion is supported by the concurrently filed Brief in Support of LPG's Motion to Transfer, the Schedule of Actions, and the copies of the docket sheets and pending complaints in each of the Actions.  LPG has informed all parties of its intent to file this motion. *Eaton* did not indicate her position.  *Beech* indicated that she would not be willing to do anything that is likely to delay discovery, and she did not indicate her position after a request for

---

[3] *See* https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021%20Report%20Cumulativ e%20Terminated%20MDLs.pdf (*last visited November 22, 2022*).

[4] *In re Polyurethane Foam AT*, MDL No. 2196.
[5] *In re Commercial Money Center, Inc., Equipment Lease*, MDL No. 1490; *In re Heparin PL*, MDL No. 1953.

clarification. *Topp*, *Rizo*, and *Graham* indicated they oppose MDL, but that they would be "open to a discussion about the informal coordination of discovery." *Hammett* indicated that he opposes the MDL Motion, is willing to discuss informal discovery, further indicating that he is not inclined to agree to "coordinate with Plaintiff's lawyers at other firms across the country." *Williamson* indicated that she would oppose the MDL, further advising that at this time, she is not open to the informal coordination of discovery and scheduling with the other pending cases. *Klaus, Scarlett*, and *Sheffield* indicated that they do not anticipate opposing this Motion (subject to further review), and that they would be open to informal discovery and scheduling with the other pending cases.

WHEREFORE, LPG respectfully requests that the Panel transfer the Actions referenced in the Schedule of Actions to the Southern District of Ohio for centralization and consolidation before the Honorable Judge Sargus. Alternatively, LPG respectfully requests that the Panel transfer the Actions to the Northern District of Ohio.

Dated: December 6, 2022.

Respectfully submitted,

**LUPER NEIDENTHAL & LOGAN, LPA**

*/s/ Matthew T. Anderson*

Christopher R. Pettit (OH Bar 0065694)
Matthew T. Anderson (OH Bar 0082730)
Kyle T. Anderson (OH Bar 0097806)
Kirsten M. Cox (OH Bar 102183)
1160 Dublin Road, Suite 400
Columbus, OH 43215
Phone : (614) 221-7663
Fax: 800-345-4948
Email: cpettit@LNLattorneys.com
Email: manderson@LNLattorneys.com
Email: kanderson@LNLattorneys.com
Email: kcox@LNLattorneys.com
*Attorneys for Defendant, The Litigation Practice Group, PC*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

MDL No. __1:22-P-122__

In re:  THE LITIGATION PRACTICE
GROUP, PC, CREDIT REPAIR
ORGANIZATIONS ACT LITIGATION

<u>MEMORANDUM IN SUPPORT OF THE LITIGATION PRACTICE GROUP'S
MOTION TO TRANSFER ACTIONS TO THE SOUTHERN DISTRICT OF OHIO
PURSUANT TO 28 U.S.C. §1407</u>

I.      <u>INTRODUCTION</u>

The Litigation Practice Group, PC ("LPG") is a law firm, organized under California law

as a Professional Corporation.  LPG practices primarily in the areas of bankruptcy, civil litigation,

commercial litigation, real estate litigation, and collections harassment/FDCPA claims.

Currently pending against LPG are no less than nine (9) cases brought under the Credit

Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq*.  A tenth matter involves a state

law claim under a similar state statute, the Kansas Credit Services Organization Act ("KCSOA"),

K.S.A. 50-1116, *et seq*.  An eleventh matter implicates LPG under CROA, expressly referring in

the Complaint to LPG's alleged wrongful conduct.  Two of the eleven Actions are class actions,

containing class definitions which substantially overlap.

The fundamental allegations in ten of the actions are that LPG violated CROA by

obtaining payment for its services prior to such services being fully performed; making alleged

untrue statements and/or representations; failing to make certain written disclosures; failing to

provide certain information in such disclosures; failing to afford a cancellation clause; and/or

1

attempting to obtain a waiver of rights from LPG's client.

The cases listed in the Schedule of Actions (the "Actions") present a suitable situation for coordination or consolidation for pretrial proceedings. There are multiple, similar (and nearly identical) claims pending nationwide against LPG which allege nearly identical fact patterns.

Transferring the Actions to one federal district is necessary for several reasons. Transfer is necessary to reduce the burden on the federal courts by eliminating duplicative discovery and motions, and to guard against inconsistent rulings. This is particularly significant here – and alone is justification for consolidating the Actions – as the parties will be seeking discovery rulings on the attorney-client privilege in the context of LPG's attorney-client relationship with the putative class members.

By way of example, the plaintiff in the *Beech* class action seeks discovery of the complete and unredacted records and files of all putative class members. This information is protected by the attorney-client privilege and/or the attorney work product doctrine. LPG appropriately objected, and *Beech* moved to compel production. (*See Beech* Docket, No. 20). Pursuant to the *Beech* Court's recent order, at the time of filing this Motion, LPG is in the process of supplementing discovery and producing a privilege log.

The same issue will inevitably arise in the *Eaton* class action, which has not yet proceeded to the discovery phase. If *Beech* and *Eaton* are permitted to continue as independent actions, without coordination or consolidation, two different district courts will ultimately issue a discovery ruling addressing the inviolate attorney-client privilege. The risk of an inconsistent ruling on the attorney-client privilege is significant – not only to LPG, but to the entire practice of law, given the precedent that such a decision will set.

Non-consolidation of the Actions thus puts the important, inviolate principle of attorney-

client privilege at risk of being stripped, subjecting the issue to potentially inconsistent rulings.

Transfer will also reduce inefficiencies because the parties, counsel, and witnesses will not be required to defend against duplicative actions in different states if this Motion is granted. Specifically, without centralization, and in addition to the issue surrounding the attorney-client privilege, LPG is likely to confront duplicative discovery and multiple motions to certify the same or overlapping classes. This will unnecessarily burden the federal court system and potentially lead to inconsistent rulings, which are the very problems that Section 1407 is designed to address. *See* Manual for Complex Litigation (Fourth) §20.131 at 220 (stating "[t]he objective of transfer is to eliminate duplication in discovery, avoid conflicting rulings and schedules, reduce litigation cost, and save the time and effort of the parties, the attorneys, the witnesses, and the courts.").

The Southern District of Ohio is the most appropriate transferee district, given its MDL experience, current staffing and caseloads, accessibility, and convenience for counsel. Alternatively, the Northern District of Ohio is likewise an appropriate transferee district.

All Actions are in their infancy, as less than nine (9) months separate the first-filed action from the most recently filed actions. Moreover, written discovery has only commenced – and minimally – in two of the eleven pending actions. Therefore, no weight is necessary to defer to the first-filed case as the transferee district.

For the reasons that follow, the Actions should be transferred to a single District Court for coordinated and consolidated pretrial proceedings. The situation in play here is exactly what Congress had in mind enacting 28 U.S.C. § 1407.

## II.  BACKGROUND AND SUMMARY OF THE ACTIONS

LPG is a law firm, providing legal services to its clients. Toward that end, LPG enters into a written engagement letter with its clients, entitled a LEGAL SERVICES AGREEMENT. (*See*

*Beech Complaint at Ex. A*).  For many of its clients, LPG performs legal services with one of the objectives being to assist the client in avoiding bankruptcy.  In this vein, LPG assists those clients with disputed creditor balances, ultimately negotiating with creditors and helping clients pay down debt.  This representation also includes pursuing claims against unscrupulous debt collectors, under the Fair Debt Collection Practices Act ("FDCPA"), who are harassing LPG clients with unlawful collection phone calls and letters.  LPG also defends its clients in creditor lawsuits brought to collect alleged unpaid balances.

Ten of the Actions allege violations of CROA, and the allegations are nearly identical in each case.  These ten Actions allege that LPG violated CROA when it allegedly received payment for the performance of its services before such services were fully performed.  Five Actions state that LPG violated CROA when it allegedly made untrue statements and did not provide a written statement of rights.  (See *Price*, *Topp*, *Hammett*, *Graham*, and *Rizo*).  Two Actions allege that LPG violated CROA when it misrepresented its services.  (See *Eaton* and *Price*).  Five Actions allege LPG violated CROA when it failed to provide written disclosures and/or that it did not include certain information in such disclosures.  (See *Beech, Topp, Hammett, Graham,* and *Rizo*).  Four Actions allege that LPG violated CROA when the documents it provided did not include a cancellation clause. (See *Beech, Topp, Hammett*, and *Graham*).  Finally, three Actions allege that LPG violated CROA when it attempted to obtain a waiver of rights from the consumer.  (See *Topp, Graham*, and *Rizo*).

In sum, ten Actions allege payment for the performance of services before such services were fully performed, and all Actions allege some type of untruthful statements, misrepresentation of services, and/or improper or omitted disclosures.  The Actions also allege varying degrees of

4

violations of state consumer protection laws, again arising from the same nucleus of operative facts.

Based on the allegations in the Actions (in addition to the varying state law claims), plaintiffs seek injunctive relief, actual damages, punitive damages, and attorney fees and costs, all arising from the same nucleus of operative facts (i.e., LPG's representation of its clients). *Eaton* and *Beech* seek relief for putative nationwide class actions.

The *Eaton* putative class action was filed first, removed to the Northern District of Georgia on March 4, 2022. *Eaton* is in its infancy, as Plaintiff filed a Second Amended Complaint on November 3, 2022. Discovery has not commenced in *Eaton*, and a case schedule has not yet been established.

The *Beech* putative class action was filed next, on March 17, 2022, in the Southern District of Mississippi. *Beech* is also in its relative infancy, with written discovery only minimally commenced. Class counsel in *Beech* sought discovery from LPG of all records and files of LPG clients over the prior five (5) years, all of which would be protected by the attorney-client privilege, notwithstanding that the discovery request is unduly burdensome. *Beech* filed a Motion to Compel responses on September 21, 2022, and the matter was fully briefed on October 6, 2022. (*Beech*, Docket Nos. 20, 25). LPG is currently assembling its supplemental discovery responses and a privilege log. (*Beech*, Text Docket Entry of December 2, 2022).

The *Eaton* and *Beech* cases seek to certify substantially overlapping classes, with respect to all persons who entered into attorney-client relationships with LPG.

The *Price* litigation was filed on May 13, 2022, in the Middle District of Pennsylvania. *Price* is in its infancy, as the Case Management Conference was only recently conducted on September 22, 2022. (*Price*, Docket No. 25). Discovery has only minimally commenced in *Price*.

Plaintiff served her first sets of written discovery on September 2, 2022, and September 6, 2022. In a case of legal maneuvering, *Price* moved to dismiss her Complaint on December 2, 2022, in hopes of avoiding the transfer of her case. LPG is contemplating an opposition thereto.

*Topp* was filed on July 26, 2022, in the Western District of Texas. The *Topp* case is likewise in its infancy. *Topp* filed his First Amended Complaint on November 1, 2022, in response to LPG's Motion to Dismiss. (*Topp*, Docket Nos. 9, 10). Discovery has not commenced at this time, and there is no case schedule in *Topp*.

*Hammett* was filed on October 25, 2022, in the Northern District of Georgia. The named defendant in *Hammett* is Debt Resolution Direct, although LPG is heavily implicated in the allegations set forth in *Hammett's* Complaint. LPG has suggested a substitution of parties, substituting LPG as the proper defendant in *Hammett*, although *Hammett's* counsel advises that discovery is needed first. Discovery has not commenced and there is no case schedule.

The *Graham* and *Rizo* actions were filed on October 31, 2022, in the Central and Eastern Districts of California, respectively. *Graham* and *Rizo* have the same legal counsel, the law firm of Sulaiman Law Group, located in Lombard, Illinois (near Chicago). LPG's response date for *Graham* and *Rizo* is January 6, 2023. Discovery has not commenced, and there is no case schedule for the *Graham* and *Rizo* actions.

Sulaiman Law Group also represents the plaintiff in the *Topp* litigation in the Western District of Texas.

The *Klaus*, *Scarlett*, and *Sheffield* cases were filed on November 18, 2022, in the Southern (*Scarlett*) and Northern (*Klaus, Sheffield*) Districts of Ohio. *Klaus*, *Scarlett*, and *Sheffield* are represented by the same law firm, Luftman Heck and Associates, located in Columbus, Ohio. The answer date for these three matters has not yet been docketed. No discovery has commenced and

there is no case schedule in *Klaus, Scarlett,* or *Sheffield.*

Defense counsel has inquired of Plaintiffs' counsel whether they would oppose this motion and whether they would be open to informal discovery and scheduling with the other pending cases.

Eaton's counsel did not respond, despite repeated follow up communications. Counsel for *Beech* did not affirmatively take a position, instead indicating that they would not be willing to do anything that is likely to delay discovery. Counsel for *Price* did not express an opinion on whether he would oppose this Motion but did advise that he would be open to discussing the informal coordination of discovery and scheduling, subject to the details being offered of the scheduling. This was before counsel for *Price* moved to dismiss. Counsel for *Topp*, *Graham*, and *Rizzo* indicated that he would oppose this Motion for transfer, also advising that if the MDL is approved, he would be open to a discussion about the informal coordination of discovery. Counsel for *Hammett* indicated that she would oppose this Motion. On the inquiry of coordinated discovery, *Hammett's* counsel indicated that she is inclined not to agree if it would require counsel to coordinate with plaintiffs' lawyers at other firms across the country. Counsel for *Klaus, Scarlett,* and *Sheffield* indicated that he does not anticipate opposing this Motion (subject to his review). Counsel also advised that he would be open to informal discovery and scheduling with the other pending cases. Counsel for *Williamson* advised that he opposes the MDL and that at this time he is not open to coordination and scheduling of discovery with the other cases.

## III. <u>LAW AND ARGUMENT</u>

Under 28 U.S.C. §1407, actions pending in different districts and involving one or more common questions of fact may be transferred to any district for coordinated or consolidated pretrial procedures. The Panel makes such transfers upon its determination that (1) the cases involve

common questions of fact; (2) transferring will further "the convenience of parties and witnesses;" and (3) transferring "will promote the just and efficient conduct of [the] actions." 28 U.S.C. §1407(a); *In re Cutter Labs., Inc. "Braunwald-Cutter" Aortic Heart Valve Products Liability Litig.*, 465 F. Supp. 1295, 1296 (J.P.M.L. 1979).

The Actions are sufficiently numerous and complex to justify coordination here, consistent with the Panel's prior transfer of similar "consumer protection" allegations. *See, e.g., In re First Nat'l Bank, Heavener, Okla. (First Mortgage Revenue Bonds) Sec. Litig.*, 451 F. Supp. 995, 997 (J.P.M.L. 1978) (centralization was "necessary, even though only two actions are involved, in order to prevent duplicative pretrial proceedings and eliminate the possibility of inconsistent pretrial rulings"); *In re Okun*, 609 F. Supp. 2d 1380 (J.P.M.L. 2009) (centralizing two actions); *In Re: Payless ShoeSource, Inc.*, 609 F. Supp. 2d 1372 (J.P.M.L. 2009) (same); *In re Aetna, Inc.*, 609 F. Supp. 2d 1370 (J.P.M.L. 2009) (same); *In re Transunion Rental Screening Sols, Inc.*, 437 F. Supp. 3d 1377 (J.P.M.L. 2020) (approving transfer of six nationwide class action cases with common factual issues alleging violations of FCRA); *In re Michaels Stores, Inc., Fair Credit Report Act (FCRA) Litig.*, 96 F. Supp. 1380 (J.P.M.L. 2015) (approving transfer of three nationwide class action cases with common factual issues alleging violations of FCRA); *In re Midland Credit Mgmt., Inc., Telephone Consumer Protection Act Litig.*, 818 F. Supp. 2d 1377 (J.P.M.L. 2011) (approving transfer of four cases with common factual issues alleging violations of TCPA); *In re Portfolio Recovery Assocs., LLC, Telephone Consumer Protection Act Litig.*, 846 F. Supp. 2d 1380, 1381 (J.P.M.L. 2011) (approving transfer of five nationwide class action cases with common factual issues alleging violations of TCPA); *In re Collecto, Inc.*, 999 F. Supp. 2d 1373 (J.P.M.L 2014) (approving transfer of three cases, and one subsequently filed tag-along case, with common factual issues alleging violations of TCPA).

As explained in detail below, these Actions merit the same treatment.

**A.     The Actions Share Common Factual Issues Arising from the Same Overarching Allegations**

The initial test for transfer and coordination under Section 1407 is the presence of similar questions of fact.  *In re Fed. Election Campaign Act Litig*., 511 F. Supp. 821, 823 (J.P.M.L. 1979). This threshold requirement is satisfied where, as here, "two or more complaints assert comparable allegations against identical defendants based upon similar transactions and events…." *In re Air West, Inc. Sec. Litig*., 384 F. Supp. 609, 611 (J.P.M.L. 1974).

The Actions LPG seeks to consolidate all involve the same overarching claim – that LPG violated CROA, or other "credit services" statutes, in the performance of its services.  By way of one example, the plaintiff in nine Actions alleges that LPG violated CROA by receiving payment before LPG fully performed its services.  In sum, the Actions pose several common questions of fact including but not limited to those set forth below.

1.     Whether LPG is a "credit repair organization;"

2.     Whether the plaintiffs are "consumers;"

3.     Whether LPG's services were for the express or implied purpose of improving a consumer's credit, credit history, or credit rating;

4.     Whether LPG provided advice or assistance to any consumer for the express or implied purpose of improving a consumer's credit, credit history, or credit rating;

5.     Whether LPG charged or received money before its services were fully performed;

6.     Whether LPG failed to make certain written disclosures, or whether certain disclosures were even required to be made;

7.     Whether LPG made untrue or misleading representations about the services it offered; and

8.     Whether LPG attempted to obtain a waiver from any consumer of any protection provided by or under CROA.

Since discovery in these Actions will focus substantially on these common issues of fact, transfer is appropriate under Section 1407.  *See, e.g., In re Midland*, 818 F. Supp. 2d at 1378.

While LPG is by no means conceding the issue of class certification, the Actions assert and allege that there are numerous common issues between all purported class members. Specifically, a foundational common question raised is whether the plaintiffs are "consumers" and whether LPG is a "credit repair organization" under CROA. Naturally, this will result in similar discovery occurring across each Action.

A transfer pursuant to Section 1407 "does not require a complete identity or even majority of common factual or legal issues as a prerequisite to transfer." *In re Katz Interactive Call Processing Patent Litig.*, 481 F. Supp. 2d 1353, 1355 (J.P.M.L. 2007). Although the legal claims asserted in addition to CROA differ slightly in each case due to the differing state consumer-protection laws invoked, all plaintiffs seek damages for the same alleged conduct, arising from a common nucleus of operative facts. The Panel has long held that "Section 1407 requires the existence of common questions of fact, not common questions of law." *In re Air Crash Disaster at Huntington, W. Va. On Nov. 14, 1970*, 342 F. Supp. 1400, 1402 (J.P.M.L. 1972).

Here, the Actions are premised on primarily the same alleged fact patterns – that LPG received payment before services were fully performed, and that LPG, in some form or another, made certain misrepresentations or otherwise failed to make appropriate disclosures to the plaintiffs. As such, coordination or consolidation remains appropriate.

Furthermore, the claims made by the individual plaintiffs in the Actions are subsumed by the *Beech* and *Eaton* putative class actions, as *Beech* and *Eaton* seek to certify nationwide classes of consumers who retained LPG.

Accordingly, the issues in all Actions substantially overlap, as there are minimal differences amongst the Actions. Moreover, the proposed class definitions in *Beech* and *Eaton* substantially, if not completely, overlap with one another, as many of the plaintiffs claim, *inter*

*alia*, that LPG charged or received money before its services were fully performed.

**B.      Centralization Serves the Interests of the Courts, Parties, and Witnesses**

Centralization is appropriate, convenient for the parties and witnesses, and used by the courts when it enables the parties to conserve resources. *In re Novartis Wage and Hour Litig.*, 460 F. Supp. 2d 1382-83 (J.P.M.L. 2006) (finding centralization warranted to serve the convenience of parties and witnesses to conserve their resources); *In re Am. Online, Inc.*, 162 F. Supp. 2d 690, 691 (J.P.M.L. 2001) (same). Furthermore, it is more convenient for the parties to avoid duplicative discovery, and thus the Panel favors centralization to avoid this result. *In re Foundry Resins Antitrust Litig.*, 342 F. Supp. 2d 1346, 1347 (J.P.M.L. 2004) (centralization and consolidation favored to eliminate duplicative discovery).

Since ten of the Actions allege the same or similar CROA violations based on overlapping fact patterns, transferring the Actions to a single judge is convenient not only for the parties, but also for the federal court system. Specifically, transferring the Actions will eliminate the need for several courts to address the same legal issues and similar factual scenarios. Transfer will also avoid duplicative document productions and duplicative written discovery responses. A transfer of the Actions will also eliminate the need for LPG's witnesses to sit for multiple, redundant depositions, which will invariably result in the same types of questions concerning LPG's business practices.

Any inconvenience to individual parties does not outweigh the substantial economies centralization offers the litigation globally. *See, e.g., In re Crown Life Ins. Premium Litig.*, 178 F. Supp. 2d 1365, 1366 (J.P.M.L. 2001) (noting that "transfer is often necessary to further the expeditious resolution of the litigation taken as a whole"). The transferee judge can minimize unnecessary inconvenience and expense through a pretrial discovery plan that "consider[s] all

11

parties' legitimate discovery needs, while ensuring that common parties and witnesses are not subjected to duplicative discovery demands." *In re Rembrandt Techs., LP, Patent Litig.*, 493 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007). In addition, the plan may allow for discovery regarding any non-common issues, such as those related to the alleged federal "credit repair" violations and the state law analogs. *See In re Satyam*, 712 F. Supp. 2d at 1382.

Further, there are currently nine (9) different sets of attorneys for the plaintiffs in the Actions, and, given the early stage of the litigation and the threat of additional lawsuits, it is likely that there will be more. This too counsels in favor of transfer. *See In re Discover Card Payment Prot. Plan Mktg. & Sales Practices Litig.*, 764 F. Supp. 2d 1341, 1343 (J.P.M.L. 2011) ("the actions and potential tag-along actions in this litigation are brought by several competing counsel, which makes voluntary cooperation among counsel in the different districts a less workable alternative"). Transfer will therefore provide convenience for all parties.

Centralization would promote judicial economy by allowing a single judge to develop expertise in the common factual and legal questions of the Actions and make consistent rulings that may apply to, and/or inform, decisions across multiple cases. Due to the (likely increasing) number of actions, jurisdictions, and counsel involved, informal coordination is not a viable alternative to streamline the pretrial litigation process.

"[T]ransfer under Section 1407 has the salutary effect of placing all actions in th[e] docket before a single judge who can formulate a pretrial program that: 1) allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues; [] and 2) ensures that pretrial proceedings will be conducted in a manner leading to a just and expeditious resolution of the actions to the benefit of not just some but all of the litigation's parties." *In re Ins. Brokerage Antitrust Litig.*, 360 F. Supp. 2d 1371, 1372 (J.P.M.L. 2005).

12

Therefore, centralization of the Actions here will serve the best interests of the federal Courts, the Parties involved, their counsel, and the witnesses.

### C.     <u>Centralization Will Promote Just and Efficient Conduct Of The Actions</u>

#### 1.     <u>Centralization Will Prevent Inconsistent and Conflicting Rulings on the Attorney-Client Privilege</u>

Injustices and inefficiencies, such as conflicting rulings, are best avoided by transferring cases pursuant to Section 1407. *See In re A.H Robins Co. "Dalkon Shield" IUD Prods. Liab. Litig*, 406 F. Supp. 540, 542 (J.P.M.L. 1975) (transfer necessary to eliminate the possibility of conflicting pretrial rulings); *In re Hawaiian Hotel Room Rate Antitrust Litig.*, 438 F. Supp. at 936 (consolidation of five actions was necessary "in order to… eliminate the possibility of inconsistent pretrial rulings…"); *In re Commercial Money Ctr., Inc. Equip. Lease Litig*, 229 F. Supp. 2d 1379, 1380 (J.P.M.L. 2002) (same).

LPG is a law firm, organized as a professional corporation. As such, LPG's relationships with its clients are governed by the attorney-client privilege and the attorney work product doctrine. "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981), citing 8 J. Wigmore, Evidence § 2290 (McNaughton rev. 1961). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co.*, 449 U.S. at 389. "The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." *Id.*

Here, class counsel in *Beech* has asked LPG, through written discovery, to breach the

attorney-client privilege by providing the complete and unredacted records and files of all LPG clients over a five-year period. In addition to Beech's discovery requests being unduly burdensome and overbroad, these records are nonetheless protected by the attorney-client privilege. As such, LPG appropriately objected on this basis, among others.

Beech then filed a Motion to Compel responses on September 21, 2022, and the matter was fully briefed on October 6, 2022. (*Beech*, Docket Nos. 20, 25). LPG is currently organizing supplemental discovery responses and a privilege log.

This issue of attorney-client privilege is likely to come front and center in the *Eaton* class action as well. The *Eaton* matter likewise seeks to certify a class consisting of LPG clients who allegedly paid compensation to LPG before services were fully performed. It is thus anticipated that counsel in *Eaton* will similarly request records pertaining to LPG's representation of other putative class members, which information is protected by the attorney-client privilege and the work product doctrine.

Consequently, the risk of two inconsistent and conflicting rulings on the attorney-client privilege is significant and must be avoided at all costs. This factor, with nothing more, is justification alone for centralizing and transferring the Actions into a single District Court for consolidated and coordinated pretrial proceedings.

2.   **Class Actions are Appropriate and Necessary for Transfer Due to the Risk of Inconsistent and Conflicting Class Determinations**

Congress when enacting 28 U.S.C. §1407 identified class action cases as those cases particularly appropriate for transfer and consolidation for Multidistrict Litigation proceedings. *In re Plumbing Fixture Cases*, 298 F.Supp. 484, 493 (J.P.M.L. 1968). The Panel has consistently found in favor of centralization to avoid inconsistent rulings on the issue of class certification. *In*

*re Charlotte Rusee, Inc.*, 505 F. Supp. 2d 1377, 1378 (J.P.M.L 2007) (stating "[c]entralization under Section 1407 will… prevent inconsistent pretrial rulings, especially with respect to class certification."); *In re Pharm. Ben. Managers*, 452 Supp. 2d 1352, 1353 (J.P.M.L. 2006) (same); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 844 F. Supp. 1552, 1554 (J.P.M.L. 1994) (finding centralization appropriate to "prevent inconsistent pretrial rulings (especially with respect to class certifications and summary judgments)"); *In re Sugar Indus. Antitrust Litig.*, 395 F. Supp. 1271, 1273 (J.P.M.L. 1975) (stating "[w]e have consistently held that transfer of actions under Section 1407 is appropriate, if not necessary, where the possibility of inconsistent class determinations exists.").

As stated by the Panel on multiple occasions, class action cases under Federal Civil Rule 23 present highly persuasive, if not compelling, cases for transfer and consolidation under Section 1407 due to the risk of inconsistent class determinations by different courts. *In re Natural Resources Fund*, 372 F.Supp. 1404, 1404 (J.P.M.L. 1974) (holding that the presence of Rule 23 class allegations presents "highly persuasive if not compelling reason[s] for transfer of all actions to a single judge"); *In re Equity Funding Corp.*, 375 F.Supp. 1380, 1385-86 (J.P.M.L. 1974) (holding that the transfer and consolidation of class action cases is appropriate if not necessary due to the possibility of conflicting and inconsistent class determinations).

The Panel's interest in avoiding inconsistent class certification rulings will be furthered by granting LPG's request for transfer. The Actions consist of two putative class actions (*Beech* and *Eaton)*, both of which seek to certify substantially overlapping – if not identical – class actions. Along these lines, two of the chief class certification questions – whether individual or common issues predominate and whether the class action device is the superior method for adjudication – are the same in all the Actions. By way of one example, the *Beech* and *Eaton* Courts will need to

determine, among other things, whether class-wide adjudication is infeasible given the extensive individual inquiries necessary to identify potential class members and resolve the merits of their claims (i.e., whether LPG received payment before it fully provided its services in each case and whether LPG is a "credit repair organization").

The existence of two putative class actions within the Actions mitigates strongly in favor of transfer and removes any doubt inherent in transferring a "minimal" number of actions. *See In Re: Transocean Ltd. Sec. Litig. (No. II)*, 753 F. Supp. 2d 1373, 1374 (J.P.M.L. 2010) (applying heavier burden where there were only two actions); *cf. In Re: Azek Bldg. Prods.,* 999 F. Supp. 2d 1366 (J.P.M.L. 2014).

Because the Actions are sufficiently numerous and complex, and specifically, the *Beech* and *Eaton* putative class actions, the heavier burden to demonstrate the appropriateness of centralization does not exist. *Id.* The risk of inconsistent class rulings is simply too great to ignore. *In re Charlotte Rusee, Inc.*, 505 F. Supp. 2d at 1378.

Accordingly, if these Actions are not centralized, there is a substantial risk of inconsistent class rulings. Transfer will thus ensure consistent application of Federal Civil Rule 23 and avoid that risk.

**D.   The Southern District of Ohio Is the Most Appropriate Forum for Centralizing These Actions**

"The Panel uses no single factor to select the transferee district." Manual for Complex Litigation (Fourth) §20.131 at 221. Rather, the Panel considers a myriad of factors, such as where "the largest number of cases is pending, where discovery has occurred, where cases have progressed furthest, the site of the occurrence of the common facts, where the cost and inconvenience will be minimized, and the experience, skill, and caseloads of available judges."

*Id.*

Under this analysis, LPG acknowledges that there simply is no clear-cut or obvious answer. All Actions remain in their infancy, and little-to-no discovery has taken place. The Actions were all filed within nine (9) months of one another, and thus no case has progressed substantially further than the others.

With all factors considered, LPG respectfully submits that the Southern District of Ohio is the most appropriate transferee district. The Honorable Judge Sargus of that Court is now presiding over the *Scarlett* case. Currently, Judge Sargus presides over two (2) of the three (3) MDL proceedings pending in the Southern District of Ohio[1] and has previous experience with an MDL that terminated in 2008. The Southern District of Ohio maintains the resources to accept the transfer and consolidation of the Actions.

Further, the Southern District of Ohio is centrally located and easily accessible by the parties in each Action. LPG's outside nationwide counsel, Luper Neidenthal & Logan, is located in the Southern District of Ohio. Three of the Actions are brought by Ohio plaintiffs (*Klaus, Scarlett*, and *Sheffield*), whose legal counsel, Luftman Heck & Associates, is also located in Columbus, Ohio. This convenience will make it easier for counsel to meet and confer to discuss any discovery or other disputes, which are anticipated.

Additionally, counsel for the *Topp*, *Rizo*, and *Graham* plaintiffs, Sulaiman Law, is located in Lombard, Illinois, near Chicago. Lombard is less than a six-hour drive, and a short plane flight, from Columbus, Ohio.

Thus, transferring the Actions to Judge Sargus will not only be convenient for the parties

---

[1] *In re E.I. du Pone de Nemours and Company C-8 Personal Injury Litigation,* MDL No. 2433; *In re Davol, Inc./C.R. Bard, Inc., Polypropylene Hernia Mesha Products Liability Litigation*, MDL No. 2846.

and witnesses, but also will promote the just and efficient conduct of the Actions.

LPG recognizes that the Southern District of Ohio is not home to the first-filed Action. Still, the Case Management Conference in the *Scarlett* case has not occurred, and if the Actions are transferred, it will give the parties an opportunity to coordinate all case schedules, given that all Actions are in their infancy. The first-filed case of *Eaton* should be given no weight, as there is no case schedule in *Eaton*, with the Second Amended Complaint only recently having been filed.

Accordingly, the first-filed and most advanced case factors should be given less weight here, if any, because the first-filed case is not the most convenient, just, or efficient way to consolidate and transfer the Actions, given that all cases are virtually at the same stage.

Moreover, cost and inconvenience will be minimized most in the Southern District of Ohio. Ohio is geographically a central location that is suitable for travel for participants in all Actions. In fact, Ohio is within one day's drive of more than 60% of the United States and Canadian total populations.[2] As stated above, three of the Actions have plaintiffs residing in Ohio (with their counsel located in Columbus), nationwide counsel for LPG is located in Ohio, and counsel for three of the other plaintiffs are a half-day drive or one hour flight away. Further, it exhibits overlap with the Actions in that the Ohio cases allege "charging or receiving money or other valuable consideration for the performance of services before such services were fully performed" claims under 15 U.S.C. §1679b(b). As it currently stands, Ohio is home to three of the eleven Actions subject to transfer.

Additionally, the Southern District of Ohio currently has three MDL proceedings and has

---

[2] https://www.transportation.ohio.gov/static/Programs/TransportOhio/TransportOhio_StatewideFreightPlan.pdf; (page 33); Last visited November 22, 2022.

the resources to accept the transfer and consolidation of the Actions.[3] Further, this District has administered and resolved over twenty MDL actions since 1975.[4] Accordingly, since the Southern District of Ohio has administered a substantial number of MDL proceedings and has recent experience with MDL cases, it will surely be able to manage these Actions in an efficient and expeditious manner.

Alternatively, the Northern District of Ohio is a suitable transferee district. The Northern District of Ohio has presided over thirty-three (33) terminated MDL proceedings and is currently overseeing three (3). The Honorable Jack Zouhary of that court is now presiding over the *Sheffield* case, and the Honorable James G. Carr is now presiding over the *Klaus* case. Neither Judge is overseeing a currently pending MDL. Both judges have MDL experience, however, in that Judge Zouhary has overseen one (1) MDL[5] and Judge Carr has overseen two (2) MDL proceedings.[6]

## IV.      **CONCLUSION**

The parties and the judiciary will benefit from centralizing the eleven (11) current Actions (and any further tag-along cases) into a single district. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including rulings with respect to class certification and the attorney-client privilege; and conserve the resources of the parties, their counsel, and the judiciary. Thus, LPG respectfully requests that, pursuant to 28 U.S.C. §1407, this Panel transfer

---

[3] See   https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-September-15-2022.pdf (*last visited November 16, 2022*).

[4]                                                                                                                                         *See* https://www.jpml.uscourts.gov/sites/jpml/files/JPML%20FY%202021%20Report%20Cumulative%20Terminated% 20MDLs.pdf (*last visited November 16, 2022*).

[5] *In re Polyurethane Foam AT*, MDL No. 2196.

[6] *In re Commercial Money Center, Inc., Equipment Lease*, MDL No. 1490; *In re Heparin PL*, MDL No. 1953.

the Actions for coordinated or consolidated pretrial proceedings to the United States District Court

for the Southern District of Ohio.

Dated: December 6, 2022.                    Respectfully submitted,

**LUPER NEIDENTHAL & LOGAN, LPA**

*/s/ Matthew T. Anderson*

Christopher R. Pettit (OH Bar 0065694)
Matthew T. Anderson (OH Bar 0082730)
Kyle T. Anderson (OH Bar 0097806)
Kirsten M. Cox (OH Bar 102183)
1160 Dublin Road, Suite 400
Columbus, OH 43215
Phone : (614) 221-7663
Fax: 800-345-4948
Email: cpettit@LNLattorneys.com
Email: manderson@LNLattorneys.com
Email: kanderson@LNLattorneys.com
Email: kcox@LNLattorneys.com
*Attorneys for Defendant, The Litigation*
*Practice Group, PC*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

MDL No. <u>1:22-P-122</u>

In re:  **THE LITIGATION PRACTICE GROUP, PC, CREDIT REPAIR ORGANIZATIONS ACT LITIGATION**

**SCHEDULE OF ACTIONS**

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiff:**<br>Gloria Eaton<br>(Putative Class Action)<br><br>**Defendant:**<br>The Litigation Practice Group, PC | N.D. Georgia, Atlanta Division | 1:22-cv-00917-VMC | Victoria M. Calvert |
| **Plaintiff:**<br>Carolyn Beech<br>(Putative Class Action)<br><br>**Defendant:**<br>Litigation Practice Group, PC | S.D. Mississippi, Southern Division | 1:22-cv-00057-HSO-BWR | Halis S. Ozerden |
| **Plaintiff:**<br>Debra Price<br><br>**Defendants:**<br>Litigation Practice Group, PC<br>Daniel March, Esq.,<br>Marque Carey, Esq.,<br>Randall Clark, Esq.,<br>Michael Robinson, Esq.,<br>Jayde Trinh, Esq., and<br>Howard Gutman, Esq. | M.D. Pennsylvania, Scranton Division | 3:22-cv-00707-MEM | Malachy E. Mannion |

1

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiff:**<br>Kenneth Topp<br><br>**Defendant:**<br>The Litigation Practice Group, PC | W.D. Texas, Waco Division | 6:22-cv-00814-ADA-JCM | Alan D. Albright |
| **Plaintiff:**<br>Darcy D. Williamson (Trustee)<br><br>**Defendant:**<br>Litigation Practice Group, PC | Bankruptcy Court D. Kansas | 22-40216<br><br>Adversary No. 22-07015 | Dale L. Somers |
| **Plaintiff:**<br>James Hammett<br><br>**Defendant:**<br>Debt Resolution Direct, LLC, d/b/a Debt Advisors of America Company | N.D. Georgia, Atlanta Division | 1:22-cv-04249-SDG | Steven D. Grimberg |
| **Plaintiff:**<br>Johnny W. Rizo<br>**Defendant:**<br>The Litigation Practice Group, PC | E.D. California, Sacramento Division | 2:22-cv-01959-DAD-DB | Dale A. Drozd |
| **Plaintiff:**<br>Beverly A. Graham<br>**Defendant:**<br>The Litigation Practice Group, PC | C.D. California, Los Angeles Division | 2:22-cv-07915-MAR | (Magistrate) Margo A. Rocconi |
| **Plaintiff:**<br>Teresa Klaus<br><br>**Defendant:**<br>The Litigation Practice Group, PC | N.D. Ohio Toledo Division | 3:22-cv-02094-JGC | James G. Carr |

| Case Captions | Court | Civil Action No. | Judge |
|---|---|---|---|
| **Plaintiff:**<br>Kathlene Scarlett<br><br>**Defendant:**<br>The Litigation Practice Group, PC | S.D. Ohio, Columbus Division | 2:22-cv-04106-EAS-KAJ | Edmund A. Sargus, Jr. |
| **Plaintiffs:**<br>Geneva Sheffield<br>Myranda Sheffield<br><br>**Defendant:**<br>The Litigation Practice Group, PC | N.D. Ohio Toledo Division | 3:22-cv-02093-JZ | Jack Zouhary |

Dated:  December 6, 2022.

Respectfully submitted,

**LUPER NEIDENTHAL & LOGAN, LPA**

*/s/ Matthew T. Anderson*

Christopher R. Pettit (OH Bar 0065694)
Matthew T. Anderson (OH Bar 0082730)
Kyle T. Anderson (OH Bar 0097806)
Kirsten M. Cox (OH Bar 102183)
1160 Dublin Road, Suite 400
Columbus, OH 43215
Phone : (614) 221-7663
Fax: 800-345-4948
Email: cpettit@LNLattorneys.com
Email: manderson@LNLattorneys.com
Email: kanderson@LNLattorneys.com
Email: kcox@LNLattorneys.com
*Attorneys for Defendant, The Litigation Practice Group, PC*

**BEFORE THE UNITED STATES JUDICIAL PANEL
ON MULTIDISTRICT LITIGATION**

MDL No. <u>1:22-P-122</u>

**In re: THE LITIGATION PRACTICE
GROUP, PC, CREDIT REPAIR
ORGANIZATIONS ACT LITIGATION**

**PROOF OF SERVICE**

I hereby certify that a copy of the foregoing Motion, Brief, Schedule of Actions, and this Certificate of Service was served on December 6, 2022, by electronic mail only, to the following:

ROBERT P. COCCO
ROBERT P. COCCO PC
1500 WALNUT ST., STE 900
PHILADELPHIA, PA 19102
EMAIL: RCOCCO@RCN.COM
***ATTORNEY FOR PLAINTIFF DEBRA PRICE***
***M.D. PENNSYLVANIA NO. 3:22-cv-00707-MEM***

CHELSEA FEAGLE
CLIFTON R. DORSEN
JAMES MARVIN FEAGLE
SUITE B
2374 MAIN STREET
TUCKER, GA 30084
EMAIL: CFEAGLE@SKAARANDFEAGLE.COM
EMAIL: CDORSEN@SKAARANDFEAGLE.COM
EMAIL: JFEAGLE@SKAARANDFEAGLE.COM
***ATTORNEYS FOR PLAINTIFF GLORIA EATON***
***N.D. GEORGIA NO. 1:22-cv-00917-VMC***

JUSTIN THARPE HOLCOMBE
KRIS KELLY SKAAR
SKAAR & FEAGLE, LLP
133 MIRRAMONT LAKE DRIVE
WOODSTOCK, GA 30189
EMAIL: JHOLCOMBE@SKAARANDFEAGLE.COM
EMAIL: KSKAAR@SKAARANDFEAGLE.COM
***ATTORNEYS FOR PLAINTIFF GLORIA EATON***
***N.D. GEORGIA NO. 1:22-cv-00917-VMC***

1

DANIEL A. EDELMAN
EDELMAN COMBS LATTURNER AND GOODWIN, LLC
20 S. CLARK ST., SUITE 1500
CHICAGO, IL 60603-1824
EMAIL: DEDELMAN@EDCOMBS.COM
***ATTORNEY FOR PLAINTIFF CAROLYN BEECH***
***S.D. MISSISSIPPI NO. 1:22-cv-00057-HSO-BWR***

JASON E. GRAEBER
JASON GRAEBER, ATTORNEY AT LAW
2496 PASS ROAD
BILOXI, MS 39531
EMAIL: JASON@JASONGRAEBERLAW.COM
***ATTORNEY FOR PLAINTIFF CAROLYN BEECH***
***S.D. MISSISSIPPI NO. 1:22-cv-00057-HSO-BWR***

NATHAN CHARLES VOLHEIM
SULAIMAN LAW GROUP, LTD.
2500 SOUTH HIGHLAND AVENUEE, SUITE 200
LOMBARD, IL 60148
EMAIL: NVOLHEIM@SULAIMANLAW.COM
***ATTORNEY FOR PLAINTIFF KENNETH TOPP***
***W.D. Texas No. 6:22-cv-00814-ADA-JCM***

JENNA DAKROUB
PRICE LAW GROUP, APC
8245 N. 85TH WAY
SCOTTSDALE, AZ 85258
EMAIL: JENNA@PRICELAWGROUP.COM
***ATTORNEY FOR PLAINTIFF JAMES HAMMETT***
***N.D. Georgia No. 1:22-cv-04249-SDG***

BOBBY CHARLES WALKER
SULAIMAN LAW GROUP, LTD
2500 SOUTH HIGHLAND AVENUE
SUITE 200
LOMBARD, IL 60148
EMAIL: BWALKER@SULAIMANLAW.COM
**ATTORNEY FOR PLAINTIFF BEVERLY A. GRAHAM**
**C.D. CALIFORNIA NO. 2:22-cv-07915-MAR**
**ATTORNEY FOR PLAINTIFF JOHNNY W. RIZO**
**E.D. CALIFORNIA NO. 2:22-cv-01959-DAD-DB**

Jeremiah E. Heck
David B. Schultz
Luftman Heck & Associates LLP
6253 Riverside Drive, Suite 200
Columbus, OH 43017
Email: dschultz@lawlh.com
**Attorney for Plaintiff Teresa Klaus**
**N.D. Ohio No. 3:22-cv-02094-JGC**
**Attorney for Plaintiff Kathlene Scarlett**
**S.D. Ohio No. 2:22-cv-04106-EAS-KAJ**
**Attorney for Plaintiffs Geneva Sheffield and Myranda Sheffield**
**N. D. Ohio No. 3:22-cv-02093-JZ**

J. Michael Morris
Klenda Austerman LLC
301 N. Main St., Suite 1600
Wichita, KS 67202-4816
Email: Jmmorris@klendalaw.com
**Attorney for Plaintiff Darcy D. Williamson, Trustee**
**Bankruptcy Court, D. Kansas Adversary No. 22-07015**

Dated: December 6, 2022.                    Respectfully submitted,

                                             **LUPER NEIDENTHAL & LOGAN, LPA**

                                             */s/ Matthew T. Anderson*
                                             _____
                                             Christopher R. Pettit (OH Bar 0065694)
                                             Matthew T. Anderson (OH Bar 0082730)
                                             Kyle T. Anderson (OH Bar 0097806)
                                             Kirsten M. Cox (OH Bar 102183)
                                             1160 Dublin Road, Suite 400
                                             Columbus, OH 43215
                                             Phone : (614) 221-7663
                                             Fax: 800-345-4948
                                             Email: cpettit@LNLattorneys.com
                                             Email: manderson@LNLattorneys.com
                                             Email: kanderson@LNLattorneys.com
                                             Email: kcox@LNLattorneys.com
                                             *Attorneys for Defendant, The Litigation*
                                             *Practice Group, PC*

I further certify that a copy of the foregoing Motion, Brief, Schedule of Actions, and this Certificate of Service was served on December 6, 2022, by electronically filing a Notice with each of the District Court clerks below:

Clerk, Middle District of Pennsylvania, Scranton Division
Clerk, Northern District of Georgia, Atlanta Division
Clerk, Southern District of Mississippi, Southern Division
Clerk, Western District of Texas, Waco Division
Clerk, Northern District of Georgia, Atlanta Division
Clerk, Eastern District of California, Sacramento Division
Clerk, Central District of California, Los Angeles Division
Clerk, Southern District of Ohio, Columbus Division
Clerk, Northern District of Ohio, Toledo Division
Clerk, Northern District of Ohio, Toledo Division
Clerk, Bankruptcy Court, District of Kansas


Dated: December 6, 2022.                          Respectfully submitted,

                                                  **LUPER NEIDENTHAL & LOGAN, LPA**

                                                  */s/ Matthew T. Anderson*
                                                  _____
                                                  Christopher R. Pettit (OH Bar 0065694)
                                                  Matthew T. Anderson (OH Bar 0082730)
                                                  Kyle T. Anderson (OH Bar 0097806)
                                                  Kirsten M. Cox (OH Bar 102183)
                                                  1160 Dublin Road, Suite 400
                                                  Columbus, OH 43215
                                                  Phone : (614) 221-7663
                                                  Fax: 800-345-4948
                                                  Email: cpettit@LNLattorneys.com
                                                  Email: manderson@LNLattorneys.com
                                                  Email: kanderson@LNLattorneys.com
                                                  Email: kcox@LNLattorneys.com
                                                  *Attorneys for Defendant, The Litigation*
                                                  *Practice Group, PC*

# EXHIBIT A

4months,SUBMDJ,VMCLC3

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:22-cv-00917-VMC

Eaton v. The Litigation Practice Group, PC
Assigned to: Judge Victoria M. Calvert
Case in other court: State County of Dekalb County,
              22A00366
Cause: 15:1679 Credit Repair Organizations

Date Filed: 03/04/2022
Jury Demand: Both
Nature of Suit: 480 Consumer Credit
Jurisdiction: Federal Question

### Plaintiff

**Gloria Eaton**
*inividually and on Behalf of all others
similarly situated*

represented by **Chelsea Feagle**
Skaar and Feagle, LLP
Suite B
2374 Main Street
Tucker, GA 30084
404-373-1970
Email: cfeagle@skaarandfeagle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Clifton R. Dorsen**
Skaar and Feagle, LLP
Suite B
2374 Main Street
Tucker, GA 30084
404-373-1978
Email: cdorsen@skaarandfeagle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James Marvin Feagle**
Skaar and Feagle, LLP
Suite B
2374 Main Street
Tucker, GA 30084
404-373-1970
Fax: 404-601-1855
Email: jfeagle@skaarandfeagle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James W. Hurt , Jr.**
Hurt Stolz, P.C.
1551 Jennings Mill Road
Suite 3100-B
Watkinsville, GA 30677
706-395-2750
Fax: 706-996-2576
Email: jhurt@hurtstolz.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Justin Tharpe Holcombe**
Skaar & Feagle, LLP
133 Mirramont Lake Drive
Woodstock, GA 30189
770-427-5600
Fax: 404-601-1855
Email:
jholcombe@skaarandfeagle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kris Kelly Skaar**
Skaar & Feagle, LLP
133 Mirramont Lake Drive
Woodstock, GA 30189
770-427-5600
Email: kskaar@skaarandfeagle.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group, PC**     represented by

**Christopher R. Pettit**
Luper, Neidenthal & Logan
1160 Dublin Road
Ste 400
Columbus, OH 43215-7050
614-229-4407
Fax: 866-345-4948
Email: cpettit@lnlattorneys.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel J. Huff**
Huff Powell & Bailey
Suite 950
999 Peachtree St., N.E.
Atlanta, GA 30309
404-892-4022
Email: dhuff@huffpowellbailey.com
*TERMINATED: 06/07/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**David Donald Mackenzie**
Huff Powell & Bailey
Suite 950
999 Peachtree St., N.E.
Atlanta, GA 30309
404-969-0100
Email:
dmackenzie@huffpowellbailey.com
*TERMINATED: 06/07/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Devon G. Zawko**
Huff Powell & Bailey
Suite 950
999 Peachtree St., N.E.
Atlanta, GA 30309
678-294-6640
Email:
dzawko@huffpowellbailey.com
*TERMINATED: 06/07/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kyle Anderson**
Luper, Neidenthal & Logan
1160 Dublin Road
Ste #400
Columbus, OH 43215
614-221-4409
Email: kanderson@lnlattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**James William Hays**
Hays & Potter, LLP

3945 Holcomb Bridge Road
Suite 300
Peachtree Corners, GA 30092
770-934-8858
Fax: 770-934-8932
Email: beau@hpmlawatl.com
*ATTORNEY TO BE NOTICED*

**Matthew T. Anderson**
Luper Neidenthal & Logan
1160 Dublin Road
Suite 400
Columbus, OH 43215-1052
614-221-7663
Fax: 866-345-4948
Email: manderson@lnlattorneys.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/04/2022 | 1 | NOTICE OF REMOVAL with COMPLAINT filed by The Litigation Practice Group, PC. (Filing fee $ 402.00 receipt number AGANDC-11634455) (Attachments: # 1 Exhibit -A -Complaint, # 2 Exhibit -B -All Other Filings, # 3 Civil Cover Sheet)(eop) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 03/04/2022) |
| 03/04/2022 | 2 | Certificate of Interested Persons by The Litigation Practice Group, PC. (Zawko, Devon) (Entered: 03/04/2022) |
| 03/08/2022 | 3 | Certificate of Interested Persons by Gloria Eaton. (Hurt, James) (Entered: 03/08/2022) |
| 03/11/2022 | 4 | ANSWER to 1 NOTICE OF REMOVAL with Jury Demand by The Litigation Practice Group, PC. Discovery ends on 8/8/2022.(Zawko, Devon) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 03/11/2022) |
| 03/11/2022 | 5 | MOTION to Dismiss by The Litigation Practice Group, PC. (Attachments: # 1 Exhibit Exhibit B - LPG California Registration and Standing, # 2 Exhibit Exhibit C - Mr. Williams' Georgia Bar Status)(Zawko, Devon) (Entered: 03/11/2022) |
| 03/11/2022 | 6 | SEALED NOTICE Of Filing Filing is Exhibit A to LPG's Motion to Dismiss and Memorandum of Law in Support by The Litigation Practice Group, PC re 5 MOTION to Dismiss (Zawko, Devon) Modified on 3/14/2022 (bgt). (Entered: 03/11/2022) |

| 03/11/2022 | 7 | MOTION for Leave to File Matters Under Seal re: 6 Notice of Filing by The Litigation Practice Group, PC. (Attachments: # 1 Brief LPG's Memorandum in Support of Motion to File Under Seal, # 2 Text of Proposed Order Proposed Order Granting LPG's Motion to File Under Seal) (Zawko, Devon) (Entered: 03/11/2022) |
|---|---|---|
| 03/12/2022 | 8 | First AMENDED COMPLAINT against The Litigation Practice Group, PCwith Jury Demand filed by Gloria Eaton.(Hurt, James) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 03/12/2022) |
| 03/13/2022 | 9 | ORDER denying as moot Defendant's 5 Motion to Dismiss. Signed by Judge J. P. Boulee on 3/13/2022. (bgt) (Entered: 03/14/2022) |
| 03/13/2022 | 10 | ORDER granting Defendant's 7 Motion for Leave to File Under Seal. The Clerk is DIRECTED to seal Exhibit "A" to Defendant's Motion to Dismiss. Signed by Judge J. P. Boulee on 3/13/2022. (bgt) (Entered: 03/14/2022) |
| 03/25/2022 | 11 | ANSWER to 8 Amended Complaint by The Litigation Practice Group, PC. (Zawko, Devon) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 03/25/2022) |
| 03/25/2022 | 12 | MOTION to Dismiss with Brief In Support by The Litigation Practice Group, PC. (Attachments: # 1 Brief Memorandum of Law in Support of LPG's Motion to Dismiss Plaintiff's First Amended Complaint, # 2 Exhibit Exhibit B - Law Firm Registration and Standing, # 3 Exhibit Exhibit C - Mr. Williams's Georgia Bar Status)(Zawko, Devon) (Entered: 03/25/2022) |
| 03/25/2022 | 13 | SEALED NOTICE Of Filing Filing is Exhibit A to LPG's Memorandum of Law in Support of Motion to Dismiss Plaintiff's First Amended Complaint. by The Litigation Practice Group, PC re 12 MOTION to Dismiss (Zawko, Devon) Modified on 3/28/2022 (bgt). (Entered: 03/25/2022) |
| 03/25/2022 | 14 | MOTION for Leave to File Matters Under Seal re: 13 Notice of Filing, with Brief In Support by The Litigation Practice Group, PC. (Attachments: # 1 Brief LPG's Memorandum in Support of Motion to File Under Seal, # 2 Text of Proposed Order Proposed Order Granting LPG's Motion to File Under Seal)(Zawko, Devon) (Entered: 03/25/2022) |
| 03/28/2022 | 15 | ORDER granting Defendant's 14 Motion for Leave to File Under Seal. The Clerk is DIRECTED to seal Exhibit "A" to Defendant's Motion to Dismiss Plaintiff's First Amended Complaint. Signed by Judge J. P. Boulee on 3/28/2022. (bgt) (Entered: 03/28/2022) |
| 04/01/2022 | 16 | Joint MOTION for Extension of time to file Joint Preliminary Report and Discovery Plan by Gloria Eaton. (Hurt, James) Modified on 4/19/2022 (vs). (Entered: 04/01/2022) |
| 04/05/2022 | 17 | Consent MOTION for Extension of Time To Respond to Defendant's Motion to Dismiss re: 12 MOTION to Dismiss by Gloria Eaton. |

| | | (Attachments: # [1] Text of Proposed Order)(Hurt, James) (Entered: 04/05/2022) |
|---|---|---|
| 04/06/2022 | | ORDER {by Docket Entry Only}: For good cause shown, the Consent Motion for Extension of Time [17] is GRANTED. IT IS HEREBY ORDERED that Plaintiff's deadline to respond to Defendant's Motion to Dismiss is extended through and including April 22, 2022. Ordered by Judge J. P. Boulee on 4/6/22. (ceo) (Entered: 04/06/2022) |
| 04/12/2022 | | Case Reassigned to Judge Victoria M Calvert. Judge J. P. Boulee no longer assigned to case. NOTICE TO ALL COUNSEL OF RECORD: The Judge designation in the civil action number assigned to this case has been changed to 1:22-cv-00917-VMC. Please make note of this change in order to facilitate the docketing of pleadings in this case. (abm) (Entered: 04/12/2022) |
| 04/19/2022 | | Submission of [16] Joint MOTION for extension of time to file Joint Preliminary Report and Discovery Plan , to District Judge Victoria M Calvert. (vs) (Entered: 04/19/2022) |
| 04/20/2022 | [18] | STANDING ORDER: GUIDELINES TO PARTIES AND COUNSEL IN CASES PROCEEDING BEFORE THE HONORABLE VICTORIA M. CALVERT. Signed by Judge Victoria M Calvert on 4/20/2022.(kxm) (Entered: 04/21/2022) |
| 04/22/2022 | [19] | RESPONSE in Opposition re [12] MOTION to Dismiss filed by Gloria Eaton. (Skaar, Kris) (Entered: 04/22/2022) |
| 04/22/2022 | [20] | MOTION to Amend [8] Amended Complaint, with Brief In Support by Gloria Eaton. (Attachments: # [1] Exhibit A: Second Amended Class Action Complaint for Damages, # [2] Exhibit B: Proposed Order)(Skaar, Kris) (Entered: 04/22/2022) |
| 04/28/2022 | [21] | Consent Motion for Extension of Time to File Response to Plaintiff's Motion to Amend Complaint and Plaintiff's Response in Opposition to Defendant's Motion to Dismiss re: [20] MOTION to Amend [8] Amended Complaint, [19] Response in Opposition to Motion by The Litigation Practice Group, PC. (Attachments: # [1] Text of Proposed Order Granting Consent Motion for Extension of Time)(Zawko, Devon) Modified on 4/29/2022 to edit text(lwb). (Entered: 04/28/2022) |
| 04/28/2022 | [22] | ORDER granting [21] Consent MOTION for Extension of Time to File Response to Plaintiff's Motion to Amend Complaint and Plaintiff's Response in Opposition to Defendant's Motion to Dismiss re: [20] MOTION to Amend [8] Amended Complaint. Defendant shall have up to and including May 6, 2022 to respond toPlaintiffs Response in Opposition to Defendants Motion to Dismiss and Plaintiffs Motion to Amend Complaint. Signed by Judge Victoria M. Calvert on 4/28/2022. (vs) (Entered: 04/28/2022) |
| 04/28/2022 | | ORDER (by docket text only) granting [16] Joint Motion for Extension of |

| | | time to file Joint Preliminary Report and Discovery Plan. The time for the parties to file their Joint Preliminary Report and Discovery Plan is extended until thirty (30) days after this Court rules on the pending motion to dismiss. Entered by Judge Victoria M. Calvert on 4/28/2022. (vs) (Entered: 04/28/2022) |
|---|---|---|
| 05/06/2022 | 23 | REPLY BRIEF re 12 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by The Litigation Practice Group, PC. (Mackenzie, David) (Entered: 05/06/2022) |
| 05/06/2022 | 24 | RESPONSE in Opposition re 20 MOTION to Amend 8 Amended Complaint, filed by The Litigation Practice Group, PC. (Mackenzie, David) (Entered: 05/06/2022) |
| 05/11/2022 | | Submission of 12 MOTION to Dismiss , to District Judge Victoria M. Calvert. (vs) (Entered: 05/11/2022) |
| 05/20/2022 | 25 | REPLY BRIEF re 20 MOTION to Amend 8 Amended Complaint, filed by Gloria Eaton. (Skaar, Kris) (Entered: 05/20/2022) |
| 05/23/2022 | | Submission of 20 MOTION to Amend 8 Amended Complaint, , to District Judge Victoria M. Calvert. (vs) (Entered: 05/23/2022) |
| 06/07/2022 | 26 | Certification of Consent to Substitution of Counsel. James William Hays replacing attorney Devon G. Zawko; Daniel J. Huff and David Donald Mackenzie. (Hays, James) (Entered: 06/07/2022) |
| 06/10/2022 | 27 | APPLICATION for Admission of Matthew T. Anderson Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11859591).by The Litigation Practice Group, PC. (Hays, James) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/10/2022) |
| 06/10/2022 | 28 | APPLICATION for Admission of Kyle T. Anderson Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11859600).by The Litigation Practice Group, PC. (Hays, James) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/10/2022) |
| 06/10/2022 | 29 | APPLICATION for Admission of Christopher R. Pettit Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11859607).by The Litigation Practice Group, PC. (Hays, James) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/10/2022) |
| 06/15/2022 | | RETURN of 27 APPLICATION for Admission of Matthew T. Anderson Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11859591). to attorney for correction re: local counsel. (gas) (Entered: 06/15/2022) |
| 06/15/2022 | | RETURN of 28 APPLICATION for Admission of Kyle T. Anderson Pro Hac Vice (Application fee $ 150, receipt number AGANDC-11859600). to attorney for correction re: local counsel. (gas) (Entered: 06/15/2022) |
| 06/15/2022 | | RETURN of 29 APPLICATION for Admission of Christopher R. Pettit Pro |

| | | Hac Vice (Application fee $ 150, receipt number AGANDC-11859607). to attorney for correction re: local counsel. (gas) (Entered: 06/15/2022) |
|---|---|---|
| 06/22/2022 | 30 | APPLICATION for Admission of Matthew T. Anderson Pro Hac Vice.by The Litigation Practice Group, PC. (Hays, James) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/22/2022) |
| 06/22/2022 | 31 | APPLICATION for Admission of Kyle T. Anderson Pro Hac Vice.by The Litigation Practice Group, PC. (Hays, James) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/22/2022) |
| 06/22/2022 | 32 | APPLICATION for Admission of Christopher R. Pettit Pro Hac Vice.by The Litigation Practice Group, PC. (Hays, James) Documents for this entry are not available for viewing outside the courthouse. (Entered: 06/22/2022) |
| 06/28/2022 | | APPROVAL by Clerks Office re: 30 APPLICATION for Admission of Matthew T. Anderson Pro Hac Vice.. Attorney Matthew T. Anderson added appearing on behalf of The Litigation Practice Group, PC (gas) (Entered: 06/28/2022) |
| 06/28/2022 | | APPROVAL by Clerks Office re: 31 APPLICATION for Admission of Kyle T. Anderson Pro Hac Vice.. Attorney Kyle T. Anderson added appearing on behalf of The Litigation Practice Group, PC (gas) (Entered: 06/28/2022) |
| 06/29/2022 | | APPROVAL by Clerks Office re: 32 APPLICATION for Admission of Christopher R. Pettit Pro Hac Vice. Attorney Christopher R. Pettit added appearing on behalf of The Litigation Practice Group, PC (cdg) (Entered: 06/29/2022) |
| 06/30/2022 | | ORDER (by docket text only) granting 30 Application of Matthew T. Anderson for Admission Pro Hac Vice. Entered by Judge Victoria M. Calvert on 6/30/22. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step. (vs) (Entered: 06/30/2022) |
| 06/30/2022 | | ORDER (by docket text only)granting 31 Application of Kyle T. Anderson for Admission Pro Hac Vice. Entered by Judge Victoria M. Calvert on 6/30/22. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(vs) (Entered: 06/30/2022) |
| 06/30/2022 | | ORDER (by docket text only) granting 32 Application of Christopher R. Pettit for Admission Pro Hac Vice. Entered by Judge Victoria M. Calvert on 6/30/22. If the applicant does not have CM/ECF access in the Northern District of Georgia already, they must request access at http://pacer.gov. If they have electronically filed in this district in a previous case, please omit this step.(vs) (Entered: 06/30/2022) |

| 07/01/2022 | | Clerk's Certificate of Mailing to Attorney Matthew T. Anderson RE: NEF of Order on Application for Admission PHV. (aaq) (Entered: 07/01/2022) |
|---|---|---|
| 07/01/2022 | | Clerk's Certificate of Mailing Attorney Kyle T. Anderson RE: NEF on Application for Admission PHV. (aaq) (Entered: 07/01/2022) |
| 07/01/2022 | | Clerk's Certificate of Mailing Attorney Christopher R. Pettit RE: NEF on Application for Admission PHV. (aaq) (Entered: 07/01/2022) |
| 11/03/2022 | 33 | ORDER Granting 20 Plaintiff's Motion to Leave to File Second Amended Complaint and Denying as Moot 12 Defendant's Motion to Dismiss. The Clerk is DIRECTED to file the Second Amended Complaint [20-1]. Signed by Judge Victoria M. Calvert on November 3, 2022. (lwb) (Entered: 11/03/2022) |
| 11/03/2022 | 34 | SECOND AMENDED COMPLAINT for damages against The Litigation Practice Group, PC, with Jury Demand filed by Gloria Eaton.(lwb) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 11/03/2022) |
| 11/09/2022 | 35 | NOTICE of Appearance by Matthew T. Anderson on behalf of Daniel S. March, The Litigation Practice Group, PC (Anderson, Matthew) (Entered: 11/09/2022) |
| 11/10/2022 | 36 | Consent MOTION for Extension of Time to File Answer re 34 Amended Complaint, by The Litigation Practice Group, PC. (Attachments: # 1 Text of Proposed Order)(Hays, James) (Entered: 11/10/2022) |
| 11/10/2022 | 37 | Consent MOTION for Extension of Time re: Order on Motion for Miscellaneous Relief, *Extend Time for Submission of Joint Preliminary Report* by The Litigation Practice Group, PC. (Attachments: # 1 Text of Proposed Order)(Hays, James) (Entered: 11/10/2022) |
| 11/10/2022 | 38 | Supplemental MOTION for Extension of Time to File Answer re 34 Amended Complaint, by The Litigation Practice Group, PC. (Attachments: # 1 Text of Proposed Order)(Hays, James) (Entered: 11/10/2022) |
| 11/14/2022 | 39 | ORDER Granting 36 Motion for Extension of Time to Answer Amended Complaint. Defendant's response is due on December 1, 2022. Signed by Judge Victoria M. Calvert on November 14, 2022. (lwb) (Entered: 11/14/2022) |
| 11/14/2022 | 40 | ORDER granting 37 Motion for Extension of Time re Extend Time for Submission of Joint Preliminary Report. Deadline is December 19, 2022. Signed by Judge Victoria M. Calvert on November 14, 2022. (lwb) (Entered: 11/14/2022) |
| 12/01/2022 | 41 | MOTION to Dismiss with Brief In Support by The Litigation Practice Group, PC. (Attachments: # 1 Memorandum of Law)(Hays, James) (Entered: 12/01/2022) |

Case Case:00057-HSO-BW Document-64 Filed 12/06/22 Page 471 of 347

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/02/2022 12:42:48 | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00917-VMC |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| GLORIA EATON, individually and on behalf of all others similarly situated, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| v. | ) | |
| | ) | 1:22-cv-00917-VMC |
| THE LITIGATION PRACTICE GROUP, PC. | ) ) | |
| | ) | **CLASS ACTION** |
| Defendant. | ) | Jury Trial Demanded |
| | ) | |

## <u>SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES</u>

COMES NOW, Gloria Eaton ("Plaintiff"), individually and on behalf of all others similarly situated, and files this second Amended Class Action Complaint for Damages, pursuant to Fed. R. Civ. P. (a) (1) (A), against The Litigation Practice Group, PC ("Defendant") for violations of the Credit Repair Organizations Act, <u>15 U.S.C. § 1679</u> *et seq.*, the Georgia Debt Adjustment Act, <u>OCGA §§ 18-5-1</u> *et seq.*, the Georgia Fair Business Practices Act, <u>OCGA §§ 10-1-390</u> *et. seq.,* the Georgia Unfair and Deceptive Practices Towards the Elderly Act ("GaUDPTEA"), <u>OCGA §§ 10-1-850</u> through 857, for money had and received*,* and restitution, showing this Honorable Court the following:

## NATURE OF THE ACTION

1.

This is a proposed class action brought on behalf of all Georgia residents who have done business with Defendant from July 1, 2003 to the present wherein Defendant engaged in debt adjusting as defined by Georgia's Debt Adjustment Act, OCGA §§ 18-5-1 *et seq.,* (hereinafter the "Act" or "GDAA") for said Georgia residents. Further, Plaintiff proposes a class action for violations of the Credit Repair Organizations Act, 15 U.S.C. § 1679 et seq. (hereinafter the "Act" or "CROA") for all Georgia residents who have done business with Defendant within the five years preceding the filing of this Complaint through the current date.

2.

Plaintiff also pursues this action under the Fair Business Practices Act, OCGA §§ 10-1-390 *et seq*., (hereinafter "FBPA") which authorizes, in addition to all other remedies, recovery of actual damages, plus exemplary damages and, in the case of intentional violations of the FBPA, treble damages; personal liability of responsible corporate officers when a corporate defendant fails to pay a judgment

within thirty days, and reasonable attorneys' fees and costs of litigation, because the GDAA provides that a violation of the GDAA is also a violation of the FBPA.[1]

3.

Further, Plaintiff also pursues this action for money had and received, as Defendant has received money that the Plaintiff and class members in equity and good conscience is entitled to recover and that Defendant is not entitled in good conscience to keep.

4.

Plaintiff also pursues this action for restitution, as Plaintiff and the class members have paid money to Defendant for the performance of an illegal contract.

## PARTIES, JURISDICTION AND VENUE

5.

Plaintiff is domiciled in the state of Georgia and DeKalb County.

6.

Defendant The Litigation Practice Group PC [hereinafter "LPG"] is a California professional corporation, not registered with the Georgia Secretary of

---

[1] See OCGA § 18-5-4(d).

State, with its principal place of business at 17542 17th Street, Suite 100, Tustin, California 92780.

<p style="text-align:center">7.</p>

Defendant names as its registered agent for service of process Daniel S. March, at 17542 17th Street, Suite 100, Tustin, California 92780.

<p style="text-align:center">8.</p>

Defendant is subject to the jurisdiction of this Court pursuant to the Georgia Long Arm Statute, OCGA § 9-10-91, as Defendant transacts business within the state, has committed a tortious act or omission within this state, and/or has committed a tortious injury in this state caused by an act or omission outside this state.

<p style="text-align:center">9.</p>

Defendant regularly solicits and transacts business in Georgia, engages in other persistent courses of conduct in Georgia, or derives substantial revenue from services rendered in this state.

<p style="text-align:center">10.</p>

Defendant has not complied with the annual registration requirements of OCGA § 18-5-3.1 and is therefore not authorized to offer debt adjustment services

in this state, but has nevertheless engaged within this state in said debt adjustment services.

<div align="center">11.</div>

Venue is proper in this Court pursuant to OCGA § 9-10-93.

<div align="center">12.</div>

Defendant is subject to the jurisdiction and venue of this Court.

<div align="center">**STATEMENT OF FACTS**</div>

<div align="center">13.</div>

LPG is a corporation organized under the laws of the State of California.

<div align="center">14.</div>

LPG is based in California.

<div align="center">15.</div>

LPG has not been granted authority to conduct business in Georgia by the Georgia Secretary of State

<div align="center">16.</div>

LPG, in addition to being recognized as a for-profit corporation by the California Secretary of State, is also registered by the State Bar of California as a "Law Corporation".

17.

The State Bar of California licenses not just individuals as attorneys, but also business entities (i.e., "Law Corporations").

18.

Being recognized by the State Bar of California as a "Law Corporation" is a manner in which law firms are licensed to practice law in California.

19.

LPG is not licensed to practice law in the State of Georgia.

20.

Notwithstanding that Defendant purports to be a law firm, LPG's Facebook page identifies it as a "Financial Consultant."

21.

LPG holds itself out as engaging in a professional business of representing consumer debtors against the claims of their creditors throughout the nation.

22.

LPG specifically holds itself out as engaging a professional business of representing consumer debtors against the claims of their creditors in the State of Georgia.

23.

LPG does not employ any Georgia attorneys.

24.

LPG does not have an office in Georgia.

25.

The address at which LPG claims to have an office in Georgia is occupied by a business known as NPHUB.

26.

LPG does not keep assets in the State of Georgia.

27.

Under California law, a "Law Corporation" is subject to specific regulatory and reporting requirements.

28.

A regulatory requirement imposed on all Law Corporations by the State Bar of California is that each Law Corporation must report to the State Bar of California all attorneys that practice law on behalf of the Law Corporation.

29.

LPG has never reported an attorney licensed to practice in the State of Georgia.

30.

LPG has never reported Rayshawn Williams as an attorney that practices law on behalf of LPG.

31.

LPG is not licensed to practice law in the State of Georgia.

32.

LPG is not authorized to practice law in the State of Georgia.

33.

Any attempt by LPG to practice law in the State of Georgia is unauthorized.

34.

In an effort to reach the greatest number of potential customers, LPG employs nation-wide mass marketing techniques including telemarketing and a sophisticated internet presence.

35.

Potential customers may interface with LPG personnel by telephone or electronic communications.

36.

This interaction necessarily involves analysis and the provision of legal advice by Defendant's staff.

37.

The decision of how to respond to a Georgia consumer's creditors is the practice of law in Georgia.

38.

As such, these functions should be performed by a Georgia lawyer.

39.

None of LPG's staff are licensed to practice law in the State of Georgia.

40.

None of LPG's staff operate under the supervision of any attorney licensed in the State of Georgia.

41.

None of LPG's staff operate under the adequate supervision of any attorney.

42.

The goal of LPG staff's telephone and electronic communications is for LPG to "onboard" or "sign-up" the consumer, take their information, and get the consumer to enter into a contract that includes the consumer's obligation to make a series of pre-authorized electronic payments from the consumer's bank account.

43.

Prior to entering into a contract with LPG, Plaintiff communicated with LPG's non-attorney staff.

44.

LPG's customer communications staff are not attorneys.

45.

LPG's customer communications staff are not under the supervision of a Georgia attorney.

46.

LPG's customer communications staff are not under the adequate supervision of any attorney.

47.

After several telephone conversations with LPG's non-attorney staff, on or about April 8, 2021, Plaintiff entered into a contract with LPG. [Hereainfter "AGREEMENT"]

48.

Plaintiff listed 14 consumer debts totaling approximately $52,000.00.

49.

The debts included a Target credit card.

50.

The debt referenced in the preceding paragraph is designated "TD BANK USA/TARGETCRED" in the AGREEMENT.

51.

The AGREEMENT obligated Plaintiff to pay $13,108.75 in 30 monthly payments (29 payments of $436.96 and a final payment of $436.91).

52.

The fee to be paid to LPG was calculated as 25% of the total balance.

53.

Plaintiff commenced monthly payments of $436.96 beginning in May 2021.

54.

LPG took at least five monthly payments from Plaintiff.

55.

LPG undertook to provide legal services to Plaintiff in the State of Georgia by providing legal representation in regard to her debts.

56.

LPG specifically undertook to represent Plaintiff in litigation in the State of Georgia where Plaintiff lives.

57.

The AGREEMENT is a standard form into which the specific information of each consumer is inserted.

58.

In the AGREEMENT, LPG undertook to perform various services to assist consumers, such as Plaintiff, in dealing with their creditors.

59.

These services specifically include "[a]ssist[ing the consumer] in removing erroneous or inaccurate information reported in connection with debts"; "[r]epresent[ing the consumer] in any lawsuit filed against [the consumer] in connection with any of these debts"; and "[d]efend[ing the consumer] against any collection activity or lawsuit[.]"

60.

In the AGREEMENT, LPG undertook to "investigate [the consumer's] delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts[.]"

61.

For a consumer that resides in the State of Georgia, the "determination [of] the most effective method" to deal with debts would necessarily require a thorough understanding of Georgia law.

62.

For a consumer that resides in the State of Georgia, a competent "determination [of] the most effective method" to deal with debts would require a thorough understanding of collection law as it is practiced in the Courts of Georgia.

63.

For a consumer that resides in the State of Georgia, such "determination" as referenced in the preceding paragraphs should be made by an attorney licensed in the State of Georgia.

64.

The very fact that LPG has made a determination that its services are appropriate for a consumer (by signing the consumer up) constitutes the rendering of a legal opinion and the practice of law in the State of Georgia.

65.

LPG knew that Ms. Eaton was a resident of the State of Georgia.

66.

All services which LPG promised to deliver were of necessity to be delivered for her benefit in the State of Georgia.

67.

LPG knew that it was promising to deliver services in the State of Georgia.

68.

Since consumer collection litigation is generally filed in the home state and county of the consumer debtor, LPG knew that it was promising to deliver the service of defending legal actions in the State of Georgia.

69.

Specifically, LPG undertook to represent and defend Plaintiff in any lawsuit filed against Plaintiff in Georgia in connection with any debts listed with LPG.

70.

Plaintiff has never entered into any agreement with attorney Rayshawn Williams.

71.

Plaintiff has never entered into an agreement with any other LPG affiliated attorney that was authorized to practice law in Georgia.

72.

Plaintiff was sued on the Target Credit Card debt in the Magistrate Court of DeKalb County.

73.

Ms. Eaton provided LPG with a copy of the Target Credit Card lawsuit that had been served upon her.

74.

Ms. Eaton reasonably understood that LPG was undertaking to properly represent her and protect her interests in the legal action brought against her to collect the Target Credit Card debt.

75.

LPG did not take any action to properly represent or defend Plaintiff.

76.

LPG allowed the collection action on the Target Credit Card debt to go into default.

77.

LPG allowed a motion for entry of default judgment to go unchallenged.

78.

A competent attorney experienced in the practice of collection law would have answered and avoided a motion for default judgment.

79.

Notwithstanding the fact that LPG had made no effort to defend Plaintiff in the Target Credit Card collection action, throughout the months of at least June and July, 2021, LPG had non-attorney staff members make monthly telephone calls to Plaintiff in which the callers asserted that LPG was effectively handling all of Plaintiff's debts, including the Target Credit Card debt.

80.

The fact that LPG's non-attorney staff would repeatedly assert that LPG was effectively handling the Target Credit Card debt under these circumstances clearly indicates a lack of adequate attorney supervision.

81.

On or about September 15, 2021, a second collection action on another debt was filed against Plaintiff in the Magistrate Court of DeKalb County.

82.

As a result of Ms. Eaton's inquiry about the second collection action, Ms. Eaton learned that the public online docket showed that LPG had taken no action on

the Target Credit Card, that said case was allowed to go into default, and that a motion for default judgment had been filed against her.

83.

This was the first time Plaintiff knew that no appropriate actions had been taken to defend her against the Target Credit Card collection action.

84.

In fact, LPG had simply done nothing.

85.

LPG doing nothing in a Georgia Court is consistent with its licensing status in the State of Georgia and its lack of experience with Georgia collection law.

86.

LPG never informed Ms. Eaton that it had failed to properly represent her.

87.

Having learned that there was a default against her and that she was subject of an undefended collection action, Plaintiff became extremely upset.

88.

Plaintiff contacted LPG regarding the newly discovered fact that LPG had not done as it had promised.

89.

A representative of LPG referred Plaintiff to a purported local attorney who LPG's representative stated would help Plaintiff with the Target Credit Card judgment.

90.

Plaintiff called that purported local attorney's telephone number only to be told that the named attorney no longer worked at that firm.

91.

Plaintiff called back to LPG and was later given the name and telephone number of another attorney identified as Rayshawn Williams.

92.

Rayshawn Williams is not an employee of LPG.

93.

Rayshawn Williams provides no supervision over any of the staff of LPG.

94.

When Plaintiff finally spoke with Rayshawn Williams sometime in October, 2021, he stated that he had only been assigned to Target Credit Card case one week previously.

95.

Although Rayshawn Williams was apologetic, he placed the blame on some other person that was "previously responsible" (or words to that effect) for the Target Credit Card collection action.

96.

Rayshawn Williams never represented Ms. Eaton and never took any action on behalf of Ms. Eaton.

97.

As a result of LPG's failures, Plaintiff's faith in LPG was shaken, and she could no longer rely upon the promises it had made in the AGREEMENT.

98.

On the same day as Plaintiff's conversation with Rayshawn Williams, Plaintiff stopped payments to LPG.

99.

Defendant renders unauthorized legal services to consumers such as Ms. Eaton in the State of Georgia without being licensed to do so.

100.

Defendant claims to refer cases to a licensed attorney in the State of Georgia named Rayshawn Williams.

101.

In fact, the AGREEMENT states:

> You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time, but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, provided only that at all times LPG shall have an affiliated attorney in all 50 states and the District of Columbia.

[*Doc. 13, p. 3*].

102.

Ms. Eaton never spoke with any attorney in the regular employ of LPG.

103.

No attorney took any action on her behalf.

104.

The fact that LPG may, from time to time, refer or attempt to refer cases to an attorney licensed in Georgia, such as Rayshawn Williams, does not make its operations representing Georgia consumers authorized.

105.

To the extent LPG does refer some of its customers to an attorney licensed in Georgia, said attorneys operate their own practices in Georgia separate and apart from LPG.

106.

LPG's purported "Georgia attorneys" do not supervise LPG's staff or otherwise control the representation of the Georgia consumer.

107.

Rather, LPG controls the Georgia referral attorney with limited referrals for limited tasks.

108.

Based on these limited referrals for specific tasks, any Georgia attorney receiving referrals from LPG is not free to use his or her best professional judgment to properly represent a consumer such as Plaintiff.

109.

The fact that LPG may on occasion refer matters to a Georgia attorney does not render its practice authorized.

110.

Even if LPG occasionally makes a referral of an attorney to its Georgia customers, it did not continuously maintain an affiliated attorney licensed to practice in Georgia during a significant portion of the period of time during and subsequent to the time when LPG failed to defend the Target Credit Card case.

111.

Even if LPG had belatedly involved a Georgia Attorney after commencement

of representation, this did not absolve or cure the unauthorized practice of law.

## **THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. § 1679**

112.

The Credit Repair Organizations Act ("CROA") states as its purpose:

> (1) to ensure that prospective buyers of the services of
> credit repair organizations are provided with the
> information necessary to make an informed decision
> regarding the purchase of such services; and

> (2) to protect the public from unfair or deceptive
> advertising and business practices by credit repair
> organizations.

15 U.S.C. § 1679 (b).

113.

Plaintiff and the Class Members are consumers within the definition of CROA.

15 U.S.C. § 1679a (1).

114.

Defendant is a "credit repair organization" within the definition of CROA, as

it is:

> [a] person who uses any instrumentality of interstate
> commerce or the mails to sell, provide, or perform (or
> represent that such person can or will sell, provide, or

perform) any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of—

(i) improving any consumer's credit record, credit history, or credit rating; or

(ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)[.]

15 U.S.C. § 1679a (3) (A).

### 115.

Defendant received payments from Plaintiff and the Class Members for the express purpose of improving her credit record, credit history or credit rating and engaged in the above-described activities, which if successful, would necessarily result in credit repair, since a settled debt would reduce the consumer's debt-to-credit ratio (utilization), increase the consumer's credit score, and would appear on a credit report as paid, partly paid, or settled.

### 116.

CROA states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." 15 U.S.C. § 1679b (b).

## COUNT ONE – VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

117.

LPG's AGREEMENT with Plaintiff and members of the purported class include the following clause regarding the description of the services it will perform for its customers:

**Description of Services to be Performed**

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

Doc. 13.

118.

LPG's AGREEMENT also contains a clause relating to their refund policy which makes one of the criteria for a refund to be credit-repair-related, "if the debt

is still reporting to one of the following credit bureaus (Experian, Equifax, or Trans Union).

<div align="center">119.</div>

In the AGREEMENT, LPG undertook to "[a]ssist [Ms. Eaton] in removing erroneous or inaccurate information reported in connection with debts identified below[.]"

<div align="center">120.</div>

CROA states that:

(a) Liability established

Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

(1) Actual damages

The greater of-

(A) the amount of any actual damage sustained by such person as a result of such failure; or

(B) any amount paid by the person to the credit repair organization.

(2) Punitive damages

(A) Individual actions

In the case of any action by an individual, such additional amount as the court may allow.

(B) Class actions

In the case of a class action, the sum of-

(i) the aggregate of the amount which the court may allow for each named plaintiff; and

(ii) the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

(3) Attorneys' fees

In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

(b) Factors to be considered in awarding punitive damages

In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors-

(1) the frequency and persistence of noncompliance by the credit repair organization;

(2) the nature of the noncompliance;

(3) the extent to which such noncompliance was intentional; and

(4) in the case of any class action, the number of consumers adversely affected.

15 U.S.C. § 1679g.

121.

Plaintiff and the Class Members have suffered actual damages under CROA by paying fees to Defendant for credit repair services that were not yet performed.

122.

Plaintiff and the Class Members are entitled to recover their actual damages [15 U.S.C. § 1679g (a) (1)] as well as punitive damages [15 U.S.C. § 1679g (a) (2) (A)] and attorneys' fees and costs [15 U.S.C. 1679g (a) (3)] from Defendant under CROA.

## **GEORGIA'S DEBT ADJUSTMENT ACT, OCGA §§ 18-5-1 *et seq.***

123.

Plaintiff incorporates by reference all preceding paragraphs of this Complaint as if fully restated herein and further states as follows:

124.

The GDAA at OCGA § 18-5-1, defines debt adjusting as:

> [D]oing business in debt adjustments, budget counseling, debt management, or debt pooling service or holding oneself out, by words of similar import, as providing services to debtors in the management of their debts and contracting with a debtor for a fee to:
>
> (A) Effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor;

(B) Receive from the debtor and disburse to his or her creditors any money or other thing of value.

125.

Defendant fits squarely within the definition of a "debt adjuster" as Defendant "provid[es] services to debtors in the management of their debts and contracting with a debtor for a fee to effect the adjustment, compromise, or discharge of any account, note or other indebtedness of the debtor."

126.

From its initial creation by the Georgia General Assembly in 1956 until its amendment of July 1, 2003, the GDAA stated that "[i]t shall be unlawful for any person to engage in the business of debt adjusting" and that **"[a]ny person who engages in the business of debt adjusting . . . shall be guilty of a misdemeanor**." OCGA § 18-5-2 (1956) (emphasis added).

127.

Thus, the original GDAA undeniably closed and locked the door for persons to offer debt adjusting for a fee in this state, unless incidental to the practice of law in this state. Defendant's agreement clearly states that it is a California law firm and is not licensed to practice law or provide legal advice in the State of Georgia.

128.

In 2003, the General Assembly substantially amended the GDAA. In the amendment's enabling clause, the legislature stated that the purpose is:

> To limit the maximum charge that may be imposed for the provision of debt adjustment services; to provide for definitions; to provide for exemptions from those provisions related to debt adjustment; to require persons engaged in debt adjusting to obtain an annual audit of all accounts and to maintain a certain amount and type of insurance coverage; to provide for the disbursement of a debtor's funds within 30 days of receipt; to require persons engaged in debt adjusting to maintain trust accounts for debtors' funds; to provide for civil and criminal violations and penalties; to provide for investigation and enforcement; to provide for related matters; to provide for an effective date; to repeal conflicting laws; and for other purposes.

2003 Ga. Laws No. 103 p. 392 (House Bill No. 385).

129.

The amended GDAA thus removed the out-and-out prohibition on debt adjusting for a fee and cracked the door to allow debt adjusters to operate in Georgia as long as the Act's mandates are followed.

130.

The amended GDAA commands that the debt adjuster "*shall* maintain a separate trust account for the receipt of any and all funds from debtors and the disbursement of such funds on behalf of debtors" (OCGA § 18-5-3.2(b)); "*shall*

disburse to the appropriate creditors all funds received from the debtor, less any fees authorized by [the Act], within thirty days of receipt" (OCGA § 18-5-3.2(a)); "*shall* obtain annual audits from independent CPAs on all accounts in which Georgia debtors' funds have been deposited" (OCGA § 18-5-3.1(a)(1)); "*shall* obtain a specified level of insurance coverage for employee dishonesty depositor's forgery and computer fraud" (OCGA § 18-5-3.1(a)(2)); and "*shall not*:

> accept from a debtor who resides in this state, either directly or indirectly, any charge, fee, contribution, or combination thereof in an amount in excess of 7·5 percent of the amount paid monthly by such debtor to such person for distribution to creditors of such debtor . . .

OCGA § 18-5-2 (emphasis added).

<div align="center">131.</div>

The amendment further provided for a civil remedy for a person's violation of the GDAA. OCGA § 18-5-4 states:

> Any person who engages in debt adjusting in violation of the provisions of [OCGA § 18-5-2 or § 18-5-3.2(a)] shall further be liable to the debtor in an amount equal to the total of all fees, charges, or contributions paid by the debtor plus $5,000.00. Such debtor shall have the right to bring a cause of action directly against such person for violation of the provisions of this chapter.

## COUNT TWO – VIOLATIONS OF GEORGIA'S DEBT ADJUSTMENT ACT

132.

Plaintiff incorporates each of the foregoing paragraphs as if fully restated herein.

133.

Defendant is engaged in the business of providing "Debt Adjusting" services as that term is defined in OCGA § 18-5-1.

134.

Defendant provided Debt Adjusting services to Plaintiff and the Class Members while they resided in the State of Georgia.

135.

Defendant contracted for and accepted from Plaintiff and the Class Members a charge, fee, contribution, or combination thereof of a monthly fee in which no part of it went to creditors and thus was 100% retained by Defendant as a fee. Defendant's retention of all payments by Plaintiff and the Class Members violated the GDAA because said sums were all an amount in excess of the statutorily allowed 7.5% permitted by the GDAA to be retained from funds paid by plaintiffs for the distribution to Plaintiff's and the Class Members' creditors.

136.

Due to said violations of the GDAA, pursuant to OCGA § 18-5-4 (b) (2),
Defendant is liable to Plaintiff and the Class Members in an amount equal to the total
of all fees, charges, and/or contributions paid by Plaintiff and the Class Members to
Defendant, plus statutory damages in the amount of $5,000.00 per Class Member.

## THE GEORGIA FAIR BUSINESS PRACTICES ACT

137.

The Fair Business Practice Act ("FBPA"), at OCGA § 10-1-391 (a), states:

> The purpose of this part shall be to protect consumers and
> legitimate business enterprises from unfair or deceptive
> practices in the conduct of any trade or commerce in part
> or wholly in the state. It is the intent of the General
> Assembly that such practices be swiftly stopped, and this
> part shall be liberally construed and applied to promote its
> underlying purposes and policies.

138.

The GDAA at OCGA § 18-5-4 states that a violation of the GDAA is also a
violation of the FBPA.

## COUNT THREE – VIOLATIONS OF THE FBPA

139.

Defendant's violations of the GDAA also violated the FBPA.

140.

Defendant intentionally violated the FBPA when it violated the GDAA, by overcharging Plaintiffs and the putative class fees in a percentage greater than the 7.5% allowed under the GDAA.

141.

Defendant is therefore liable to Plaintiff and the class members, in addition to their remedies under the GDAA, for their actual damages, for treble their actual damages for Defendant's intentional violation of the FBPA, and for exemplary damages, plus reasonable attorneys' fees and costs of litigation.

## <u>GEORGIA'S STATE PROCEDURAL PROHIBITION ON CLASS ACTIONS PURSUANT TO THE FBPA IS PRE-EMPTED BY FED. R. CIV. P. 23</u>

142.

The FBPA, at OCGA § 10-1-399(a), states:

> Any person who suffers injury or damages as a result of a violation of Chapter 5B of this title, as a result of consumer acts or practices in violation of this part, as a result of office supply transactions in violation of this part or whose business or property has been injured or damaged as a result of such violations ***may bring an action individually, but not in a representative capacity***, against the person or persons engaged in such violations under the rules of civil procedure to seek equitable injunctive relief and to recover his or her general and exemplary damages sustained as a consequence thereof in any court having jurisdiction over the defendant[.]

Emphasis supplied.

143.

However, as the United States Supreme Court held in *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010):

> [Fed. R Civ. P. 23] says that if the prescribed preconditions are satisfied "[a] class action may be maintained" (emphasis added)--not "a class action may be permitted." Courts do not maintain actions; litigants do. The discretion suggested by Rule 23's "may" is discretion residing in the plaintiff: He may bring his claim in a class action if he wishes. And like the rest of the Federal Rules of Civil Procedure, Rule 23 automatically applies "in all civil actions and proceedings in the United States district courts," Fed. Rule Civ. Proc. 1.

Id. at 400.

> In sum, it is not the substantive or procedural nature or purpose of the affected state law that matters, but the substantive or procedural nature of the Federal Rule. We have held since *Sibbach [v. Wilson & Co.*, 312 U.S. 1, 14 (1941)], and reaffirmed repeatedly, that the validity of a Federal Rule depends entirely upon whether it regulates procedure.

Id. at 410.

144.

Further, the Eleventh Circuit held in *Lisk v. Lumber One Wood Preserving, LLC*, 792 F.3d 1331 (11th Cir. 2015):

This appeal presents two issues. The first arises from a conflict between Federal Rule of Civil Procedure 23, which authorizes class actions including for consumer claims of this kind, and the ADTPA[2], which creates a private right of action but forbids private class actions. We hold that Rule 23 controls.

145.

Thus, any prohibition under Georgia's FBPA to the implication of Fed. R. Civ. P. 23 has been abolished, and this matter may proceed as a class action in federal court.

## COUNT FOUR – MONEY HAD AND RECEIVED

146.

The tort of money had and received lies in all cases where another has received money which the plaintiff *ex aequo et bono* (what is just and fair or according to equity and good conscience) is entitled to recover and which defendant is not entitled to retain.

---

[2] The Alabama Deceptive Trade Practices Act ("ADTPA") is Alabama's equivalent law to Georgia's Fair Business Practices Act.

147.

Although legal in form, being an action in implied assumpsit, it is founded on the equitable principle that no one ought to unjustly enrich himself at the expense of another, and it is a substitute for a suit in equity.

148.

It is the appropriate remedy where one wrongfully receives and retains the money of another.

149.

Plaintiff and the class members have paid money to Defendant LPG for services that were not delivered and which LPG was not legally licensed to provide.

150.

LPG has no right to retain any money paid by Plaintiff and the class member.

151.

Therefore, Plaintiff and the class members seek a recovery of all funds paid to LPG.

## COUNT FIVE – RESTITUTION

### 152.

Plaintiff and the class members executed illegal contracts with Defendant LPG for LPG to provide legal services for which it was not licensed to provide in the State of Georgia.

### 153.

Defendant LPG misrepresented to Plaintiff and the class members that LPG was authorized and able to provide legal services to Plaintiff and the class members for which it was not licensed to provide in the State of Georgia.

### 154.

Plaintiff and the class members paid valuable consideration towards the illegal contract for services that LPG was not authorized to provide.

### 155.

Plaintiff and the class members seek restitution of the money paid to Defendant LPG towards this illegal contract for services.

## COUNT SIX – ELDER ABUSE

### 156.

At all times that Plaintiff Ms. Eaton had any dealings with LPG, she was over 60 years of age.

157.

Defendant's actions constitute unfair or deceptive practices toward the elderly under Georgia's elder abuse statute, O.C.G.A. §§ 10-1-850 through 857.

158.

As a result of defendant's actions, Ms. Eaton, and the subclasses of each those class members that were over 60 years of age, are entitled to an award of 1) actual damages, including but not limited to general damages for emotional distress caused by defendant's actions, 2) punitive damages, 3) statutory damages of up to $10,000.00 per each violation, as well as 4) an award of costs and attorney fees.

## CLASS ACTION ALLEGATIONS

159.

Plaintiff seeks to have this Court certify the following classes:

**Class 1 (Debt Adjustment Class)**: All persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendant on or after July 1, 2003 and from whom Defendant accepted, directly or indirectly, any charge, fee, contribution, or combination thereof, in violation of the Georgia Debt Adjustment Act.

**Class 2 (CROA Class(**: All persons who, while residing in the state of Georgia, received credit repair services from Defendant on or after five (5) years from the filing of this Complaint through the current time.

**Class 3 (FBPA Class)**: All persons who, while residing in the state of Georgia, received debt settlement or debt

adjusting services from Defendant on or after on or after four (4) years from the filing of this Complaint through the current time and from whom Defendant accepted, directly or indirectly, any charge, fee, contribution, or combination thereof, in violation of the Georgia Debt Adjustment Act, which also constitutes a violation of the Georgia Fair Business Practices Act.

**Class 4 (Money Had and Received Class)**: All persons who, while residing in the state of Georgia, paid money to Defendant on or after on or after four (4) years from the filing of this Complaint through the current time for Defendant's commission of the tort of money had and received.

**Class 5 (Restitution Class)**: All persons who, while residing in the state of Georgia, paid money to Defendant on or after on or after four (4) years from the filing of this Complaint through the current time for services promised under an illegal contract, and such persons seek restitution from Defendant.

**Sub-Classes 6-10 (Elder Abuse)**: Within each of the five separate proposed classes exists an additional and distinct subclass for purposes of Count Six for all members over the age of 60.

160.

On information and belief, the named Plaintiff and the Plaintiff Class Members were solicited by Defendant through a standard marketing scheme which Defendant offered Debt Adjustment services and credit repair services. Such marketing and services are typical of those experienced by the Plaintiff and the proposed Plaintiff Class Members.

161.

On information and belief, the contract entered into between Defendant and Plaintiff is a standard contract which is substantially the same as the contract Defendant entered into with the Plaintiff Class Members.

162.

On information and belief, the fees collected by Defendant from the proposed Plaintiff Class Members are uniformly assessed to every customer of Defendant and can readily be determined from a ministerial review of the records of Defendant.

163.

The names and addresses of the Plaintiff Class Members can readily be determined from a ministerial review of the records of Defendant and through the account statements of Defendant pertaining to collection of such charges, fees, contributions, or combinations thereof.

164.

The membership of the class is numerous and joinder of individual plaintiffs is impractical. On information and belief, Defendant has provided Debt Adjustment services to hundreds of residents of the State of Georgia since July 1, 2003. Further, Defendant has provided credit repair services to hundreds of residents of the State of Georgia for the period of the past five years through the current time.

165.

There are questions of law and fact common to all members of the Plaintiff class, and these common questions of law and fact predominate over any individual issues. The principal questions pertinent to the class as a whole include:

a) Whether Defendant's standard means of doing business in debt adjustments, debt settlement, debt reduction, budget counseling, and debt management constitutes "Debt Adjustment" under OCGA § 18-5-1;

b) Whether Defendant is a "credit repair organization" within the definition of CROA;

c) Whether Defendant violated OCGA § 18-5-2 by accepting excessive fees from Plaintiff Class Members for the provision of Debt Adjustment services;

d) Whether Defendant violated CROA by "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization" 15 U.S.C. § 1679b (a) (3);

e) Whether Defendant violated CROA by "charg[ing] or receiv[ing] any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for

any consumer before such service is fully performed"
15 U.S.C. § 1679b (b);

f) Whether Defendant committed the tort of money had and received;

g) Whether Plaintiff and the class members entered into illegal contracts for legal services with Defendant;

h) Whether Plaintiff and the class members are entitled to restitution for money paid for illegal services that Defendant was unauthorized by Georgia law to provide;

i) The liability of Defendant for violations of the Georgia Debt Adjustment Act;

j) The liability of Defendant for violations of the Georgia Fair Business Practices Act;

k) The liability of Defendant for violations of CROA;

l) The appropriate measure of damages and the appropriate remedies;

m) The availability of statutory damages pursuant to OCGA § 18-5-4;

n) The availability of general damages, treble damages and attorneys' fees and costs pursuant to OCGA § 10-1-399 (a), (c), and (d); and

o) Defenses raised by Defendant.

166.

The claims of the named Plaintiff are typical of the claims of the Plaintiff Class Members, which all arise from the same operative facts and are based on the same legal theories, and Plaintiff's claims will thus adequately represent those of the Plaintiff Class Members.

167.

The named Plaintiff will fairly and adequately protect the interests of the Plaintiff Class Members. Plaintiffs have retained counsel with experience in class action litigation, and they are not aware of any interest that might cause them not to vigorously pursue this case.

168.

A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder is impracticable. The expense and burden of individual litigation make it virtually impossible for the members of the class to proceed individually, and it is therefore most efficient to resolve all claims based on Defendant's conduct in one forum.

169.

The Plaintiff is aware of no difficulties that will be encountered in the management of this litigation that would render the action unmanageable. This is not

a class action that will require an analysis of Defendant's conduct as to individual Class Members.

170.

Prosecution of separate actions by individual Plaintiff Class Members would be inefficient and create adjudications that would not be dispositive of the interests of the other members not parties to the adjudication.

171.

Plaintiff is not aware of any other pending actions against this Defendant for these same causes of action.

172.

Without a class action mechanism, members of the Plaintiff Class would be substantially impaired or impeded in their ability to protect their interests. The value of claims of the individual Class Members would be in an amount that makes prosecution outside of the class action uneconomical.

173.

A final judgment on the merits of the named Plaintiff's claims would be fully dispositive of the claims and interests of those similarly situated who are not specifically named as a plaintiff in this action.

**WHEREFORE**, Plaintiff being entitled to a trial by jury and judgment against Defendant, prays for the following:

a) That summons be directed to Defendant and served upon it as provided by law;

b) That this Court set this matter down for a class certification discovery scheduling conference following the commencement of this action;

c) That Plaintiff be designated class representative for the Classes as defined herein;

d) That Plaintiff's counsel be designated class counsel for the Classes as defined herein;

e) That a Class be certified for all persons who, while residing in the State of Georgia, received debt settlement or debt adjusting services from Defendant on or after July 1, 2003 and from whom Defendants accepted, directly or indirectly, any charge, fee, contribution, or combination thereof (Debt Adjustment Class);

f) That a Class be certified for all persons who, while residing in the State of Georgia, received credit repair services from Defendant on or after five years from the date of the filing of this Complaint through the current time (CROA Class);

g) That a Class be certified for all persons who, while residing in the state of Georgia, received debt settlement or debt adjusting services from Defendant on or after on or after four (4) years from the filing of this Complaint through the current time and from whom Defendant accepted, directly or indirectly, any charge, fee, contribution, or combination thereof, in violation of the Georgia Debt Adjustment Act, which also constitutes a violation of the Georgia Fair Business Practices Act (FBPA Class);

h) That a Class be certified for all persons who, while residing in the state of Georgia, paid money to Defendant on or after on or after four (4) years from the filing of this Complaint through the current time for Defendant's commission of the tort of money had and received (Money Had and Received Class);

i) That a Class be certified for all persons who, while residing in the state of Georgia, paid money to Defendant on or after on or after four (4) years from the filing of this Complaint through the current time for services promised under an illegal contract, and such persons seek restitution from Defendant (Restitution Class);

j) That for each and every class certified, a separate subclass be certified, for each member in that class that is at least 60 years of age. For each such

subclass member, an award of additional punitive damages and statutory damages of up to $10,000.00 per each violation.

k) That the Court hold a hearing as soon as practicable for the determination of class certification for the Classes;

l) For each violation of OCGA §§ 18-5-1 *et seq.* by Defendant, that Plaintiff and the members of the Class be awarded an amount equal to all charges, fees, contributions, or combinations therefore paid to Defendant plus $5,000.00 as allowed under OCGA §§ 18-5-1 *et seq.*;

m) For each violation of OCGA § 10-1-390 *et seq.* by Defendant that Plaintiff and the members of the Class be awarded their actual damages, and treble their actual damages pursuant to OCGA § 10-1-399 (c);

n) That Plaintiff be awarded her attorneys' fees and expenses of litigation pursuant to OCGA § 10-1-399 (d);

o) For each violation of CROA by Defendant, that Plaintiff and the members of the Class be awarded their actual damages;

p) For its violations of CROA, that this Court award punitive damages to the Class pursuant to the guidelines as outlined in 15 U.S.C. § 1679g (b);

q) That this Court award attorneys' fees and costs against Defendant pursuant to 15 U.S.C. § 1679g (a) (3);

r) For its commission of the tort of money had and received, that this Court award damages for the amount of money taken by Defendant from Plaintiff and the class members;

s) For its collection of money pursuant to an illegal contract, that this Court award restitution to Plaintiff and the class members;

t) That Defendant be required to pay all monies herein referred to in subparagraph l) through s) into a common fund for the benefit of the Classes;

u) That the Court conduct a "fairness hearing," after due and proper notice to all members of the Classes, and make such award of attorneys' fees and expenses as the Court deems appropriate from the common fund (as above referred to) and/or from Defendant;

v) That Plaintiff, individually and as class representative for the Classes, have a trial by jury;

w) That Plaintiff and the members of the Classes be awarded interest on any award granted, with such interest accruing from the time of the filing of this Complaint until the time final Judgment in this case is paid;

x) That the named Plaintiff be awarded an incentive award from Defendant for the benefit the named Plaintiff has conferred on the Class members

through her commitment of time and expense in conducting this lawsuit;
and

y) That the named Plaintiff, individually and as class representative of all
others similarly situated, have such other equitable and further relief as this
Court deems proper.

Respectfully submitted, this 22[th] day of April, 2022.

**HURT STOLZ, P.C.**

/s/  James W. Hurt, Jr.
By:  James W. Hurt, Jr.
Georgia Bar No.:  380104

1551 Jennings Mill Road
Suite 3100-B
Watkinsville, Georgia 30677
(706) 395-2750
Facsimile:  706-996-2576
jhurt@hurtstolz.com

**SKAAR & FEAGLE, LLP**

s/  Kris Skaar
Kris Skaar
Georgia Bar No. 649610
James M. Feagle
Georgia Bar No.: 256916
Chelsea R. Feagle
Georgia Bar No.: 110863
Justin T. Holcombe
Cliff R. Dorsen

2374 Main Street, Suite B
Tucker, Georgia 30084

(404) 373-1970
Facsimile:  404-601-1855
jfeagle@skaarandfeagle.com          **ATTORNEYS FOR PLAINTIFF**
**AND THE PUTATIVE CLASSES**

# EXHIBIT B

**U.S. District Court**
**Southern District of Mississippi (Southern)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-00057-HSO-BWR**

Beech v. Litigation Practice Group, PC
Assigned to: District Judge Halil S. Ozerden
Referred to: Magistrate Judge Bradley W. Rath
Cause: 28:1331 Fed. Question

Date Filed: 03/17/2022
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Carolyn Beech**
*on behalf of herself and the class members*
*described in complaint*

represented by **Daniel A. Edelman - PHV**
EDELMAN COMBS LATTURNER AND
GOODWIN, LLC
20 S. Clark St., Suite 1500
Chicago, IL 60603-1824
312-739-4200
Fax: 312-419-0379
Email: dedelman@edcombs.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason E. Graeber**
JASON GRAEBER, ATTORNEY AT LAW
2496 Pass Road
Biloxi, MS 39531
228-207-7117
Fax: 228-207-8634
Email: jason@jasongraeberlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Litigation Practice Group, PC**

represented by **Matthew T. Anderson - PHV**
LUPER NEIDENTHAL & LOGAN
1160 Dublin Road
Suite 400
Columbus, OH 43215
614-221-7663
Fax: 866-345-4948
Email: manderson@lnlattorneys.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher R. Pettit - PHV**
LUPER NEIDENTHAL & LOGAN
1160 Dublin Road
Suite 400
Columbus, OH 43215
614-229-4407

Fax: 866-345-4948
Email: dedelman@edcombs.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kyle T. Anderson - PHV**
LUPER NEIDENTHAL & LOGAN
1160 Dublin Road
Suite 400
Columbus, OH 43215
614-229-4409
Email: kanderson@lnlattorneys.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca Mansell**
ROLFES HENRY, LPA
2113 Government Street
Ste H-2
Ocean Springs, MS 39564
601-665-5118
Fax: 513-579-0222
Email: rmansell@rolfeshenry.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2022 | 1 | COMPLAINT with jury demand against Litigation Practice Group, PC (Filing fee $ 402; receipt number 14643014190), filed by Carolyn Beech. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit A - Legal Services Agreement, # 3 Exhibit B - Electronic Payment Authorization, # 4 Exhibit C - Preauthorized checking and ACH authorization form, # 5 Exhibit D - Smarter Path to Debt Relief Services) (JCH) (Entered: 03/17/2022) |
| 03/17/2022 | 2 | Summons Issued as to Litigation Practice Group, PC. (JCH) (Entered: 03/17/2022) |
| 03/21/2022 | 3 | MOTION for Daniel A. Edelman to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4793529) by Carolyn Beech (Graeber, Jason) (Entered: 03/21/2022) |
| 03/21/2022 | | DOCKET ANNOTATION as to #3: (1) Case number should be listed as 1:22cv57 HSO-RHWR on all future filed pleadings; (2) Resident attorney did not sign page 6 of the main document; and (3) The Certificate of Good Standing should have been scanned separately and attached as an Exhibit. (RLW) (Entered: 03/21/2022) |
| 03/22/2022 | 4 | Amended MOTION for Daniel A. Edelman to Appear Pro Hac Vice by Carolyn Beech (Attachments: # 1 Exhibit A- Certificate of Good Standing)(Graeber, Jason) (Entered: 03/22/2022) |
| 03/23/2022 | | TEXT ONLY ORDER finding as moot 3 Motion to Appear Pro Hac Vice; granting 4 Motion to Appear Pro Hac Vice. That Attorney Daniel A. Edelman be admitted pro hac vice in this case on behalf of Plaintiff Carolyn Beech in association with local counsel conditioned upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. NO FURTHER WRITTEN ORDER WILL ISSUE FROM THE COURT. Signed by Magistrate Judge Robert H Walker on 3/23/2022 (AB) (Entered: 03/23/2022) |
| 03/24/2022 | 5 | CERTIFICATE OF SERVICE by Carolyn Beech re 2 Summons Issued (Graeber, Jason) (Entered: 03/24/2022) |
| 03/25/2022 | | DOCKET ANNOTATION as to #5. Incorrect event code selected. Counsel should refile this document using the event code "Summons Returned Executed" which can be found under service of process. This event will set the answer deadline. (wld) (Entered: 03/25/2022) |

| 03/25/2022 | 6 | **ERROR**Disregard this entry. SUMMONS Returned Executed by Carolyn Beech. Litigation Practice Group, PC served on 3/10/2022, answer due 4/12/2022. (Graeber, Jason) Modified on 3/28/2022 (RLW). (Entered: 03/25/2022) |
| 03/28/2022 | | DOCKET ANNOTATION as to #6: A return on summons should not be filed without the first page, as issued by the clerk's office, preceding the return. Attorney is directed to refile using the original issued summons with the word RETURN stamped on it. The 2 summons docketed as summons issued on 3/17/22 should not be used. (RLW) (Entered: 03/28/2022) |
| 03/29/2022 | 7 | SUMMONS Returned Executed by Carolyn Beech. (Graeber, Jason) (Entered: 03/29/2022) |
| 03/29/2022 | | Set/Reset Deadlines: Litigation Practice Group, PC answer due 4/11/2022. (RLW) (Entered: 03/29/2022) |
| 03/31/2022 | 8 | Summons Issued as to Litigation Practice Group, PC. (Oxford Address) (wld) (Entered: 03/31/2022) |
| 04/18/2022 | 9 | First MOTION for Extension of Time to File Answer to Plaintiff's 1 Complaint, by Litigation Practice Group, PC (Mansell, Rebecca) Modified on 4/19/2022 to create relationship to document #1 (RLW). (Entered: 04/18/2022) |
| 04/19/2022 | | DOCKET ANNOTATION as to #9: Advising attorney that on the screen that prompts filer to select document to be answered, this entry should have been linked to the 1 Complaint instead of typing in the verbiage. Attorney is not required to re-file. Court staff added linkage. (RLW) (Entered: 04/19/2022) |
| 04/19/2022 | | TEXT ONLY ORDER granting Defendant's 9 unopposed Motion for Extension of Time to Respond to Plaintiff's Complaint. The deadline for Litigation Practice Group, PC to answer or otherwise respond to the Complaint is 5/9/2022. NO FURTHER ORDER WILL ISSUE. Signed by Magistrate Judge Robert H Walker on 4/19/22 (HM) (Entered: 04/19/2022) |
| 05/09/2022 | 10 | *Defendant's* ANSWER to 1 Complaint, *of Plaintiff Carolyn Beech* by Litigation Practice Group, PC. (Mansell, Rebecca) (Entered: 05/09/2022) |
| 05/10/2022 | 11 | Rule 16(a) Initial Order: Telephonic Case Management Conference set for 6/22/2022 at 9:00 AM before Magistrate Judge Robert H Walker. (AB) (Entered: 05/10/2022) |
| 05/31/2022 | 12 | First MOTION for Matthew T. Anderson to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4848899) by Litigation Practice Group, PC (Attachments: # 1 Exhibit Certificate of Good Standing)(Mansell, Rebecca) (Entered: 05/31/2022) |
| 05/31/2022 | 13 | First MOTION for Christopher R. Pettit to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4848943) by Litigation Practice Group, PC (Attachments: # 1 Exhibit Certificate of Good Standing)(Mansell, Rebecca) (Entered: 05/31/2022) |
| 05/31/2022 | 14 | First MOTION for Kyle T. Anderson to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4848965) by Litigation Practice Group, PC (Attachments: # 1 Exhibit Certificate of Good Standing)(Mansell, Rebecca) (Entered: 05/31/2022) |
| 06/01/2022 | | TEXT ONLY ORDER granting 12 Motion to Appear Pro Hac Vice; granting 13 Motion to Appear Pro Hac Vice; granting 14 Motion to Appear Pro Hac Vice. That Attorneys Matthew T. Anderson, Christopher R. Pettit and Kyle T. Anderson be admitted pro hac vice in this case on behalf of Defendant Litigation Practice Group, PC in association with local counsel conditioned upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. NO FURTHER WRITTEN ORDER WILL ISSUE FROM THE COURT. Signed by Magistrate Judge Robert H Walker on 6/1/22 (AB) (Entered: 06/01/2022) |
| 06/22/2022 | | Minute Entry for proceedings held before Magistrate Judge Robert H Walker: Telephonic Case Management Conference held on 6/22/2022. PARTICIPANTS: Jason E. Graeber and Daniel A. Edelman - PHV (counsel for Plaintiff); Matthew T. Anderson - PHV and Rebecca Mansell (counsel for Defendant). A Case Management Order will not be entered at this time. (AB) (Entered: 06/22/2022) |
| 06/22/2022 | | TEXT ONLY SCHEDULING ORDER: The parties will conduct class certification-related discovery |

| | | which shall end December 1, 2022. The deadline for filing any motion to conditionally certify collective action shall be January 31, 2023 in accordance with the Local Uniform Civil Rules. If a motion is not filed on or before said date, the Court will reconvene the case management conference. NO FURTHER WRITTEN ORDER WILL ISSUE FROM THE COURT. Signed by Magistrate Judge Robert H Walker on 6/22/2022 (AB) (Entered: 06/22/2022) |
|---|---|---|
| 06/23/2022 | [15](#) | First NOTICE of Service of *Discovery Request for Admission, Request for Interrogatories,* Request for Production by Carolyn Beech (Edelman - PHV, Daniel) (Entered: 06/23/2022) |
| 06/24/2022 | [16](#) | First NOTICE of Service of Request for Admissions by Carolyn Beech (Edelman - PHV, Daniel) (Entered: 06/24/2022) |
| 06/24/2022 | [17](#) | First NOTICE of Service of Interrogatories by Carolyn Beech (Edelman - PHV, Daniel) (Entered: 06/24/2022) |
| 06/24/2022 | | DOCKET ANNOTATION as to #15: This document notices service of multiple forms of discovery. Each event should be separately docketed. The same PDF document may be used for all entries. Attorney is advised to docket additional events as needed. These events are found in the electronic docketing system under Discovery Documents. The additional events were docketed as documents #16 and #17. (RLW) (Entered: 06/24/2022) |
| 08/01/2022 | [18](#) | ORDER REASSIGNING CASE. Case reassigned to Magistrate Judge Bradley W. Rath for all further proceedings. Magistrate Judge Robert H Walker no longer assigned to case. Signed by Chief District Judge Daniel P. Jordan, III on 8/1/2022 (VM) (Entered: 08/01/2022) |
| 08/01/2022 | | Parties should include the newly assigned Magistrate Judge's initials BWR on future filings. (VM) (Entered: 08/01/2022) |
| 08/05/2022 | [19](#) | STIPULATION *EXTENSION FOR DEFENDANT'S DISCOVERY RESPONSES* by Litigation Practice Group, PC (Anderson - PHV, Matthew) (Entered: 08/05/2022) |
| 08/05/2022 | | DOCKET ANNOTATION as to #19: Advising attorney that in the future, when adding additional verbiage to a docket entry, the words should not be added in all capital letters. (RLW) (Entered: 08/05/2022) |
| 08/18/2022 | | Set Hearing: Settlement Conference set for 9/8/2022 09:00 AM in Chambers 5.150 (Jackson) Ball before Magistrate Judge F. Keith Ball. Seven (7) days before the settlement conference, the parties must submit via e-mail to ball_chambers@mssd.uscourts.gov an updated CONFIDENTIAL SETTLEMENT MEMORANDUM. All parties, including a person with full settlement authority, are required to be present at the conference unless excused by the Court. If a party believes the scheduled settlement conference would not be productive and should be cancelled, the party is directed to inform the Court via e-mail of the grounds for their belief at least seven (7) days prior to the conference. (JEJ) (Entered: 08/18/2022) |
| 08/25/2022 | | TEXT-ONLY ORDER cancelling settlement conference set for September 8, 2022. No further written order shall issue from the Court. Signed by Magistrate Judge F. Keith Ball on 8/25/2022. (JEJ) (Entered: 08/25/2022) |
| 08/25/2022 | | ***Deadlines/Hearings terminated: settlement conference set for 9/8/2022, is terminated. (JEJ) (Entered: 08/25/2022) |
| 09/21/2022 | [20](#) | MOTION to Compel *discovery responses* by Carolyn Beech (Attachments: # [1](#) Exhibit 1-Good faith certificate - declaration, # [2](#) Exhibit 2-LPGs Discovery responses)(Graeber, Jason) (Entered: 09/21/2022) |
| 09/21/2022 | | DOCKET ANNOTATION as to #20: Advising attorney that the District Judge's initials are HSO, not H50. Please make the correction on future filed pleadings. (RLW) (Entered: 09/21/2022) |
| 10/05/2022 | [21](#) | **ERROR**Disregard this entry. Response in Opposition re [] MOTION to Compel discovery responses by Carolyn Beech (Attachments: # [1](#) Exhibit 1-Good faith certificate - declaration, # 2 Exhibit 2-LPGs Discovery responses) (Graeber, Jason) filed by Litigation Practice Group, PC (Attachments: # [1](#) Exhibit A - Declaration of Matthew T. Anderson) (Anderson - PHV, Kyle) Modified on 10/6/2022 to remove relationship to document #20 (RLW). (Entered: 10/05/2022) |

| 10/05/2022 | 22 | **ERROR**Disregard this entry. MEMORANDUM in Opposition re [] MOTION to Compel discovery responses filed by Litigation Practice Group, PC (Mansell, Rebecca) Modified on 10/6/2022 to remove relationship to document #20 (RLW). (Entered: 10/05/2022) |
| 10/06/2022 | | DOCKET ANNOTATION as to #21 and #22: Attorney is advised to refile the Response in Opposition and Memorandum in Opposition pursuant to Local Rule 83.1(d)(3) which requires signature of the resident attorney. These documents are filed in error and will be disregarded on the docket. (RLW) (Entered: 10/06/2022) |
| 10/06/2022 | 23 | RESPONSE in Opposition re 20 MOTION to Compel *discovery responses* filed by Litigation Practice Group, PC (Mansell, Rebecca) (Entered: 10/06/2022) |
| 10/06/2022 | 24 | MEMORANDUM in Opposition re 20 MOTION to Compel *discovery responses* filed by Litigation Practice Group, PC (Attachments: # 1 Affidavit Affidavit of Matthew Anderson)(Mansell, Rebecca) (Entered: 10/06/2022) |
| 10/06/2022 | 25 | REPLY to Response to Motion re 20 MOTION to Compel *discovery responses* filed by Carolyn Beech (Attachments: # 1 Exhibit 1-Emailed dated August 24, 2022 to Judge Balls chambers)(Graeber, Jason) (Entered: 10/06/2022) |
| 10/11/2022 | | DOCKET ANNOTATION as to #24: (1) Documents filed as exhibits must include an exhibit sticker on the document identifying each exhibit, and (2) Exhibit should have been selected from the category box, not Affidavit and the exhibit letter should have also been included in the description box. It is not necessary to refile. (RLW) (Entered: 10/11/2022) |
| 11/26/2022 | 26 | MOTION for Extension of Time to Complete Discovery by Carolyn Beech (Graeber, Jason) (Entered: 11/26/2022) |
| 11/30/2022 | | NOTICE of Hearing on Motion 20 MOTION to Compel *discovery responses*, and 26 MOTION for Extension of Time to Complete Discovery: TELEPHONIC Motion Hearing set for 12/2/2022 at 2:00 PM before Magistrate Judge Bradley W. Rath. Counsel for Plaintiff will place the call to Judge Rath's Chambers (228-563-1755) with all necessary counsel on the line. (AB) (Entered: 11/30/2022) |
| 12/02/2022 | 27 | Response in Opposition re 26 MOTION for Extension of Time to Complete Discovery by Carolyn Beech (Graeber, Jason) filed by Litigation Practice Group, PC (Mansell, Rebecca) (Entered: 12/02/2022) |
| 12/02/2022 | | Minute Entry for proceedings held before Magistrate Judge Bradley W. Rath: TELEPHONIC Motion Hearing held on 12/2/2022 re 26 MOTION for Extension of Time to Complete Discovery filed by Carolyn Beech, 20 MOTION to Compel *discovery responses* filed by Carolyn Beech. PARTICIPANTS: Jason E. Graeber and Daniel A. Edelman - PHV (counsel for Plaintiff); Rebecca Mansell, Matthew T. Anderson - PHV and Kyle T. Anderson - PHV (counsel for Defendant). Order to follow. (AB) (Entered: 12/02/2022) |
| 12/02/2022 | | TEXT ONLY ORDER granting Plaintiff Carolyn Beech's Motion to Compel Discovery Responses 20 . Defendant Litigation Practice Group, PC (LPG) indicated in its 10/5/22 Response 22 to the Motion to Compel that it would revisit its responses to Plaintiff's written discovery. Fifty-eight days have passed since that representation, and LPG has not amended its responses. Within ten days of this Order, LPG shall produce to Plaintiff LPG's amended responses to Plaintiffs Requests for Admission 10, 11, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25; Interrogatories 1, 3, 4, 5, 6 and 7; and Requests for Production 1-11, 14 and 17. Within 30 days of this Order, LPG shall produce a privilege log. LPG did not sign its initial responses to Plaintiffs Interrogatories. Fed. R. Civ. P. 33(b)(5) requires the officer or agent of LPG who furnished the information to sign them, and the attorney who makes objections to sign any objections. The officer or agent of LPG who furnishes the information in LPG's amended responses to Interrogatories must sign the responses on behalf of LPG. NO FURTHER ORDER WILL ISSUE. Signed by Magistrate Judge Bradley W. Rath on 12/2/22 (HM) (Entered: 12/02/2022) |
| 12/02/2022 | | TEXT ONLY ORDER granting 26 Plaintiff's Motion for 90-day extension of case deadlines. The class discovery deadline is extended to 2/1/23. The deadline for Plaintiff to file a motion for class certification is now 4/17/23. NO FURTHER ORDER WILL ISSUE. Signed by Magistrate Judge Bradley W. Rath on 12/2/22 (HM) (Entered: 12/02/2022) |

**PACER Service Center**

**Transaction Receipt**

| 12/06/2022 10:39:54 | | | |
|---|---|---|---|
| **PACER Login:** | mta00004 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00057-HSO-BWR |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### SOUTHERN DIVISION

CAROLYN BEECH,
on behalf of herself and the
class members described below,

          Plaintiff,

vs.

THE LITIGATION PRACTICE
GROUP, PC,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

SOUTHERN DISTRICT OF MISSISSIPPI
**FILED**

MAR 17 2022

ARTHUR JOHNSTON
BY_____ DEPUTY

1:22cv57HSO-RHWR

## COMPLAINT – CLASS ACTION

### NATURE OF THE ACTION

1.  Plaintiff brings this action for damages pursuant to the Credit Repair Organizations Act ("CROA") under 15 U.S.C. § 1679 et seq.

### JURISDICTION AND VENUE

2.  This Court has jurisdiction under 15 U.S.C §1679 and 28 U.S.C. §§1331 and 1337. On information and belief, the Court also has jurisdiction under 28 U.S.C. §1332(d), the amount in controversy exceeding $5 million on a classwide basis, there being more than 100 class members, and the parties being of diverse citizenship.

3.  This Court has personal jurisdiction over Defendant because Defendant solicited business from residents of Mississippi and collected money from residents of Mississippi under contracts that are void pursuant to the CROA.

4.  Venue in this District is proper because a material portion of the events at issue occurred here.

5.  Article III is satisfied because Plaintiff and each class member is entitled to void a contract providing for the payment of money to Defendant, or recover money back from Defendant, or both.

1

**PARTIES**

6.     Plaintiff Carolyn Beech is a resident and domiciliary of Carriere, Pearl River County, Mississippi.

7.     Defendant The Litigation Practice Group PC ("LPG") is a California corporation with its principal offices at 17542 East 17th Street, Suite 100, Tustin, CA 92780.  Its registered agent is Daniel S. March at that address.  Daniel S. March is also its sole officer and director.

8.     LPG is a credit repair organization that offers its clients both legal and non-legal services designed to resolve their debt issues and improve their credit history, including working towards actively settling debts for such consumers.

**FACTS**

9.     In late 2021, LPG solicited Plaintiff Carolyn Beech for a "debt forgiveness" program.

10.     Under this program:

    a.     LPG would negotiate settlements of Ms. Beech's delinquent debts, amounting to $12,650.44;

    b.     Ms. Beech would pay $296.95 / month for 24 months.

11.     LPG specifically told Plaintiff Carolyn Beech that its program would repair her credit and improve her credit score.

12.     Ms. Beech signed the following documents via her phone:

    a.     Legal services agreement (Exhibit A);

    b.     Electronic payment authorization (Exhibit B);

    c.     Preauthorized checking and ACH authorization form (Exhibit C).

13.     Each of the documents in Exhibits A-C is a standard form regularly used by Defendant LPG.

14.     To induce her to enter into the agreement, LPG provided Ms. Beech with a document entitled "Smarter Path to Debt Relief Services" (Exhibit D).  This document suggested

2

that LPG could provide useful services to a consumer if the consumer answered the following questions in the affirmative:

        a.     "Has your credit score already been negatively impacted?"

        b.     "My credit report was damaged and needs to be worked on by a knowledgeable lawyer."

15.    A consumer reading the material would understand from it that LPG could improve one's credit score and repair credit damage.

16.    In addition, the services offered by Defendant LPG, of settling debts for less than the amounts due, would necessarily result in credit repair, in that delinquent debts would be reported as settled, and the consumer's credit utilization (amount of credit used compared to amount of credit available, a key measure of creditworthiness) would be reduced.

17.    Exhibit D is a standard form regularly used by LPG.

18.    Exhibits A-D were the only documents Ms. Beech received from LPG.

19.    After making three payments Ms. Beech ceased doing so after she was served with summonses and complaints on two of the debts that LPG had undertaken to negotiate for her.

## COUNT I -- CREDIT REPAIR ORGANIZATIONS ACT

20.    Plaintiff incorporates paragraphs 1-19.

21.    The CROA was enacted "(1)to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2)to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. §1679(b).

22.    Plaintiff is a "consumer" as defined by 15 U.S.C. §1679a(1).

23.    Defendant LPG is a "credit repair organization" as defined by 15 U.S.C. §1679a(3), in that it is a "person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of – (i) improving a consumer's credit, credit history, or credit

3

rating, or (ii) providing advice or assistance to any consumer with regard to any activity or service described in clause (i)."

<p style="text-align:center"><strong>Payment Before Services Fully Performed</strong></p>

24.     15 U.S.C. §1679b(b ) provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

25.     Defendant LPG violated §1679b(b) by charging and receiving money for services it agreed to perform before such services were fully performed.

26.     It is the standard policy and practice of Defendant LPG to charge a monthly sum before services are performed.

27.     Defendant LPG's practice of charging a monthly sum before services are performed is inherently in violation of the CROA.

28.     This prohibition was included in the CROA because of repetitive instances in which credit repair organizations obtained payments toward credit repair services, the consumers discontinued such services (often when the creditors with whom debts were to be negotiated filed lawsuits), and the credit repair organizations obtained money in excess of any benefit to the consumer.  The practice was considered inherently unfair and deceptive.

<p style="text-align:center"><strong>Failure to Make Disclosures</strong></p>

29.     The CROA provides that a credit repair organization must provide consumers with certain written disclosures in its contracts.

30.     These disclosures are intended to provide consumers with information they need to avoid unnecessary use of expensive credit repair organizations.

31.     15 U.S.C. §1679c(a) requires provision of a written statement informing the consumer of their rights under the Fair Credit Reporting Act and the CROA.

32.     15 U.S.C. §1679c(b) provides that "the written statement required under this section

<p style="text-align:center">4</p>

shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

33.     Defendant LPG violated 15 U.S.C. §§ 1679c(a)-(b) through its failure to provide the written disclosures required.

34.     Defendant LPG never provided such disclosures, nor did it provide a separate document containing such disclosures.

35.     On information and belief, it is the standard policy and practice of Defendant LPG to not provide the required disclosures.

### Failure to Provide Cancellation Rights

36.     The CROA, pursuant to 15 U.S.C. §1679d(4), requires credit repair organization to include, in the contract between them and a consumer, "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'"

37.     Under 15 U.S.C. §1679e, a credit repair organization must provide a consumer a separate notice of a consumer's cancellation right.

38.     The only disclosure of cancellation rights is a statement in the last two sentences of the six sentences on the fourth page of Exhibit A that "You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email or fax, and shall not be responsible for any payments due after the date of cancellation.  A payment due within three days of the date of written cancellation shall be processed and shall not be refunded."

39.     The statement is not that required by the CROA, and is not bold or conspicuous. There is no separate notice of right to cancel.

40.     It is the standard practice of Defendant LPG to present cancellation rights in the

5

manner described above.

41.     Defendant LPG violated 15 U.S.C. §§1679d(4) and 1679e through its failure to provide the disclosure required by the CROA both in the contract between the parties and in a separate form.

42.     The CROA requires a notice of cancellation rights because consumers would often contract for expensive and unnecessary credit repair services that they would, upon reflection, decide were expensive and unnecessary, only to find themselves contractually obligated.

43.     The CROA further dictates that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person." 15 U.S.C. §1679f(c).

44.     The contracts of Plaintiff and the members of the class described below are void.

45.     The CROA provides for damages in 15 U.S.C. §1679g:

(a)     Liability established

Any person who fails to comply with any provision of this subchapter with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:

(1)     Actual damages

The greater of—

(A)     the amount of any actual damage sustained by such person as a result of such failure; or

(B)     any amount paid by the person to the credit repair organization.

(2)     Punitive damages

(A)     Individual actions

In the case of any action by an individual, such additional amount as the court may allow.

(B)     Class actions

In the case of a class action, the sum of—

6

           (i)     the aggregate of the amount which the court may allow for each named plaintiff; and

           (ii)    the aggregate of the amount which the court may allow for each other class member, without regard to any minimum individual recovery.

    (3)    Attorneys' fees

        In the case of any successful action to enforce any liability under paragraph (1) or (2), the costs of the action, together with reasonable attorneys' fees.

(b)    Factors to be considered in awarding punitive damages

    In determining the amount of any liability of any credit repair organization under subsection (a)(2), the court shall consider, among other relevant factors—

    (1)    the frequency and persistence of noncompliance by the credit repair organization;

    (2)    the nature of the noncompliance;

    (3)    the extent to which such noncompliance was intentional; and

    (4)    in the case of any class action, the number of consumers adversely affected.

## CLASS ALLEGATIONS

46.    Plaintiff brings this claim on behalf of 3 classes, pursuant to Fed.R.Civ.P. 23(a) and 23(b)(3).

47.    Class A consists of all persons who, on or after a date five years prior to the filing of this action, entered into contracts with Defendant LPG, which contracts were not cancelled within three business days, that provide for monthly payments before services are fully performed.

48.    Class B consists of all persons who, on or after a date five years prior to the filing of this action, entered into contracts with Defendant LPG, which contracts were not cancelled within three business days, and who were not provided with the written statement described in 15 U.S.C. §1679c(a).

49.    Class C consists of all persons who, on or after a date five years prior to the filing of this action, entered into contracts with Defendant LPG, which contracts were not cancelled within

three business days, and who were not provided with both (a) a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: "You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right" and (b) a separate notice of cancellation form.

50.     The members of the three classes may well be coterminous.

51.     Residents of Georgia are excluded from the classes.

52.     Plaintiff may alter the class definitions to conform to developments in the case and discovery.

53.     On information and belief, there are more than 100 members of each class, and each class is so numerous that joinder of all members is not practicable.

54.     There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendant LPG engages in the practices described and whether such practices violates the CROA..

55.     Plaintiff's claim is typical of the claims of the class members. All are based on the same factual and legal theories.

56.     Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer litigation.

57.     A class action is superior for the fair and efficient adjudication of this matter, in that:

     a.     Individual actions are not economically feasible.

     b.     Members of the class are likely to be unaware of their rights;

     c.     Congress intended class actions to be the principal enforcement mechanism under the CROA.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class

8

members and against Defendant LPG for:

      i.      A declaration that the practices complained of herein are unlawful and violate the CROA;

      ii.     Actual damages as provided under 15 U.S.C. §1679g(a)(l);

      iii.    Punitive damages, as provided under 15 U.S.C. §1679g(a)(2)(A);

      iv.    Litigation expenses, reasonable attorney fees and costs as provided under 15 U.S.C. §1679g(a)(3); and

      v.     Such other or further relief as the Court deems appropriate.

*s/ Jason Graeber*
Jason Graeber

Jason Graeber
250 Beauvoir Road, Suite 4C
Biloxi, MS 39501
(228) 207-7117
jason@jasongraeberlaw.com

admission pro hac vice to be applied for

Daniel A. Edelman
Tara L. Goodwin
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

9

## JURY DEMAND

Plaintiff demands trial by jury.

s/ Jason Graeber
Jason Graeber

T:\38577\Pleading\Complaint DAE 3-16-22_Pleading.wpd

10

## NOTICE OF ASSIGNMENT

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

*s/ Jason Graeber*
Jason Graeber

## DOCUMENT PRESERVATION DEMAND

Plaintiff hereby demands that defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiff, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiff, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiff demands that defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the defendant.

_s/ Jason Graeber_
Jason Graeber

T:\38577\Pleading\Complaint DAE 3-16-22_Pleading.wpd

**EXHIBIT A**



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC, a State Bar of California licensed law corporation, and its employed and affiliated attorneys (collectively "LPG") will provide legal services wherein it will represent you in connection with the disputes you have with the creditors listed below (see Creditor Information). LPG will do the following as part of its representation of you:

- Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any of the debts identified below;
- Dispute the legal validity of the debts identified below;
- Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;
- Represent you in any lawsuit filed against you in connection with any of these debts;
- Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;
- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and
- Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

LPG will serve as your attorney for all purposes in connection with these disputes and will be available to render all legal assistance necessary to resolve these debts. The fees that are set forth below are flat fees that are all inclusive — no additional fee or cost will be charged by LPG at any time during the duration of your dispute with the creditors identified below. All fees are earned by LPG at the time they are paid and are for services rendered to you as set forth herein.

### Client Authorization

You authorize LPG to challenge, where applicable, each of the debts listed below, which you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein. Finally, you authorize LPG to communicate with you via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication.

## Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the fees set forth below for the legal services provided by LPG, which services are outlined above. No fee or other cost will be charged or collected beyond the flat fee set forth below. This is the only amount that you have to pay to LPG for its services, which includes any cost, filing fee or vendor's fee associated with LPG's representation of you, and this fee is not escrowed but rather earned received by LPG. This fee does NOT, however, include any settlement that you may have to pay to any creditor if you opt to settle a debt prior to or during the course of a lawsuit.

## Refund Policy

If you reach the conclusion of LPG's representation of you and a debt remains in dispute without resolution, you will be eligible to receive a full refund of the fees that you paid towards your representation in connection with that account (i.e., you will be refunded the fees paid in proportion to the debt that was not resolved). A debt is "in dispute" under this paragraph if, at the time of completion of LPG's representation of you, no lawsuit was filed regarding the debt, no settlement was reached regarding the debt, no acknowledgment of invalidity was received from the creditor regarding the debt, and the debt is still reporting to one of the following credit bureaus: Experian, Equifax, or Transunion.

## Debt Settlement

You may request that LPG settle any debt identified below at any point in the course of LPG's representation of you. Where requested, LPG will negotiate the most favorable settlement it is able to negotiate on your behalf. Any settlement reached as a result of your request shall be your responsibility, and shall be paid directly from you to the creditor. At the point that you reach a settlement with a creditor, your payment to LPG will be reduced and to adjust for the settled account being removed from the representation herein contemplated. LPG will only settle a debt where litigation is active or contemplated.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to you from the date you execute this Agreement until the conclusion of your representation.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

## Malpractice Insurance

LPG hereby discloses that it maintains a malpractice insurance policy that covers its representation of you and that the limit of such policy is no less than $1,000,000.00 per claim and $1,000,000.00 per claimant. If you desire to make a claim against that insurance policy, you must first contact LPG and disclose your claim and the nature of the claim, at which point LPG agrees to assist you in obtaining any and all information necessary to prepare a file a claim.

## Applicable Law and Confidentiality

You understand and agree that LPG is based out of the State of California, is a licensed law corporation under the State Bar of California, and that California law applies to this Agreement. You further understand that LPG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of California. You further understand and agree that you have sought the representation of LPG with full knowledge of its location and licensing, and that LPG works with attorneys licensed in all 50 states and the District of Columbia as affiliated counsel to allow LPG to provide a complete representation of you in any state in which you are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, provided only that at all times LPG shall have an affiliated attorney in all 50 states and the District of Columbia.

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) required by the State Bar of California Rules of Professional Conduct, (b) you refuse to communicate with LPG or respond to reasonable requests for information necessary to represent you in an effective way, (c) you fail to make timely payment of the amount due under hereunder, or (d) your payments are returned multiple times for any reason. LPG will not pay any of the debts identified below and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's representation of you. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

Client Signature: 
Date:
Co-Applicant Signature: _____
Date: _____

## THE LITIGATION PRACTICE GROUP PC

**Daniel S. March, Managing Shareholder**
**17542 E. 17th Street, Ste 100**
**Tustin, CA 92780**
**Support@LPGLaw.com**
**Tel. 949.715.0644**
**Fax. 949.315.4332**

## Creditor Information

| Creditor | Account # | Debt Balance |
|---|---|---|
| FSTHERITAG | | $3,206.00 |
| ONEMAIN | | $2,168.00 |
| 1st Franklin Financial | | $1,612.00 |
| FIRST SVG CC | | $562.00 |
| TBOMASPIRE | | $411.00 |
| FST PREMIER | | $376.00 |
| TBOMMILSTNE | | $327.00 |
| TBOMASPIRE | | $221.00 |
| FSB BLAZE | | $194.00 |
| Peral River Credit | | $2,416.00 |
| ADVANTAGE | | $1,157.44 |
| | | $12,650.44 |

**Client Information**

**Name:** Carolyn Beech
**Address:** ███████████████████████

**Home Phone:** ███████████████████
**Cell Phone:** ███████████████████
**Email:** ███
**Last 4 SSN:** ███████████████████

███████████████████████

## Schedule of Payments

I agree to this payment schedule – **Client Initials:** 

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Dec 20, 2021 | $296.95 |
| 2 | Jan 18, 2022 | $296.95 |
| 3 | Feb 18, 2022 | $296.95 |
| 4 | Mar 18, 2022 | $296.95 |
| 5 | Apr 18, 2022 | $296.95 |
| 6 | May 18, 2022 | $296.95 |
| 7 | Jun 20, 2022 | $296.95 |
| 8 | Jul 18, 2022 | $296.95 |
| 9 | Aug 18, 2022 | $296.95 |
| 10 | Sep 19, 2022 | $296.95 |
| 11 | Oct 18, 2022 | $296.95 |
| 12 | Nov 18, 2022 | $296.95 |
| 13 | Dec 19, 2022 | $296.95 |
| 14 | Jan 18, 2023 | $296.95 |
| 15 | Feb 21, 2023 | $296.95 |
| 16 | Mar 20, 2023 | $296.95 |
| 17 | Apr 18, 2023 | $296.95 |
| 18 | May 18, 2023 | $296.95 |
| 19 | Jun 19, 2023 | $296.95 |
| 20 | Jul 18, 2023 | $296.95 |
| 21 | Aug 18, 2023 | $296.95 |
| 22 | Sep 18, 2023 | $296.95 |
| 23 | Oct 18, 2023 | $296.95 |
| 24 | Nov 20, 2023 | $296.94 |

E-Signature Completion Certificate 

 ## Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find
details below related to your e-signature submission.

---

### 🛈 Signing Details

**Document ID**
4835311

**Document Title**
LSA - LPG - English New

**Sender IP Address**
██████████████

**Number Of Signers**
1

**Signer Email**
██████████████

**Signer IP Address**
172.58.168.70

**Timestamp**
2021-12-02T17:23:45-06:00

**Document MD5 Hash**
██████████████

---

### ✿ Document Audit

✔ Sent at 1969-12-31T18:00:00-06:00 from IP ████████

✔ Delivered to ████████████████ 2021-12-02T17:19:56-06:00 from 172.58.168.70

✔ Adopted Signature at 2021-12-02T17:21:52-06:00 from 172.58.168.70

✔ Completed Signing at 2021-12-02T17:23:45-06:00 from 172.58.168.70

✔ PDF Generated at 2021-12-02T17:23:45-06:00

**Sending Agent**
Mozilla/5.0 (Linux; Android 10; LM-K300) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/89.0.4389.105
Mobile Safari/537.36

**EXHIBIT B**

## Electronic Payment Authorization

**Bank Name:** ███████████████

**Name on Account:** Carolyn Beech

**Account Type:** Checking

        Other (specify: _____ )

**Routing Number:** ███████████████

**Account Number:** ███████████████

**Next Payment Date:** Dec 20, 2021 **Amount:** $ 296.95

**Recurring Payment Date:** 18th

By signing below, I authorize and permit LPG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

### Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only. Refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least three (3) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us three (3) business days prior to the questioned debit being initiated.

### Client Signature:

███████████████

**Printed Name:**

Carolyn Beech

**EXHIBIT C**

## Preauthorized Checking and ACH Authorization Form

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by LPG, its payments processors, and/or their successors for the purpose of accumulating funds to pay for such goods and services as I so direct LPG to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

## Account Owner Name: Carolyn Beech

**Address:** █████████████████████

**Mobile Phone #:   E-Mail:** ████████████████████

## DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** ████████████

## Name as it appears on bank ACCOUNT:  Carolyn Beech

**Routing Number:** ████████  **Account Number:** ████████  **Checking or Saving:** ████████

## DESIGNATED BANK ACCOUNT PAYMENT AUTHORIZATION SCHEDULE

**Total Amount of Debit: $296.95**      **Date of Next Debit:** Dec 20, 2021

I authorize Payment Automation Network to initiate Automatic Clearing House (ACH) or Electronic Funds Transfer (EFT) or Remotely Created Check (RCC) from my designated bank account at the financial institution identified above. I authorize Payment Automation Network to debit my bank account according to the schedule of debits provided to Payment Automation Network by me or on my behalf or as otherwise provided by agreement. I understand that debits will be withdrawn on the due date unless otherwise indicated and that sufficient funds must be available in designated account at least two (2) business days prior to the actual date of the debit. Upon my approval, Payment Automation Network may adjust the amount being debited from designated bank account. This authorization is to remain in force until the schedule of debits is completed or until Payment Automation Network has received written notification from me of a change or termination, allowing Payment Automation Network no fewer than five (5) business days to act. Payment Automation Network shall not be liable to any person for not completing a transaction as a result of any limit on my designated bank account or if a financial institution fails to honor any debit from such account. I understand it is my responsibility to notify Payment Automation Network immediately if a scheduled debit does not occur. I authorize Payment Automation Network to recover funds by ACH/EFT/RCC debit from my bank account in the event of an error or in the event that a prior debit is returned for any reason, including non-sufficient funds. I understand that a $25.00 service charge will be added for every NSF draft. I understand I can call Payment Automation Network at 800-813-3740 to cancel the automatic draft payments. Payments will be drafted on the payment due date of the original Servicing agreement. I understand and agree that Payment Automation Network, Inc. is a private company, and is not affiliated with any academic or

governmental entity. The Payment Automation Network, Inc. service bridges the gap between the student loan consolidation company Software and ACH, EFT, or RCC processor. Payment Automation Network, Inc. is not a money transmitter or debt collection agency and does not receive money from individual debtors. Payment Automation Network, Inc. is not engaged in the business of debt or credit counseling or the provision of other services to individual debtors. Payment Automation Network, Inc. does not solicit, offer loan consolidation services, or provide services directly to individual debtors. Payment Automation Network, Inc. does not have a contractual relationship with individual debtors to affect the adjustment, compromise, or discharge of any loan account.

I have read and understand the information contained in this document and I affirm that the above information given by me is accurate and true to the best of my knowledge.

**Account Holder's Signature:** █████████       **Date:** 12/2/2021

**EXHIBIT D**

## SMARTER PATH TO

# Debt Relief
# Legal Services

## GET IN TOUCH

## FEATURED IN:

3/8/22, 2:57 PM

LPG Law – USA Debt Relief Legal Services Firm – Call Us!





WHY CHOOSE US?

# there's a dedicated team of attorneys for every legal matter.

At LPG Law, we have experienced attorneys for nearly every financial or legal matter. So, when you or your family face hardship, our team can litigate the debt, bankruptcy, or civil issue on your behalf to protect your future.

About Our Firm

3/8/22, 2:57 PM

LPG Law - USA Debt Relief Legal Services Firm - Call Us!

## DEDICATED & OUTCOME FOCUSED

# How Can Our **Debt Relief Attorneys** Help You?

### Step
### 1

## Call for a free phone consultation.

## 📞 949-229-6262

### Step
### 2

## An experienced debt relief attorney will speak with you and evaluate your case.

### Step
### 3

## If retained, we will move forward with the initial paperwork to begin working on your case.

## WE **FIGHT HARD** WHEN REPRESENTING YOU.

# Debt Relief is Our #1 Specialty

Our expert legal team spans across the country in our various locations from west coast to east coast with diverse backgrounds and case experience that allows us to select the right attorney for every case. Don't settle with a firm that has less resources to take on your case and have the connections, know-how and access to fight hard for you outside of court and in court when necessary.

LPG Law - USA Debt Relief Legal Services Firm - Call Us!

Has your **credit score** already been negatively impacted?

Have you been denied employment **because of your financial situtation?**

Have you been **doing everything just to pay interest** and getting behind no matter what you try?

Has your **creditor threatened** you for non payment?

Have you been **struggling to pay multiple high-interest rate credit cards** or personal loans?

Has your family been at risk **of losing your home or other assets** as a result of your financial hardship?

Were you **sent legal paperwork or a lawsuit** from your creditors for non-payment or late

Has your personal property or **car been repossessed** as a result of late payments?

If your **answer is yes** to some of these questions, you *might* have a potential legal claim.

## CONTACT US TODAY FOR A FREE CONSULTATION

## ☎ (949) 229-6262

# our core focus

LPG started with a respected group of established attorneys and has rapidly grown across the country into new states as demand for our services has flourished due to demonstrated success for our clients. We assist people that need general legal counsel, financial advisory all the way to protecting individuals in court with our full suite of litigation services.

Case 2:22-cv-00005-JRG Document 128-1 Filed 06/20/22 Page 139 of 347

and wanted to put our expertise to good use helping individuals around the country protect themselves from harassment from debtors.

## our firm

OVERVIEW

OUR MISSION

OUR ATTORNEYS

PRACTICE AREAS

WHAT OUR CLIENTS SAY

# FOCUSING EXCLUSIVELY ON

# Debt Relief &
# Litigation

*Protecting the Finances of Consumers and Average Americans*

Protecting your Finances. **Get a Free Consultation.**

    👤 Full N   ✉ Email   📞 Phone   Desc       | Get Help Now |

## WHAT WE DO

# Attorneys for **Consumers In Debt**, Civil and **Commercial** Legal Matters

Offering a way out of debt, collections harassment, legal action and financial burdens in 48 US states

LPG Law - USA Debt Relief Legal Services Firm - Call Us!

My largest **creditors** are threatening to send my case to court →

I need help consolidating **unstructured debt** from multiple sources and credit lines →

I need help with **civil litigation or arbitration.** →

I am being **harassed by creditors for collections.** →

**My credit report was damaged** and needs to be worked on by a knowledgeable lawyer. →

I am dealing with or facing imminent **personal bankruptcy issues** and seek legal advice →

**I have real estate** at risk from financial or legal issues →

3/8/22, 2:57 PM

LPG Law - USA Debt Relief Legal Services Firm - Call Us!

I need **business litigation services** for corporate issues →

# FREQUENTLY ASKED QUESTIONS

## IS THERE ANYTHING I CAN DO TO GET NEGATIVE ITEMS OFF MY CREDIT?   —

Yes. Our attorneys can get to work for you dealing with your creditors and utilizing the full extent of the law to find a resolution that is in your favor. There are many tactics from settlement to debt validation that our law firm can pursue with your creditors and their collections branches or divisions.

## MY CREDITOR WANTS TO SEND MY CASE TO COURT. SHOULD I RESPOND?   +

## HOW DOES THE PROCESS WORK TO GET STARTED? WHAT DO YOU NEED FROM   +

LPG Law - USA Debt Relief Legal Services Firm - Call Us!

## DO I HAVE ANY OPTIONS TO AVOID BANKRUPTCY OR GOING TO COURT?

+

# Get A Legal
# Case Evaluation

## Our experts are here to
## answer your questions

CONTACT US TODAY

**ADDRESS**          **WANT TO TALK?**          **SOCIAL MEDIA**

# EXHIBIT C

DIRECTMJ,SCR

# United States District Court
# Middle District of Pennsylvania (Scranton)
# CIVIL DOCKET FOR CASE #: 3:22-cv-00707-MEM

Price v. Litigation Practice Group, P.C. et al
Assigned to: Honorable Malachy E Mannion
Cause: 15:1692 Fair Debt Collection Act

Date Filed: 05/13/2022
Jury Demand: Plaintiff
Nature of Suit: 480 Consumer Credit
Jurisdiction: Federal Question

**Plaintiff**

**Debra Price**　　　　　　　　　　represented by　**Robert P. Cocco**
ROBERT P. COCCO PC
1500 WALNUT ST., STE 900
PHILADELPHIA, PA 19102
215-351-0200
Email: rcocco@rcn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Litigation Practice Group, P.C.**　　　represented by　**Christopher R Pettit**
Luper Neidenthal & Logan
1160 Dublin Road
Suite 400
Columbus, OH 43215-1052
614-229-4407
Fax: 866-345-4948
Email: cpettit@lnlattorneys.com
*ATTORNEY TO BE NOTICED*

**Kyle Anderson**
Luper, Neidenthal & Logan
1160 Dublin Road
Ste #400
Columbus
Columbus, OH 43215
614-221-7663
Email: kanderson@lnlattorneys.com
*ATTORNEY TO BE NOTICED*

**Matthew T. Anderson**
Luper Neidenthal & Logan
1160 Dublin Road
Suite 400
Columbus, OH 43215-1052
614-221-7663
Fax: 866-345-4948
Email: manderson@lnlattorneys.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel March, Esquire**                represented by    **Kyle Anderson**
*Individually and d/b/a Litigation*                       (See above for address)
*Practice Group*                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matthew T. Anderson**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Marque Carey, Esquire**                represented by    **Kyle Anderson**
*Individually and d/b/a Litigation*                       (See above for address)
*Practice Group*                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matthew T. Anderson**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Randall Clark, Esquire**               represented by    **Kyle Anderson**
*Individually and d/b/a Litigation*                       (See above for address)
*Practice Group*                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Matthew T. Anderson**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Defendant**

**Michael Robinson, Esquire**            represented by    **Kyle Anderson**
*Individually and d/b/a Litigation*                       (See above for address)
*Practice Group*                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

Matthew T. Anderson
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jayde Trinh, Esquire**
*Individually and d/b/a Litigation Practice Group*

represented by **Kyle Anderson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Matthew T. Anderson
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Howard Gutman, Esquire**
*Individually and d/b/a Litigation Practice Group*

represented by **Kyle Anderson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Matthew T. Anderson
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/13/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $402, Receipt Number 5944484), filed by Debra Price. (Attachments: # 1 Exhibit(s), # 2 Civil Cover Sheet)(ga) (Entered: 05/13/2022) |
| 05/13/2022 | 2 | Summons Issued as to All Defendants and provided TO ATTORNEY ELECTRONICALLY VIA ECF for service on Defendant(s)in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure. (NOTICE TO ATTORNEYS RECEIVING THE SUMMONS ELECTRONICALLY: You must print the summons and the attachment when you receive it in your e-mail and serve the complaint on all defendants in the manner prescribed by Rule 4 of the Federal Rules of Civil Procedure). (Attachments: # 1 Summons Packet) (ga) (Entered: 05/13/2022) |
| 06/22/2022 | 3 | SUMMONS Returned Executed by Debra Price. Marque Carey, Esquire served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |
| 06/22/2022 | 4 | SUMMONS Returned Executed by Debra Price. Randall Clark, Esquire served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |

| 06/22/2022 | [5](#) | SUMMONS Returned Executed by Debra Price. Howard Gutman, Esquire served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |
| 06/22/2022 | [6](#) | SUMMONS Returned Executed by Debra Price. Litigation Practice Group, P.C. served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |
| 06/22/2022 | [7](#) | SUMMONS Returned Executed by Debra Price. Daniel March, Esquire served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |
| 06/22/2022 | [8](#) | SUMMONS Returned Executed by Debra Price. Michael Robinson, Esquire served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |
| 06/22/2022 | [9](#) | SUMMONS Returned Executed by Debra Price. Jayde Trinh, Esquire served on 6/16/2022, answer due 7/7/2022. (Cocco, Robert) (Entered: 06/22/2022) |
| 07/05/2022 | [10](#) | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Matthew T. Anderson on behalf of Litigation Practice Group, P.C. Attorney Matthew Anderson is seeking special admission. Filing fee $ 50, receipt number APAMDC-5992747.. (Anderson, Matthew) (Entered: 07/05/2022) |
| 07/05/2022 | [11](#) | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Christopher R Pettit on behalf of Litigation Practice Group, P.C. Attorney Christopher Pettit is seeking special admission. Filing fee $ 50, receipt number APAMDC-5992779.. (Pettit, Christopher) (Entered: 07/05/2022) |
| 07/05/2022 | [12](#) | PETITION FOR SPECIAL ADMISSION (PRO HAC VICE) by Kyle Anderson on behalf of Litigation Practice Group, P.C. Attorney Kyle Anderson is seeking special admission. Filing fee $ 50, receipt number APAMDC-5992798.. (Anderson, Kyle) (Entered: 07/05/2022) |
| 07/07/2022 | [13](#) | SPECIAL ADMISSIONS FORM APPROVED as to Christopher Pettit Signed by Chief MJ Karoline Mehalchick on 7/7/2022. (cw) (Entered: 07/07/2022) |
| 07/07/2022 | [14](#) | SPECIAL ADMISSIONS FORM APPROVED as to Matthew Anderson Signed by Chief MJ Karoline Mehalchick on 7/7/2022. (cw) (Entered: 07/07/2022) |
| 07/07/2022 | [15](#) | SPECIAL ADMISSIONS FORM APPROVED as to Kyle Anderson Signed by Chief MJ Karoline Mehalchick on 7/7/2022. (cw) (Entered: 07/07/2022) |
| 07/07/2022 | [16](#) | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *with Brief in Support* by Marque Carey, Esquire, Randall Clark, Esquire, Howard Gutman, Esquire, Litigation Practice Group, P.C., Daniel March, Esquire, Michael Robinson, Esquire, Jayde Trinh, Esquire.(Anderson, Kyle) (Entered: 07/07/2022) |

| 07/07/2022 | 17 | *Defendants* ANSWER to 1 Complaint by Marque Carey, Esquire, Randall Clark, Esquire, Howard Gutman, Esquire, Litigation Practice Group, P.C., Daniel March, Esquire, Michael Robinson, Esquire, Jayde Trinh, Esquire. (Anderson, Kyle) (Entered: 07/07/2022) |
|---|---|---|
| 07/08/2022 | | DOCKET ANNOTATION: Counsel is asked to refile the brief in support to the motion to dismiss (Doc 16) as a separate document. Brief in Support can be found under responses and replies. (cw) (Entered: 07/08/2022) |
| 07/08/2022 | 18 | BRIEF IN SUPPORT re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *with Brief in Support* filed by Marque Carey, Esquire, Randall Clark, Esquire, Howard Gutman, Esquire, Litigation Practice Group, P.C., Daniel March, Esquire, Michael Robinson, Esquire, Jayde Trinh, Esquire.(Anderson, Kyle) (Entered: 07/08/2022) |
| 07/13/2022 | 19 | BRIEF IN OPPOSITION re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *with Brief in Support* filed by Debra Price. (Attachments: # 1 Proposed Order)(Cocco, Robert) (Entered: 07/13/2022) |
| 07/19/2022 | 20 | CONSENT FORM SENT (For Direct Assignment Cases to Magistrate Judges) to Marque Carey, Esquire, Randall Clark, Esquire, Howard Gutman, Esquire, Litigation Practice Group, P.C., Daniel March, Esquire, Debra Price, Michael Robinson, Esquire, Jayde Trinh, Esquire *YOU MUST SAVE THIS FORM TO YOUR DESKTOP. THEN OPEN THE SAVED FORM AND COMPLETE THE REQUIRED SECTIONS. DO NOT FILE THIS FORM IN THE CLERKS OFFICE. THE COMPLETED FORM MUST BE E-MAILED TO consents@pamd.uscourts.gov OR IF YOU DO NOT HAVE AN E-MAIL ACCOUNT YOU MAY MAIL THE FORM TO Clerks Administrative Assistant, Clerks Office, P.O. Box 1148, Scranton, PA 18501-1148. Consent Form due by 8/18/2022 (Attachments: # 1 Defendants' Direct consent Form) (cw) (Entered: 07/19/2022)* |
| 07/21/2022 | 21 | SCHEDULING ORDER: Case Management Conference set for 8/22/2022 10:00 AM before Chief MJ Karoline Mehalchick. SEE ORDER FOR CALL-IN NUMBERS. Signed by Chief MJ Karoline Mehalchick on 7/21/2022. (cw) (Entered: 07/21/2022) |
| 07/27/2022 | 22 | REPLY BRIEF re 16 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *with Brief in Support* filed by Marque Carey, Esquire, Randall Clark, Esquire, Howard Gutman, Esquire, Litigation Practice Group, P.C., Daniel March, Esquire, Michael Robinson, Esquire, Jayde Trinh, Esquire. (Anderson, Kyle) (Entered: 07/27/2022) |
| 08/15/2022 | 23 | NOTICE of joint case mngt plan , filed by Debra Price.(Cocco, Robert) (Entered: 08/15/2022) |
| 08/16/2022 | | VERBAL ORDER REASSIGNING CASE - Case reassigned to Honorable Malachy E Mannion for all further proceedings. (jkc) (Entered: 08/16/2022) |
| 08/16/2022 | 24 | VERBAL ORDER **(Text-only entry; no PDF document will issue. This** |

| | | **text-only entry constitutes the order of the court or notice on the matter.)**The CMC that is scheduled for 8/22/2022 at 10 AM is CANCELLED. (cw) (Entered: 08/16/2022) |
|---|---|---|
| 08/17/2022 | 25 | SCHEDULING ORDER: Case Management Conference set for 9/22/2022 01:30 PM before Honorable Malachy E Mannion.This conference will be held by telephone but may be held in-person if counsel requests and has the concurrence of all other counsel. The court notes that the JCM plan has been filed. Signed by Honorable Malachy E Mannion on 8/17/22. (bs) (Entered: 08/17/2022) |
| 09/23/2022 | 27 | SCHEDULING ORDER: Amended Pleadings due by 12/15/2022. Fact Discovery due by 3/15/2023. Plaintiff Expert Report is due by 2/15/2023. Defendant Expert Report is due by 2/15/2023. Supplemental due by 3/1/2023. Expert Discovery Deadline is due by 3/30/2023. Joinder of Parties due by 11/15/2022. Dispositive Motions due by 4/15/2023. Signed by Honorable Malachy E Mannion on 9/23/22. (bs) (Entered: 09/23/2022) |
| 12/01/2022 | 28 | Praecipe praecipe to dismiss Count I CROA claims . (Cocco, Robert) (Entered: 12/01/2022) |
| 12/02/2022 | 29 | MOTION to Strike 28 Praecipe by Marque Carey, Esquire, Randall Clark, Esquire, Howard Gutman, Esquire, Litigation Practice Group, P.C., Daniel March, Esquire, Michael Robinson, Esquire, Jayde Trinh, Esquire. (Attachments: # 1 Exhibit(s) A)(Anderson, Matthew) (Entered: 12/02/2022) |
| 12/02/2022 | 30 | Praecipe praecipe to Withdraw Praecipe to dismiss Count I CROA claims . (Cocco, Robert) (Entered: 12/02/2022) |
| 12/02/2022 | 31 | MOTION to Dismiss *complaint without prejudice* by Debra Price.(Cocco, Robert) (Entered: 12/02/2022) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/02/2022 12:44:54 | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-00707-MEM |
| **Billable Pages:** | 5 | **Cost:** | 0.50 |

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DEBRA PRICE,<br>319 Putnam Street<br>Scranton, PA 18508,<br><br>          Plaintiff,<br>      v.<br><br>LITIGATION PRACTICE GROUP P.C.<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780,<br><br>DANIEL MARCH, ESQ., individually and d/b/a<br>LITIGATION PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>MARQUE CAREY, ESQ.,<br>individually and d/b/a LITIGATION<br>PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>RANDALL CLARK, ESQ.,<br>individually and d/b/a LITIGATION<br>PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>MICHAEL ROBINSON, ESQ.,<br>individually and d/b/a LITIGATION<br>PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>JAYDE TRINH, ESQ., individually and d/b/a<br>LITIGATION PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>HOWARD GUTMAN, ESQ., individually and<br>d/b/a LITIGATION PRACTICE GROUP<br>17542 E 17th Street, Suite 100,<br>Tustin CA 92780;<br><br>          Defendants. | NO. |

## **COMPLAINT**

### I.   JURISDICTION AND VENUE

1.      Subject matter jurisdiction is conferred upon this Court by 15 U.S.C. §§ 45(a) and 53(b) and 28 U.S.C. §§ 1331, 1337(a), and 1345.

2.      Venue is proper in this District under 15 U.S.C. § 53(b) and 28 U.S.C. § 1391(b) and (c).

### II.   PARTIES

3.      Plaintiff, DEBRA PRICE, is an adult individual residing at the above captioned address.

4.      Defendant LITIGATION PRACTICE GROUP, P.C. ("LPG"), is California law firm with principal offices at the above captioned address in California and is a professional corporation conducting business in the Commonwealth of Pennsylvania.

5.      Defendant, DANIEL MARCH, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

6.      Defendant, MARQUE CAREY, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

7.      Defendant, RANDALL CLARK, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned

address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

8. Defendant, MICHAEL ROBINSON, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

9. Defendant, JAYDE TRINH, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

10. Defendant, HOWARD GUTMAN, ESQ. d/b/a LPG is an adult individual doing business as a debt settlement and credit repair organization at the above captioned address, at all times material also doing business as an attorney admitted to practice of law in the State of California and not so admitted in the Commonwealth of Pennsylvania.

11. The individual attorney Defendants are sometimes collectively referred to herein as "the Attorney Defendants".

12. Upon information and belief, LPG is nothing more than an alter ego of the Attorney Defendants over which they exercise complete dominion and control as a vehicle for the Attorney Defendants and their accomplices to deceive unsuspecting and desperate consumers into paying them large sums of money under the pretext of "debt settlement". The scheme involved promising debt relief to vulnerable consumers which is nothing more than an illusory scheme to collect funds from these consumers that they

could better use themselves to negotiate debt settlements or pursue alternate traditional forms of debt remediation as discussed below.

13.     At all times relevant hereto, defendants acted by and through their agents, servants, and employees who acted within the scope of their authority and within the course of their employment.

## III.     FACTUAL BACKGROUND

### A.     Background - Nature of Debt Settlement Operations Generally

14.     Debt settlement is a form of consumer debt relief, targeted to consumers with thousands of dollars of unsecured debt.

15.     Unlike debt remediation options such as traditional credit counseling, debt management plans, debt consolidation loans, and possibly bankruptcy, debt settlement is an aggressive form of debt relief in which consumers stop paying all of their unsecured debts and begin saving the money they would normally use to pay those debts.

16.     After several months, when the accounts are in default, the debt settlement company will contact the creditor, and negotiate a lump-sum payoff of the debt, ideally at a highly reduced percentage.

17.     The consumer then uses the money that he/she has been saving to pay the lump-sum, and can then have the benefit of a significant portion of their original debt being forgiven. As will be described later herein, defendants did not allow plaintiff to use saved funds for negotiated payoffs but incredibly demanded additional funds towards such payments.

18.     Because debt settlement only works if consumers are not making monthly payments on their unsecured debts (since creditors will not want to settle a debt if they

are receiving monthly payments), there are inherent risks involved with participating in a debt settlement program that can have catastrophic effects on the consumer. Specifically, consumers entering a debt settlement program may experience any or all of the following:

    a.  Because the creditor is no longer receiving monthly payments, creditors will likely engage in collection activities including filing a lawsuit against the consumer for breaking their contract.

    b.  The consumer will owe significantly more on their account if a settlement is reached and concomitantly reduce the actual savings from the debt settlement program because creditors will continue to assess interest, late fees, over-limit charges, and any other fees associated with the account.

    c.  The consumer's credit reports will reflect the late charges and non-payment of their unsecured debt causing the consumer's credit score to drop while participating in the program and the consumer may experience the long term effects of a low credit score, which can include difficulty in buying a house or car, obtaining insurance, or obtaining employment.

    d.  Creditors are under no obligation to accept, or even entertain, a settlement offer.

19.    Debt settlement is largely a "for-profit" industry involving companies charging consumers large fees typically calculated as a percentage of the total debt the consumer brings into the program and often collected in the first several months of the program.

**B.  <u>Nature of Debt Validation /Credit Repair Services</u>**

20.     Since at least February 2021, and continuing thereafter, defendants, directly or through their representatives, have promoted, offered for sale, and sold credit repair services to consumers via Defendant LPG's Internet website which it maintains to attract consumers to purchase defendants' debt relief and credit repair services.

21.     Through verbal statements by their representatives and through written statements on their website, defendants have offered "credit repair" services purporting to remove or attempt to remove derogatory information from, or improve, consumers' credit histories, credit records, or credit ratings.

22.     Before providing any of the promised services, defendants' representatives request and obtain at least partial payment for these services.

23.     Defendants require consumers to sign written contracts for defendants' services.

**C.  The Credit Repair Organizations Act**

24.     The Credit Repair Organizations Act took effect on April 1, 1997, and has since that date remained in full force and effect.

25.     Defendants are "credit repair organizations" as that term is defined in the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3).

26.     The purposes of the Credit Repair Organizations Act, according to Congress, are:

a.  to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and

b.  to protect the public from unfair or deceptive advertising and business

practices by credit repair organizations.

27.     The Credit Repair Organizations Act prohibits credit repair organizations from charging or receiving any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform before such service is fully performed. 15 U.S.C. § 1679b(b).

28.     Pursuant to Section 410(b)(1) of the Credit Repair Organizations Act, 15 U.S.C. § 1679h(b)(l ), any violation of any requirement or prohibition of the Credit Repair Organizations Act constitutes an unfair and deceptive act or practice in commerce in violation of § 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## IV.     FACTUAL ALLEGATIONS

29.     On or about February 17, 2021, plaintiff entered into a standardized adhesion contract of exculpation with LPG in an illusory several page "Legal Services Agreement" contract whereby she agreed to pay $260.10 monthly to defendant "to invalidate your debts and remove such invalid debts from your credit reports", and, if it cannot do so, "may elect to have LPG negotiate a settlement on your behalf with the concerned creditor" (see **Exhibit A**).

30.     The five credit card accounts plaintiff wished to have negotiated totaled over $16,000.00.

31.     To pay the monthly fee, Plaintiff provided Defendants with a cancelled check to her personal checking account for which she was sole depositor.

32.     The accounts plaintiff wished to have negotiated, and that LPG promised to remove from credit reporting by its contract, were accurate, but LPG nevertheless recommended that they be disputed as inaccurate.

7

33.     Defendants did not inform plaintiff and does not inform its customers generally that accurate negative credit items cannot be legally challenged as inaccurate.

34.     To make matters even more confusing, LPG presented Plaintiff with another written contract, this time with an affiliated entity and agent, Help Finance Group, LLC ("HFG"), which also promised to negotiate debts on plaintiff's behalf but, in exculpatory fine print in the contract, essentially disclaimed any obligation to perform any debt settlement or legal services for her, and disclaimed any representations that it would actually perform such services.

35.     At all times herein, Plaintiff only had contact with LPG and, upon information and belief, HFG was an agent of and/or alter ego of LPG and acted at its direction and control.

36.     In order to get relief from her cumulative debt, the HFG contract requires Plaintiff to agree to accumulate funds in a settlement savings fund escrow account over up to 180 days before any negotiation of debt can begin.

37.     On or about April 2022, Defendants withdrew the monthly $260.10 fee from a different checking account than had been authorized by Plaintiff, a checking account held jointly by Plaintiff and her husband as co-depositors.

38.     Two payments were withdrawn until Plaintiff's reported the issue to her bank and demanded Defendants return the two payments and cease any further withdrawals from the unauthorized account.

39.     Defendants have negotiated no debt reduction, indeed Plaintiff's debts have increased, and has removed none of the debts from her credit.  As a result, all of her debts have gone into collection while she has been enrolled in Defendants' program and

Plaintiff has been sued by one creditor in Lackawanna County, Docket no. MJ-45106-CV-0000117-2022.

40.    Defendants' contract with plaintiff for debt settlement and credit repair services is void insofar as it promises nothing real and its purpose is to give the appearance of legal propriety to illegal debt settlement activities detailed in this Complaint, thereby enriching defendant at the expense of heavily indebted Pennsylvania consumers, and preempting for itself consumers' money that should have been used to pay creditors or to file for bankruptcy relief.

41.    Plaintiff suffered ascertainable loss by reason of defendant's actions.

**Causes of Action**

<div align="center">

**COUNT I**
**VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT**

</div>

42.    In connection with the sale and performance of services for consumers by a credit repair organization, as that term is defined in § 403(3) of the Credit Repair Organizations Act, 15 U.S.C. § 1679a(3), defendants have charged or received money or other valuable consideration for the performance of credit repair services that defendants have agreed to perform before such services were fully performed. Defendants have thereby violated Section 404(b) of the Credit Repair Organizations Act. 15 U.S.C. § 1679b(b).

43.    In connection with the defendants' agreement to provide credit repair services, defendants violated the CROA, *inter alia*, § 1679b(a)(1) by making untrue or misleading statements to a consumer reporting agency; §1679b(a)(3) by misrepresenting its services; and §1679b(a)(4) by engaging in acts, practices or courses of business which constitute or result in the commission of a deception on its customers, plaintiff or the

consumer reporting agencies; §1679b(b) by charging and receiving money for the performance of its agreement before the service was fully performed; and §1679d(b) by failure to include the information required by that subsection.

## COUNT II
### VIOLATIONS OF THE FAIR CREDIT EXTENSION UNIFORMITY ACT (FCEUA) and
### PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)
### (Plaintiff v. All defendants)

44.     Plaintiff incorporates all foregoing allegations as though set forth in full.

45.     Defendants are each a "debt collector" as defined by 73 P.S. § 2270.3 of the FCUEA in that, at all times herein, defendant was "engaging or aiding directly or indirectly in collecting a debt owed or alleged to be owed a creditor".

46.     Plaintiff is a "consumer" as defined by 73 P.S. § 2270.3 of the FCUEA.

47.     All of the above contacts by Defendants with plaintiff, including but not limited to attempting to settle the May 2017 debt, were "communications" relating to a debt as defined by 73 P.S. § 2270.3 of the FCUEA.

48.     Because Defendants' business model is premised on compromising the amount of debt owed rather than eliminating it as an attorney filing a chapter 7 bankruptcy or defending a debt collection litigation, all of the above contacts by Defendants were with the purpose of engaging or aiding indirectly in collecting plaintiff's debts owed or alleged to be owed to her creditors.

49.     Moreover, even Defendants' limited promise of compromising the amount of debt paid is illusory in that no results are promised, Ex. _, Sec. 3 titled, "No Guarantees of Results".

50. Defendants, by their conduct as described above including but not limited to failing to settle any debt with plaintiff's creditors from "settlement savings fund" escrow account, violated the FDCPA including but not limited to the following:

    a) §1692e(5), engaged in false, deceptive, and misleading representations in connection with the debt collection activities described herein;

    b) §1692f Otherwise used unfair or unconscionable means to collect or attempt to collect a debt by collecting funds from plaintiff towards an illusory promise of debt remediation when, instead, plaintiff's debt burden was increased by the fees and charges collected by defendants resulting in no net financial relief to plaintiff and instead worsening her financial burdens.

51. The foregoing acts and omissions of defendants in violation of the FDCPA, including but not limited to giving plaintiff a futile illusory contract to conceal the fact that defendants are not providing plaintiff with any legal services to settle any of her debts, constitute numerous and multiple *per se* violations of the FCEUA and UTPCPL, including but not limited to 73 P.S. § 2270.4(a), as evidenced by the following conduct:

    a) The use of false, deceptive or misleading representations or means in connection with the collection of a debt;

    b) The use of false representation or deceptive means to collect a debt or obtain information about a consumer;

    c) The use of unfair or unconscionable means to collect or attempt to collect an alleged debt;

52.     Defendants' acts which violated similar provisions in the Fair Debt Collection Practices Act ("FDCPA") as described above thereby renders such acts *per se* unfair and deceptive practice violations of the Unfair Trade Practices Consumer Protection Law, 73 P.S. § 201-1 *et. Seq.,* FCEUA, 73 P.S. § 2270.4(a).

<div align="center">

**COUNT II**
**Breach of Contract/ Covenant of Good Faith and Fair Dealing**
**(Plaintiff v. the Attorney Defendants)**

</div>

53.     Plaintiff incorporates all foregoing allegations as though set forth in full.

54.     Plaintiff and Defendants entered into a contract for legal services.

55.     Defendants' aforementioned conduct constitutes a breach (express, implied, or as a matter of law) of that agreement to provide competent and effective legal services, as well as a breach of the covenant of good faith and fair dealing.

56.     As a direct and proximate cause of the aforementioned breach of the agreement to provide legal services, Plaintiff has been damaged, as set forth above.

<div align="center">

**COUNT III - Breach of Fiduciary Duty**
**(Plaintiff v. the Attorney Defendants)**

</div>

57.     Plaintiff incorporates all foregoing allegations as though set forth in full.

58.     Plaintiff and Defendants were in a fiduciary, attorney-client relationship.

59.     Defendants' aforementioned conduct constitutes a breach of that fiduciary relationship.

60.     As a direct and proximate cause of the aforementioned breach of fiduciary duty, Plaintiff has been damaged as set forth above.

<div align="center">

**PRAYER**

</div>

**WHEREFORE,** Plaintiff demands judgment against defendants, jointly and severally, or singly as indicated, for:

<div align="center">12</div>

(a) Actual, compensatory, and punitive Damages for violation of CROA;

(b) Costs and reasonable attorney's fees for violation of CROA;

(c) Declaratory and injunctive relief, and such other and further relief as law or equity may provide for violation of CROA.

(d) Actual damages pursuant to 73 P.S.§ 201-9.2(a) against Defendants;

(e) Treble actual damages pursuant 73 P.S.§ 201-9.2(a) against Defendants;

(f) Costs of litigation and reasonable attorney's fees pursuant to 73 P.S.§ 201-9.2(a), and;

(g) Actual damages for breach of contract and fiduciary duty.

(h) Such other and further relief as the Court shall deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff demands trial by jury.

ROBERT P. COCCO, P.C.
BY:     /s/Robert P. Cocco

Attorney for Plaintiff

Dated: May 10, 2022



1351 Calle Avanzado | Suite 4
San Clemente, CA 92673
Tel 949.593.0440
Fax 949.415.7816

admin@coastprocessing.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus. The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement.  In the event a lawsuit was initiated against you before the date you execute this

Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of the progress of services performed under this agreement at reasonable intervals of no greater frequency than once a month.

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

## Debt Settlement

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

**Client Acknowledgements**

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) the client`s payments are returned multiple times for any reason. LPG will not pay your debts and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to admin@coastprocessing.com and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to admin@coastprocessing.com. In addition, you, the client may terminate LPG's services under this agreement at any time via an email to admin@coastprocessing.com.**

Client Signature: _Debra Price_____     Date: 2/17/2021_____

Co-Applicant Signature: _____     Date: _____

**Creditor Information**

| Creditor | Account # | Amount Owed |
|---|---|---|
| LENDINGCLU | ███████ | $7,007.00 |
| FNB OMAHA | ███████ | $4,413.00 |
| Cap one | ███████ | $1,450.00 |
| Cap one | ███████ | $1,331.00 |
| BARCLAYSBK | ███████ | $984.00 |
| | | **$15,185.00** |

**Client Information**

Name: Debra Price

Address: 319 Putnam St, , Stranton PA 18508

Home

Cell Ph

Email:

Las 4 S

**Co-Client Information**

Name:

Address: , ,

Home Phone:

Cell Phone:

Email:

Last 4 SSN:

## Schedule of Payments

I agree to this payment schedule – Client Initials: _DP_____

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Feb 26, 2021 | $260.10 |
| 2 | Mar 26, 2021 | $260.10 |
| 3 | Apr 26, 2021 | $260.10 |
| 4 | May 26, 2021 | $260.10 |
| 5 | Jun 28, 2021 | $260.10 |
| 6 | Jul 26, 2021 | $260.10 |
| 7 | Aug 26, 2021 | $260.10 |
| 8 | Sep 27, 2021 | $260.10 |
| 9 | Oct 26, 2021 | $260.10 |
| 10 | Nov 26, 2021 | $260.10 |
| 11 | Dec 27, 2021 | $260.10 |
| 12 | Jan 26, 2022 | $260.10 |
| 13 | Feb 28, 2022 | $260.10 |
| 14 | Mar 28, 2022 | $260.10 |
| 15 | Apr 26, 2022 | $260.10 |
| 16 | May 26, 2022 | $260.10 |
| 17 | Jun 27, 2022 | $260.10 |
| 18 | Jul 26, 2022 | $260.10 |
| 19 | Aug 26, 2022 | $260.10 |
| 20 | Sep 26, 2022 | $260.10 |
| 21 | Oct 26, 2022 | $260.10 |
| 22 | Nov 28, 2022 | $260.10 |
| 23 | Dec 27, 2022 | $260.10 |
| 24 | Jan 26, 2023 | $260.10 |
| 25 | Feb 27, 2023 | $260.10 |
| 26 | Mar 27, 2023 | $260.10 |
| 27 | Apr 26, 2023 | $260.10 |
| 28 | May 26, 2023 | $260.10 |
| 29 | Jun 26, 2023 | $260.10 |
| 30 | Jul 26, 2023 | $260.10 |
| 31 | Aug 28, 2023 | $260.10 |
| 32 | Sep 26, 2023 | $260.10 |
| 33 | Oct 26, 2023 | $260.10 |
| 34 | Nov 27, 2023 | $260.10 |
| 35 | Dec 26, 2023 | $260.10 |
| 36 | Jan 26, 2024 | $260.18 |

**Electronic Payment Authorization**

Bank Name: COMMUNITY BANK N.A.

Name on Account: Debra Price

Account Type:    Checking

___ Other (specify: _____ )

Routing Number: ████████

Account Number: ████████

Next Payment Date: Feb 26, 2021 Amount: $ 260.10

Recurring Payment Date: 26th

By signing below, I authorize and permit LPG or their designees, EPPS, Omnifund, Equipay, Forte, a CSG Company, or Authorize.NET to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day.  This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by members will be observed.  If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed.  The member agrees with all of the provisions and conditions outlined within.

**Acknowledgment of Refunds & Draft Date Changes**

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process.  All refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment.  If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated.  Please call us at 949-593-0440 or at admin@coastprocessing.com.

Client Signature: *Debra Price*

Date: 2/17/2021

Printed Name:   Debra Price

_____          _____

ID: 3522897 Signed: 2021-02-17T14:29:29-06:00

**Electronic Funds Transfer (EFT) Authorization to Debit Bank Account**

Account Owner Name: Debra Price

Social Security Number: ███████          Birth Date: ███████

Address: 319 Putnam St          City: Stranton          State: PA          Zip: 18508

Mobile Phone #:          Bank Name: COMMUNITY BANK N.A.

Routing Number: ███████          Account Number: ███████

Total Amount of Debit: $260.10          Date of Next Debit: Feb 26, 2021          Checking or Saving: Checking

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

### Schedule of Fees and Charges

| | |
|---|---|
| Monthly Banking Fee: | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |

**PREMIUM DISBURSEMENT SERVICES**

| | |
|---|---|
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time. I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement. I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC, and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf. My signature below provides permission to be contacted by phone at the number provided with this authorization. A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS. Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature: *Debra Price*          Date: 2/17/2021



E-Signature Completion Certificate

## Your Document Was Successfully Signed!



Congratulations, your document(s) was successfully signed. Please find details below related to your e-signature submission.

### ⓘ Signing Details

| | |
|---|---|
| Document ID | Signer Email |
| 3522897 | debbieprice98@yahoo.com |
| Document Title | Signer IP Address |
| Legal Service Agreement with LPG - ASF ( English ) | 73.175.109.248 |
| Sender IP Address | Timestamp |
| 45.22.90.58 | 2021-02-17T14:29:29-06:00 |
| Number Of Signers | Document MD5 Hash |
| 1 | d41d8cd98f00b204e9800998ecf8427e |

### ✳ Document Audit

✓ Sent at 2021-02-17T14:25:23-06:00 from IP 45.22.90.58

✓ Delivered to debbieprice98@yahoo.com at 2021-02-17T14:27:48-06:00 from 73.175.109.248

✓ Adopted Signature at 2021-02-17T14:28:04-06:00 from 73.175.109.248

✓ Completed Signing at 2021-02-17T14:29:29-06:00 from 73.175.109.248

✓ PDF Generated at 2021-02-17T14:29:29-06:00

Sending Agent

Mozilla/5.0 (iPhone; CPU iPhone OS 14_4 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.0.3 Mobile/15E148 Safari/604.1

# EXHIBIT D

**Query**   **Reports**   **Utilities**   **Help**   **Log Out**

CASREF

# U.S. District Court [LIVE]
## Western District of Texas (Waco)
## CIVIL DOCKET FOR CASE #: 6:22-cv-00814-ADA-JCM

Topp v. The Litigation Practice Group, PC          Date Filed: 07/26/2022
Assigned to: Judge Alan D Albright                 Jury Demand: Plaintiff
Referred to: Judge Jeffrey C. Manske               Nature of Suit: 480 Consumer Credit
Cause: 15:1679 Credit Repair Organization Act      Jurisdiction: Federal Question

**Plaintiff**

**Kenneth Topp**                    represented by   **Nathan Charles Volheim**
                                                     Sulaiman Law Group, Ltd.
                                                     2500 South Highland Aveneue, Suite 200
                                                     Lombard, IL 60148
                                                     630-568-3056
                                                     Fax: 630-575-8188
                                                     Email: nvolheim@sulaimanlaw.com
                                                     *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group, PC**    represented by   **Keith C. Thompson**
                                                          Keith C. Thompson
                                                          11003 Quaker Ave.
                                                          Lubbock, TX 79424
                                                          806-783-8322
                                                          Fax: 806-783-8357
                                                          Email: kct@kctlaw.us
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Kyle T. Anderson**
                                                          Luper Neidenthal & Logan, LPA
                                                          1160 Dublin Road, Suite 400
                                                          Columbus, OH 43215
                                                          (614) 229-4473
                                                          Fax: (614) 229-4473
                                                          *LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/26/2022 | 1 | COMPLAINT ( Filing fee $ 402 receipt number 0542-16301899), filed by Kenneth Topp. (Attachments: # 1 Civil Cover Sheet)(Volheim, Nathan) (Entered: 07/26/2022) |
| 07/26/2022 | 2 | REQUEST FOR ISSUANCE OF SUMMONS by Kenneth Topp. (Volheim, Nathan) (Entered: 07/26/2022) |
| 07/26/2022 | 3 | NOTICE of Attorney Appearance by Nathan Charles Volheim on behalf of Kenneth Topp (Volheim, Nathan) (Entered: 07/26/2022) |
| 07/26/2022 | | All parties shall comply with the Standing Orders located at https://www.txwd.uscourts.gov/judges-information/standing-orders/. (lad) (Entered: 07/26/2022) |
| 07/26/2022 | 4 | Summons Issued as to The Litigation Practice Group, PC. (lad) (Entered: 07/26/2022) |
| 07/26/2022 | | Case assigned to Judge Alan D Albright and REFERRED to Magistrate Judge Jeffrey C. Manske. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (lad) (Entered: 07/26/2022) |
| 08/04/2022 | 5 | WAIVER OF SERVICE Returned Executed by Kenneth Topp as to The Litigation Practice Group, PC. Waiver sent on 7/29/2022, answer due 9/27/2022. (Volheim, Nathan) (Entered: 08/04/2022) |
| 10/03/2022 | 6 | STATUS REPORT ORDER Status Report due by 10/13/2022. Signed by Judge Jeffrey C. Manske. (lad) (Entered: 10/03/2022) |
| 10/06/2022 | 7 | STIPULATION *of Extension of Time to Move or Plead* by The Litigation Practice Group, PC. (Thompson, Keith) (Entered: 10/06/2022) |
| 10/06/2022 | | Reset Deadlines: The Litigation Practice Group, PC answer due 10/18/2022. (lad) (Entered: 10/06/2022) |
| 10/13/2022 | 8 | STATUS REPORT by Kenneth Topp. (Volheim, Nathan) (Entered: 10/13/2022) |
| 10/18/2022 | 9 | Motion to Dismiss for Failure to State a Claim *(Plaintiff's Complaint)* by The Litigation Practice Group, PC.. Motions referred to Judge Jeffrey C. Manske. (Thompson, Keith) (Entered: 10/18/2022) |
| 11/01/2022 | 10 | AMENDED COMPLAINT *First* against The Litigation Practice Group, PC amending 1 Complaint., filed by Kenneth Topp.(Volheim, Nathan) |

| | | (Entered: 11/01/2022) |
|---|---|---|
| 11/02/2022 | | Text Order MOOTING 9 Motion to Dismiss for Failure to State a Claim entered by Judge Jeffrey C. Manske. This Motion to Dismiss is MOOT as Plaintiff has filed an Amended Complaint. (This is a text-only entry generated by the court. There is no document associated with this entry.) (MQlc) (Entered: 11/02/2022) |
| 11/17/2022 | 11 | MOTION to Appear Pro Hac Vice by Keith C. Thompson ( Filing fee $ 100 receipt number ATXWDC-16766926) by on behalf of The Litigation Practice Group, PC.. Motions referred to Judge Jeffrey C. Manske. (Thompson, Keith) (Entered: 11/17/2022) |
| 11/18/2022 | 12 | Opposed MOTION for Extension of Time to File Answer re 10 Amended Complaint by The Litigation Practice Group, PC. (Attachments: # 1 Proposed Order Granting Motion to Extend Time). Motions referred to Judge Jeffrey C. Manske. (Thompson, Keith) (Entered: 11/18/2022) |
| 11/18/2022 | 13 | ORDER GRANTING 11 Motion to Appear Pro Hac Vice for Attorney Kyle T. Anderson for The Litigation Practice Group, PC. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge Alan D Albright. (bw) (Entered: 11/18/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/02/2022 11:45:51 | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 6:22-cv-00814-ADA-JCM |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | |
|---|---|
| KENNETH TOPP, | AMENDED CIVIL COMPLAINT |
| Plaintiff, | |
| v. | CASE NO. 6:22-cv-00814-ADA-JCM |
| THE LITIGATION PRACTICE GROUP, PC, | JURY TRIAL DEMANDED |
| Defendants. | |

## FIRST AMENDED COMPLAINT

Now comes KENNETH TOPP ("Plaintiff"), by and through the undersigned, complaining as to the conduct of THE LITIGATION PRACTICE GROUP, PC ("Defendant") as follows:

### NATURE OF THE ACTION

1.  Plaintiff brings this action for damages pursuant to the Credit Repair Organizations Act ("CROA") under 15 U.S.C. § 1679 *et seq.,* the Texas Credit Services Organizations Act ("TCSOA") under Tex. Fin. Code § 393.101 *et seq.,* and the Texas Consumer Debt Management Services Act ("TCDSMA") under Tex. Fin. Code § 394.201 *et seq.,* in connection with Defendants' unlawful conduct.

### JURISDICTION AND VENUE

2.  This action arises under and is brought pursuant to the CROA. Subject matter jurisdiction is conferred upon this Court by 15 U.S.C §1679, as well as 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. §1367.

3.   Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Defendant conducts business within the Western District of Texas and a substantial portion of the events or omissions giving rise to the instant claims occurred within the Western District of Texas.

## PARTIES

4.   Plaintiff is a "person," as defined by 47 U.S.C. § 153(39), and consumer over 18 years of age, residing in Killeen, Texas, which lies within the Western District of Texas.

5.   Defendant is a credit repair organization, debt settlement provider, and law corporation that offers its customers the ability to eliminate and resolve their debt issues through Defendant's myriad services. Defendant is a professional corporation organized under the laws of the state of California with its principal place of business located at 17542 17th Street, Suite 100, Tustin, California.

6.   Defendant is a "person" as defined by 47 U.S.C. §153(39).

7.   Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers at all times relevant to the instant action.

## FACTS SUPPORTING CAUSES OF ACTION

8.   In approximately May of 2022, Plaintiff had numerous delinquent obligations which he wanted to address and was seeking out the assistance of various debt relief and credit repair companies.

9.   Plaintiff subsequently happened upon Defendant and its services.

10.  Defendant advised that its services included disputing inaccurate information that was appearing on Plaintiff's credit reports and impacting his credit score, and would similarly assist

Plaintiff in reaching negotiated settlements with his various creditors in order to resolve the obligations for less than the balance being sought by such creditors.

11. Defendant represented its services as being for the explicit and implicit purpose of improving his credit score, history, and/or rating, as Defendant represented that the disputed information on the credit report would result in the improvement of Plaintiff's credit since certain negative information would be removed, and that by engaging in negotiations to reduce the balance on certain enrolled debts, Plaintiff would be able to address debts that would otherwise be unaffordable, which would further improve his credit history.

12. Upon information and belief, Defendant routinely represents to prospective customers and/or enrolled clients that its services will restore their credit.

13. Defendant further advised that its services would include setting up a bank account, into which Plaintiff's monthly payments would go and from which Defendant would take funds to perform its services and pay Plaintiff's creditors when settlements were reached.

14. Plaintiff found Defendant's services desirable as he believed Defendant would be able to get certain information removed from his credit report and would actively resolve his obligations, and so Plaintiff agreed to utilize Defendant's services and entered into a contract for the provision of the same.

15. However, after one month of using Defendant's services, and paying approximately $350, Plaintiff cancelled his agreement with Defendant as he was frustrated by the lack of action taken by Defendant.

16. Upon information and belief, rather than actually provide the services Defendant represented it would provide, Defendant instead applied Plaintiff's payments towards various upfront flat-fees that were unrelated to any work performed by Defendant.

3

17.  Defendant thus charged Plaintiff for its services before engaging in any performance of its duties under the agreement, let alone completely performing the services justifying its retention of the charged fees.

18.  After Plaintiff attempted to cancel his agreement with Defendant, Defendant began bombarding Plaintiff with phone calls.

19.  Plaintiff politely requested that Defendant cease in contacting him at the beginning of July 2022.

20.  However, Defendant repeatedly contacted Plaintiff despite his demands that such contacts cease up until the filing of this Complaint.

21.  Defendant has failed to refund Plaintiff his payments despite being obligated to do so as it failed to perform any services justifying its retention of such fees.

22.  Frustrated, distressed, and confused over Defendant's conduct, Plaintiff spoke with the undersigned regarding his rights.

23.  Plaintiff has suffered concrete harm as a result of Defendant's actions, including but not limited to, emotional distress, aggravation, mental anguish, pecuniary harm stemming from payments made for deficient credit repair services, out of pocket damages including paying Defendant for services it did not perform, out of pocket damages stemming from Defendant's failure to refund Plaintiff's payments, out of pocket damages stemming from Defendant's charging of up front fees instead of using such funds as represented, as well as numerous violations of his state and federally protected interests – interests which were harmed put at a material risk of harm stemming from Defendant's conduct.

### COUNT I – VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

24. Plaintiff repeats and realleges paragraphs 1 through 20 as though fully set forth herein.

25. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1679a(1) of the CROA.

26. Defendant is a "credit repair organization" as defined by §1679a(3) of the CROA, as it is a person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of improving a consumer's credit, credit history, or credit rating, or providing assistance to any consumer with regard to any activity or service for the purpose of improving a consumer's credit.

27. Defendant's represented services in disputing and seeking to remove information from Plaintiff's credit report renders it a credit repair organization under the CROA, as does its conduct in purporting to resolve obligations on behalf of consumers for less than the full balance owed.

### a. Violations of CROA §§ 1679b(a)(3)-(4)

28. The CROA, pursuant to 15 U.S.C. § 1679b(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization." Additionally, pursuant to 15 U.S.C. § 1679b(a)(4), any person is prohibited from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

29. Defendant violated the above referenced provisions of the CROA through its misrepresentations and deception as to the nature of the credit repair services it could provide Plaintiff. Defendant represented to Plaintiff that his payments would go towards resolving his enrolled obligations; however, he later found out the nature of Defendant's deceptive representation as his initial payment went entirely towards Defendant's fees and that Plaintiff would need to make payments beyond his monthly payments to settle any debts. Defendant

engaged in these deceptive representations and omission regarding the nature of its services and the charged fees so as to deprive Plaintiff of information that, had it been clarified, would have resulted in Plaintiff refusing to use Defendant's services. Upon information and belief, Defendant engages in this behavior on a persistent and frequent basis in order to dupe vulnerable and desperate consumers into making payments under false and deceptive pretenses.

### b. Violations of CROA § 1679b(b)

30. The CROA, pursuant to 15 U.S.C. § 1679b(b), provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

31. Defendant violated § 1679b(b) through its charging and receiving of money for services agreed to perform before such services were fully performed. Defendant improperly charged and retained Plaintiff's payment despite not performing, let alone completely performing, the services justifying the retention of such fees and charges.

### c. Violation of CROA § 1679c

32. The CROA provides that a credit repair organization must provide consumers with certain written disclosures in the contract underpinning the provision of credit repair services to consumers. Pursuant to 15 U.S.C. § 1679c(b), "the written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

6

33. Defendant violated 15 U.S.C. §§ 1679c(a)-(b) through its failure to provide the written disclosures required under § 1679c. Defendant never provided such disclosures, nor did it provide a separate document containing such disclosures.

### d. Violation of CROA §§ 1679d(4) & 1679e

34. The CROA, pursuant to 15 U.S.C. § 1679d(4), requires credit repair organization to include, in the contract between them and a consumer, "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'" 15 U.S.C. § 1679e further outlines the extent of a consumer's cancellation rights under CROA while requiring such disclosure to be given to consumers in writing.

35. Defendant violated 15 U.S.C. §§ 1679d(4) & 1679e through its complete failure to provide the above disclosure in immediate proximity to the space reserved for Plaintiff's signature on the contract, as well as its failure to provide the notice of cancellation to Plaintiff.

### e. Violation of CROA § 1679f(b)

36. The CROA, pursuant to 15 U.S.C. § 1679f(b) provides that, "[a]ny attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under [the CROA] shall be treated as a violation of [the CROA]."

37. Defendant violated 15 U.S.C. § 1679f(b) through its attempt to obtain Plaintiff's waiver of the protections afforded him under the CROA. Defendant's contract contain numerous efforts to obtain a waiver of Plaintiff's vital consumer protection rights protected by the CROA,

including but not limited to the protection regarding the time of when Defendant's fees are "earned" and when Defendant may properly collect such fees.

38. The CROA further dictates that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679f(c).

WHEREFORE, Plaintiff, KENNETH TOPP, respectfully requests that the Honorable Court enter judgment in his favor as follows:

a. Declaring that the practices complained of herein are unlawful and violate the aforementioned bodies of law;

b. Awarding Plaintiff actual damages to be determined at trial, as provided under 15 U.S.C. § 1679g(a)(1);

c. Awarding Plaintiff punitive damages, in an amount to be determined at trial, as provided under 15 U.S.C. § 1679g(a)(2)(A);

d. Awarding Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. § 1679g(a)(3); and

e. Awarding any other relief as the Arbitrator deems just and appropriate.

### COUNT II – VIOLATIONS OF THE TEXAS CREDIT SERVICES ORGANIZATION ACT

39. Plaintiff restates and realleges paragraphs 1 through 46 as though fully set forth herein.

40. Plaintiff is a "consumer" as defined by Tex. Fin. Code § 393.001(1).

41. Defendant is a "credit services organization" as defined by Tex. Fin. Code § 393.001(3).

### a. Violations of Tex. Fin. Code §§ 393.20 & 393.202

42. The TCSOA, pursuant to Tex. Fin. Code § 393.201, outlines certain requirements of the contracts entered into between consumers and credit services organizations. § 393.202 discusses the nature of a consumer's right to cancel contracts and how such right must be disclosed to consumers.

43. Defendant violated §§ 393.201(b)(1)-(4) & 393.202 through their failure to provide the information required under Texas law in the contract with Plaintiff. Defendant's contract plainly fails to contain the requisite information.

### b. Violations of Tex. Fin. Code § 393.302

44. The TCOSA, pursuant to Tex. Fin. Code § 393.302, prohibits credit service organizations from receiving money for their services before such services are fully performed.

45. Defendant violated § 393.302 in much the same way it violated § 1679b(b) of the CROA.

### c. Violations of Tex. Fin. Code §§ 393.304(1) & 393.305

46. The TCSOA, pursuant to Tex. Fin. Code § 393.304(1), prohibits a credit services organization from "mak[ing] or us[ing] a false or misleading representation in the offer or sale of the services of the organization." Similarly, pursuant to Tex. Fin. Code § 393.305, "[a] credit services organization or a representative of the organization may not directly or indirectly engage in a fraudulent or deceptive act, practice, or course of business relating to the offer or sale of the services of the organization."

47. Defendant violated §§ 393.304(1) & 393.305 in much the same way it violated §§ 1679b(a)(3)-(4) of the CROA.

WHEREFORE, Plaintiff, KENNETH TOPP, respectfully requests that the Honorable Court enter judgment in his favor as follows:

a. Declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b. Awarding Plaintiff actual damages pursuant to Tex. Fin. Code § 393.503(a)(1);

c. Awarding Plaintiff punitive damages pursuant to Tex. Fin. Code § 393.503(b);

d. Enjoin Defendant from further violations of law pursuant to Tex. Fin. Code § 393.502,

e. Awarding Plaintiff's costs and reasonable attorney fees, pursuant to Tex. Fin. Code §§ 393.503(a)(2)-(3); and,

f. Awarding any other relief the Honorable Court deems just and appropriate.

### COUNT III – VIOLATIONS OF THE TEXAS CONSUMER DEBT MANAGEMENT SERVICES ACT

48. Plaintiff restates and realleges paragraphs 1 through 45 as though fully set forth herein.

49. Plaintiff is a "consumer" as defined by Tex. Fin. Code § 394.202(4).

50. Defendant is a "provider" of "debt management service" as defined by Tex. Fin. Code §§ 394.202(6) & (10).

### a. Violations of Tex. Fin. Code § 394.207

51. The TCDMSA, pursuant to Tex. Fin. Code § 394.207, provides that "[a] provider may not engage in false or deceptive advertising,"

52. Defendant violated § 394.207 in much the same way its deceptive representations regarding the nature of, and fees surrounding, its services violated § 1679b(a)(3)-(4) of the CROA.

### b. Violations of Tex. Fin. Code § 394.209

53. The TCDMSA, pursuant to Tex. Fin. Code § 394.209, outlines the various requirements of the contracts entered into between debt management providers and consumers.

54. Defendant violated § 394.209(b) through its failure to include the required statements, disclosures, and information in its contract with Plaintiff.

### c. Violations of Tex. Fin. Code § 394.210

55. The TCDMSA, pursuant to Tex. Fin. Code § 394.210(c), provides that "[a] provider may not impose fees or other charges upon a consumer or receive payment for debt management services until the consumer has entered into a debt management service agreement with the provider that complies with Section 394.209."

10

56. Defendant violated § 394.210(c) through its charging of Plaintiff for its debt management services without entering into a contract which complies with Texas law.

### d. Violations of Tex. Fin. Code § 394.212

57. The TCDMSA, pursuant to Tex. Fin. Code § 394.212, outlines a number of prohibited practices on the part of providers.

58. Pursuant to § 394.212(a)(9), a provider may not "engage in an unfair, deceptive, or unconscionable act or practice in connection with a service provided to a consumer."

59. Defendant violated § 394.212(a)(9) in much the same way it violated §§ 1679b(a)(3)-(4) of the CROA.

### e. Violations of Tex. Fin. Code § 394.213

60. Pursuant to § 394.213, "a provider has a duty to a consumer who receives debt management services from the provider to ensure that client money held by the provider is managed properly at all times."

61. Defendant violated § 394.213 through its failure to ensure that Plaintiff's money was managed properly. As discussed above, Defendant failed to meaningfully perform the services it represented, and similarly allowed Plaintiff's funds to be mismanaged and applied to unnecessary legal fees which were never actually performed.

WHEREFORE, Plaintiff, KENNETH TOPP, respectfully requests that the Honorable Court enter judgment in his favor as follows:

a. Declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

b. Awarding Plaintiff actual damages pursuant to Tex. Fin. Code § 394.215(c);

c. Awarding Plaintiff punitive damages pursuant to Tex. Fin. Code § 394.215(c);

d. Enjoin Defendant from further violations of law pursuant to Tex. Fin. Code § 394.215(d);

e.  Awarding Plaintiff's costs and reasonable attorney fees, pursuant to Tex. Fin. Code § 394.215(c); and,

f.  Awarding any other relief the Honorable Court deems just and appropriate.

Dated: November 1, 2022                         Respectfully submitted,

                                                  s/ Nathan C. Volheim
                                                    Nathan C. Volheim, Esq. #6302103
                                                    Counsel for Plaintiff
                                                    Admitted in the Western District of Texas
                                                    Sulaiman Law Group, Ltd.
                                                    2500 South Highland Ave., Suite 200
                                                    Lombard, Illinois 60148
                                                    (630) 568-3056 (phone)
                                                    (630) 575-8188 (fax)
                                                    nvolheim@sulaimanlaw.com

12

# EXHIBIT E

# U.S. Bankruptcy Court
## District of Kansas (Topeka)
## Bankruptcy Petition #: 22-40216

|  |  |
|---|---|
| *Date filed:* | 04/28/2022 |
| *Debtor discharged:* | 08/08/2022 |
| *Joint debtor discharged:* | 08/08/2022 |
| *341 meeting initially set for:* | 05/31/2022 |
| *341 meeting (re)scheduled for:* | 07/26/2022 |
| *Deadline for objecting to discharge:* | 08/01/2022 |
| *Deadline for financial mgmt. course:* | 08/01/2022 |

*Assigned to:* Chief Judge Dale L. Somers
Chapter 7
Voluntary
Asset

*Debtor disposition:* Standard Discharge
*Joint debtor disposition:* Standard Discharge

| | |
|---|---|
| **Debtor**<br>**Daniel Verne Rowe**<br>2439 S Margrave St<br>Fort Scott, KS 66701-2968<br>BOURBON-KS<br>SSN / ITIN: xxx-xx-7009 | represented by **Troy A. Berberick**<br>Berberick Law, LLC<br>2900 SW Wanamaker Dr., Suite 204<br>Topeka, KS 66614<br>(785) 291-2121<br>Fax : 785-670-8283<br>Email: berbericklawoffice@gmail.com |
| **Joint Debtor**<br>**Michelle Lee Rowe**<br>2439 S Margrave St<br>Fort Scott, KS 66701-2968<br>BOURBON-KS<br>SSN / ITIN: xxx-xx-1246 | represented by **Troy A. Berberick**<br>(See above for address) |

**Trustee**
**Darcy D Williamson TR**
Williamson Law Office
1109 SW Westside Drive
Topeka, KS 66615
785-233-9908

**U.S. Trustee**
**U.S. Trustee**
Office of the United States Trustee
301 North Main Suite 1150
Wichita, KS 67202
(316) 269-6637

Email All Attorneys

CM/ECF addresses only. Editable in your email program.

| Filing Date | # | Docket Text |
|---|---|---|
| 04/28/2022 | [1](#)<br>(56 pgs) | Chapter 7 Voluntary Petition for Individual. Fee Amount $338 Filed by Daniel Verne Rowe, Michelle Lee Rowe Debtor Declaration Re: Electronic Filing due by 05/5/2022. (Berberick, Troy) (Entered: 04/28/2022) |
| 04/28/2022 | | Receipt of filing fee for Voluntary Petition (Chapter 7, Credit Card )( 22-40216) [misc,volp7cc] ( 338.00). Receipt number A18021615,amount $ 338.00. (U.S. Treasury) (Entered: 04/28/2022) |
| 04/28/2022 | [2](#)<br>(1 pg) | Certificate of Credit Counseling Filed by Debtor Daniel Verne Rowe, Joint Debtor Michelle Lee Rowe. (Berberick, Troy) Modified on 5/2/2022 - see entry 8 for joint debtor's certificate (tbc). (Entered: 04/28/2022) |
| 04/28/2022 | 3 | DeBN Request Form: Initial Declination Request for the Debtor and Initial Declination Request for the Joint Debtor Filed by Debtor Daniel Verne Rowe. (Berberick, Troy) (Entered: 04/28/2022) |
| 04/28/2022 | 4 | Declaration Re: Electronic Filing Filed by Debtor Daniel Verne Rowe, Joint Debtor Michelle Lee Rowe (RE: related document(s)1 Voluntary Petition (Chapter 7, Credit Card )). (Berberick, Troy) (Entered: 04/28/2022) |
| 04/28/2022 | 5 | Meeting of Creditors & Notice of Appointment of Trustee Williamson TR, Darcy D to be held on 5/31/2022 at 09:00 AM at Conf Call by Trustee Williamson. *Autogenerated* Last day to oppose discharge or dischargeability is 8/1/2022. (Entered: 04/28/2022) |
| 04/29/2022 | [6](#)<br>(1 pg) | Order to Correct Voluntary Petition in Bankruptcy. Signed on 4/29/2022 Incomplete Filings due by 5/12/2022. (tkg) (Entered: 04/29/2022) |

| 04/29/2022 | [7](#)<br>(3 pgs; 2 docs) | Meeting of Creditors and Notice of Requirement to Complete Course in Financial Management. Certificate of Financial Management Due: 8/1/2022. (tkg) (Entered: 04/29/2022) |
|---|---|---|
| 04/29/2022 | [8](#)<br>(1 pg) | Certificate of Credit Counseling Filed by Joint Debtor Michelle Lee Rowe. (Berberick, Troy) (Entered: 04/29/2022) |
| 04/29/2022 | [9](#)<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Creditor PRA Receivables Management, LLC. (Smith, Valerie) (Entered: 04/29/2022) |
| 05/01/2022 | [10](#)<br>(4 pgs) | BNC Certificate of Mailing - Meeting of Creditors. (RE: related document(s)[7](#) Meeting of Creditors Chapter 7 No Asset) Notice Date 05/01/2022. (Admin.) (Entered: 05/01/2022) |
| 05/01/2022 | [11](#)<br>(2 pgs) | BNC Certificate of Mailing. (RE: related document(s)[7](#) Meeting of Creditors Chapter 7 No Asset) Notice Date 05/01/2022. (Admin.) (Entered: 05/01/2022) |
| 05/01/2022 | [12](#)<br>(2 pgs) | BNC Certificate of Mailing. (RE: related document(s)[6](#) Order to Correct Voluntary Petition) Notice Date 05/01/2022. (Admin.) (Entered: 05/01/2022) |
| 05/02/2022 | [13](#)<br>(2 pgs) | Notice of Appearance and Request for Notice by Wendee Elliott-Clement with Certificate of Service Filed by Creditor LoanCare, LLC. (Elliott-Clement, Wendee) (Entered: 05/02/2022) |
| 05/03/2022 | [14](#)<br>(1 pg) | Notice of Appearance and Request for Notice Filed by Creditor Ally Bank, c/o AIS Portfolio Services, LP. (Rawal, Arvind) (Entered: 05/03/2022) |
| 05/04/2022 | [15](#)<br>(3 pgs) | Employee Income Records Filed by Joint Debtor Michelle Lee Rowe. (Berberick, Troy) (Entered: 05/04/2022) |
| 05/10/2022 | [16](#)<br>(1 pg) | Financial Management Course Certificate Filed *for debtor* (Bhatt, Jai) (Entered: 05/10/2022) |

| 05/10/2022 | [17](#)<br>(1 pg) | Financial Management Course Certificate Filed *for joint debtor* (Bhatt, Jai) (Entered: 05/10/2022) |
|---|---|---|
| 05/31/2022 | 18 | Continuance of Meeting of Creditors. Rescheduled Meeting to be held on 6/27/2022 at 10:30 AM at Conf Call by Trustee Williamson. (Williamson TR, Darcy) (Entered: 05/31/2022) |
| 06/27/2022 | 19 | Continuance of Meeting of Creditors. Rescheduled Meeting to be held on 7/26/2022 at 10:30 AM at Conf Call by Trustee Williamson. (Williamson TR, Darcy) (Entered: 06/27/2022) |
| 07/12/2022 | 20 | Trustee's Request for Court Closing Information. This is a Text Only entry. No document is attached. Filed by Darcy D Williamson TR. (Williamson TR, Darcy) (Entered: 07/12/2022) |
| 07/12/2022 | 21 | Notice of Closing Information: **Total fees due: $0** Adversary fee due: $0 Reopening fee due: $0 Appeal fee due: $0 Filing fee due (unpaid by debtor): $0 This is a Text Only entry. No document is attached. (tkg) (Entered: 07/12/2022) |
| 07/26/2022 | 22 | Meeting of Creditors Held and Concluded. (Williamson TR, Darcy) (Entered: 07/26/2022) |
| 08/08/2022 | [23](#)<br>(2 pgs) | Order Discharging Debtor(s) (Admin.) (Entered: 08/08/2022) |
| 08/11/2022 | [24](#)<br>(4 pgs) | BNC Certificate of Mailing - Order of Discharge. (RE: related document(s)[23](#) Order Discharging Debtor(s)) Notice Date 08/11/2022. (Admin.) (Entered: 08/11/2022) |
| 08/18/2022 | [25](#)<br>(1 pg) | Trustee's Notice of Assets & Request for Notice to Creditors Filed by Darcy D Williamson TR. (Williamson TR, Darcy) (Entered: 08/18/2022) |
| 08/18/2022 | [26](#)<br>(1 pg) | Order Setting Last Day To File Proofs of Claim Signed on 8/18/2022 Proofs of Claims due by 11/28/2022. (tdc) (Entered: 08/18/2022) |

| | 27<br>(3 pgs) | BNC Certificate of Mailing. (RE: related document(s)26 Order Setting Last Day To File Proofs of Claim) Notice Date 08/21/2022. (Admin.) (Entered: 08/21/2022) |
|---|---|---|
| 08/21/2022 | | |
| 08/22/2022 | 28<br>(2 pgs) | Trustee's Interim Report. (Williamson TR, Darcy) (Entered: 08/22/2022) |
| 10/03/2022 | 29<br>(9 pgs) | Adversary case 22-07015. Complaint by J. Michael Morris on behalf of Darcy D. Williamson against Litigation Practice Group PC. Receipt Number Deferred, Fee Amount $350 Nature(s) of Suit: (11 (Recovery of money/property - 542 turnover of property)),(13 (Recovery of money/property - 548 fraudulent transfer)),(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy))) (Morris, J.) (Entered: 10/03/2022) |
| 10/27/2022 | 30<br>(2 pgs) | Trustee's Interim Report. (Williamson TR, Darcy) (Entered: 10/27/2022) |
| 10/31/2022 | 31<br>(7 pgs; 3 docs) | Application to Employ J. Michael Morris as Special Counsel Filed on behalf of Trustee Darcy D Williamson TR (Attachments: # 1 Affidavit of Attorney # 2 Mailing Matrix), with Certificate of Service.(Williamson TR, Darcy) (Entered: 10/31/2022) |
| 10/31/2022 | 32<br>(4 pgs; 2 docs) | Notice of Objection Deadline. Proposed Hearing to be held 12/13/22 at 11:00 am. Certificate of Service on 10/31/22. Filed by Darcy D Williamson TR on behalf of Darcy D Williamson TR *(RE: related document(s)31 Application to Employ J. Michael Morris as Special Counsel Filed on behalf of Trustee Darcy D Williamson TR (Attachments: # 1 Affidavit of Attorney # 2 Mailing Matrix), with Certificate of Service. (Williamson TR, Darcy))* Objections due by 11/23/2022. (Attachments: # 1 Mailing Matrix) (Williamson TR, Darcy) (Entered: 10/31/2022) |
| 10/31/2022 | 33 | Application to Employ Darcy D. Williamson as |

| | (3 pgs; 2 docs) | Attorney for Trustee Filed on behalf of Trustee Darcy D Williamson TR (Attachments: # 1 Affidavit of Attorney), with Certificate of Service.(Williamson TR, Darcy) (Entered: 10/31/2022) |
| --- | --- | --- |
| 10/31/2022 | 34 (2 pgs) | Order Granting Application to Employ (Related Doc # 33) Signed on 10/31/2022. (tkg) (Entered: 10/31/2022) |
| 11/02/2022 | 35 (3 pgs) | BNC Certificate of Mailing - PDF Document. (RE: related document(s)34 Order on Application to Employ) Notice Date 11/02/2022. (Admin.) (Entered: 11/02/2022) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 12/02/2022 11:29:07 | | |
| PACER Login: | kyleanderson | Client Code: | |
| Description: | Docket Report | Search Criteria: | 22-40216 Fil or Ent: filed Doc From: 0 Doc To: 99999999 Term: included Format: html Page counts for documents: included |
| Billable Pages: | 3 | Cost: | 0.30 |

UNITED STATES BANKRUPTCY COURT
DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| Daniel v. Rowe, | ) | Case No. 22-40216 |
| Michelle L. Rowe, | ) | Chapter 7 |
| Debtors. | ) | |
| _____ | ) | |
| Darcy D. Williamson, Trustee, | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. |
| | ) | |
| Litigation Practice Group PC, | ) | |
| Defendant. | ) | |

**COMPLAINT TO AVOID FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548 AND FOR TURNOVER AND RECOVERY UNDER THE KANSAS CREDIT SERVICES ORGANIZTION ACT AND THE KANSAS CONSUMER PROTECTION ACT**

Darcy D. Williamson, Trustee, for her Complaint states:

**Jurisdiction**

1.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, 11 U.S.C §§ 542, 548, and 550, and Fed. R. Bank. P. 7001.

2.      This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), (E), (H), and (O).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

4.      This adversary proceeding is brought in the Chapter 7 bankruptcy of Daniel V. and Michelle L. Rowe, Case No. 22-40215, pending before the United States Bankruptcy Court for the District of Kansas.

5.      The plaintiff consents to entry of a final order or judgment by the Bankruptcy Court.

**Parties / Background**

28X4115

6.      Plaintiff, Darcy D. Williamson, Trustee ("Trustee"), is the duly appointed, qualified, and acting Trustee in the above referenced bankruptcy case.  Her business address is 1109 SW Westside Dr., Topeka, KS 66615.

7.      Defendant Litigation Practice Group P.C. ("LPG") is a California "licensed law corporation" and may be served c/o Daniel S. March, Agent for Service of Process, 17542 E 17th Street, Ste. 100, Tustin, CA 92780.

8.      Prior to filing bankruptcy on April 28, 2022, the debtors were struggling financially.  They could not pay their bills as they became due.  When they filed bankruptcy, the debtors listed total assets of $230,390.00 including exempt assets (home and vehicles) of $216,890.00, and debts of $360,798.00, including secured debt of $311,982.00 ($229,890 collateral value) and unsecured debt of $40,816.00.

9.      The debtors were at all times here relevant residents of Kansas.  While in Kansas the debtor Daniel V. Rowe contacted LPG after viewing its website.

10.      On November 23, 2021, debtor Daniel V. Rowe entered into a Legal Services Agreement with LPG, also electronically.

11.      Under the Legal Services Agreement, LPG said that it would:

- Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any of the debts identified below;

- Dispute the legal validity of the debts identified below;

- Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;

- Represent you in any lawsuit filed against you in connection with any of these debts;

2

- Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;

- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and

- Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

(Agreement, p. 1)  Further, LPG would ". . . [w]here requested" negotiate a settlement of any debt identified in the Agreement.  In such event, the debtor(s) would be responsible to directly pay such settlement (Agreement, p. 3).  The Agreement listed seven (7) unsecured creditors totaling $24,478.00.

12.     A "flat fee" under a Schedule of Payments was charged by LPG as follows:  35 monthly charges of $341.14 and 1 charge of $340.98, for a total of $12,280.88 (Agreement pp. 2, 7).

### COUNT I.  Fraudulent Transfer Under 11 U.S.C. § 548

13.     The debtors, and/or debtor Daniel V. Rowe, transferred $1,364.56 to LPG between December, 2021 and March, 2022 pursuant to the Schedule of Payments set out in the Legal Services Agreement.

14.     Such transfer(s) was/were of an interest of the debtor(s) in property, made within 2 years before the date of the filing of the petition, and for which the debtor(s) received less than a reasonably equivalent value in exchange, and was/were insolvent on the date such transfer(s) were made.

3

15.     The Trustee may, therefore, avoid such transfer(s) pursuant to 11 U.S.C. §
548(a)(1), and recover the same from defendant LPG pursuant to 11 U.S.C. § 550(a)(1).


**COUNT II.  Violation of the Kansas Credit Services Organization Act**

16.     As to the debtor(s), LPG acted as a "credit services organization" under the
Kansas Credit Services Organization Act ("KCSOA"), K.S.A. 50-1116 *et seq*.  It engaged in, or
held out to the public as willing to engage in, the business of "debt management services" for a
fee.  K.S.A. 50-1117(c) and (d).

17.     However, LPG had not obtained a license from the Kansas Bank Commissioner,
as required by K.S.A. 50-1118(a).  As such, LPG violated the KCSOA.

18.     LPG further violated the KCSOA as follows:

(a)     failure to provide the debtor/consumer with a credit education program.  K.S.A.
50-1120(a);

(b)     failure to prepare and provide a written analysis of a budget plan for all of the
debtor/consumer's debt obligations.  K.S.A. 50-1120(b)(1)(B);

(c)     failure to provide to the debtor/consumer a list of each creditor reasonably
expected to participate or not in the debt management services agreement K.S.A. 50-1120(b)(2);

(d)     failure to include in the written debt management services agreement:

- a list of participating creditors to which payments will be made by LPG, including
  the amount owed each creditor, the amount of each payment, the date each
  payment will be made, and the anticipated payoff date;

- the name of each creditor reasonably expected not to participate;

4

- a disclosure that LPG also may receive compensation for the debtor/consumer's creditors for providing debt management services;

- a disclosure that LPG may not, as a condition of entering into a debt management services agreement, require the debtor/consumer to purchase any other produce or service, no solicit or offer to sell any other product or service during the term of the debt management services agreement;

- a disclosure that LPG may not require a voluntary contribution for any service provided by LPG;

- a disclosure that, by executing the debt management services agreement, the debtor/consumer authorizes any financial institution in which LPG has established a trust account for the deposit of the debtor/consumer's funds to disclose to the commissioner any financial records relating to the trust account; and

- a notice substantially similar to the following:  "The Kansas Office of the State Bank Commissioner accepts questions and complaints from consumers regarding (name and license number of licensee) at 700 SW Jackson, Suite 300, Topeka, Kansas, 66603, or by calling toll-free 1-877-387-8523."

K.S.A. 50-1120(c)

(e)     failure to include in its electronic solicitation or advertising, the license number on record with the commissioner, in that LPG failed to obtain such a license.  K.S.A. 50-1120(d);

(f)     advertising or causing to be advertised the services of a credit services organization to a Kansas consumer without first obtaining a license.  K.S.A. 50-1121(f);

(g)     receiving or charging a fee in the form of an "other promise to pay (the Schedule of Payments).  K.S.A. 50-1121(k).

5

19.     The debtor(s) are entitled to damages for such violations in an amount of not less than the amount paid by the debtor(s) to LPG, $1,364.56, plus reasonable attorney fees, costs, and punitive damages.  K.S.A. 50-1133.  The debtor(s) right to such damages is property of the estate, and the Trustee is entitled to turnover of such damages from LPG pursuant to 11 U.S.C. § 542(b).

## **COUNT III.  Violation of the Kansas Consumer Protection Act**

20.     Each violation of the KCSOA, as set out in Count II above, is also a deceptive act or practice under the Kansas Consumer Protection Act ("KCPA").  K.S.A. 50-1132.

21.     The KCPA provides for "damages or a civil penalty . . . whichever is greater" for violation of the act.  K.S.A. 50-634(b).  The civil penalty is up to $10,000.00 for each violation. K.S.A. 50-636(a).

22.     The court should award a civil penalty of $10,000.00 for each of the violations set out in Count II above, or a total of up to $70,000.00.

## **Demands for Relief**

23.     Based on the above, the Plaintiff/Trustee requests an Order:

(a)     avoiding the transfer of the $1,364.56 and recovery from LPG;

(b)     awarding damages under the KCSOA, to include reasonable attorney fees for this action;

(c)     awarding damages under the KCPA, to include civil penalties; and

(d)     awarding costs and pre and post-judgment interest.

*s/ J. Michael Morris*
J. Michael Morris, #09292
KLENDA AUSTERMAN LLC
301 N. Main St., Ste. 1600
Wichita, KS 67202-4816

6

Phone: (316) 267-0331
Fax: (316) 267-0333
Jmmorris@klendalaw.com
*Attorney for Darcy D. Williamson, Trustee*

7

B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET**<br>(Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER**<br>(Court Use Only) |
|---|---|

| **PLAINTIFFS**<br>Darcy D. Williamson, Trustee | **DEFENDANTS**<br>Litigation Practice Group PC |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Klenda Austerman LLC<br>301 N. Main St., Ste. 1600, Wichita, KS 67202-4816<br>Phone: (316) 267-0331 | **ATTORNEYS** (If Known) |
| **PARTY** (Check One Box Only)<br>□ Debtor     □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor     □ Other<br>X Trustee | **PARTY** (Check One Box Only)<br>□ Debtor     □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor     X Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Complaint to avoid fraudulent transfer under 11 U.S.C. § 548 and for turnover and recovery under the Kansas Credit Services Organizton Act and the Kansas Consumer Protection Act.

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- ☑ 11-Recovery of money/property - §542 turnover of property
- □ 12-Recovery of money/property - §547 preference
- ☑ 13-Recovery of money/property - §548 fraudulent transfer
- □ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- □ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- □ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- □ 41-Objection / revocation of discharge -§727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- □ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- □ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- □ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- □ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
- □ 61-Dischargeability - §523(a)(5), domestic support
- □ 68-Dischargeability - §523(a)(6), willful and malicious injury
- □ 63-Dischargeability - §523(a)(8), student loan
- □ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- □ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- □ 71-Injunctive relief – imposition of stay
- □ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- □ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- □ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- □ 01-Determination of removed claim or cause

**Other**
- □ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- ☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ |
| Other Relief Sought | |

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Daniel V. Rowe and Michelle L. Rose | BANKRUPTCY CASE NO.<br>22-40216 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Kansas | DIVISION OFFICE<br>Topeka | NAME OF JUDGE<br>Somers |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>9/30/22 | PRINT NAME OF ATTORNEY (OR PLAINTIFF) | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

# EXHIBIT F

# U.S. District Court
## Northern District of Georgia (Atlanta)
## CIVIL DOCKET FOR CASE #: 1:22-cv-04249-SDG

Hammett v. Debt Resolution Direct, LLC
Assigned to: Judge Steven D. Grimberg
Cause: 15:1679 Credit Repair Organizations

Date Filed: 10/25/2022
Jury Demand: Plaintiff
Nature of Suit: 480 Consumer Credit
Jurisdiction: Federal Question

### Plaintiff

**James Hammett**

represented by **Jenna Dakroub**
Price Law Group, APC
8245 N. 85th Way
Scottsdale, AZ 85258
818-600-5513
Email: jenna@pricelawgroup.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

### Defendant

**Debt Resolution Direct, LLC**
*doing business as*
Debt Advisors of America Company

represented by **Kyle Anderson**
Luper, Neidenthal & Logan
1160 Dublin Road
Ste #400
Columbus, OH 43215
614-221-4409
Email: kanderson@lnlattorneys.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew T. Anderson**
Luper Neidenthal & Logan
1160 Dublin Road
Columbus, OH 43215
614-221-7663
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James William Hays**

Hays & Potter, LLP
3945 Holcomb Bridge Road
Suite 300
Peachtree Corners, GA 30092
770-934-8858
Fax: 770-934-8932
Email: beau@hpmlawatl.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/25/2022 | 1 | COMPLAINT with Jury Demand filed by James Hammett. (Filing fee $402, receipt number AGANDC-12154988) (Attachments: # 1 Civil Cover Sheet)(gas) Please visit our website at http://www.gand.uscourts.gov/commonly-used-forms to obtain Pretrial Instructions and Pretrial Associated Forms which includes the Consent To Proceed Before U.S. Magistrate form. (Entered: 10/26/2022) |
| 10/25/2022 | 2 | Certificate of Interested Persons by James Hammett. (gas) (Entered: 10/26/2022) |
| 10/25/2022 | 3 | Electronic Summons Issued as to Debt Resolution Direct, LLC. (gas) (Entered: 10/26/2022) |
| 10/28/2022 | 4 | STANDING ORDER REGARDING CIVIL LITIGATION Signed by Judge Steven D. Grimberg on 10/28/2022. (gas) (Entered: 10/31/2022) |
| 11/03/2022 | 5 | CERTIFICATE of Compliance re 4 Order (Dakroub, Jenna) (Entered: 11/03/2022) |
| 11/09/2022 | 6 | Return of Service Executed by James Hammett. Debt Resolution Direct, LLC served on 10/27/2022, answer due 11/17/2022. (Dakroub, Jenna) (Entered: 11/09/2022) |
| 11/10/2022 | 7 | NOTICE of Appearance by James William Hays on behalf of Debt Resolution Direct, LLC (Hays, James) (Entered: 11/10/2022) |
| 11/10/2022 | 8 | STIPULATION *for Extension for Defendant to Answer* by James Hammett. (Dakroub, Jenna) (Entered: 11/10/2022) |
| 12/01/2022 | 9 | MOTION to Dismiss for Failure to State a Claim with Brief In Support by Debt Resolution Direct, LLC. (Attachments: # 1 Memorandum of Law) (Hays, James) Modified on 12/2/2022 to edit text (gas). (Entered: 12/01/2022) |
| 12/01/2022 | 10 | Corporate Disclosure Statement by Debt Resolution Direct, LLC.(Hays, James) (Entered: 12/01/2022) |
| 12/01/2022 | 11 | CERTIFICATE of Compliance *Withstanding Order* (Hays, James) (Entered: 12/01/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/02/2022 12:47:33 | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-04249-SDG |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| JAMES HAMMETT, | **Case No.**: |
| Plaintiff, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | 1. **CROA, 15 U.S.C. § 1679,** *et seq.* |
| Debt Resolution Direct, LLC d/b/a Debt Advisors of America Company, | |
| Defendants. | |

Plaintiff James Hammett ("Mr. Hammett" or "Plaintiff") alleges violations of the Credit Repair Organizations Act ("CROA"), 15 U.S.C. § 1679, *et seq.* against Debt Resolution Direct, LLC d/b/a Debt Advisors of America Company ("DAA" or "Defendant"):

## INTRODUCTION

1.    Plaintiff's Complaint arises from violations of the Credit Repair Organizations Act by DAA.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, because Plaintiff alleges violation of the CROA, a federal law. 15 U.S.C. § 1679g (CROA) (establishing civil liability).

1

3.      Venue in the Northern District of Georgia is proper pursuant to 28 U.S.C. § 1391 because Defendant regularly transacts business within this District, is otherwise subject to personal jurisdiction in this District, and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

## PARTIES

4.      Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

5.      Plaintiff is a natural person who resides in Cobb County, Georgia

6.      Plaintiff is a consumer as defined by the CROA, 15 U.S.C. §1679a(1).

7.      Defendant is a credit repair organization ("CRO") as defined by both the CROA, 15 U.S.C. § 1697(a)(3), and Article 4 of the Georgia State criminal code, O.C.G.A. § 16-9-59(a)(2)(A), and a debt settlement company that offers "a form of debt consolidation without a loan" through a personalized "debt restructure program."[1]

8.      For example, Defendant advertises the following service for individuals with a "total debt of $25,000" –

a.   A "monthly payment" of $408;

---

[1]  Reduce your monthly payments today!, Debt Advisers of America, https://www.debtadvisorsofamerica.com/ (last visited Oct 3, 2022).

    b.  A "total repayment" of $18,750;

    c.  A "debt free in" estimate of 46 months;

    d.  An "interest rate" of 0%; and

    e.  "1-on-1 expert help."[2]

    9.    During all times pertinent to this Complaint, Defendant conducted business in the State of Georgia on a routine and systematic basis.

    10.    Defendant is headquartered at 6863 Friars Rd, Ste 101, San Diego, CA 92108-1266.

    11.    During all times pertinent to this Complaint, Defendant acted through its authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and/or insurers.

    12.    Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional.

## FACTUAL ALLEGATIONS

    13.    Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth at length herein.

    14.    Congress enacted the CROA, in part, "to protect the public from

---

[2]  Reduce your monthly payments today!, Debt Advisers of America, https://www.debtadvisorsofamerica.com/ (last visited Oct 3, 2022).

unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. § 1679(b)(2).

15.    In so doing, Congress expressly found that "[c]ertain advertising and business practices of some companies engaged in the business of credit repair services have worked a financial hardship upon consumers, particularly those of limited economic means and who are inexperienced in credit matters." 15 U.S.C. § 1679(a)(2).

16.    The CROA was enacted primarily for the benefit and protection of individual consumers who are experiencing "credit problems." *See* 15 U.S.C. § 1679(a)(1) ("…consumers who have experienced credit problems may seek assistance from credit repair organizations which offer to improve the credit standing of such consumers.").

17.    At all times pertinent to this Complaint, Mr. Hammett was such a consumer. Under circumstances irrelevant to this action, at some point prior to December 2020 Mr. Hammett experienced financial hardship, falling behind on a myriad of debts which were impacting his credit score.

18.    On or about December 9, 2020, Mr. Hammett, who was then a resident of the State of Arizona, received an unsolicited flyer in the mail from DAA, advertising help for credit issues.

4

19.     Mr. Hammett called the number on the flyer and spoke to a representative of DAA regarding the possibility of DAA assisting Mr. Hammett with his debt and credit issues.

20.     DAA advised Mr. Hammett that he could enroll a number of his debts into its program, at which point Mr. Hammett would make monthly payments, and that DAA would, in turn, use such funds for the purpose of assisting Mr. Hammett in resolving his obligation.

21.     Mr. Hammett was expressly instructed by DAA that, if he signed up for the program, he should stop paying all of his creditors and only pay DAA.

22.     DAA further informed Mr. Hammett that DAA's program included legal services provided by non-party Litigation Practice Group ("LPG"), a law firm which DAA represented as "Debt Advisers of America's attorneys" even though LPG and DAA are separate entities, which offered services including the deletion of all charge-off and late-payment notations from his credit report using the Fair Credit Reporting Act.

23.     Mr. Hammett was led to believe that DAA's program, if it worked as advertised, would result in Mr. Hammett having the derogatory information and accounts appearing on his credit report resolved or otherwise removed, so that such accounts would no longer impact his credit in the manner they were.

5

24. Believing that, by signing up and paying for DAA's advertised services, he would have his accounts resolved and credit improved by paying DAA instead of his creditors, Mr. Hammett agreed to utilize DAA's services.

25. DAA's representative then introduced Mr. Hammett to a representative from LPG, explicitly representing to Mr. Hammett that LPG was DAA's partner and would provide the legal portion of the services offered through the program, including credit report review and removal of accounts reporting charge-offs or late payments status.

26. Mr. Hammett signed a retainer agreement with LPG, at the direction of DAA's representative, and set up automatic payments for the credit repair and debt relief program through a third-party payment processor identified as non-party Coastal Processing Company ("Coastal Processing").

27. Mr. Hammett entered into an agreement with DAA and began paying the demanded monthly payment of approximately $255 through Coastal Processing.

28. Sometime thereafter, LPG informed Mr. Hammett that it would start processing his payments rather than Coastal Processing.

29. Upon information and belief, Mr. Hammett's first payment made to DAA was an up-front, one-time fee of approximately $255 charged for services

6

DAA had not yet performed.

30.    As Mr. Hammett continued making his monthly payments, DAA continued charging Mr. Hammett fees for services not yet performed.

31.    DAA failed to clarify to Mr. Hammett the way in which his payments would be apportioned or what portions would go towards certain fees.

32.    During this time, Mr. Hammett continued to call DAA regularly and speak to its representative, requesting updates on the progress.

33.    While Mr. Hammett was led to believe that his payments were going towards actively resolving his debts or otherwise addressing his credit, DAA failed to perform the services that were represented, and Mr. Hammett received no benefit at as result of DAA's program.

34.    In the Fall of 2021, Mr. Hammett moved to Cobb County, Georgia.

35.    Mr. Hammett expressly informed DAA's representative of his move to Georgia via telephone.

36.    DAA continued to accept Mr. Hammett's monthly payments and assured him that such payments were going towards the resolution of his debt and credit concerns when he called.

37.    On March 11, 2021, Mr. Hammett received letters from LPG stating that, under the enrolled program, LPG had sent dispute letters to all three credit

7

bureaus to remove all unverified debt under the FCRA.

38.     In March 2022, Mr. Hammett pulled his credit reports from all three major consumer reporting agencies and discovered that his credit report had declined substantially since beginning DAA's program. Specifically, prior to retaining DAA, Mr. Hammett's credit score had been approximately 672. As of March 2022, Mr. Hammett's credit scores were as follows:

    a.  Equifax: 548

    b.  Experian: 552

    c.  Trans Union: 548

39.     Mr. Hammett also discovered that neither DAA nor LPG, despite explicit representations to the contrary, had sent dispute letters to the consumer reporting agencies and that multiple accounts enrolled in DAA's program were still reporting as derogatory accounts having been charged off or with late payment notation.

40.     In other words, during the time wherein Mr. Hammett was paying DAA for the express purpose of resolving his debts and improving his credit, Mr. Hammett's debts became massively delinquent, and his credit score dropped over 120 points.

41.     Shocked, Mr. Hammett called all three of the consumer reporting

agencies and was informed by the same that they had never received any documents or disputes from DAA or any company associated with DAA.

42.    Upon learning this, Mr. Hammett called DAA and spoke to the representative, demanding proof that any disputes had actually been sent. Neither DAA nor LPG could provide such proof.

43.    Mr. Hammett paid thousands of dollars in monthly payments to DAA before cancelling his contract in or around March 2022, due to DAA's failure to provide any benefit to Mr. Hammett, much less the benefits that were represented to Mr. Hammett as forthcoming if he enrolled in DAA's program.

44.    DAA's actions have caused Mr. Hammett substantial harm.

45.    Mr. Hammett's credit score dropped over 120 points on average, causing third-party potential creditors to view him less favorably. Furthermore, the drop in credit score prevented Mr. Hammett from accessing $17,000 from his SBA Disaster Loan, taken out to assist his business during the COVID-19 pandemic.

46.    Mr. Hammett is now in a serious financial predicament, being forced to consider filing for bankruptcy due to DAA's false representations and failure to provide the services promised.

47.    All of this has caused Mr. Hammett enormous amounts of stress emotional and mental distress, including but not limited to stress, anxiety, mental

anguish, aggravation, sleeplessness, and headaches.

## COUNT I
### Violations of the CROA, 15 U.S.C. § 1679, *et seq.*

48.     Plaintiff incorporates herein by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

49.     Mr. Hammett is a "consumer" as defined by 15 U.S.C. § 1679a(1) of the CROA.

50.     DAA is a "credit repair organization" as defined by § 1679a(3) of the CROA, as it is an entity which uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of improving a consumer's credit, credit history, or credit rating, or providing assistance to any consumer with regard to any activity or service for the purpose of improving a consumer's credit.

51.     DAA is also a "credit repair organization" as defined by § O.C.G.A. § 16-9-59(a)(2)(A) of the Georgia State criminal code, as it is an entity which, with respect to the extension of credit to a buyer by others, sells, provides, or performs, or represents that [it] can or will sell, provide, or perform, in return for the payment of money or other valuable consideration the service of improving a buyer's credit

10

record, history, or rating or providing advice or assistance to a buyer with regard to the same.

52.     DAA's program was presented to Mr. Hammett and consumers as having the implicit purpose of improving credit history, as if it worked properly, it would allow Mr. Hammett to pay down his debts and reestablish his credit. DAA's connecting Mr. Hammett with LPG further illustrates that it is a credit repair organization under the CROA.

53.     DAA's actions as a CRO during all times after receiving notice that Mr. Hammett had moved to Georgia constitute a misdemeanor under Georgia State law, O.C.G.A. Section 16-9-59.

### *Violations of CROA § 1679b(a)*

54.     The CROA, under 15 U.S.C. § 1679(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization." Additionally, under § 1679a(4), any person is prohibited from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception of any person in connection with the offer or sale of the services of the credit repair organization."

55.     DAA violated the above referenced provisions of the CROA through

11

the generally deceptive and misleading nature in which it held out its services to Mr. Hammett. DAA promised Mr. Hammett that its program and partnerships would result in all of Mr. Hammett's enrolled debts being addressed and resolved. However, DAA failed to meaningly perform any of the services it represented it would perform.

56.     DAA further violated the above referenced provisions of the CROA through its misrepresentations and deceptions as to the nature of the fees that would be assessed in connection with the advertised services it offered. DAA suggested to Mr. Hammett that his payments would go towards resolving his obligations. However, DAA deceptively omitted the fact that there would be extensive charges for various fees and services that were not properly explained to Claimant, including fees charged by LPG and other monies simply pocketed by DAA for services not yet rendered. DAA's conduct was designed to convince Mr. Hammett that utilizing DAA's services would be beneficial, while failing to mention any information that would make Mr. Hammett rethink the appropriateness of DAA's program.

57.     DAA further violated the above referenced provisions of the CROA through it generally fraudulent and deceptive business model. Upon information and belief, DAA is part of a scheme whereby it seeks to enroll vulnerable

consumers in its programs based on incomplete and deceptive information absent the intent to provide the services as advertised. After a consumer has been convinced of the potential upsides of DAA's program, and upon further information and belief, DAA has the consumer sign a retainer with LPG for the supposed legal services to be performed, and then has the payment for the entire program processed through a third-party vendor, Coastal Processing. Upon information and belief, LPG and DAA share portions of the services charges without informing the consumer of the same. As such, DAA engages in a deceptive and unfair scheme designed to transfer a consumer's money to its own pockets before such consumer gets wise to the ineffective nature of DAA's services.

58.    Finally, DAA violated the above referenced provisions of the CROA by engaging in activity which is illegal under state law. DAA's actions as a CRO during all times after receiving notice that Mr. Hammett had moved to Georgia constitute a misdemeanor under Article 4 of Georgia State law, which sets forth "Fraud and Related Offenses." Specifically, DAA violated O.C.G.A. Section 16-9-59, committing a misdemeanor as a result. Engagement in activity expressly defined as an offense "related" to "fraud" under state law constitutes "engag[ment], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or

deception of any person in connection with the offer or sale of the services of the credit repair organization." *See* § 1679a(4). Thus, DAA's violation of Georgia state law is a per se violation of the CROA.

### *Violations of CROA § 1679b(b)*

59. The CROA, under § 1679b(b), explicitly states that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such services is fully performed."

60. DAA violated § 1679b(b) by charging and receiving money from Mr. Hammett in exchange for the performance of services before such services were fully performed. DAA charged Mr. Hammett consideration on an upfront basis before any services were performed, in plain violation of § 1679b(b) and attempted to hide such charge as a fee for legal services to LPG by having all payments process by a third-party vendor, Coastal Processing, and by splitting such payments with LPG. Furthermore, throughout the life of their dealings, DAA engaged in this scheme on a monthly basis, charging Mr. Hammett a flat-fee or otherwise causing undisclosed services fees to be created for services before such services were fully performed.

61. Mr. Hammett paid DAA thousands of dollars in fees despite DAA

failing to perform the services and achieve the represented results that would have justified its collection of such payments and fees.

### _Violations of CROA §§ 1679c, 1679d & 1679e_

62.     The CROA, under § 1679c, outlines various disclosures that CROs must provide prior to entering into agreements with consumers such as Mr. Hammett.

63.     Further, § 1679d(a), expressly requires a CRO to enter into a written and dated contract before providing or purporting to provide credit repair services.

64.     Further, § 1679d(b) outlines various requirements for any contracts between CROs and their customers, including a written description of "the terms and conditions of payment, including the total amount of all payments to be made by the consumer to the credit repair organization or to any other person" and "a full and detailed description of the services to be performed by the credit repair organization for the consumer" and "all guarantees of performance; and an estimate of the date by which the performance of the services (to be performed by the credit repair organization or any other person) will be complete" and "the credit repair organization's name and principal business address" and finally "a conspicuous statement, in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows:

15

'You may cancel this contract without penalty or obligation at any time before midnight on the 3rd business day after the date on which you signed the contract. See attached notice of cancelation form.'"

65.    Further, § 1679e requires copies of the required notice of cancellation to be provided to consumers.

66.    DAA failed completely to comply with the requirements under § 1679d(b). Specifically, DAA

     a.    Failed to enter into a written contract which included the total amount of payments to be made to DAA or "any other person" (such as LPG);

     b.    Failed to include a full description of the services to be performed, including all guarantees of performance and an estimate of the time in which the services would be performed by either DAA or "any other person" (such as LPG); and

     c.    Failed to include its organizational name and principal place of business address in the required written contract;

67.    Further, DAA attempted to escape the requirements under §§ 1679c, 1679d & 1679e by failing to provide Mr. Hammett with a written contract for its advertised services, and instead having Mr. Hammett sign a retainer agreement with LPG (who it represented to Mr. Hammett as DAA's attorneys), and by having

16

all payments routed through a third-party processing vendor, Coastal Processing.

68.    DAA entered into an illegal oral agreement with Mr. Hammett to provide services as a CRO and failed completely to provide the required disclosures under §§ 1679c, 1679d & 1679e.

69.    Due to DAA's noncompliance with the above referenced CROA provisions, its agreement with Mr. Hammett is void and unenforceable under 15 U.S.C. § 1679f(c).

### *DAA's Liability*

70.    DAA's violations of the CROA render it liable to Mr. Hammett for actual damages, punitive damages, and an award of costs and reasonable attorneys fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment against Defendant for the following:

(a)    A declaration that the practices complaint of herein are unlawful and violative of the CROA;

(b)    An award of actual damages to be determined at trial, pursuant to 15 U.S.C. § 1679g(a)(1)(A);

(c)    An award of punitive damages, as allowed by the Court pursuant to 15 U.S.C. § 1679g(a)(2)(A),

17

(d)     Costs and reasonable attorneys' fees pursuant to 15 U.S.C. §

1679g(a)(3); and

(e)     Such other and further relief as this Honorable Court may deem just

and proper, including any applicable pre-judgment and post-judgment

interest, and/or declaratory relief.

## <u>J</u>URY DEMAND

Plaintiff hereby demands jury trial on all issues so triable.


RESPECTFULLY SUBMITTED this 25th day of October 2022,

<div style="margin-left:50%;">

*/s/Jenna Dakroub*
Jenna Dakroub GA: 385021
**Price Law Group, APC**
8245 N. 85th Way
Scottsdale, AZ 85258
E: jenna@pricelawgroup.com
T: (818) 600-5513
F: (818) 600-5513
*Attorney for Plaintiff,*
*James Hammett*

</div>

18

# EXHIBIT G

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA (Western Division - Los Angeles)
# CIVIL DOCKET FOR CASE #: 2:22-cv-07915-MAR

Beverly A Graham v. The Litigation Practice Group PC
Assigned to: Magistrate Judge Margo A. Rocconi
Cause: 15:1692 Fair Debt Collection Act

Date Filed: 10/31/2022
Jury Demand: Plaintiff
Nature of Suit: 480 Consumer Credit
Jurisdiction: Federal Question

**Plaintiff**

**Beverly A Graham**          represented by **Bobby Charles Walker**
Sulaiman Law Group, Ltd
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
630-575-8181
Fax: 630-575-8188
Email: bwalker@sulaimanlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group PC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/31/2022 | 1 | COMPLAINT Receipt No: ACACDC-34242540 - Fee: $402, filed by Plaintiff Beverly A Graham. (Attorney Bobby Charles Walker added to party Beverly A Graham(pty:pla))(Walker, Bobby) (Entered: 10/31/2022) |
| 10/31/2022 | 2 | NOTICE of Interested Parties filed by Plaintiff Beverly A Graham, (Walker, Bobby) (Entered: 10/31/2022) |
| 10/31/2022 | 3 | CIVIL COVER SHEET filed by Plaintiff Beverly A Graham. (Walker, Bobby) (Entered: 10/31/2022) |
| 10/31/2022 | 4 | Request for Clerk to Issue Summons on Complaint (Attorney Civil Case Opening) 1 filed by Plaintiff Beverly A Graham. (Walker, Bobby) (Entered: 10/31/2022) |

| 11/01/2022 | 5 | NOTICE TO COUNSEL re Magistrate Judge Direct Assignment Program. This case has been randomly assigned to Magistrate Judge Margo A. Rocconi. (Attachments: # 1 CV11-C) (car) (Entered: 11/01/2022) |
| 11/01/2022 | 6 | 21 DAY Summons Issued re Complaint (Attorney Civil Case Opening) 1 as to Defendant The Litigation Practice Group PC. (car) (Entered: 11/01/2022) |
| 11/14/2022 | 7 | WAIVER OF SERVICE Returned Executed filed by Plaintiff Beverly A Graham. upon The Litigation Practice Group PC waiver sent by Plaintiff on 11/7/2022, answer due 1/6/2023. Waiver of Service signed by Kyle T. Anderson. (Walker, Bobby) (Entered: 11/14/2022) |

| **PACER Service Center** | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/02/2022 09:49:13 | | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-07915-MAR End date: 12/2/2022 |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

1
2
3
4
5
6

**SULAIMAN LAW GROUP, LTD.**
Bobby C. Walker, Esq. (State Bar No. 321788)
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
Telephone: (630) 575-8181 Ext. 149
Facsimile: (630) 575-8188
Email: bwalker@sulaimanlaw.com
Attorney for Plaintiff

7
8
9
10

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

11
12
13
14
15
16

| | |
|---|---|
| BEVERLY A. GRAHAM, | Case No. 2:22-cv-07915 |
| Plaintiff, | **COMPLAINT FOR DAMAGES** |
| v. | **1. VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. §1679 ET SEQ.;** |
| THE LITIGATION PRACTICE GROUP, PC, | |
| Defendant. | **DEMAND FOR JURY TRIAL** |

17
18
19
20
21
22
23
24
25
26
27
28

## COMPLAINT

NOW comes BEVERLY A. GRAHAM ("Plaintiff"), by and through the undersigned, complaining as to the conduct of THE LITIGATION PRACTICE GROUP, PC ("Defendant") as follows:

### NATURE OF THE ACTION

1. Plaintiff brings this action for damages pursuant to the Credit Repair Organizations Act ("CROA") for Defendant's unlawful conduct.

### JURISDICTION AND VENUE

1

2.  This action arises under and is brought pursuant to the CROA.  Subject matter jurisdiction is conferred upon this Court by 15 U.S.C §1679, as well as 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States.

3.  Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Defendant resides within, conducts business within, and a substantial portion of the events or omissions giving rise to the claims occurred within, the Central District of California.

### PARTIES

4.  Plaintiff is a natural "person," as defined by 47 U.S.C. § 153(39), over 18 years of age.

5.  Defendant is a credit repair organization, debt settlement provider, and law corporation that offers its customers the ability to eliminate and resolve their debt issues through Defendant's myriad services, including assisting consumers with resolving debts that would otherwise be unresolved, as well as through disputing information appearing on consumer's credit reports so that such information could be removed and in turn improve consumer's credit scores. Defendant is a professional corporation organized under the laws of the state of California with its principal place of business located at 17542 17th Street, Suite 100, Tustin, California.

6.  Defendant is a "person" as defined by 47 U.S.C. §153(39).

7.  Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers at all times relevant to the instant action.

## FACTS SUPPORTING CAUSES OF ACTION

8.   In approximately May of 2022, Plaintiff was seeking to improve her credit and to take care of some obligations that were causing her financial difficulty.

9.   Plaintiff subsequently happened upon Defendant's services

10. Upon speaking with Plaintiff, Defendant advised that its services included disputing information that was appearing on, and negatively impacting, Plaintiff's credit reports in order to get that information removed and to improve her credit.

11. Defendant further offered various "legal" services in connection with its disputes.

12. Defendant explicitly represented that its services would improve Plaintiff's credit history, score, and rating, as Defendant advised that through the disputes, Plaintiff's credit report would improve by having negative information removed from her credit report.

13. Defendant further advised that Plaintiff's monthly payments would be put into a dedicated account, and Defendant would then use such funds to negotiate debts for reduced balances, which would further improve Plaintiff's credit and result in her being debt free by having Defendant resolve obligations that she would otherwise be unable to resolve on her own.

14. Upon information and belief, Defendant explicitly informs consumers that the explicit purpose of its business is to restore consumer's credit.

3

15.  Plaintiff found Defendant's services desirable as she believed that, by making payments to Defendant instead of each individual creditor, her credit score would improve and Defendant would take care of all of Plaintiff's enrolled obligations.

16.  As a result, Plaintiff agreed to utilize Defendant's services and entered into a contract for the provision of the same.

17.  Plaintiff subsequently began making her monthly payments to Defendant, which totaled approximately $349.00 per month.

18.  Plaintiff has been making payments for 4 months; however, Defendant has failed to meaningfully deliver any services.

19.  Upon information and belief, Defendant has been taking funds from Plaintiff's monthly payments and, rather than use them to resolve the obligations as represented, is instead applying such charges to various fees for services, including legal services, that Defendant has not performed, let alone fully performed.

20.  Furthermore, upon information and belief, Defendant is engaged in a pattern of practice of representing its service one way when speaking with consumers, only to cut against those very representations in the contractual documents Defendant has consumers sign.

21.  Frustrated and distressed over Defendant's conduct, Plaintiff spoke with the undersigned regarding her rights.

22.  Plaintiff has suffered concrete harm as a result of Defendant's actions, including but not limited to, emotional distress, aggravation, mental anguish,

4

pecuniary harm, denial of the benefit of her bargain, making payments for deficient credit repair services, relying upon Defendant's representations to her detriment, being subjected to improper fees, as well as a violation of her federally protected interests – interests which were harmed and put at a material risk of harm as a result of Defendant's conduct.

## COUNT I – VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

23. Plaintiff repeats and realleges paragraphs 1 through 22 as though fully set forth herein.

24. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1679a(1) of the CROA.

25. Defendant is a "credit repair organization" as defined by §1679a(3) of the CROA, as it is a person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied purpose of improving a consumer's credit, credit history, or credit rating, or providing assistance to any consumer with regard to any activity or service for the purpose of improving a consumer's credit.

### a. Violations of CROA § 1679b(a)

26. The CROA, pursuant to 15 U.S.C. § 1679b(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization." Additionally, pursuant to 15 U.S.C. § 1679b(a)(4), any person is prohibited from "engag[ing], directly or indirectly, in any act, practice, or

5

course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

27. Defendant violated the above referenced provisions of the CROA through its misrepresentations and deception as to the nature of the credit repair services it would provide Plaintiff. Upon information and belief, Defendant represented to Plaintiff that all she had to do was pay Defendant a single monthly fee, and that Defendant would use those payments to resolve all of Plaintiff's allegations. However, in the contract Defendant has consumers sign, Defendant cuts against the representations made orally, as rather than using the funds to settle the debts, Defendant uses the funds to pay for its charges and fees, and that any settlement Defendant reaches will have to come out of Plaintiff's pocket in addition to the monthly payments. Defendant thus deceptively and misleadingly represents the nature of its services to induce consumers to sign up for its services, likely banking on the notion that consumers will not carefully consider the contractual language being put in front of them by someone who has just promised to resolve all of their credit issues.

**b. Violations of CROA § 1679b(b)**

28. The CROA, pursuant to 15 U.S.C. § 1679b(b), provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for

the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

29. Defendant violated § 1679b(b) through its charging and receiving of money for services it agreed to perform for Plaintiff before such services were fully performed. Defendant charged Plaintiff up-front fees and monthly fees unrelated to any services Defendant fully performed, and further took portions of Plaintiff's payments for certain "legal" fees that had not been performed and which were completely unnecessary for Plaintiff.

### c. Violation of CROA § 1679c

30. The CROA provides that a credit repair organization must provide consumers with certain written disclosures in the contract underpinning the provision of credit repair services to consumer. Pursuant to 15 U.S.C. § 1679c(b), "the written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

31. Defendant violated 15 U.S.C. § 1679c through its failure to provide the written disclosures required under § 1679c. Defendant never provided such disclosures, nor did it provide a separate document containing such disclosures.

### d. Violation of CROA §§ 1679d & 1679e

7

32. The CROA, pursuant to 15 U.S.C. § 1679d(4), requires credit repair organization to include, in the contract between them and a consumer, "a conspicuous statement **in bold face type**, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'" 15 U.S.C. § 1679e further outlines the extent of a consumer's cancellation rights under the CROA, while requiring such disclosure to be given to consumers in writing and separate from the contract.

33. Defendant violated 15 U.S.C. § 1679d through its failure to provide the requisite statutory disclosure in the manner required by the CROA. Defendant further violated § 1679e through its failure to provide a notice of cancellation form to Plaintiff in its contract.

34. As a result of Defendant's deficient contract, the contract should be deemed void and unenforceable. 15 U.S.C. § 1679f(c).

**e. Violation of CROA § 1679f(b)**

35. The CROA, pursuant to 15 U.S.C. § 1679f(b) provides that, "[a]ny attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under [the CROA] shall be treated as a violation of [the CROA]."

8

36. Defendant violated 15 U.S.C. § 1679f(b) through its attempt to obtain Plaintiff's waiver of the protections afforded him under the CROA. Defendant's contract attempts to waive the protection for consumers against credit repair organizations charging before the full completion of services, as it attempts to get consumers to agree that Defendant's fees are "earned" upon payment by Plaintiff, rather than when they fully complete the services agreed to perform, as required by the CROA. Defendant further attempts to get consumer's to contractually acknowledge the very opposite of what Defendant orally represented, illustrating Defendant's efforts to insulate itself from the knowingly false representations it makes to consumers.

37. The CROA further dictates that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679f(c).

WHEREFORE, Plaintiff, BEVERLY A. GRAHAM, respectfully requests that this Honorable Court enter judgment in her favor as follows:

a. Declaring that the practices complained of herein are unlawful and violate the aforementioned bodies of law;

b. Awarding Plaintiff actual damages to be determined at trial, as provided under 15 U.S.C. § 1679g(a)(1);

c. Awarding Plaintiff punitive damages, in an amount to be determined at trial, as provided under 15 U.S.C. § 1679g(a)(2)(A);

d. Awarding Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. § 1679g(a)(3); and

9

e. Awarding any other relief as this Honorable Court deems just and
   appropriate.


Dated: October 31, 2022                    Respectfully submitted,

                                           /s/Bobby C. Walker
                                           Bobby C. Walker, Esq.
                                           California Bar No. 321788
                                           *Counsel for Plaintiff*
                                           Sulaiman Law Group, Ltd
                                           2500 S Highland Ave, Suite 200
                                           Lombard, IL 60148
                                           Telephone: (630) 575-8181 Ext. 149
                                           bwalker@sulaimanlaw.com

# EXHIBIT H

Query    Reports    Utilities    Help    Log Out

CIVIL

# U.S. District Court
# Eastern District of California - Live System (Sacramento)
# CIVIL DOCKET FOR CASE #: 2:22-cv-01959-DAD-DB

Rizo v. The Litigation Practice Group, PC
Assigned to: District Judge Dale A. Drozd
Referred to: Magistrate Judge Deborah Barnes
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 10/31/2022
Jury Demand: Plaintiff
Nature of Suit: 480 Consumer Credit
Jurisdiction: Federal Question

**Plaintiff**

**Johnny W. Rizo**    represented by    **Bobby Charles Walker**
Sulaiman Law Group, Ltd
2500 South Highland Avenue
Suite 200
Lombard, IL 60148
630-575-8181
Fax: 630-575-8188
Email: bwalker@sulaimanlaw.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group, PC**

| Date Filed | # | Docket Text |
|---|---|---|
| 10/31/2022 | 1 | COMPLAINT against The Litigation Practice Group, PC by Johnny W. Rizo. Attorney Walker, Bobby Charles added. (Filing fee $ 402, receipt number ACAEDC-10522327) (Attachments: # 1 Civil Cover Sheet)(Walker, Bobby) (Entered: 10/31/2022) |
| 10/31/2022 | 2 | SUMMONS ISSUED as to *The Litigation Practice Group, PC* with answer to complaint due within *21* days. Attorney *Bobby Charles Walker* *Sulaiman Law Group, Ltd* *2500 South Highland Ave, Suite 200* *Lombard, IL 60148*. (Kastilahn, A) (Entered: 10/31/2022) |
| 10/31/2022 | 3 | CIVIL NEW CASE DOCUMENTS ISSUED; Initial Scheduling Conference set for 3/7/2023 at 01:30 PM in Courtroom 4 (DAD) before District Judge |

| | | Dale A. Drozd. (Attachments: # [1](#) Standing Order, # [2](#) Consent Form, # [3](#) VDRP) (Kastilahn, A) (Entered: 10/31/2022) |
| 11/14/2022 | [4](#) | NOTICE OF INTERESTED PARTIES by Johnny W. Rizo. (Walker, Bobby) (Entered: 11/14/2022) |
| 11/14/2022 | [5](#) | WAIVER of SERVICE RETURNED EXECUTED: Waiver sent to The Litigation Practice Group, PC on 11/7/2022. (Walker, Bobby) Modified on 11/16/2022 (Mena-Sanchez, L). (Entered: 11/14/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/02/2022 09:50:35 | | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-01959-DAD-DB |
| **Billable Pages:** | 1 | **Cost:** | 0.10 |

https://ecf.caed.uscourts.gov/cgi-bin/DktRpt.pl?113951180120155-L_1_0-1　　　　2/2

**SULAIMAN LAW GROUP, LTD.**
Bobby C. Walker, Esq. (State Bar No. 321788)
2500 South Highland Avenue, Suite 200
Lombard, IL 60148
Telephone: (630) 575-8181 Ext. 149
Facsimile: (630) 575-8188
Email: bwalker@sulaimanlaw.com
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHNNY W. RIZO,<br><br>               Plaintiff,<br><br>    v.<br><br>THE LITIGATION PRACTICE<br>GROUP, PC,<br><br>            Defendant. | Case No.<br><br>**COMPLAINT FOR DAMAGES**<br><br>**1. VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT, 15 U.S.C. §1679 ET SEQ.;**<br><br>**2. VIOLATION OF THE CALIFORNIA CREDIT SERVICES ORGANIZATIONS ACT OF 1984, CAL. CIV. CODE §1789.10 ET SEQ.**<br><br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

NOW comes JOHNNY W. RIZO ("Plaintiff"), by and through the undersigned, complaining as to the conduct of THE LITIGATION PRACTICE GROUP, PC ("Defendant") as follows:

### NATURE OF THE ACTION

1. Plaintiff brings this action for damages pursuant to the Credit Repair Organizations Act ("CROA") under 15 U.S.C. § 1679 *et seq.* the California Credit

1

Services Organizations Act of 1984 ("CCSOA") pursuant to Cal. Civ. Code §1789.10 *et seq.* for Defendant's unlawful conduct.

### JURISDICTION AND VENUE

2. This action arises under and is brought pursuant to the CROA. Subject matter jurisdiction is conferred upon this Court by 15 U.S.C §1679, as well as 28 U.S.C. §§1331 and 1337, as the action arises under the laws of the United States. Supplemental jurisdiction exists for the state law claims pursuant to 28 U.S.C. §1367.

3. Venue is proper in this Court pursuant to 28 U.S.C. §1391 as Defendant conducts business within the Eastern District of California and a substantial portion of the events or omissions giving rise to the claims occurred within the Eastern District of California.

### PARTIES

4. Plaintiff is a natural "person," as defined by 47 U.S.C. § 153(39), over 18 years of age, residing in Stockton, California, which lies within the Eastern District of California.

5. Defendant is a credit repair organization, debt settlement provider, and law corporation that offers its customers the ability to eliminate and resolve their debt issues through Defendant's myriad services, including assisting consumers with resolving debts that would otherwise be unresolved, as well as through disputing information appearing on consumer's credit reports so that such information could be removed and in turn improve consumer's credit scores. Defendant is a professional

corporation organized under the laws of the state of California with its principal place of business located at 17542 17th Street, Suite 100, Tustin, California.

6. Defendant is a "person" as defined by 47 U.S.C. §153(39).

7. Defendant acted through its agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives and insurers at all times relevant to the instant action.

### FACTS SUPPORTING CAUSES OF ACTION

8. In approximately 2020, Plaintiff was seeking to improve his credit and to take care of some obligations that were causing him financial difficulty.

9. Plaintiff subsequently happened upon an advertisement offered by Defendant, located on social media, which offered consumers the ability to improve their credit through certain services.

10. Upon speaking with Plaintiff, Defendant advised that its services included disputing information that was appearing on, and negatively impacting, Plaintiff's credit reports, and through such efforts, Defendant would get the debts rendered uncollectable, in turn removing any obligation for Plaintiff to make payment on such debts.

11. Defendant explicitly represented that its services would improve Plaintiff's credit history, score, and rating, as Defendant advised that through the disputes, Plaintiff's credit report would improve by having negative information removed from his credit report.

3

12. Defendant further advised that because Plaintiff would not have pay these debts, his credit score would improve.

13. Plaintiff was explicitly informed by one of Defendant's representatives that "My team and I will be working with you over these next months to invalidate your debts with the creditors and collection agencies and to **restore your credit**." (emphasis added).

14. Defendant affirmatively represented that this information would be removed from Plaintiff's credit reports promptly upon signing up with Defendant's services

15. Plaintiff found Defendant's services desirable as he believed Defendant would be able to get certain information removed from his credit report and would actively resolve his obligations, and so Plaintiff agreed to utilize Defendant's services and entered into a contract for the provision of the same.

16. Plaintiff subsequently began making his monthly payments to Defendant, which totaled $130.00 per month.

17. Defendant inappropriately charged Plaintiff for its services before performing any of the services it agreed to perform for Plaintiff.

18. After months of making payments, Plaintiff saw no improvement to his credit score despite Defendant's representations to the contrary.

19. Plaintiff would speak with Defendant about what it was doing and looking for updates, and Defendant persistently strung Plaintiff along assuring him that it was working on it and that its services would ultimately work.

4

20. Due to Defendant's failure to deliver any of the services it represented it would perform, Plaintiff cancelled his services with Defendant.

21. Despite Plaintiff cancelling his agreement and Defendant failing to provide any of the services for which it was paid, Defendant failed to refund Plaintiff's payments for services Defendant failed to perform.

22. Frustrated and distressed over Defendant's conduct, Plaintiff spoke with the undersigned regarding his rights.

23. Plaintiff has suffered concrete harm as a result of Defendant's actions, including but not limited to, emotional distress, aggravation, mental anguish, pecuniary harm, denial of the benefit of his bargain, making payments for deficient credit repair services, relying upon Defendant's representations to his detriment, being subjected to improper fees, as well as a violation of his state and federally protected interests – interests which were harmed and put at a material risk of harm as a result of Defendant's conduct.

## COUNT I – VIOLATIONS OF THE CREDIT REPAIR ORGANIZATIONS ACT

24. Plaintiff repeats and realleges paragraphs 1 through 23 as though fully set forth herein.

25. Plaintiff is a "consumer" as defined by 15 U.S.C. § 1679a(1) of the CROA.

26. Defendant is a "credit repair organization" as defined by §1679a(3) of the CROA, as it is a person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or

other valuable consideration, for the express or implied purpose of improving a consumer's credit, credit history, or credit rating, or providing assistance to any consumer with regard to any activity or service for the purpose of improving a consumer's credit.

27. Defendant is a credit repair organization as it explicitly holds its services out as offering consumers the ability to

### a. Violations of CROA § 1679b(a)

28. The CROA, pursuant to 15 U.S.C. § 1679b(a)(3) prohibits any person from "mak[ing] or us[ing] any untrue or misleading representation of the services of the credit repair organization." Additionally, pursuant to 15 U.S.C. § 1679b(a)(4), any person is prohibited from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization."

29. Defendant violated the above referenced provisions of the CROA through its misrepresentations and deception as to the nature of the credit repair services it would provide Plaintiff. Defendant affirmatively represented the efficacy of its services, yet failed to provide the represented results in the manner represented. Defendant said the issues would be resolved promptly, yet no action or results were delivered despite Plaintiff's maintenance of payments for months. Defendant's conduct harmed Plaintiff as he agreed to use Defendant's services and continue

making payments under the false belief that the debts would be removed from his credit report and would no longer be collectable, yet Defendant failed to deliver the services inducing Plaintiff's payments.

30. Defendant further violated the above referenced provisions of the CROA through the generally deceptive and fraudulent nature of its business practices. Defendant represented to Plaintiff, and represents to consumers, that its debt validation services would be effective at getting the debts rendered uncollectable. However, Defendant fails to sufficiently explain the unlikelihood with which, through disputes alone, debts would be rendered noncollectable or that a consumer's obligation would otherwise be extinguished. Upon information and belief, Defendant offers its debt validation program for the purpose of inducing consumers into using Defendant's services, despite Defendant knowing them to be ineffective, so that Defendant can subsequently provide additional services, and charge further sums, for subsequent services.

## b. Violations of CROA § 1679b(b)

31. The CROA, pursuant to 15 U.S.C. § 1679b(b), provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed."

32. Defendant violated § 1679b(b) through its charging and receiving of money for services it agreed to perform for Plaintiff before such services were fully

7

performed. Defendant charged Plaintiff up-front fees and monthly fees unrelated to any services Defendant fully performed.

### c. Violation of CROA § 1679c

33. The CROA provides that a credit repair organization must provide consumers with certain written disclosures in the contract underpinning the provision of credit repair services to consumer. Pursuant to 15 U.S.C. § 1679c(b), "the written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

34. Defendant violated 15 U.S.C. § 1679c through its failure to provide the written disclosures required under § 1679c. Defendant never provided such disclosures, nor did it provide a separate document containing such disclosures.

### d. Violation of CROA §§ 1679d & 1679e

35. The CROA, pursuant to 15 U.S.C. § 1679d(4), requires credit repair organization to include, in the contract between them and a consumer, "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'" 15 U.S.C. §

8

1679e further outlines the extent of a consumer's cancellation rights under the CROA, while requiring such disclosure to be given to consumers in writing and separate from the contrat.

36. Defendant violated 15 U.S.C. § 1679d through its failure to provide the requisite statutory disclosure in the manner required by the CROA. Defendant further violated § 1679e through its failure to provide a notice of cancellation form to Plaintiff in its contract.

37. As a result of Defendant's deficient contract, the contract should be deemed void and unenforceable. 15 U.S.C. § 1679f(c).

### e. Violation of CROA § 1679f(b)

38. The CROA, pursuant to 15 U.S.C. § 1679f(b) provides that, "[a]ny attempt by any person to obtain a waiver from any consumer of any protection provided by or any right of the consumer under [the CROA] shall be treated as a violation of [the CROA]."

39. Defendant violated 15 U.S.C. § 1679f(b) through its attempt to obtain Plaintiff's waiver of the protections afforded him under the CROA. Defendant's contract attempts to get consumers to acknowledge the receipt of statutorily required disclosures which were never provided. Defendant's contract further attempts to waive the protection for consumers against credit repair organizations charging before the full completion of services, as it attempts to get consumers to agree that

9

Defendant's fees are "earned" upon payment by Plaintiff, rather than when they fully complete the services agreed to perform, as required by the CROA.

40. The CROA further dictates that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person." 15 U.S.C. § 1679f(c).

WHEREFORE, Plaintiff, JOHNNY W. RIZO, respectfully requests that this Honorable Court enter judgment in his favor as follows:

a. Declaring that the practices complained of herein are unlawful and violate the aforementioned bodies of law;

b. Awarding Plaintiff actual damages to be determined at trial, as provided under 15 U.S.C. § 1679g(a)(1);

c. Awarding Plaintiff punitive damages, in an amount to be determined at trial, as provided under 15 U.S.C. § 1679g(a)(2)(A);

d. Awarding Plaintiff costs and reasonable attorney fees as provided under 15 U.S.C. § 1679g(a)(3); and

e. Awarding any other relief as this Honorable Court deems just and appropriate.

## COUNT II – VIOLATIONS OF THE CALIFORNIA CREDIT SERVICES ORGANIZATION ACT OF 1984

41. Plaintiff restates and realleges paragraphs 1 through 40 as though fully set forth herein.

42. Plaintiff is a "buyer" as defined by Cal. Civ. Code § 1789.12(c).

43. Defendant is a "credit services organization" as defined by Cal. Civ. Code § 1789.12(a).

10

### a. Violation of CCSOA § 1789.13

44. The CCSOA, pursuant to Cal. Civ. Code § 1789.13, provides a list of prohibited conduct for credit services organizations.

45. Pursuant to § 1789.13(a), a credit services organization cannot "charge or receive any money or other valuable consideration prior to full and complete performance of the services the credit services organization has agreed to perform for or on behalf of the buyer."

46. Defendant violated § 1789.13(a) when it charged and received money from Plaintiff without fully completing the services. As alluded to *supra.,* Defendant improperly retained Plaintiff's payments without first fully performing the services justifying such retained payments.

47. Pursuant to § 1789.13(g), credit services organization cannot "[m]ake or use untrue or misleading representations in the offer or sale of the services of a credit services organization." Similarly, pursuant to § 1789.13(h), a credit services organization cannot "[e]ngage, directly or indirectly, in an act, practice, or course of business that operates or would operate as a fraud or deception upon a person in connection with the offer or sale of the services of a credit service organization."

48. Defendant violated §§ 1789.13(g)&(h) through its deceptive and misleading representations regarding the nature and efficacy of its services, as discussed *supra.*

### b. Violations of CCSOA §§ 1789.14-1789.15

49. The CCSOA, pursuant to Cal. Civ. Code § 1789.15, provides the extent of information that must be provided to a buyer by a credit services organization under § 1789.14.

50. Defendant violated these provisions of the CCSOA by failing to provide Plaintiff such disclosures and similarly failing to provide Plaintiff a copy of the disclosures.

### c.  Violations of CCSOA § 1789.16

51. The CCSOA, much like the CROA, requires credit services organizations to include a conspicuous statement regarding a consumer's right to cancel a contract, and also provide a duplicate "Notice of Cancellation" form. *See* Cal. Civ. Code §§ 1789.16(a)(1), (b).

52. Defendant violated §§ 1789.16(a)(1) and (b) by failing to provide the required disclosure in the manner required by California law, and further by failing to provide a separate notice of cancellation form.

WHEREFORE, Plaintiff, JOHNNY W. RIZO, respectfully requests that this Honorable Court enter judgment in his favor as follows:

   a.  Declaring that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

   b.  Awarding Plaintiff actual damages pursuant to Cal. Civ. Code § 1789.21(a);

   c.  Awarding Plaintiff punitive damages pursuant to Cal. Civ. Code § 1789.21(a);

d.  Awarding Plaintiff's costs and reasonable attorney fees, pursuant to Cal. Civ. Code § 1789.21(a); and

e.  Awarding any other relief as this Honorable Court deems just and appropriate.

Dated: October 31, 2022        Respectfully submitted,

/s/Bobby C. Walker
Bobby C. Walker, Esq.
California Bar No. 321788
*Counsel for Plaintiff*
Sulaiman Law Group, Ltd
2500 S Highland Ave, Suite 200
Lombard, IL 60148
Telephone: (630) 575-8181 Ext. 149
bwalker@sulaimanlaw.com

13

# EXHIBIT I

# U.S. District Court
## Northern District of Ohio (Toledo)
## CIVIL DOCKET FOR CASE #: 3:22-cv-02094-JGC

Klaus v. The Litigation Practice Group PC

Assigned to: Judge James G. Carr

Cause: 28:1331 Fed. Question

Date Filed: 11/18/2022

Jury Demand: Plaintiff

Nature of Suit: 890 Other Statutory Actions

Jurisdiction: Federal Question

**Plaintiff**

**Teresa Klaus**                    represented by **David B. Schultz**
                                    Luftman Heck - Dublin
                                    6253 Riverside Drive
                                    Dublin, OH 43017
                                    614-347-1949
                                    Fax: 614-347-1949
                                    Email: dschultz@lawlh.com
                                    *ATTORNEY TO BE NOTICED*

                                    **Jeremiah E. Heck**
                                    Luftman Heck - Dublin
                                    Ste. 200
                                    6253 Riverside Drive
                                    Dublin, OH 43017
                                    614-224-1500
                                    Email: jheck@lawlh.com
                                    *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group PC**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2022 | 1 | **Complaint** For Declaratory and Injunctive Relief with jury demand against The Litigation Practice Group PC. Filing fee paid $ 402, Receipt number AOHNDC-11720651.. Filed by Teresa Klaus. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet) (Heck, Jeremiah) (S,Ja). (Entered: 11/18/2022) |
| 11/21/2022 | 2 | Civil Cover Sheet filed by Teresa Klaus. Related document(s) 1 .(Heck, |

| | | Jeremiah) (Entered: 11/21/2022) |
|---|---|---|
| 11/21/2022 | | Judge James G. Carr assigned to case. (S,Ja) (Entered: 11/21/2022) |
| 11/21/2022 | | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Darrell A. Clay. (S,Ja) (Entered: 11/21/2022) |
| 11/21/2022 | 3 | Magistrate Consent Form issued. (S,Ja) (Entered: 11/21/2022) |
| 11/21/2022 | | **Notice re Prompt Service.** Counsel for Plaintiff is responsible for **promptly** serving the Complaint on Defendant(s) upon receiving the issued summons from the Clerk and, after service has been perfected, electronically filing a Return of Service or an executed Waiver of Service for each Defendant. <br><br> Service is to be accomplished pursuant to Fed. R. Civ. P. 4, which includes provisions for personal service and waiver of service, and Local Rule 4.2. If you wish the Clerk to serve the Complaint on Defendant(s) (a seldom used alternative because it does not save time or money), you **must** provide the Clerk's office with copies of the Complaint along with other necessary documents, in the manner set forth in Local Rule 4.2(a). (S,Ja) (Entered: 11/21/2022) |

## PACER Service Center

### Transaction Receipt

| 12/02/2022 12:51:46 | | | |
|---|---|---|---|
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-02094-JGC |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| TERESA KLAUS, | : | Case No. 3:22-cv-2094 |
| | : | |
| Plaintiffs, | : | Hon. |
| | : | |
| -vs- | : | |
| | : | |
| THE LITIGATION PRACTICE GROUP PC, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT AND REQUEST FOR DECLARATORY
## RELIEF AND JURY DEMAND
## Introduction

1.    This is an action for damages brought by a consumer against Defendant for violations of the Debt Adjustment Companies Act, R.C. § 4710.01, et seq. ("DACA"), the Ohio Consumer Sales Practices Act, R.C. § 1345.01, et seq. ("OCSPA"), the Ohio Credit Services Organization Act R.C. §4712.01, et seq. ("OCSOA"), the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j ("CROA"), the Telemarketing Sales Rule 16 C.F.R. § 310.2 ("TSR"), Breach of Contract, and Common Law Fraud, all of which prohibit persons engaged in debt adjusting and credit repair from engaging in abusive, deceptive, and unfair practices.

## Parties

2.    Plaintiff, TERESA KLAUS, is a consumer residing at 707 Jackson St., Delphos, Ohio 45833.

3.    Upon information and belief, Defendant THE LITIGATION PRACTICE GROUP PC (hereinafter "LPG") is a California debt settlement and debt validation company operating from an address at 17542 E 17th Street, Ste 100, Tustin, CA 92780, and doing

1

business in the state of Ohio.

4.   Defendant regularly engages in business in Ohio and directed at residents of Ohio and have otherwise availed themselves of the Ohio marketplace and secured the benefits of that marketplace. Such conduct included, among other things; holding itself out as debt settlement company providing services to Ohio residents; directing business solicitations into the State of Ohio, directed at indebted Ohio residents, seeking participation in Defendants' debt settlement, credit repair and debt elimination programs; contracting in Ohio with Ohio consumers for various services, including debt validation; offering to perform and/or performing activities for Ohio residents including debt settlement, credit repair and debt elimination functions.

**Statement of Facts**

5.   On or before, June 9, 2021, Plaintiffs contacted LPG to discuss possible debt elimination services.

6.    Plaintiff had several telephone conversations wherein she was led to believe she was retaining Defendant for debt adjustment services which necessarily included credit repair and debt elimination.

7.   Based upon the representations made by LPG in the phone calls, Plaintiff believed by enrolling in the program, she could eliminate their overall debt by disputing the validity of the debts under the statutes of the Consumer Financial Protection Bureau and the Fair Debt Collection Practices Act.

8.   A representative of LPG sent Plaintiffs an Agreement to review and sign; the representative also instructed Plaintiffs they had a right to withhold payments to their creditors while the accounts were in dispute.

9.   The written agreement that Plaintiff signed with the Defendants is attached hereto as Exhibit "A".

2

10.     On or about June 28, 2021, Plaintiff began paying Defendant $329.53 a month for its services.

11.     Defendants charged substantial up-front fees; Plaintiff's credit scores severely reduced pursuant to her participation in the program; Plaintiff's credit scores will not recover in the near future.

12.     Enrolling in LPG's program resulted in no reduction to Plaintiff's total debt owed as agreed, in fact, Plaintiff's total indebtedness increased substantially due to interest and fees.

13.     Shortly after enrolling in Defendants' program, a lawsuit was filed against Plaintiff by one of her creditors.

14.     Enrolling in LPG's program resulted in no payments being made to Plaintiff's creditors.

15.     Upon information and belief, the only services provided to Plaintiff from Defendant was the mailing of verification packets to Plaintiff's creditors.

16.     While Defendant represented mailing these packets would eliminate Plaintiff's debt, it knew this representation was false, and the mailings would have no legal effect with regard to reducing Plaintiff's debt.

17.     Defendant made various misrepresentations or non-disclosures in an effort to induce Plaintiff to enter into the illegal agreement including, but not limited to:

- Unsubstantiated claims of savings; Defendant represented to Plaintiff that the program would eliminate her total debt; however, Defendant does not have a record of accomplishment to support that statement.

- Misleading or failing to adequately inform consumers, including Plaintiff, that they will be subject to continued collection efforts, including lawsuits,

3

and that their account balances will increase due to extended nonpayment under the program.

• Defendant represented that the majority of consumers which retain it go on to complete the program thereby becoming debt free; however, a high percentage of consumers who attempt Defendant's debt verification program do not become debt free as a result of its services.

• Defendant accepted money from Plaintiff for the purpose of eliminating all debts on the program for less than the amount owed knowing there was a substantial likelihood that they could not provide the services as promised. Defendant knew its business model was legally unsound and nonsensical.

18. Based upon the misrepresentations of the LPG representative, Plaintiff agreed to enter into a contract for the debt relief services of LPG.

19. Plaintiff agreed to pay specified fees which, unknown to Plaintiff, were illegal due to the substantial amount of the fees and requirement of payment up front.

20. LPG withdrew $2,965.77 in fees from Plaintiff over a period of approximately one year.

21. The Telemarketing Sales Rule prohibits debt relief companies from charging up-front fees prior to settling accounts because, among other reasons, such a business model is designed to fail from the beginning. TSR, 16 C.F.R. § 310.4 (a)(5)(i)

22. Further, given the lengthy period of time creditors do not receive money owed, (oftentimes without any contact with the debt relief companies or the debtor), the creditor will often opt to bring a lawsuit for money owed.

23. Defendant advised Plaintiff to quit paying her debts knowing the debt would

4

continue to accumulate interest, over the limit fees, and late fees.

24.     Defendant represented they would attempt to eliminate Plaintiff's total debt balance by providing a debt elimination program by sending validation documentation to the third-party collectors collecting on the debts in the program hoping debt collection would cease.

25.     While disclaiming that it is practicing law, the vast majority of services LPG agreed to provide Plaintiff were in fact legal services. The Agreement is a legal fee agreement whereby LPG agreed to practice law and provide legal services in exchange for money.

26.     Defendant's actions did not reduce Plaintiff total debt balance, and in fact, Plaintiff owes more money and have been sued on numerous accounts enrolled in the Defendant's debt elimination program.

### Count One:
### (Violations of the Ohio Consumer Sales Practices Act and Debt Adjustment Companies Act)

27.     Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

28.     The activity described in all previous paragraphs is a "consumer transaction" as defined by R.C. § 1345.01(A). Defendant solicited and retained Plaintiff to perform debt adjustment services for a fee.

29.     Plaintiff's debts at issue were incurred for personal, family and/or household use.

30.     Defendant is a "supplier" as that term is defined in R.C. § 1345.01(C), since Defendant engaged in the business of effecting "consumer transactions", either directly or indirectly, by operating a debt adjustments service for consumers in Ohio for purposes that are primarily for personal, family or household within the meaning specified in R.C. §1345.01(A).

31.     Defendant is a "person" as defined by the DACA, R.C. § 4710.01(A) engaged in

5

the act of "debt adjusting" as defined by the DACA, R.C. § 4710.01(B), and a "supplier" as defined by the OCSPA, R.C. § 1345.01(C), since Defendant was engaged in the business of debt adjusting, budget counseling, debt management, or debt pooling services, or holding oneself out, by words of similar import, as providing services to debtors in the management of their debt to a consumer in the State of Ohio for purposes that were primarily for personal, family or household use.

32.     Plaintiff is a "consumer" as defined by the OCSPA, R.C. § 1345.01(D).

33.     Defendant charged and accepted fees or contributions in excess of what are reasonable fees or contributions, in violation of R.C. §§ 4710.02(A)(3), 4710.02(B)(1-3) and 4710.02(F)(1). Defendant knew that the debt settlement program's fees exceeded the amount permitted by R.C. § 4710.02(B).

34.     Upon information and belief, Defendant failed to arrange for and undergo an audit conducted by an independent, third party, certified public accountant of the person's business and then file the audit and opinion with the consumer protections division of the attorney general in violation of R.C. §§ 4710.02(D)(1-2) and 4710.02(F)(2).

35.     Upon information and belief, Defendant failed to obtain and maintain insurance coverage not less than $100,000.00 for employee dishonesty, forgery, and fraud in violation of R.C. §§ 4710.02(E)(1-2) and 4710.02(F)(2).

36.     Defendant's transactions failed to include the notices, statements, and cancellation forms as defined by R.C. §§ 4710.05(A) and (B). Such failure is a violation of R.C. § 1345.02(A) of the OCSPA.  Defendant committed unfair, deceptive and unconscionable acts or practices in violation of R.C. §§ 1345.02(A) and/or 1345.03(A) of the Consumer Sales Practices Act including:

- Defendant operated a debt settlement company in the State of Ohio without complying with applicable Ohio law, namely, R.C. § 4710, et seq.

- Defendant charged an excessive fee for debt adjusting and failed to provide the service pursuant to the Failure to Deliver Rule, O.A.C. § 109:4-3-09(A).

- Defendant is an out of state corporations, failed to register with the Ohio Secretary of State prior to doing business in Ohio as required by R.C. § 1703.03.

- Defendant made false or misleading statements to induce a purchaser to pay for services.

- Defendant engaged in debt adjustment activities, including holding out that it could affect the adjustment, compromise, or discharge of any account, note, or other indebtedness of consumers who sign up for its services, without complying with R.C. §§ 4710.02(A) and (B), specifically that Defendant charged fees in excess of those permitted by the Ohio Debt Adjusters Act.

- Defendant violated Ohio Adm. Code § 109:4-3-09(A) by accepting money from consumers for goods or services ordered by mail, telephone, or otherwise and then failed to make full delivery or make a full refund as promised.

- Defendant had knowledge of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction.

- Defendant required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the

7

supplier.

37.    Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. § 1345.01 et seq.

*38.*    Defendant committed said violation after such decisions were available for public inspection pursuant to R.C. § 1345.05(A)(3). *State ex rel. Petro v. Debticated Consumer Counseling, Inc.* (Lucas Co. C.P. 2003), Case No. CIO 2002 4856, (PIF# 2173); *State of Ohio ex rel. Cordray v. United Law Group, Inc.* (Franklin Co. C.P. 2010)*,* Case No. 10 CVH 021567, (PIF# 2874); *State of Ohio, ex rel. Cordray v. Brotherton* (Greene Co. C.P. 2010), Case No. 2009 CV 0709, (PIF# 2831); *In Re Nationwide Debt Solution, Inc.* (2010), Docket No. 384784 (PIF# 2878); *In Re Budulator Corporation, Inc.* (2010), Docket No. 388509 (PIF# 2876); *State of Ohio ex rel. Rogers v. Richard Pinnix d/b/a Pinnix Business Services* (Franklin Co. C.P. 2008), Case No. 07CVH08-10491(PIF# 2726); *State of Ohio ex rel. Dann v. American Housing Authority, Inc.* (Lucas Co. C.P. 2008), Case No. CI-0200705443 (PIF# 2676); *State of Ohio ex rel. Petro v. AAA All Ohio Roofing, et al.* (Franklin Co. C.P. 2003), Case No. 02CVH022119 (PIF# 2152); *State ex rel. Montgomery v. Bayview Group, Inc.* (Franklin Co. C.P. 2003), Case No. 97CVH12 10749 (PIF# 1727).

39.    Plaintiff has suffered damages due to the illegal and deceptive acts in violation of the Ohio Consumer Sales Practices Act in that:

- She paid fees that were both illegal and were not in exchange for any services of value.

- She quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to her described in the Complaint.

8

- As a result, her creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- She suffered mental and emotional hardship, mental and emotional stress, and anxiety.

### Count Two:
### (Violations of the Ohio Credit Services Organizations Act)

40.   Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

41.   Defendant is a credit service organization as defined by R.C. § 4712.01(C)(1) in that Defendant accepted money in order to improve Plaintiffs' credit record and gave advice in connection with doing so.

42.   Plaintiff is a buyer as defined by R.C. § 4712.01(A) in that she was solicited and purchased the services of Defendant.

43.   Defendant has failed to register as a credit services organization with the Ohio Division of Financial Institutions in violation of R.C. § 4712.02(A).

44.   Pursuant to R.C. §4712.11(A), Defendant's violation of R.C. § 4712.02(A) constitutes unfair or deceptive acts or practices in violation of R.C. § 1345.02.

45.   Plaintiff has suffered damages due to the illegal and deceptive acts in violation of the Ohio Credit Services Organization Act in that:

- she paid fees that were both illegal and were not in exchange for any services of value.

- she quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to her described in the

9

Complaint.

- As a result, her creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- She suffered mental and emotional hardship, mental and emotional stress, and anxiety.

<u>**Count Three**</u>:
**(Violations of the Credit Repair Organizations Act)**

46. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

47. The Credit Repair Organizations Act was enacted to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services and to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b). The CROA provides that a credit repair organization:

a. May not charge or receive any money or other valuable consideration for services which the credit repair organization has agreed to perform before such service is fully performed, 15 U.S.C. § 1679(b);

b. May not provide services without a written and dated contract that includes a full and detailed description of the services to be performed and other terms and conditions set forth in 15 U.S.C. §§ 1679d(a)(1), 1679d(b);

c. Must provide to the consumer, before any contract or agreement between the consumer and the credit repair organization is executed, the written statement set forth in Section 405(a) of CROA concerning consumer credit

10

file rights under state and federal law and the right to cancel a contract with

a credit repair organization, 15 U.S.C. § 1679c; and

d. Must allow a consumer to cancel any contract with the credit repair

organization without penalty or obligation if the consumer notifies the credit

repair organization of the consumer's intention to cancel before midnight of

the third business day after the date the contract between the consumer and

the credit repair organization is executed, 15 U.S.C. § 1679e.

48.    Defendant is "credit repair organizations" as that term is defined in the Credit

Repair Organizations Act ("CROA"), because they use instrumentalities of interstate commerce

to sell, provide, or perform (or represent that such defendant can or will sell, provide, or

perform) a service for the express or implied purpose of improving a consumer's credit record,

credit history, or credit rating, and this service is offered in return for the payment of money.

15 U.S.C. § 1679a(3).

49.    Defendant received money prior to fully performing its services, and failed to

provide any of the proper disclosures, contracts, or right to cancel forms.

50.    Defendant's conduct as alleged in Count Three of this Complaint violates the

Credit Repair Organizations Act, and the Defendants are liable for these violations.

51.    Plaintiff has suffered damages due to the illegal and deceptive acts in violation of

the Credit Repair Organization Act in that:

•    She paid fees that were both illegal and were not in exchange for any services

of value.

•    She quit paying her creditors upon the advice of Defendant's representatives

and the many misrepresentations that were made to them described in the

Complaint.

- As a result, her creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- She suffered mental and emotional hardship, mental and emotional stress, and anxiety.

## Count Four:
## (Fraud / Fraud in the Inducement)

52.    Plaintiff repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

53.    Plaintiff specifically relied on the representations, misrepresentations, non-disclosures and implied representations described in Paragraphs 9 through 32 when making the determination to enter into a contract or continue using the services of Defendant.

54.    Defendant, through representations, websites, and the Agreement create the appearance that Plaintiff is entering into an agreement that will greatly reduce her outstanding debts.

55.    Defendant engaged in the unlawful conduct previously alleged with the actual and/or imputed knowledge of the unlawful conduct.

56.    Defendant knowingly engaged in such conduct with the purpose of inducing payment from Plaintiff.

57.    Plaintiff have been injured by the wrongful and fraudulent conduct of Defendant and have been damaged in an amount to be established at trial, as well as entitled to punitive damages in an amount to be established at trial.

## Count Five:
## (Violations of the Telemarketing Sales Rule)

58.    Plaintiff repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

59.    The Telemarketing Sales Rule ("TSR") was promulgated for the explicit purpose of preventing consumer harm from debt relief operations like the venture of the Defendant in this case.

60.    The TSR, 16 C.F.R. § 310.2(m), defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payments or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."

61.    The TSR, 16 C.F.R. § 310.2(dd), defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."

62.    The TSR, 16 C.F.R. § 310.2 (aa), defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

63.    The TSR, 16 C.F.R. § 310.2 (cc), defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

64.    Defendants are "sellers" or "telemarketers" of "debt relief services", who engages in "telemarketing", as defined in the TSR.

65.    The TSR, 16 C.F.R. § 310.4 (a)(5)(i), provides that a seller or a telemarketer may

not request or receive payment of any fee or consideration for any debt relief service until and unless among other things, "the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer" and "the customer has made at least one payment" pursuant too such an agreement or plan.

66.     The TSR, 16 C.F.R. § 310.4(a)(5)(ii), provides that a seller or a telemarketer may request or require customers to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation or settlement of a debt, provided that, among other things: the customer owns the funds held in the account and is paid interest on the account" and "the customer may withdraw from the debt relief service at any time without penalty and must receive all funds in the account, other that funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the consumer's request."

67.     The TSR, 16 C.F.R. § 310.3(a)(2)(ii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of the sales offer.

68.     The TSR, 16 C.F.R. § 310.3(a)(2)(iii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.

69.     The TSR, 16 C.F.R. § 310.3(a)(2)(x), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect

of any debt relief service.

70. In the course of telemarketing debt relief services, Defendant has requested and received payment of fees from Plaintiffs for debt relief services before renegotiating, settling, reducing, or otherwise altering the terms of his debts. Defendant requested and received payment of these fees prior to Plaintiffs making at least one payment pursuant to any settlement agreement, debt-management plan, or other valid contractual agreement between Plaintiffs and their creditors.

71. Therefore, Defendant's act or practices violate the TSR, 16 C.F.R. § 310.4(a)(5)(i), and are abusive acts or practices in telemarketing.

72. Plaintiff was charged advances fees for Defendant's debt relief services.

73. Therefore, Defendant's representations as described herein violate the TSR, C.F.R. § 310.3(a)(2)(ii) and (x), and are deceptive acts or practices in telemarketing.

74. In numerous instances, in connection with advertising, marketing, promoting, offering for sale, or sale of debt relief services, Defendant represented to Plaintiff directly or indirectly, expressly or by implication, that her total debt amount would be reduced by up to 50%.

75. In fact, Defendant does not have a track record of consistent debt reduction of this degree, if any at all.

76. Therefore, Defendant's representations as described herein violate the TSR, C.F.R. § 310.3(a)(2)(iii) and (x), and are deceptive acts or practices in telemarketing.

77. In addition, Defendant and its representatives in making its savings claims (amounts of monies s would save by using Defendant's services) did not disclose the following in violation of the TSR:

15

- State the savings was based on the Plaintiff debt when she signed up for the program.

- Include the impact of the Defendant's fees on their claimed savings to the Plaintiff.

- In calculating the results over time, did not include customers who dropped out or otherwise failed to complete the program.

**Count Six**
**(Breach of Contract)**

78.     Plaintiff repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

79.     Defendant entered into a contract with Plaintiff and represented it would eliminate Plaintiff's debt.

80.     Defendant further provided advice and explanation on the Fair Credit Reporting Act, the Federal Trade Commission Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act.

81.     Defendant cite the statutes listed in the prior paragraph as authority for its 'Debt Validation Services' though it is not clear how the Defendant would eliminate defendant's debt through the statutes listed in paragraph 86.

82.     Defendant did not perform its obligations pursuant to the contract as agreed as no debts of Plaintiff were eliminated.

83.     Plaintiff paid Defendant pursuant to the contract as agreed.

84.     Plaintiff has been damaged by Defendant's non-performance and resulting breach of the contract.

85.     As such, Plaintiffs is entitled to damages for the breach of contract.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff Teresa Klaus, prays this Court grant the following relief:

16

1. ISSUE an order declaring that the Defendant has engaged in acts and practices in violation of the Consumer Sales Practices Act, R.C. § 1345.01 et seq., the Debt Adjustment Companies Act, R.C. § 4710.01 et seq., the Ohio Credit Services Organization Act R.C. § 4712.01, et seq., the Credit Repair Organization Act 15 U.S.C. § 1679, et seq. and the Telemarketing Sales Rule 16 C.F.R. § 310, et seq.

2. ISSUE a Permanent Injunction enjoining the Defendant, its agents, servants, employees, successors or assigns, and all persons acting in concert and participation with it, directly or indirectly, through any corporate device, partnership, or other association, under this or any other name, from engaging in the acts and practices which Plaintiff complains in the State of Ohio until complying with the laws of the State of Ohio and satisfaction of any monetary obligations to Plaintiff.

3. GRANT judgment against the Defendant in the amount of three times the actual damages or $200.00 for each unlawful act specified, whichever is greater, pursuant to R.C. § 1345.09(B).

4. GRANT judgment against the Defendant for common law fraud in an amount of damages in excess of $25,000.00.

5. GRANT judgment against the Defendant in excess of $50,000.00 for violations of the Telemarketing Sales Rule 16 CFR§ 310, et seq.

6. GRANT statutory damages for violations of the Credit Repair Organization Act 15 U.S.C. § 1679g.

7. GRANT statutory damages for violations of the Ohio Credit Services Organization Act R.C. § 4712.10.

8. GRANT judgment against the Defendant in excess of $25,000.00 for its breach of

contract with Defendants.

9. Costs and reasonable attorney fees, pursuant to R.C. § 1345.09(F)(2).

10. GRANT punitive damages.

11. GRANT such other relief as this Court deems to be just, equitable and appropriate.

Respectfully Submitted:

/s/ Jeremiah E. Heck
Jeremiah E. Heck (0076742)
David B. Schultz (0077281)
Luftman Heck & Associates LLP
6253 Riverside Drive, Suite 200
Dublin, Ohio 43017
Phone: (614) 224-1500
Fax: (614) 224-2894
dschultz@lawlh.com
*Attorney for Plaintiffs*

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff, Teresa Klaus, demands trial by jury in this action.

/s/ Jeremiah E. Heck
Jeremiah E. Heck (0076742)



**THE LITIGATION PRACTICE GROUP**

1351 Calle Avanzado | Suite 4
San Clemente, CA 92673
Tel 949.229.6262
Fax 949.415.7816
admin@coastprocessing.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The purpose of this program is to challenge the legal validity of debts appearing on or being reported to credit bureaus. The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

### Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of the progress of services performed under this agreement at reasonable intervals of no greater frequency than once a month.

ID: 3923370 Signed: 2021-06-09T14:49:17-05:00

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance. A client can elect to move to a debt settlement service on any validated account in lieu of obtaining a refund. If a client makes such an election, fees will no longer be collected for such account and debt settlement services will be performed for no additional fees.

## Debt Settlement

If LPG is unable to invalidate any debt, you may elect to have LPG negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility. At the point that you reach a settlement with such creditor, your payment to LPG will be reduced and re-amortized to adjust for the settled account being removed from the representation herein contemplated. Please see the refund policy above for more details.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) the client`s payments are returned multiple times for any reason. LPG will not pay your debts and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to admin@coastprocessing.com and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to admin@coastprocessing.com. In addition, you, the client may terminate LPG's services under this agreement at any time via an email to admin@coastprocessing.com.**

Client Signature: _Teresa Klaus_____ Date: 6/9/2021_____

Co-Applicant Signature _____ Date: _____

Page 2 of 7

**Creditor Information**

| Creditor | Account # | Amount Owed |
|---|---|---|
| Capital One | | $4,394.00 |
| SYNCBJCP DC | | $3,774.00 |
| Capital One | | $3,212.00 |
| BK OF AMER | | $2,822.00 |
| SEARSCBNA | | $1,926.00 |
| KOHLSCAPONE | | $1,235.00 |
| SYNCBLOW | | $1,207.00 |
| Capital One | | $1,146.00 |
| SYNCBABCWH | | $904.00 |
| CBNA | | $809.00 |
| MERRICK BK | | $540.00 |
| CBMAURICES | | $277.00 |
| SEARS/CBNA | | $2,249.00 |
| | | $24,495.00 |

ID: 3923370 Signed: 2021-06-09T14:49:17-05:00

### Client Information

Name: Teresa Klaus

Address:                         , Delphos OH 45833


Home Phone:

Cell Phone:

Email          @roadrunner.com

Las 4 SSN: XXX-XX-

### Co-Client Information

Name:

Address: ,


Home Phone:

Cell Phone:

Email:

Last 4 SSN:

ID: 3923370 Signed: 2021-06-09T14:49:17-05:00

## Schedule of Payments

I agree to this payment schedule – Client Initials: _TK_____

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Jun 28, 2021 | $329.53 |
| 2 | Jul 28, 2021 | $329.53 |
| 3 | Aug 30, 2021 | $329.53 |
| 4 | Sep 28, 2021 | $329.53 |
| 5 | Oct 28, 2021 | $329.53 |
| 6 | Nov 29, 2021 | $329.53 |
| 7 | Dec 28, 2021 | $329.53 |
| 8 | Jan 28, 2022 | $329.53 |
| 9 | Feb 28, 2022 | $329.53 |
| 10 | Mar 28, 2022 | $329.53 |
| 11 | Apr 28, 2022 | $329.53 |
| 12 | May 31, 2022 | $329.53 |
| 13 | Jun 28, 2022 | $329.53 |
| 14 | Jul 28, 2022 | $329.53 |
| 15 | Aug 29, 2022 | $329.53 |
| 16 | Sep 28, 2022 | $329.53 |
| 17 | Oct 28, 2022 | $329.53 |
| 18 | Nov 28, 2022 | $329.53 |
| 19 | Dec 28, 2022 | $329.53 |
| 20 | Jan 30, 2023 | $329.53 |
| 21 | Feb 28, 2023 | $329.53 |
| 22 | Mar 28, 2023 | $329.53 |
| 23 | Apr 28, 2023 | $329.53 |
| 24 | May 30, 2023 | $329.53 |
| 25 | Jun 28, 2023 | $329.53 |
| 26 | Jul 28, 2023 | $329.53 |
| 27 | Aug 28, 2023 | $329.53 |
| 28 | Sep 28, 2023 | $329.53 |
| 29 | Oct 30, 2023 | $329.53 |
| 30 | Nov 28, 2023 | $329.53 |
| 31 | Dec 28, 2023 | $329.53 |
| 32 | Jan 29, 2024 | $329.53 |
| 33 | Feb 28, 2024 | $329.53 |
| 34 | Mar 28, 2024 | $329.53 |
| 35 | Apr 29, 2024 | $329.53 |
| 36 | May 28, 2024 | $329.38 |

ID: 3923370 Signed: 2021-06-09T14:49:17-05:00

**Electronic Payment Authorization**

Bank Name: PREMIER BANK

Name on Account: Teresa S. Klaus

Account Type:   Checking

_____ Other (specify: _____)

Routing Number:

Account Number:

Next Payment Date: Jun 28, 2021 Amount: $ 329.53

Recurring Payment Date: 28th

By signing below, I authorize and permit LPG or their designees, EPPS, Omnifund, Equipay, Forte, a CSG Company, or Authorize.NET to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by members will be observed.  If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed.  The member agrees with all of the provisions and conditions outlined within.

### Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process.  All refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment.  If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated.  Please call us at 949-229-6262 or at admin@coastprocessing.com.

Client Signature:   _Teresa Klaus_
_____

Date: 6/9/2021
_____

Printed Name:   Teresa Klaus
_____

_____

ID: 3923370 Signed: 2021-06-09T14:49:17-05:00

### Electronic Funds Transfer (EFT) Authorization to Debit Bank Account

Account Owner Name: Teresa S. Klaus

Social Security Number:                                          Birth Date: 04/01/1960

Address:                         City:Delphos           State:OH     Zip:  45833

Mobile Phone #:              Bank Name:  PREMIER BANK

Routing Number:                         Account Number:

Total Amount of Debit: $329.53          Date of Next Debit:Jun 28, 2021     Checking or Saving: Checking

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform.  This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief.  The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

| Schedule of Fees and Charges | |
| --- | --- |
| Monthly Banking Fee: | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |
| **PREMIUM DISBURSEMENT SERVICES** | |
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time.  I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement.  I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC, and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf.  My signature below provides permission to be contacted by phone at the number provided with this authorization.  A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS.   Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature:   *Teresa Klaus*                    Date: 6/9/2021

ID: 3923370 Signed: 2021-06-09T14:49:17-05:00

E-Signature Completion Certificate





## Your Document Was Successfully Signed!

Congratulations, your document(s) was successfully signed. Please find details below related to your e-signature submission.

### ℹ Signing Details

| | |
|---|---|
| **Document ID** | **Signer Email** |
| 3923370 | @roadrunner.com |
| **Document Title** | **Signer IP Address** |
| LSA - LPG - English | |
| **Sender IP Address** | **Timestamp** |
| | 2021-06-09T14:49:17-05:00 |
| **Number Of Signers** | **Document MD5 Hash** |
| 1 | d41d8cd98f00b204e9800998ecf8427e |

### ✴ Document Audit

✔ Sent at 2021-06-09T14:12:19-05:00 from IP 35.132.242.205

✔ Delivered to @roadrunner.com at 2021-06-09T14:34:51-05:00 from 184.57.134.162

✔ Adopted Signature at 2021-06-09T14:35:36-05:00 from 184.57.134.162

✔ Completed Signing at 2021-06-09T14:49:17-05:00 from 184.57.134.162

✔ PDF Generated at 2021-06-09T14:49:17-05:00

**Sending Agent**
Mozilla/5.0 (iPhone; CPU iPhone OS 14_5_1 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/14.1 Mobile/15E148 Safari/604.1

# EXHIBIT J

# U.S. District Court
## Southern District of Ohio (Columbus)
## CIVIL DOCKET FOR CASE #: 2:22-cv-04106-EAS-KAJ

Scarlett v. The Litigation Practice Group PC
Assigned to: Judge Edmund A. Sargus
Referred to: Magistrate Judge Kimberly A. Jolson
Cause: Civil Miscellaneous Case

Date Filed: 11/18/2022
Date Terminated: 11/28/2022
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Kathlene Scarlett**                     represented by    **David B Schultz**
Luftman Heck & Associates LLP
6253 Riverside Dr.
Dublin, OH 43017
614-224-1500
Email: dschultz@lawlh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeremiah E Heck**
Luftman Heck and Associates LLP
6253 Riverside Drive
Suite 200
Dublin, OH 43017
614-224-1500
Email: jheck@lawlh.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group PC**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2022 | 1 | COMPLAINT with JURY DEMAND against The Litigation Practice Group PC ( Filing fee $ 402 paid - receipt number: AOHSDC-9148010), filed by |

| | | Kathlene Scarlett. (Attachments: # 1 Exhibit Exhibit A, # 2 Civil Cover Sheet Civil Cover Sheet) (Heck, Jeremiah) (Entered: 11/18/2022) |
|---|---|---|
| 11/21/2022 | 2 | NOTICE by Plaintiff Kathlene Scarlett re 1 Complaint, *Civil Cover Sheet* (Heck, Jeremiah) (Entered: 11/21/2022) |
| 11/28/2022 | 3 | ORDER transferring this case to the United States District Court for the Southern District of Ohio, Western Division at Dayton for all further proceedings. Signed by Magistrate Judge Kimberly A. Jolson on 11/28/2022. (kk2) (Entered: 11/28/2022) |
| 11/28/2022 | | Intra District Transfer - Case transferred to Western Division at Dayton as case number 3:22-cv-342. This case has been closed and all future filings should be made in case number 3:22-cv-342. (kk2) (Entered: 11/28/2022) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 12/02/2022 12:53:19 | | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-04106-EAS-KAJ |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| KATHLENE SCARLETT, | : | Case No. 2:22-cv-4106 |
| | : | |
| Plaintiff, | : | Hon. |
| | : | |
| -vs- | : | |
| | : | |
| THE LITIGATION PRACTICE GROUP PC, | : | |
| | : | |
| Defendant. | : | |

## COMPLAINT AND REQUEST FOR DECLARATORY
## RELIEF AND JURY DEMAND
### Introduction

1.     This is an action for damages brought by a consumer against Defendant for violations of the Debt Adjustment Companies Act, R.C. § 4710.01, et seq. ("DACA"), the Ohio Consumer Sales Practices Act, R.C. § 1345.01, et seq. ("OCSPA"), the Ohio Credit Services Organization Act R.C. §4712.01, et seq. ("OCSOA"), the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j ("CROA"), the Telemarketing Sales Rule 16 C.F.R. § 310.2 ("TSR"), Breach of Contract, and Common Law Fraud, all of which prohibit persons engaged in debt adjusting and credit repair from engaging in abusive, deceptive, and unfair practices.

### Parties

2.     Plaintiff, KATHLENE SCARLETT, is a consumer residing at 1787 Cherokee Dr., Apt. A, Dayton, Ohio 45449.

3.     Upon information and belief, Defendant THE LITIGATION PRACTICE GROUP PC (hereinafter "LPG") is a California debt settlement and debt validation company operating from an address at 17542 E 17th Street, Ste 100, Tustin, CA 92780, and doing business in the state of Ohio.

4. Defendant regularly engages in business in Ohio and directed at residents of Ohio and have otherwise availed themselves of the Ohio marketplace and secured the benefits of that marketplace. Such conduct included, among other things; holding itself out as debt settlement company providing services to Ohio residents; directing business solicitations into the State of Ohio, directed at indebted Ohio residents, seeking participation in Defendants' debt settlement, credit repair and debt elimination programs; contracting in Ohio with Ohio consumers for various services, including debt validation; offering to perform and/or performing activities for Ohio residents including debt settlement, credit repair and debt elimination functions.

## **Statement of Facts**

5. On or before September 2021, Plaintiffs contacted LPG to discuss possible debt elimination services.

6. Plaintiff had several telephone conversations wherein she was led to believe she was retaining Defendant for debt adjustment services which necessarily included credit repair and debt elimination.

7. Based upon the representations made by LPG in the phone calls, Plaintiff believed by enrolling in the program, she could eliminate their overall debt by disputing the validity of the debts under the statutes of the Consumer Financial Protection Bureau and the Fair Debt Collection Practices Act.

8. A representative of LPG sent Plaintiffs an Agreement to review and sign; the representative also instructed Plaintiffs they had a right to withhold payments to their creditors while the accounts were in dispute.

9. The written agreement that Plaintiff signed with the Defendants is attached hereto as Exhibit "A".

10. On or about October 4, 2021, Plaintiff began paying Defendant $254.38 a month

for its services.

11. Defendants charged substantial up-front fees; Plaintiff's credit scores severely reduced pursuant to her participation in the program; Plaintiff's credit scores will not recover in the near future.

12. Enrolling in LPG's program resulted in no reduction to Plaintiff's total debt owed as agreed, in fact, Plaintiff's total indebtedness increased substantially due to interest and fees.

13. Shortly after enrolling in Defendant's program, a lawsuit was filed against Plaintiff by one of her creditors.

14. Enrolling in LPG's program resulted in no payments being made to Plaintiff's creditors.

15. Upon information and belief, the only services provided to Plaintiff from Defendant was the mailing of verification packets to Plaintiff's creditors.

16. While Defendant represented mailing these packets would eliminate Plaintiff's debt, it knew this representation was false, and the mailings would have no legal effect with regard to reducing Plaintiff's debt.

17. Defendant made various misrepresentations or non-disclosures in an effort to induce Plaintiff to enter into the illegal agreement including, but not limited to:

- Unsubstantiated claims of savings; Defendant represented to Plaintiff that the program would eliminate her total debt; however, Defendant does not have a record of accomplishment to support that statement.

- Misleading or failing to adequately inform consumers, including Plaintiff, that they will be subject to continued collection efforts, including lawsuits, and that their account balances will increase due to extended nonpayment

3

under the program.

- Defendant represented that the majority of consumers which retain it go on to complete the program thereby becoming debt free; however, a high percentage of consumers who attempt Defendant's debt verification program do not become debt free as a result of its services.

- Defendant accepted money from Plaintiff for the purpose of eliminating all debts on the program for less than the amount owed knowing there was a substantial likelihood that they could not provide the services as promised. Defendant knew its business model was legally unsound and nonsensical.

18.    Based upon the misrepresentations of the LPG representative, Plaintiff agreed to enter into a contract for the debt relief services of LPG.

19.    Plaintiff agreed to pay specified fees which, unknown to Plaintiff, were illegal due to the substantial amount of the fees and requirement of payment up front.

20.    LPG withdrew over $2,600 in fees from Plaintiff over a period of approximately one year.

21.    The Telemarketing Sales Rule prohibits debt relief companies from charging up-front fees prior to settling accounts because, among other reasons, such a business model is designed to fail from the beginning. TSR, 16 C.F.R. § 310.4 (a)(5)(i)

22.    Further, given the lengthy period of time creditors do not receive money owed, (oftentimes without any contact with the debt relief companies or the debtor), the creditor will often opt to bring a lawsuit for money owed.

23.    Defendant advised Plaintiff to quit paying her debts knowing the debt would continue to accumulate interest, over the limit fees, and late fees.

4

24.     Defendant represented they would attempt to eliminate Plaintiff's total debt balance by providing a debt elimination program by sending validation documentation to the third-party collectors collecting on the debts in the program hoping debt collection would cease.

25.     While disclaiming that it is practicing law, the vast majority of services LPG agreed to provide Plaintiff were in fact legal services. The Agreement is a legal fee agreement whereby LPG agreed to practice law and provide legal services in exchange for money.

26.     Defendant's actions did not reduce Plaintiff total debt balance, and in fact, Plaintiff owes more money and have been sued on numerous accounts enrolled in the Defendant's debt elimination program.

### Count One:
### (Violations of the Ohio Consumer Sales Practices Act and Debt Adjustment Companies Act)

27.     Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

28.     The activity described in all previous paragraphs is a "consumer transaction" as defined by R.C. § 1345.01(A). Defendant solicited and retained Plaintiff to perform debt adjustment services for a fee.

29.     Plaintiff's debts at issue were incurred for personal, family and/or household use.

30.     Defendant is a "supplier" as that term is defined in R.C. § 1345.01(C), since Defendant engaged in the business of effecting "consumer transactions", either directly or indirectly, by operating a debt adjustments service for consumers in Ohio for purposes that are primarily for personal, family or household within the meaning specified in R.C. § 1345.01(A).

31.     Defendant is a "person" as defined by the DACA, R.C. § 4710.01(A) engaged in the act of "debt adjusting" as defined by the DACA, R.C. § 4710.01(B), and a "supplier" as

defined by the OCSPA, R.C. § 1345.01(C), since Defendant was engaged in the business of debt adjusting, budget counseling, debt management, or debt pooling services, or holding oneself out, by words of similar import, as providing services to debtors in the management of their debt to a consumer in the State of Ohio for purposes that were primarily for personal, family or household use.

32. Plaintiff is a "consumer" as defined by the OCSPA, R.C. § 1345.01(D).

33. Defendant charged and accepted fees or contributions in excess of what are reasonable fees or contributions, in violation of R.C. §§ 4710.02(A)(3), 4710.02(B)(1-3) and 4710.02(F)(1). Defendant knew that the debt settlement program's fees exceeded the amount permitted by R.C. § 4710.02(B).

34. Upon information and belief, Defendant failed to arrange for and undergo an audit conducted by an independent, third party, certified public accountant of the person's business and then file the audit and opinion with the consumer protections division of the attorney general in violation of R.C. §§ 4710.02(D)(1-2) and 4710.02(F)(2).

35. Upon information and belief, Defendant failed to obtain and maintain insurance coverage not less than $100,000.00 for employee dishonesty, forgery, and fraud in violation of R.C. §§ 4710.02(E)(1-2) and 4710.02(F)(2).

36. Defendant's transactions failed to include the notices, statements, and cancellation forms as defined by R.C. §§ 4710.05(A) and (B). Such failure is a violation of R.C. § 1345.02(A) of the OCSPA. Defendant committed unfair, deceptive and unconscionable acts or practices in violation of R.C. §§ 1345.02(A) and/or 1345.03(A) of the Consumer Sales Practices Act including:

  • Defendant operated a debt settlement company in the State of Ohio without

complying with applicable Ohio law, namely, R.C. § 4710, et seq.

- Defendant charged an excessive fee for debt adjusting and failed to provide the service pursuant to the Failure to Deliver Rule, O.A.C. §109:4-3-09(A).

- Defendant is an out of state corporations, failed to register with the Ohio Secretary of State prior to doing business in Ohio as required by R.C. § 1703.03.

- Defendant made false or misleading statements to induce a purchaser to pay for services.

- Defendant engaged in debt adjustment activities, including holding out that it could affect the adjustment, compromise, or discharge of any account, note, or other indebtedness of consumers who sign up for its services, without complying with R.C. §§ 4710.02(A) and (B), specifically that Defendant charged fees in excess of those permitted by the Ohio Debt Adjusters Act.

- Defendant violated Ohio Adm. Code § 109:4-3-09(A) by accepting money from consumers for goods or services ordered by mail, telephone, or otherwise and then failed to make full delivery or make a full refund as promised.

- Defendant had knowledge of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction.

- Defendant required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier.

37.     Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. § 1345.01 et seq.

*38.*     Defendant committed said violation after such decisions were available for public inspection pursuant to R.C. § 1345.05(A)(3). *State ex rel. Petro v. Debticated Consumer Counseling, Inc.* (Lucas Co. C.P. 2003), Case No. CIO 2002 4856, (PIF# 2173); *State of Ohio ex rel. Cordray v. United Law Group, Inc.* (Franklin Co. C.P. 2010)*,* Case No. 10 CVH 021567, (PIF# 2874); *State of Ohio, ex rel. Cordray v. Brotherton* (Greene Co. C.P. 2010), Case No. 2009 CV 0709, (PIF# 2831); *In Re Nationwide Debt Solution, Inc.* (2010), Docket No. 384784 (PIF# 2878); *In Re Budulator Corporation, Inc.* (2010), Docket No. 388509 (PIF# 2876); *State of Ohio ex rel. Rogers v. Richard Pinnix d/b/a Pinnix Business Services* (Franklin Co. C.P. 2008), Case No. 07CVH08-10491(PIF# 2726); *State of Ohio ex rel. Dann v. American Housing Authority, Inc.* (Lucas Co. C.P. 2008), Case No. CI-0200705443 (PIF# 2676); *State of Ohio ex rel. Petro v. AAA All Ohio Roofing, et al.* (Franklin Co. C.P. 2003), Case No. 02CVH022119 (PIF# 2152); *State ex rel. Montgomery v. Bayview Group, Inc.* (Franklin Co. C.P. 2003), Case No. 97CVH12 10749 (PIF# 1727).

39.     Plaintiff has suffered damages due to the illegal and deceptive acts in violation of the Ohio Consumer Sales Practices Act in that:

  •   She paid fees that were both illegal and were not in exchange for any services of value.

  •   She quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to her described in the Complaint.

  •   As a result, her creditors exercised their right to the default interest rate

accelerating the balances owed by enormous amounts to be determined at trial.

- She suffered mental and emotional hardship, mental and emotional stress, and anxiety.

**Count Two:**
**(Violations of the Ohio Credit Services Organizations Act)**

40. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

41. Defendant is a credit service organization as defined by R.C. § 4712.01(C)(1) in that Defendant accepted money in order to improve Plaintiffs' credit record and gave advice in connection with doing so.

42. Plaintiff is a buyer as defined by R.C. § 4712.01(A) in that she was solicited and purchased the services of Defendant.

43. Defendant has failed to register as a credit services organization with the Ohio Division of Financial Institutions in violation of R.C. § 4712.02(A).

44. Pursuant to R.C. §4712.11(A), Defendant's violation of R.C. § 4712.02(A) constitutes unfair or deceptive acts or practices in violation of R.C. § 1345.02.

45. Plaintiff has suffered damages due to the illegal and deceptive acts in violation of the Ohio Credit Services Organization Act in that:

- she paid fees that were both illegal and were not in exchange for any services of value.

- she quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to her described in the Complaint.

9

- As a result, her creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- She suffered mental and emotional hardship, mental and emotional stress, and anxiety.

### Count Three:
### (Violations of the Credit Repair Organizations Act)

46. Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

47. The Credit Repair Organizations Act was enacted to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services and to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b). The CROA provides that a credit repair organization:

a. May not charge or receive any money or other valuable consideration for services which the credit repair organization has agreed to perform before such service is fully performed, 15 U.S.C. § 1679(b);

b. May not provide services without a written and dated contract that includes a full and detailed description of the services to be performed and other terms and conditions set forth in 15 U.S.C. §§ 1679d(a)(1), 1679d(b);

c. Must provide to the consumer, before any contract or agreement between the consumer and the credit repair organization is executed, the written statement set forth in Section 405(a) of CROA concerning consumer credit file rights under state and federal law and the right to cancel a contract with

10

a credit repair organization, 15 U.S.C. § 1679c; and

    d.  Must allow a consumer to cancel any contract with the credit repair organization without penalty or obligation if the consumer notifies the credit repair organization of the consumer's intention to cancel before midnight of the third business day after the date the contract between the consumer and the credit repair organization is executed, 15 U.S.C. § 1679e.

48.    Defendant is "credit repair organizations" as that term is defined in the Credit Repair Organizations Act ("CROA"), because they use instrumentalities of interstate commerce to sell, provide, or perform (or represent that such defendant can or will sell, provide, or perform) a service for the express or implied purpose of improving a consumer's credit record, credit history, or credit rating, and this service is offered in return for the payment of money. 15 U.S.C. § 1679a(3).

49.    Defendant received money prior to fully performing its services, and failed to provide any of the proper disclosures, contracts, or right to cancel forms.

50.    Defendant's conduct as alleged in Count Three of this Complaint violates the Credit Repair Organizations Act, and the Defendants are liable for these violations.

51.    Plaintiff has suffered damages due to the illegal and deceptive acts in violation of the Credit Repair Organization Act in that:

- She paid fees that were both illegal and were not in exchange for any services of value.

- She quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to them described in the Complaint.

11

- As a result, her creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- She suffered mental and emotional hardship, mental and emotional stress, and anxiety.

### Count Four:
### (Fraud / Fraud in the Inducement)

52.    Plaintiff repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

53.    Plaintiff specifically relied on the representations, misrepresentations, non-disclosures and implied representations described in Paragraphs 9 through 32 when making the determination to enter into a contract or continue using the services of Defendant.

54.    Defendant, through representations, websites, and the Agreement create the appearance that Plaintiff is entering into an agreement that will greatly reduce her outstanding debts.

55.    Defendant engaged in the unlawful conduct previously alleged with the actual and/or imputed knowledge of the unlawful conduct.

56.    Defendant knowingly engaged in such conduct with the purpose of inducing payment from Plaintiff.

57.    Plaintiff have been injured by the wrongful and fraudulent conduct of Defendant and have been damaged in an amount to be established at trial, as well as entitled to punitive damages in an amount to be established at trial.

### Count Five:
### (Violations of the Telemarketing Sales Rule)

58.    Plaintiff repeats, realleges, and reincorporates by reference all of the foregoing

paragraphs.

59.     The Telemarketing Sales Rule ("TSR") was promulgated for the explicit purpose of preventing consumer harm from debt relief operations like the venture of the Defendant in this case.

60.     The TSR, 16 C.F.R. § 310.2(m), defines "debt relief service" as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payments or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."

61.     The TSR, 16 C.F.R. § 310.2(dd), defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."

62.     The TSR, 16 C.F.R. § 310.2 (aa), defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

63.     The TSR, 16 C.F.R. § 310.2 (cc), defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

64.     Defendants are "sellers" or "telemarketers" of "debt relief services", who engages in "telemarketing", as defined in the TSR.

65.     The TSR, 16 C.F.R. § 310.4 (a)(5)(i), provides that a seller or a telemarketer may not request or receive payment of any fee or consideration for any debt relief service until and

unless among other things, "the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer" and "the customer has made at least one payment" pursuant too such an agreement or plan.

66.     The TSR, 16 C.F.R. § 310.4(a)(5)(ii), provides that a seller or a telemarketer may request or require customers to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation or settlement of a debt, provided that, among other things: the customer owns the funds held in the account and is paid interest on the account" and "the customer may withdraw from the debt relief service at any time without penalty and must receive all funds in the account, other that funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the consumer's request."

67.     The TSR, 16 C.F.R. § 310.3(a)(2)(ii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of the sales offer.

68.     The TSR, 16 C.F.R. § 310.3(a)(2)(iii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.

69.     The TSR, 16 C.F.R. § 310.3(a)(2)(x), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.

70. In the course of telemarketing debt relief services, Defendant has requested and received payment of fees from Plaintiffs for debt relief services before renegotiating, settling, reducing, or otherwise altering the terms of his debts. Defendant requested and received payment of these fees prior to Plaintiffs making at least one payment pursuant to any settlement agreement, debt-management plan, or other valid contractual agreement between Plaintiffs and their creditors.

71. Therefore, Defendant's act or practices violate the TSR, 16 C.F.R. § 310.4(a)(5)(i), and are abusive acts or practices in telemarketing.

72. Plaintiff was charged advances fees for Defendant's debt relief services.

73. Therefore, Defendant's representations as described herein violate the TSR, C.F.R. § 310.3(a)(2)(ii) and (x), and are deceptive acts or practices in telemarketing.

74. In numerous instances, in connection with advertising, marketing, promoting, offering for sale, or sale of debt relief services, Defendant represented to Plaintiff directly or indirectly, expressly or by implication, that her total debt amount would be reduced by up to 50%.

75. In fact, Defendant does not have a track record of consistent debt reduction of this degree, if any at all.

76. Therefore, Defendant's representations as described herein violate the TSR, C.F.R. § 310.3(a)(2)(iii) and (x), and are deceptive acts or practices in telemarketing.

77. In addition, Defendant and its representatives in making its savings claims (amounts of monies s would save by using Defendant's services) did not disclose the following in violation of the TSR:

- State the savings was based on the Plaintiff debt when she signed up

15

for the program.

- Include the impact of the Defendant's fees on their claimed savings to the Plaintiff.

- In calculating the results over time, did not include customers who dropped out or otherwise failed to complete the program.

## Count Six
## (Breach of Contract)

78.    Plaintiff repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

79.    Defendant entered into a contract with Plaintiff and represented it would eliminate Plaintiff's debt.

80.    Defendant further provided advice and explanation on the Fair Credit Reporting Act, the Federal Trade Commission Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act.

81.    Defendant cite the statutes listed in the prior paragraph as authority for its 'Debt Validation Services' though it is not clear how the Defendant would eliminate defendant's debt through the statutes listed in paragraph 86.

82.    Defendant did not perform its obligations pursuant to the contract as agreed as no debts of Plaintiff were eliminated.

83.    Plaintiff paid Defendant pursuant to the contract as agreed.

84.    Plaintiff has been damaged by Defendant's non-performance and resulting breach of the contract.

85.    As such, Plaintiffs is entitled to damages for the breach of contract.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Teresa Klaus, prays this Court grant the following relief:

1.   ISSUE an order declaring that the Defendant has engaged in acts and practices in

16

violation of the Consumer Sales Practices Act, R.C. § 1345.01 et seq., the Debt Adjustment Companies Act, R.C. § 4710.01 et seq., the Ohio Credit Services Organization Act R.C. § 4712.01, et seq., the Credit Repair Organization Act 15 U.S.C. § 1679, et seq. and the Telemarketing Sales Rule 16 C.F.R. § 310, et seq.

2. ISSUE a Permanent Injunction enjoining the Defendant, its agents, servants, employees, successors or assigns, and all persons acting in concert and participation with it, directly or indirectly, through any corporate device, partnership, or other association, under this or any other name, from engaging in the acts and practices which Plaintiff complains in the State of Ohio until complying with the laws of the State of Ohio and satisfaction of any monetary obligations to Plaintiff.

3. GRANT judgment against the Defendant in the amount of three times the actual damages or $200.00 for each unlawful act specified, whichever is greater, pursuant to R.C. § 1345.09(B).

4. GRANT judgment against the Defendant for common law fraud in an amount of damages in excess of $25,000.00.

5. GRANT judgment against the Defendant in excess of $50,000.00 for violations of the Telemarketing Sales Rule 16 CFR§ 310, et seq.

6. GRANT statutory damages for violations of the Credit Repair Organization Act 15 U.S.C. § 1679g.

7. GRANT statutory damages for violations of the Ohio Credit Services Organization Act R.C. § 4712.10.

8. GRANT judgment against the Defendant in excess of $25,000.00 for its breach of contract with Defendants.

9.  Costs and reasonable attorney fees, pursuant to R.C. § 1345.09(F)(2).

10. GRANT punitive damages.

11. GRANT such other relief as this Court deems to be just, equitable and appropriate.

Respectfully Submitted:

*/s/ Jeremiah E. Heck*
Jeremiah E. Heck (0076742)
David B. Schultz (0077281)
Luftman Heck & Associates LLP
6253 Riverside Drive, Suite 200
Dublin, Ohio 43017
Phone: (614) 224-1500
Fax: (614) 224-2894
dschultz@lawlh.com
*Attorney for Plaintiffs*

### DEMAND FOR JURY TRIAL

Please take notice that Plaintiff, Kathlene Scarlett, demands trial by jury in this action.

*/s/ Jeremiah E. Heck*
Jeremiah E. Heck (0076742)

## Debt Settlement

You may request that LPG settle any debt identified below at any point in the course of LPG's representation of you. Where requested, LPG will negotiate the most favorable settlement it is able to negotiate on your behalf. Any settlement reached as a result of your request shall be your responsibility, and shall be paid directly from you to the creditor. At the point that you reach a settlement with a creditor, your payment to LPG will be reduced and to adjust for the settled account being removed from the representation herein contemplated. LPG will only settle a debt where litigation is active or contemplated.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency to you from the date you execute this Agreement until the conclusion of your representation.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original signed agreement. This agreement may not be modified except in writing by both parties.

## Malpractice Insurance

LPG hereby discloses that it maintains a malpractice insurance policy that covers its representation of you and that the limit of such policy is no less than $1,000,000.00 per claim and $1,000,000.00 per claimant. If you desire to make a claim against that insurance policy, you must first contact LPG and disclose your claim and the nature of the claim, at which point LPG agrees to assist you in obtaining any and all information necessary to prepare a file a claim.

## Applicable Law and Confidentiality

You understand and agree that LPG is based out of the State of California, is a licensed law corporation under the State Bar of California, and that California law applies to this Agreement. You further understand that LPG is bound to strict rules of confidentiality and attorney-client privilege in connection with the rules applicable to attorneys licensed to practice law in the State of California. You further understand and agree that you have sought the representation of LPG with full knowledge of its location and licensing, and that LPG works with attorneys licensed in all 50 states and the District of Columbia as affiliated counsel to allow LPG to provide a complete representation of you in any state in which you are sued or in which a dispute might arise. You have the right to know the licensed attorney with whom LPG has affiliated in any state and at any time but understand and agree that LPG may choose to change the local attorney with whom it is affiliated in any given jurisdiction, provided only that at all times LPG shall have an affiliated attorney in all 50 states and the District of Columbia.

Case 2:23-cv-00049-FMO-SK Document 1-1 Filed 01/09/23 Page 308 of 347 Page ID #:420

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) required by the State Bar of California Rules of Professional Conduct, (b) you refuse to communicate with LPG or respond to reasonable requests for information necessary to represent you in an effective way, (c) you fail to make timely payment of the amount due under hereunder, or (d) your payments are returned multiple times for any reason. LPG will not pay any of the debts identified below and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's representation of you. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to the address, email, or fax number provided below, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email, or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded.

Client Signature:  _Kathlene Scarlett_

Date:  9/20/2021

Co-Applicant Signature:

Date:

## THE LITIGATION PRACTICE GROUP PC

**Daniel S. March, Managing Shareholder**
**17542 E. 17th Street, Ste 100**
**Tustin, CA 92780**
**Support@LPGLaw.com**
**Tel. 949.715.0644**
**Fax. 949.315.4332**

ID: 4417741 Signed: 2021-09-20T12:22:49-05:00

## Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts, up to and including the initiation of lawsuits on your behalf against your creditors and their third-party debt collectors.

In addition, if a lawsuit is filed against you, LPG will represent you in such a lawsuit and will not charge any additional fees for such representation provided such a lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

## Fees

You will pay the fees set forth below for the legal services provided by LPG, which services are outlined above. No fee or other cost will be charged or collected beyond the flat fee set forth below. This is the only amount that you have to pay to LPG for its services, which includes any cost, filing fee or vendor's fee associated with LPG's representation of you, and this fee is not escrowed but rather earned received by LPG. This fee does NOT, however, include any settlement that you may have to pay to any creditor if you opt to settle a debt prior to or during the course of a lawsuit.

## Refund Policy

If you reach the conclusion of LPG's representation of you and a debt remains in dispute without resolution, you will be eligible to receive a full refund of the fees that you paid towards your representation in connection with that account (i.e., you will be refunded the fees paid in proportion to the debt that was not resolved). A debt is "in dispute" under this paragraph if, at the time of completion of LPG's representation of you, no lawsuit was filed regarding the debt, no settlement was reached regarding the debt, no acknowledgment of invalidity was received from the creditor regarding the debt, and the debt is still reporting to one of the following credit bureaus: Experian, Equifax, or Transunion.

## Preauthorized Checking and ACH Authorization Form

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by LPG, its payments processors, and/or their successors for the purpose of accumulating funds to pay for such goods and services as I so direct LPG to perform. This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief. The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

**Account Owner Name:** Kathlene L Scarlett

**Address:**                                    **City:**Dayton   **State:**OH   **Zip:** 45449

**Mobile Phone #:   E-Mail:**

### DESIGNATED BANK ACCOUNT INFORMATION

**Bank Name:** JPMORGAN CHASE

**Name as it appears on bank ACCOUNT:**  Kathlene L Scarlett

**Routing Number:**                **Account Number:**                **Checking or Saving:** Checking

### DESIGNATED BANK ACCOUNT PAYMENT AUTHORIZATION SCHEDULE

**Total Amount of Debit:** $254.38        **Date of Next Debit:**Oct 04, 2021

**I authorize Payment Automation Network** to initiate Automatic Clearing House (ACH) or Electronic Funds Transfer (EFT) or Remotely Created Check (RCC) from my designated bank account at the financial institution identified above. I authorize Payment Automation Network to debit my bank account according to the schedule of debits provided to Payment Automation Network by me or on my behalf or as otherwise provided by agreement. I understand that debits will be withdrawn on the due date unless otherwise indicated and that sufficient funds must be available in designated account at least two (2) business days prior to the actual date of the debit. Upon my approval, Payment Automation Network may adjust the amount being debited from designated bank account. This authorization is to remain in force until the schedule of debits is completed or until Payment Automation Network has received written notification from me of a change or termination, allowing Payment Automation Network no fewer than five (5) business days to act. Payment Automation Network shall not be liable to any person for not completing a transaction as a result of any limit on my designated bank account or if a financial institution fails to honor any debit from such account. I understand it is my responsibility to notify Payment Automation Network immediately if a scheduled debit does not occur. I authorize Payment Automation Network to recover funds by ACH/EFT/RCC debit from my bank account in the event of an error or in the event that a prior debit is returned for any reason, including non-sufficient funds. I understand that a $25.00 service charge will be added for every NSF draft. I understand I can call Payment Automation Network at 800-813-3740 to cancel the automatic draft payments. Payments will be drafted on the payment due date of the original Servicing agreement. I understand and agree that Payment Automation Network, Inc. is a private company, and is not affiliated with any academic or

## Electronic Payment Authorization

**Bank Name:** JPMORGAN CHASE
**Name on Account:** Kathlene L Scarlett
**Account Type:** Checking
                    Other (specify: _____)
**Routing Number**
**Account Number:**
**Next Payment Date:** Oct 04, 2021 **Amount:** $ 254.38
**Recurring Payment Date:** 4th

By signing below, I authorize and permit LPG or their designees to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above. I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction. The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date. No other forms of cancellation by members will be observed. If the debit is returned because of non-sufficient funds or uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times. The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date. The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed. The member agrees with all of the provisions and conditions outlined within.

## Acknowledgment of Refunds & Draft Date Changes

ACH Refunds: If a refund is due such will be made through the ACH process only. Refunds may take up to 10 days to process. In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT. Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct. Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least three (3) business days prior to the scheduled payment. If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us three (3) business days prior to the questioned debit being initiated.

**Client Signature:**
*Kathlene Scarlett*

**Date**:
9/20/2021
**Printed Name:**
Kathlene Scarlett

governmental entity. The Payment Automation Network, Inc. service bridges the gap between the student loan consolidation company Software and ACH, EFT, or RCC processor.  Payment Automation Network, Inc. is not a money transmitter or debt collection agency and does not receive money from individual debtors. Payment Automation Network, Inc. is not engaged in the business of debt or credit counseling or the provision of other services to individual debtors. Payment Automation Network, Inc. does not solicit, offer loan consolidation services, or provide services directly to individual debtors. Payment Automation Network, Inc. does not have a contractual relationship with individual debtors to affect the adjustment, compromise, or discharge of any loan account.

I have read and understand the information contained in this document and I affirm that the above information given by me is accurate and true to the best of my knowledge.

**Account Holder's Signature:** *Kathlene Scarlett*  **Date:** 9/20/2021

# Schedule of Payments

I agree to this payment schedule – **Client Initials:** KS

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Oct 04, 2021 | $254.38 |
| 2 | Nov 04, 2021 | $254.38 |
| 3 | Dec 06, 2021 | $254.38 |
| 4 | Jan 04, 2022 | $254.38 |
| 5 | Feb 04, 2022 | $254.38 |
| 6 | Mar 04, 2022 | $254.38 |
| 7 | Apr 04, 2022 | $254.38 |
| 8 | May 04, 2022 | $254.38 |
| 9 | Jun 06, 2022 | $254.38 |
| 10 | Jul 05, 2022 | $254.38 |
| 11 | Aug 04, 2022 | $254.38 |
| 12 | Sep 06, 2022 | $254.38 |
| 13 | Oct 04, 2022 | $254.38 |
| 14 | Nov 04, 2022 | $254.38 |
| 15 | Dec 05, 2022 | $254.38 |
| 16 | Jan 04, 2023 | $254.38 |
| 17 | Feb 06, 2023 | $254.38 |
| 18 | Mar 06, 2023 | $254.38 |
| 19 | Apr 04, 2023 | $254.38 |
| 20 | May 04, 2023 | $254.38 |
| 21 | Jun 05, 2023 | $254.38 |
| 22 | Jul 05, 2023 | $254.38 |
| 23 | Aug 04, 2023 | $254.38 |
| 24 | Sep 05, 2023 | $254.38 |
| 25 | Oct 04, 2023 | $254.38 |
| 26 | Nov 06, 2023 | $254.38 |
| 27 | Dec 04, 2023 | $254.38 |
| 28 | Jan 04, 2024 | $254.38 |
| 29 | Feb 05, 2024 | $254.38 |
| 30 | Mar 04, 2024 | $254.22 |



P.O. Box 513018, Los Angeles, CA 90051-1018
Tel. (949) 715-0644 · Fax (949) 315-4332
Support@LPGLaw.com

# LEGAL SERVICES AGREEMENT

## Legal Services

The Litigation Practice Group PC, a State Bar of California licensed law corporation, and its employed and affiliated attorneys (collectively "LPG") will provide legal services wherein it will represent you in connection with the disputes you have with the creditors listed below (see Creditor Information).  LPG will do the following as part of its representation of you:

- Assist you in stopping creditors and any related debt collectors from harassing or contacting you in connection with any of the debts identified below;
- Dispute the legal validity of the debts identified below;
- Assist you in removing erroneous or inaccurate information reported in connection with debts identified below;
- Represent you in any lawsuit filed against you in connection with any of these debts;
- Defend you against any collection activity or lawsuit on any invalidated debt at any point in time, without expiration, in connection with any debt identified below;
- Initiate legal action in a court of competent jurisdiction against any creditor that violates any state or federal law in connection with any debt identified below; and
- Determine your qualification for bankruptcy under Chapter 7 or Chapter 13 of the U.S. Bankruptcy Code, and counsel you regarding the procedures and effects of bankruptcy as well as your qualification to file the same.

LPG will serve as your attorney for all purposes in connection with these disputes and will be available to render all legal assistance necessary to resolve these debts.  The fees that are set forth below are flat fees that are all inclusive – no additional fee or cost will be charged by LPG at any time during the duration of your dispute with the creditors identified below.  All fees are earned by LPG at the time they are paid and are for services rendered to you as set forth herein.

## Client Authorization

You authorize LPG to challenge, where applicable, each of the debts listed below, which you believe to be in any way invalid, inaccurate, or otherwise without a legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the resolution of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your signature to documents sent on your behalf in relation to the matters addressed herein. Finally, you authorize LPG to communicate with you via email, text message, telephone, and facsimile. Any of the authorizations set forth herein can be revoked at any time by written communication.

ID: 4417741 Signed: 2021-09-20T12:22:49-05:00

## Creditor Information

| Creditor | Account # | Debt Balance |
|---|---|---|
| WEBBNKFHUT | | $3,708.00 |
| SYNCBMORRIS | | $1,611.00 |
| BBYCBNA | | $1,475.00 |
| MERRICK BK | | $1,448.00 |
| MDNGHT VLVT | | $1,443.00 |
| CRDT FIRST | | $1,158.00 |
| CREDITONEBNK | | $1,029.00 |
| Seventh Avenue | | $871.00 |
| WEBBANKAVANT | | $505.00 |
| SYNCBJCP | | $492.00 |
| CAP1WMT | | $231.00 |
| | | **$13,971.00** |

Case 2:22-cv-00155-JAS-LAB Document 1-1 Filed 11/22/22 Page 316 of 347

## **Client Information**

**Name**: Kathlene Scarlett

**Address**:                           Dayton OH 45449

**Home Phone:**
**Cell Phone:**
**Email:**                  @gmail.com
**Last 4 SSN:** XXX-XX-

# EXHIBIT K

# U.S. District Court
# Northern District of Ohio (Toledo)
# CIVIL DOCKET FOR CASE #: 3:22-cv-02093-JZ

Sheffield et al v. The Litigation Practice Group PC
Assigned to: Judge Jack Zouhary
Cause: 28:1331 Fed. Question

Date Filed: 11/18/2022
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Plaintiff**

**Geneva Sheffield**                    represented by    **David B. Schultz**
                                                          Luftman Heck - Dublin
                                                          6253 Riverside Drive
                                                          Dublin, OH 43017
                                                          614-347-1949
                                                          Fax: 614-347-1949
                                                          Email: dschultz@lawlh.com
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jeremiah E. Heck**
                                                          Luftman Heck - Dublin
                                                          Ste. 200
                                                          6253 Riverside Drive
                                                          Dublin, OH 43017
                                                          614-224-1500
                                                          Email: jheck@lawlh.com
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Myranda Sheffield**                   represented by    **David B. Schultz**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Jeremiah E. Heck**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**The Litigation Practice Group PC**

| Date Filed | # | Docket Text |
|---|---|---|
| 11/18/2022 | 1 | **Complaint** For Declaratory and Injunctive Relief with jury demand against The Litigation Practice Group PC. Filing fee paid $ 402, Receipt number AOHNDC-11720648.. Filed by Geneva Sheffield. (Attachments: # 1 Exhibit A, # 2 Civil Cover Sheet) (Heck, Jeremiah) (S,Ja). (Entered: 11/18/2022) |
| 11/21/2022 | 2 | Civil Cover Sheet filed by All Plaintiffs. Related document(s) 1 .(Heck, Jeremiah) (Entered: 11/21/2022) |
| 11/21/2022 |   | Judge Jack Zouhary assigned to case. (S,Ja) (Entered: 11/21/2022) |
| 11/21/2022 |   | Random Assignment of Magistrate Judge pursuant to Local Rule 3.1. In the event of a referral, case will be assigned to Magistrate Judge Darrell A. Clay. (S,Ja) (Entered: 11/21/2022) |
| 11/21/2022 | 3 | Magistrate Consent Form issued. No summons provided. No summons issued. (S,Ja) (Entered: 11/21/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 12/02/2022 12:54:17 | | |
| **PACER Login:** | kyleanderson | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-02093-JZ |
| **Billable Pages:** | 2 | **Cost:** | 0.20 |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| GENEVA SHEFFIELD | : | **Case No. 3:22-cv-2093** |
| 2376 Dana St., | : | |
| Toledo, OH 43609 | : | **Judge**: |
| | : | |
| And | : | |
| | : | |
| MYRANDA SHEFFIELD | : | |
| 2376 Dana St. | : | |
| Toledo, OH 43609 | : | |
| | : | |
| Plaintiffs | : | |
| v. | : | |
| | : | |
| THE LITIGATION PRACTICE GROUP PC | : | |
| C/O Registered Agent | : | **COMPLAINT** |
| Daniel S. March | : | **FOR DECLARATORY AND** |
| Tustin, CA 92780 | : | **INJUNCTIVE RELIEF** |
| | : | |
| Defendant | : | |

---

### Introduction

1.    This is an action for damages brought by a consumer against Defendant for violations of the Debt Adjustment Companies Act, R.C. § 4710.01, et seq. ("DACA"), the Ohio Consumer Sales Practices Act, R.C. § 1345.01, et seq. ("OCSPA"), the Ohio Credit Services Organization Act R.C. §4712.01, et seq. ("OCSOA"), the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j ("CROA"), the Telemarketing Sales Rule 16 C.F.R. § 310.2 ("TSR"), Breach of Contract, and Common Law Fraud, all of which prohibit persons engaged in debt adjusting and credit repair from engaging in abusive, deceptive, and unfair practices.

### Jurisdiction and Venue

2.    This Court maintains subject matter jurisdiction pursuant to the Telemarketing Sales Rule 16 C.F.R. § 310.2 et seq., as further alleged herein.

1

3.      This Court may also exercise supplemental jurisdiction over the related state law claims arising out of the same nucleus of operative facts which give rise to any federal law claims under 28 U.S.C. § 1367.

4.      The transactions and occurrences which give rise to this action occurred in Lucas County Ohio.

5.      Venue is proper in the Southern District of Ohio.

**Parties**

6.      Plaintiff, Geneva Sheffield, is a consumer residing at 2376 Dana St., Toledo, OH 43609.

7.      Plaintiff, Myranda Sheffield, is a consumer residing at 2376 Dana St., Toledo, OH 43609.

8.      Upon information and belief, Defendant Litigation Practice Group PC (hereinafter "LPG") is a California debt settlement and debt validation company operating from an address at 17542 E 17th Street, Ste 100, Tustin, CA 92780, and doing business in the state of Ohio.

9.   Defendant regularly engages in business in Ohio and directed at residents of Ohio and have otherwise availed itself of the Ohio marketplace and secured the benefits of that marketplace. Such conduct included, among other things; holding itself out as debt settlement company providing services to Ohio residents; directing business solicitations into the State of Ohio, directed at indebted Ohio residents, seeking participation in Defendant's debt settlement, credit repair and debt elimination programs; contracting in Ohio with Ohio consumers for various services, including debt validation; offering to perform and/or performing activities for Ohio residents including debt settlement, credit repair and debt elimination functions.

2

**Statement of Facts**

10.   LPG is in the business of marketing, among other services, debt adjustment, credit repair and debt elimination services.

11.   On or before, July 7, 2020, Plaintiffs contacted LPG to discuss possible debt elimination services.

12.   Plaintiff had several telephone conversations wherein she was led to believe she was retaining Defendant for debt adjustment services which necessarily included credit repair and debt elimination.

13.   Based upon the representations made by LPG in the phone calls, Plaintiff s believed by enrolling in the program, they could eliminate their overall debt by disputing the validity of the debts under the statutes of the Consumer Financial Protection Bureau and the Fair Debt Collection Practices Act.

14.   An LPG representative sent Plaintiffs an Agreement to review and sign (attached as **Exhibit A**); the LPG representative also instructed Plaintiffs they had a right to withhold payments to their creditors while the accounts were in dispute.

15.   Defendants charged substantial up-front fees; Plaintiff's credit scores severely reduced pursuant to her participation in the program; Plaintiffs' credit scores will not recover in the near future.

16.   Enrolling in Defendants' program resulted in no reduction to Plaintiff's total debt owed as agreed, in fact, Plaintiff's total indebtedness increased substantially due to interest and fees.

17.   Plaintiffs' included only 2 accounts in Defendants program, 2 Discover Bank Student Loans.

18.    After enrolling in Defendant's program, a lawsuit was filed against Plaintiff on both Discover Bank student loans referred to in Paragraph 13, which was the entirety of the accounts included in Defendant's program.

19.    Enrolling in LPG's program resulted in no payments being made to Plaintiff's creditors.

20.    Upon information and belief, the only services provided to Plaintiff from Defendants were the mailing of verification packets to Plaintiff's creditors.

21.    While Defendants represented mailing these packets would eliminate Plaintiff's debt, it knew this representation was false, and the mailings would have no legal effect with regard to reducing Plaintiff's debt.

22.    Defendants made various misrepresentations or non-disclosures in an effort to induce Plaintiff to enter into the illegal agreement including, but not limited to:

- Unsubstantiated claims of savings; Defendants represented to Plaintiffs that the program would eliminate Plaintiffs' total debt; however, Defendants do not have a record of accomplishment to support that statement.

- Misleading or failing to adequately inform consumers, including Plaintiffs, that they will be subject to continued collection efforts, including lawsuits, and that their account balances will increase due to extended nonpayment under the program.

- Defendant represented that the majority of consumers which retain it go on to complete the program thereby becoming debt free; however, a high percentage of consumers who attempt Defendant's debt verification program do not become debt free as a result of its services.

4

- Defendant accepted money from Plaintiffs for the purpose of eliminating all debts on the program for less than the amount owed knowing there was a substantial likelihood that they could not provide the services as promised. Defendant knew its business model was legally unsound and nonsensical.

23. Based upon the misrepresentations of the Reliance representative, Plaintiff agreed to enter into a contract for the debt relief services of LPG.

24. Plaintiff agreed to pay specified fees which, unknown to Plaintiff, were illegal due to the substantial amount of the fees and requirement of payment up front.

25. LPG withdrew over $11,000 in fees from Defendant over a period of approximately three years.

26. The Telemarketing Sales Rule prohibits debt relief companies from charging up-front fees prior to settling accounts because, among other reasons, such a business model is designed to fail from the beginning. TSR, 16 C.F.R. § 310.4 (a)(5)(i)

27. Further, given the lengthy period of time creditors do not receive money owed, (oftentimes without any contact with the debt relief companies or the debtor), the creditor will often opt to bring a lawsuit for money owed.

28. Defendant advised Plaintiffs to quit paying their debts knowing the debt would continue to accumulate interest, over the limit fees, and late fees.

29. Defendant represented they would attempt to eliminate Plaintiffs' total debt balance by providing a debt elimination program by sending validation documentation to the third-party collectors collecting on the debts in the program hoping debt collection would cease.

30. The vast majority of services LPG agreed to provide Plaintiffs was in fact legal services. The Agreement is a legal fee agreement whereby LPG agreed to practice law and

provide legal services in exchange for money.

31.     Defendant's actions did not reduce Plaintiffs' total debt balance, and in fact, Plaintiff owe more money and have been sued on numerous accounts enrolled in the Defendant's debt elimination program.

**Count One:**
**(Violations of the Ohio Consumer Sales Practices Act and Debt Adjustment**
**Companies Act)**

32.     Plaintiff repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

33.     The activity described in all previous paragraphs is a "consumer transaction" as defined by R.C. § 1345.01(A). Defendant solicited and retained Plaintiff to perform debt adjustment services for a fee.

34.     Plaintiff's debts at issue were incurred for personal, family and/or household use.

35.     Defendant is a "supplier" as that term is defined in R.C. § 1345.01(C), since Defendant engaged in the business of effecting "consumer transactions", either directly or indirectly, by operating a debt adjustments service for consumers in Ohio for purposes that are primarily for personal, family or household within the meaning specified in R.C. §1345.01(A).

36.     Defendant is a "person" as defined by the DACA, R.C. § 4710.01(A) engaged in the act of "debt adjusting" as defined by the DACA, R.C. § 4710.01(B), and a "supplier" as defined by the OCSPA, R.C. § 1345.01(C), since Defendant was engaged in the business of debt adjusting, budget counseling, debt management, or debt pooling services, or holding oneself out, by words of similar import, as providing services to debtors in the management of their debt to a consumer in the State of Ohio for purposes that were primarily for personal, family or household use.

6

37.     Plaintiff is a "consumer" as defined by the OCSPA, R.C. § 1345.01(D).

38.     Defendant charged and accepted fees or contributions in excess of what are reasonable fees or contributions, in violation of R.C. §§ 4710.02(A)(3), 4710.02(B)(1-3) and 4710.02(F)(1). Defendant knew that the debt settlement program's fees exceeded the amount permitted by R.C. § 4710.02(B).

39.     Upon information and belief, Defendant failed to arrange for and undergo an audit conducted by an independent, third party, certified public accountant of the person's business and then file the audit and opinion with the consumer protections division of the attorney general in violation of R.C. §§ 4710.02(D)(1-2) and 4710.02(F)(2).

40.     Upon information and belief, Defendant failed to obtain and maintain insurance coverage not less than $100,000.00 for employee dishonesty, forgery, and fraud in violation of R.C. §§ 4710.02(E)(1-2) and 4710.02(F)(2).

41.     Defendant's transactions failed to include the notices, statements, and cancellation forms as defined by R.C. §§ 4710.05(A) and (B). Such failure is a violation of R.C. § 1345.02(A) of the OCSPA.  Defendant committed unfair, deceptive and unconscionable acts or practices in violation of R.C. §§ 1345.02(A) and/or 1345.03(A) of the Consumer Sales Practices Act including:

- Defendant operated a debt settlement company in the State of Ohio without complying with applicable Ohio law, namely, R.C. § 4710, et seq.

- Defendant charged an excessive fee for debt adjusting and failed to provide the service pursuant to the Failure to Deliver Rule, O.A.C. § 109:4-3-09(A).

- Defendant is an out of state corporations, failed to register with the Ohio Secretary of State prior to doing business in Ohio as required by R.C. §

7

1703.03.

- Defendant made false or misleading statements to induce a purchaser to pay for services.

- Defendant engaged in debt adjustment activities, including holding out that it could affect the adjustment, compromise, or discharge of any account, note, or other indebtedness of consumers who sign up for its services, without complying with R.C. §§ 4710.02(A) and (B), specifically that Defendant charged fees in excess of those permitted by the Ohio Debt Adjusters Act.

- Defendant violated Ohio Adm. Code § 109:4-3-09(A) by accepting money from consumers for goods or services ordered by mail, telephone, or otherwise and then failed to make full delivery or make a full refund as promised.

- Defendant had knowledge of the inability of the consumer to receive a substantial benefit from the subject of the consumer transaction.

- Defendant required the consumer to enter into a consumer transaction on terms the supplier knew were substantially one-sided in favor of the supplier.

42.    Such acts and practices have been previously determined by Ohio courts to violate the Consumer Sales Practices Act, R.C. § 1345.01 et seq.

*43.*    Defendant committed said violation after such decisions were available for public inspection pursuant to R.C. § 1345.05(A)(3). *State ex rel. Petro v. Debticated Consumer Counseling, Inc.* (Lucas Co. C.P. 2003), Case No. CIO 2002 4856, (PIF# 2173); *State of Ohio*

*ex rel. Cordray v. United Law Group, Inc.* (Franklin Co. C.P. 2010), Case No. 10 CVH 021567, (PIF# 2874); *State of Ohio, ex rel. Cordray v. Brotherton* (Greene Co. C.P. 2010), Case No. 2009 CV 0709, (PIF# 2831); *In Re Nationwide Debt Solution, Inc.* (2010), Docket No. 384784 (PIF# 2878); *In Re Budulator Corporation, Inc.* (2010), Docket No. 388509 (PIF# 2876); *State of Ohio ex rel. Rogers v. Richard Pinnix d/b/a Pinnix Business Services* (Franklin Co. C.P. 2008), Case No. 07CVH08-10491(PIF# 2726); *State of Ohio ex rel. Dann v. American Housing Authority, Inc.* (Lucas Co. C.P. 2008), Case No. CI-0200705443 (PIF# 2676); *State of Ohio ex rel. Petro v. AAA All Ohio Roofing, et al.* (Franklin Co. C.P. 2003), Case No. 02CVH022119 (PIF# 2152); *State ex rel. Montgomery v. Bayview Group, Inc.* (Franklin Co. C.P. 2003), Case No. 97CVH12 10749 (PIF# 1727).

44.     Plaintiff has suffered damages due to the illegal and deceptive acts in violation of the Ohio Consumer Sales Practices Act in that:

- They paid fees that were both illegal and were not in exchange for any services of value.

- They quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to her described in the Complaint.

- As a result, Plaintiffs' creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- Plaintiffs suffered mental and emotional hardship, mental and emotional stress, and anxiety.

## <u>Count Two</u>:
## <u>(Violations of the Ohio Credit Services Organizations Act)</u>

9

45. Plaintiffs repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

46. Defendant is a credit service organization as defined by R.C. § 4712.01(C)(1) in that Defendant accepted money in order to improve Plaintiffs' credit record and gave advice in connection with doing so.

47. Plaintiffs are buyers as defined by R.C. § 4712.01(A) in that she was solicited and purchased the services of Defendant.

48. Defendant failed to register as a credit services organization with the Ohio Division of Financial Institutions in violation of R.C. § 4712.02(A).

49. Pursuant to R.C. §4712.11(A), Defendants' violation of R.C. § 4712.02(A) constitutes unfair or deceptive acts or practices in violation of R.C. § 1345.02.

50. Plaintiffs have suffered damages due to the illegal and deceptive acts in violation of the Ohio Credit Services Organization Act in that:

- Plaintiffs paid fees that were both illegal and were not in exchange for any services of value.

- Plaintiffs quit paying their creditors upon the advice of LPG representatives and the many misrepresentations that were made to them described in the Complaint.

- As a result, Plaintiffs creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- Plaintiffs suffered mental and emotional hardship, mental and emotional stress, and anxiety.

## Count Three:
## (Violations of the Credit Repair Organizations Act)

51.     Plaintiffs repeats, realleges, and incorporates by reference all of the foregoing paragraphs.

52.     The Credit Repair Organizations Act was enacted to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services and to protect the public from unfair or deceptive advertising and business practices by credit repair organizations. 15 U.S.C. § 1679(b). The CROA provides that a credit repair organization:

    a.  May not charge or receive any money or other valuable consideration for services which the credit repair organization has agreed to perform before such service is fully performed, 15 U.S.C. § 1679(b);

    b.  May not provide services without a written and dated contract that includes a full and detailed description of the services to be performed and other terms and conditions set forth in 15 U.S.C. §§ 1679d(a)(1), 1679d(b);

    c.  Must provide to the consumer, before any contract or agreement between the consumer and the credit repair organization is executed, the written statement set forth in Section 405(a) of CROA concerning consumer credit file rights under state and federal law and the right to cancel a contract with a credit repair organization, 15 U.S.C. § 1679c; and

    d.  Must allow a consumer to cancel any contract with the credit repair organization without penalty or obligation if the consumer notifies the credit repair organization of the consumer's intention to cancel before midnight of the third business day after the date the contract between the consumer and

the credit repair organization is executed, 15 U.S.C. § 1679e.

53.   Defendant is a "credit repair organization" as that term is defined in the Credit Repair Organizations Act ("CROA"), because it uses instrumentalities of interstate commerce to sell, provide, or perform (or represent that such defendants can or will sell, provide, or perform) a service for the express or implied purpose of improving a consumer's credit record, credit history, or credit rating, and this service is offered in return for the payment of money. 15 U.S.C. § 1679a(3).

54.   Defendant received money prior to fully performing its services, and failed to provide any of the proper disclosures, contracts, or right to cancel forms.

55.   Defendant's conduct as alleged in Count Three of this Complaint violates the Credit Repair Organizations Act, and the Defendants are liable for these violations.

56.   Plaintiffs have suffered damages due to the illegal and deceptive acts in violation of the Credit Repair Organization Act in that:

- Plaintiffs paid fees that were both illegal and were not in exchange for any services of value.

- Plaintiffs quit paying her creditors upon the advice of Defendant's representatives and the many misrepresentations that were made to them described in the Complaint.

- As a result, Plaintiffs' creditors exercised their right to the default interest rate accelerating the balances owed by enormous amounts to be determined at trial.

- Plaintiffs suffered mental and emotional hardship, mental and emotional stress, and anxiety.

**Count Four:**
**(Fraud / Fraud in the Inducement)**

57.    Plaintiffs repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

58.    Plaintiffs specifically relied on the representations, misrepresentations, non-disclosures and implied representations described in Paragraphs 9 through 32 when making the determination to enter into a contract or continue using the services of Defendants.

59.    Defendant, through representations, websites, and the Agreement create the appearance that Plaintiffs are entering into an agreement that will greatly reduce her outstanding debts.

60.    Defendant engaged in the unlawful conduct previously alleged with the actual and/or imputed knowledge of the unlawful conduct.

61.    Defendant knowingly engaged in such conduct with the purpose of inducing payment from Plaintiffs.

62.    Plaintiffs have been injured by the wrongful and fraudulent conduct of Defendant and have been damaged in an amount to be established at trial, as well as entitled to punitive damages in an amount to be established at trial.

**Count Five:**
**(Violations of the Telemarketing Sales Rule)**

63.    Plaintiffs repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

64.    The Telemarketing Sales Rule ("TSR") was promulgated for the explicit purpose of preventing consumer harm from debt relief operations like the venture of the Defendant in this case.

65.    The TSR, 16 C.F.R. § 310.2(m), defines "debt relief service" as "any program or

13

service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payments or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."

66.    The TSR, 16 C.F.R. § 310.2(dd), defines "telemarketing" as "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call."

67.    The TSR, 16 C.F.R. § 310.2 (aa), defines "seller" as "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration."

68.    The TSR, 16 C.F.R. § 310.2 (cc), defines "telemarketer" as "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

69.    Defendant is a "seller" or "telemarketer" of "debt relief services", who engages in "telemarketing", as defined in the TSR.

70.    The TSR, 16 C.F.R. § 310.4 (a)(5)(i), provides that a seller or a telemarketer may not request or receive payment of any fee or consideration for any debt relief service until and unless among other things, "the seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer" and "the customer has made at least one payment" pursuant too such an agreement or plan.

71.    The TSR, 16 C.F.R. § 310.4(a)(5)(ii), provides that a seller or a telemarketer may

request or require customers to place funds in an account to be used for the debt relief provider's fees and for payments to creditors or debt collectors in connection with the renegotiation or settlement of a debt, provided that, among other things: the customer owns the funds held in the account and is paid interest on the account" and "the customer may withdraw from the debt relief service at any time without penalty and must receive all funds in the account, other that funds earned by the debt relief service in compliance with § 310.4(a)(5)(i)(A) through (C), within seven (7) business days of the consumer's request."

72.     The TSR, 16 C.F.R. § 310.3(a)(2)(ii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material restriction, limitation, or condition to purchase, receive, or use goods or services that are the subject of the sales offer.

73.     The TSR, 16 C.F.R. § 310.3(a)(2)(iii), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of the performance, efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer.

74.     The TSR, 16 C.F.R. § 310.3(a)(2)(x), prohibits a seller or telemarketer from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.

75.     In the course of telemarketing debt relief services, Defendant has requested and received payment of fees from Plaintiffs for debt relief services before renegotiating, settling, reducing, or otherwise altering the terms of his debts. Defendant requested and received payment of these fees prior to Plaintiffs making at least one payment pursuant to any settlement agreement, debt-management plan, or other valid contractual agreement between Plaintiffs and

their creditors.

76. Therefore, Defendant's act or practices violate the TSR, 16 C.F.R. § 310.4(a)(5)(i), and are abusive acts or practices in telemarketing.

77. Plaintiffs were charged advances fees for Defendant's debt relief services.

78. Therefore, Defendant's representations as described herein violate the TSR, C.F.R. § 310.3(a)(2)(ii) and (x), and are deceptive acts or practices in telemarketing.

79. In numerous instances, in connection with advertising, marketing, promoting, offering for sale, or sale of debt relief services, Defendant represented to Plaintiffs directly or indirectly, expressly or by implication, that Plaintiffs total debt amount would be reduced by up to 50%.

80. In fact, Defendant do not have a track record of consistent debt reduction of this degree, if any at all.

81. Therefore, Defendant's representations as described herein violate the TSR, C.F.R. § 310.3(a)(2)(iii) and (x), and are deceptive acts or practices in telemarketing.

82. In addition, Defendant and its representatives in making its savings claims (amounts of monies s would save by using Defendant's services) did not disclose the following in violation of the TSR:

- State the savings was based on the Plaintiffs' debt when they signed up for the program.

- Include the impact of the Defendant's fees on their claimed savings to the Plaintiffs.

- In calculating the results over time, did not include customers who dropped out or otherwise failed to complete the program.

16

## Count Six
### (Breach of Contract)

83.     Plaintiffs repeat, reallege, and reincorporate by reference all of the foregoing paragraphs.

84.     Defendant entered into a contract with Plaintiffs and represented it would eliminate Plaintiffs' debt.

85.     Defendant further provided advice and explanation on the Fair Credit Reporting Act, the Federal Trade Commission Act, the Truth in Lending Act, and the Fair Debt Collection Practices Act.

86.     Defendant did not perform its obligations pursuant to the contract as agreed as no debts of Plaintiffs were eliminated.

87.     Plaintiff paid Defendant pursuant to the contract as agreed.

88.     Plaintiff has been damaged by Defendant's non-performance and resulting breach of the contract.

89.     As such, Plaintiffs are entitled to damages for the breach of contract.

## Count Seven
### (Legal Malpractice)

90.     Plaintiffs repeats, realleges, and reincorporates by reference all of the foregoing paragraphs.

91.     Defendant owed a duty or obligation to Plaintiff.

92.     Defendant breached that duty or obligation by not performing any services as agreed.

93.     Defendant failed to conform to the applicable standard of care required by law.

94.     Defendant was the proximate cause of damage to Plaintiff.

17

95.     Consequently, Defendant's actions or lack of action as previously described, constitutes legal malpractice.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs, prays this Court grant the following relief:

1. ISSUE an order declaring that the Defendant has engaged in acts and practices in violation of the Consumer Sales Practices Act, R.C. § 1345.01 et seq., the Debt Adjustment Companies Act, R.C. § 4710.01 et seq., the Ohio Credit Services Organization Act R.C. § 4712.01, et seq., the Credit Repair Organization Act 15 U.S.C. § 1679, et seq. and the Telemarketing Sales Rule 16 C.F.R. § 310, et seq.

2. ISSUE a Permanent Injunction enjoining the Defendant, its agents, servants, employees, successors or assigns, and all persons acting in concert and participation with it, directly or indirectly, through any corporate device, partnership, or other association, under this or any other name, from engaging in the acts and practices which Plaintiffs complains in the State of Ohio until complying with the laws of the State of Ohio and satisfaction of any monetary obligations to Plaintiff.

3. GRANT judgment against the Defendant in the amount of three times the actual damages or $200.00 for each unlawful act specified, whichever is greater, pursuant to R.C. § 1345.09(B).

4. GRANT judgment against the Defendant for common law fraud in an amount of damages in excess of $25,000.00.

5. GRANT judgment against the Defendant in excess of $50,000.00 for violations of the Telemarketing Sales Rule 16 CFR § 310, et seq.

6. GRANT statutory damages for violations of the Credit Repair Organization Act 15 U.S.C. § 1679g.

7. GRANT statutory damages for violations of the Ohio Credit Services Organization Act R.C. § 4712.10.

8. GRANT judgment against the Defendant in excess of $25,000.00 for its breach of contract with Defendant.

9. Costs and reasonable attorney fees, pursuant to R.C. § 1345.09(F)(2).

10. GRANT punitive damages.

11. GRANT such other relief as this Court deems to be just, equitable and appropriate.

Respectfully Submitted:

*/s/ Jeremiah E. Heck*
Jeremiah E. Heck (0076742)
David B. Schultz (0077281)
Luftman Heck & Associates LLP
6253 Riverside Drive, Suite 200
Dublin, Ohio 43017
Phone: (614) 224-1500
Fax: (614) 224-2894
dschultz@lawlh.com
*Attorney for Plaintiffs*

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiffs, Geneva Sheffield and Myranda Sheffield, demands trial by jury in this action.

*/s/ Jeremiah E. Heck*
Jeremiah E. Heck (0076742)



31878 Del Obispo Suite 118-602
San Juan Capistrano, CA 92675
Phone: 949-229-6262
Fax: 949-415-7816
Admin@LitigationPracticeGroup.com | LitigationPracticeGroup.com

## LEGAL SERVICES AGREEMENT

### Legal Services

The Litigation Practice Group PC ("LPG") will provide debt validation services wherein it will assist you in removing erroneous or inaccurate information appearing on one or more of your credit reports by contesting debts appearing therein. This service is limited to information reported by creditors or purported creditors to credit bureaus. The cost of legal services rendered by LPG is set forth below, and those fees are earned by LPG for services rendered to you as set forth herein at the time such fees are paid.

### Client Authorization

You authorize LPG to challenge, where applicable, any debts appearing in your credit report(s) that you believe to be in any way invalid, inaccurate, or otherwise without legal basis. You also authorize LPG to obtain a copy of your credit report to assist in the process of analyzing your account and developing a strategy regarding the invalidation of debts that are excessive or otherwise unauthorized by law. You further authorize LPG, acting under power of attorney for you, to affix your electronic signature to documents sent on your behalf in relation to matters herein and to otherwise act on your behalf in connection with any dispute or resolution thereof processed in connection with the services you are hiring LPG to perform.

### Description of Services to be Performed

LPG will obtain your credit reports, analyze them, and develop strategies for correcting invalid or unlawful debts for which you should not be held legally responsible. Where appropriate, LPG will use existing laws and interact with creditors and credit bureaus on your behalf to invalidate your debts and remove such invalid debts from your credit reports. LPG will also interact with collection agencies, as applicable, to invalidate your debts by requiring them to supply evidence of your indebtedness to them, or any other legal mechanism. LPG will also consult with you regarding all aspects of the credit reporting process, including all laws applicable to the same. LPG will also investigate your delinquent accounts in order to determine the most effective method for invalidating your debts or otherwise removing any legal liability for such debts.

In addition, if a lawsuit is filed against you, LPG will represent you in such lawsuit and will not charge any additional fees for such representation provided such lawsuit was initiated after the date you sign this Agreement. In the event a lawsuit was initiated against you before the date you execute this Agreement and you elect to have LPG represent you, an additional fee of $500.00 will be charged. Where appropriate, if legal fees are recovered from an adverse party, LPG will retain such fees for its services. You will be responsible to pay any damages resulting from any lawsuit. Any costs incurred in a lawsuit will be paid by LPG out of the fees set forth below, including the fees of any attorney retained on your behalf in a jurisdiction in which LPG is not admitted to practice law. No additional payment from you to LPG will be necessary for the defense of any lawsuit filed against you after the date you execute this Agreement. You will, however, be responsible to pay any damages resulting from such lawsuits or any settlements reached in the course of such lawsuits.

### Fees

You will pay the following fees for the legal services provided by LPG. No fee or other cost will be charged or collected other than the following. This is the only amount you have to pay for LPG's services, and this fee is fixed, such that it is earned the moment it is transmitted to LPG. Upon request, LPG will provide an update of progress of services performed under this agreement at reasonable intervals of no greater frequency than once a month.

Page 1 of 9

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

## Refund Policy

If an account is fully validated by a creditor, such that no further dispute to the validity of the account could be made, you will receive a full refund of the fees that you paid towards the invalidation of that account (i.e., you will be refunded the fees paid in proportion to the debt that was validated). Should you have an outstanding balance with LPG at the time your refund is issued on the validated account, any refund will first be applied towards the outstanding balance.

## Debt Settlement

If LPG is unable to invalidate any debt, LPG will negotiate a settlement on your behalf with the concerned creditor without any additional fees being charged to or incurred by you for such service. Any settlement reached with any such creditor shall be your responsibility.

## Actions Required of You

You agree to provide LPG with any and all correspondence you receive from any creditor, credit bureau, attorney, or court of law. You further agree to keep a log of all communications, including telephonic and electronic communications, from any creditor or credit reporting agency.

## Right to Conduct Business Electronically and Contact You

You agree that LPG may contact you electronically and telephonically, and that any and all business with LPG may be conducted electronically. You further agree that LPG may transmit data, including that regarding your credit profile, electronically. You further agree that any electronic communication carries the risk of disclosure to a third party, and that LPG will not be held responsible for any such inadvertent disclosure of information. A facsimile or email transmission of this signed agreement, via an email attachment or otherwise, will be as valid as the original. This agreement may not be modified except in writing by both parties.

## Client Acknowledgements

By signing this agreement, you acknowledge that LPG has not instructed you to breach any contract, fail to make any required payment, or fail to perform any obligation you have lawfully incurred. LPG reserves the right to terminate this agreement if (a) client fails to make timely payment of the amount due under hereunder or (b) client`s payments are returned multiple times for any reason. LPG will not pay your debts, and does not guarantee that any debt you now have or may incur will be invalidated or settled in association with LPG's services. You understand and agree that you must forward any communication you receive in printed or electronic form from any creditor, court, or representative of other a creditor or a court to admin@coastprocessing.com, and that you must keep a log of all telephonic communications with any creditor or credit reporting agency. **Do not sign this agreement until you have received and read the information statements and notices of cancellation required by state and federal law, even if otherwise advised. By signing this agreement, you acknowledge receipt of these disclosures prior to the time of signing and agree to the terms of this agreement. You, the client, may cancel this agreement at any time before midnight CST of the 5th day after the date of execution of this agreement via an email to admin@coastprocessing.com. In addition, you, the client may terminate LPG's services under this agreement at any time via an email to admin@coastprocessing.com.**

Client Signature: _Myranda Sheffield_                    Date: 07/22/2019

Co-Applicant Signature _Geneva Sheffield_              Date: 07/22/2019

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

## Creditor Information

| Creditor | Account # | Amount Owed |
|----------|-----------|-------------|
| Discover | | $22,051.10 |
| Discover | | $21,517.45 |
| | | **$43,568.55** |

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

**Client Information**

Name: Myranda Sheffield

Address:


Home Phone:

Cell Phone:

Email:

Las 4 SSN: XXX-XX-

**Co-Client Information**

Name: Geneva Sheffield

Address:


Home Phone:

Cell Phone:

Email:

Last 4 SSN: XXX-XX-

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

## **Schedule of Payments**

I agree to this payment schedule – Client Initials:

| Payment # | Process Date | Amount |
|---|---|---|
| 1 | Aug 16, 2019 | $307.05 |
| 2 | Sep 13, 2019 | $307.05 |
| 3 | Oct 15, 2019 | $307.05 |
| 4 | Nov 13, 2019 | $307.05 |
| 5 | Dec 13, 2019 | $307.05 |
| 6 | Jan 13, 2020 | $307.05 |
| 7 | Feb 13, 2020 | $307.05 |
| 8 | Mar 13, 2020 | $307.05 |
| 9 | Apr 13, 2020 | $307.05 |
| 10 | May 13, 2020 | $307.05 |
| 11 | Jun 15, 2020 | $307.05 |
| 12 | Jul 13, 2020 | $307.05 |
| 13 | Aug 13, 2020 | $307.05 |
| 14 | Sep 14, 2020 | $307.05 |
| 15 | Oct 13, 2020 | $307.05 |
| 16 | Nov 13, 2020 | $307.05 |
| 17 | Dec 14, 2020 | $307.05 |
| 18 | Jan 13, 2021 | $307.05 |
| 19 | Feb 16, 2021 | $307.05 |
| 20 | Mar 15, 2021 | $307.05 |
| 21 | Apr 13, 2021 | $307.05 |
| 22 | May 13, 2021 | $307.05 |
| 23 | Jun 14, 2021 | $307.05 |
| 24 | Jul 13, 2021 | $307.05 |
| 25 | Aug 13, 2021 | $307.05 |
| 26 | Sep 13, 2021 | $307.05 |
| 27 | Oct 13, 2021 | $307.05 |
| 28 | Nov 15, 2021 | $307.05 |
| 29 | Dec 13, 2021 | $307.05 |
| 30 | Jan 13, 2022 | $307.05 |
| 31 | Feb 14, 2022 | $307.05 |
| 32 | Mar 14, 2022 | $307.05 |
| 33 | Apr 13, 2022 | $307.05 |
| 34 | May 13, 2022 | $307.05 |
| 35 | Jun 13, 2022 | $307.05 |
| 36 | Jul 13, 2022 | $306.96 |

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

**Electronic Payment Authorization**

Bank Name: KEY BANK

Name on Account: Geneva Sheffield

Account Type:  Savings

_____ Other (specify: _____)

Routing Number:

Account Number:

Next Payment Date: Aug 16, 2019 Amount: $ 307.05

Recurring Payment Date: 13th

By signing below, I authorize and permit LPG or their designees, to initiate electronic funds transfer via an Automated Clearing House system (ACH) from my account listed above.  I will also provide LPG with a voided check or savings deposit slip.

If necessary, LPG may make adjustments if errors have occurred during the transaction.  The date of the draft is listed above, however, if the draft date falls on a weekend or bank holiday, the debit transaction will take place on the next business day. This authority will remain in effect until LPG is notified by the member in writing at least 5 days prior to the next scheduled draft date.  No other forms of cancellation by member will be observed.  If the debit is returned because of non-sufficient funds of uncollected funds, then the originator and its financial institution may reinitiate the entry up to two (2) times.  The reversal of funds from a client's account that was drafted in error cannot be made until seven business days from the draft date.  The member agrees to waive all rights of reversal or refusal of any payment on any draft that LPG may make against the member's bank account while services are performed.  The member agrees with all of the provisions and conditions outlined within.

**Acknowledgement of Refunds & Draft Date Changes**

ACH Refunds: If a refund is due such will be made through the ACH process only if the fees were made through the ACH process.  All refunds may take up to 10 days to process.  In the event my EFT or draft is returned from my bank unpaid, I agree that a fee of $25.00 or as allowed by law may be charged to my account via draft or EFT.  Furthermore, I warrant that I am authorized to execute this payment authorization and the above information is true and correct.  Draft Date Changes: A client may stop any ACH debit by providing written notice to LPG at least five (5) business days prior to the scheduled payment.  If you should need to notify us of your intent to cancel and/or revoke this authorization you must contact us five (5) days prior to the questioned debit being initiated.  Please call us at 949-229-6262 or admin@coastprocessing.com.

Initial Here: _____

Client Signature: _Myranda Sheffield_____  Date: 07/22/2019

Printed Name:  Myranda Sheffield _____  _____

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

Electronic Funds Transfer (EFT) Authorization to Debit Bank Account

Account Owner Name: Geneva Sheffield

Social Security Number:                                                                   Birth Date:

Address:                                   City:Toledo                  State:OH      Zip: 43609

Mobile Phone #:                          Bank Name:  KEY BANK

Routing Number:                                     Account Number:

Total Amount of Debit: $307.05         Date of Next Debit:Aug 16, 2019    Checking or Saving: Savings

I hereby apply for and agree to establish a non-interest bearing special purpose account (the "Account") with a bank ("Bank") selected by EPPS, LLC and/or its successors for the purpose of accumulating funds to pay for such goods and services as I so direct EPPS, LLC to perform.  This application is subject to Bank's customer identification program, as required by the USA PATRIOT ACT and other applicable laws, and accordingly, I hereby represent that the above information is true and complete to the best of my knowledge and belief.  The bank account information provided above may be subject to account validation processes to include pre-notation and a $0.01 micro-deposit.

### Schedule of Fees and Charges

| | |
|---|---|
| Monthly Banking Fee: | Included |
| ACH/EFT Fee Per Transaction | Included |
| Chargeback/Late Return Fee | Included |
| NSF Fee | Included |
| Account Closer Fee | Included |

### PREMIUM DISBURSEMENT SERVICES

| | |
|---|---|
| Wire Transfer | Included |
| FedEx/Overnight Next Day | Included |
| 2nd Day Check With Tracking | Included |

I hereby authorize Bank, directly or through EPPS, LLC, and/or its service providers, to administer the Account on my behalf by (a) periodically transferring and depositing funds to the Account, via any payment media currently in use, and (b) periodically disbursing funds from the Account pursuant to instructions that I may give from time to time.  I hereby authorize payments from the Account for the fees and charges provided for in this application and in the agreement.  I hereby grant permission for Bank to share information regarding the Account with EPPS, LLC and any other service provider to facilitate the transactions I may initiate that involve the Account, and with any other party that is essential to the administration of the Account on my behalf.  My signature below provides permission to be contacted by phone at the number provided with this authorization.  A payment reminder will be sent to your phone number via Text Messaging prior to the payment scheduled above. This authorization shall remain in full force and effect until I provide a verbal or written termination notice to EPPS.   Any such notice, and any other written notice that is provided for in this Application or the Agreement, shall be sent to EPPS, LLC at the address set forth in the Agreement. "EPPS-Ph# 800-215-3484" will appear on your bank statement

Account Holder's Signature:

*Myranda Sheffield*                        Date: 07/22/2019

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00

ID: a48d7911-ee01-deee-0353-a67e41dababf Signed: 2019-07-22T15:02:55-05:00





# E-Signature Completion Certificate

| | |
|---|---|
| **Document ID** | 6233792 |
| **Document GUID** | a48d7911-ee01-deee-0353-a67e41dababf |
| **Document Title** | Legal Service Agreement with LPG |
| **Sender IP** | |
| **Number of Signers** | 2 |
| **Signer Email** | myrandasheff@gmail.com |
| **Signer IP** | |
| **Timestamp** | 2019-07-22T15:05:06-05:00 |
| **Document Hash** | bf39d9d8a9d61e1433b43e8d34dfbdc4 |

## Document Audit

- Sent at 2019-07-22T14:58:08-05:00 from IP 74.213.81.107
- Delivered to Myranda Sheffield myrandasheff@gmail.com at 2019-07-22T14:58:40-05:00 from 75.48.213.27
- Adopted Signature at 2019-07-22T14:58:48-05:00 from 75.48.213.27
- Completed Signing at 2019-07-22T15:02:55-05:00 from 75.48.213.27
- PDF Generated at 2019-07-22T15:05:06-05:00

## User Agent

Mozilla/5.0 (iPhone; CPU iPhone OS 12_3_2 like Mac OS X) AppleWebKit/605.1.15 (KHTML, like Gecko) Version/12.1.1 Mobile/15E148 Safari/604.1

ID: a48d7911-ee01-deee-a67e41dababf Signed: 2019-07-22T15:02:55-05:00