## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| CAROLYN BEECH,<br>on behalf of herself and the<br>class members described below,<br><br>       Plaintiff,<br><br>       vs.<br><br>THE LITIGATION PRACTICE<br>GROUP, PC;<br>TONY M. DIAB;<br>DANIEL MARSH;<br>VALIDATION PARTNERS, LLC;<br>RUSS SQUIRES;<br>WES THOMAS;<br>VULCAN CONSULTING GROUP LLC;<br>JAYDE TRINH;<br>OAKSTONE LAW GROUP PC,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:22cv57-HSO-BWR |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF
## AMENDED MOTION FOR CLASS CERTIFICATION WITH RESPECT TO
## DEFENDANTS OTHER THAN THE LITIGATION PRACTICE GROUP, PC

Jason Graeber
250 Beauvoir Road, Suite 4C
Biloxi, MS 39501
228) 207-7117
jason@jasongraeberlaw.com

Daniel A. Edelman
Tara L. Goodwin
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## I. INTRODUCTION

Plaintiff has requested certification of a single class, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), of all persons who, on or after March 17, 2017 (five years prior to the filing of this action), entered into contracts with The Litigation Practice Group, PC ("LPG"), which contracts were not cancelled within three business days. Residents of Georgia are excluded from the class.

This memorandum is submitted in support of Plaintiff's motion.

## II. NATURE OF THE ACTION

Plaintiff brings this action for damages pursuant to the Credit Repair Organizations Act, 15 U.S.C. §1679 et seq. ("CROA"). The CROA was enacted "(1) to ensure that prospective buyers of the services of credit repair organizations are provided with the information necessary to make an informed decision regarding the purchase of such services; and (2) to protect the public from unfair or deceptive advertising and business practices by credit repair organizations." 15 U.S.C. §1679(b).

Plaintiff contends that LPG is a credit repair organization that is subject to the CROA and violated it, and that the other Defendants herein either directed, funded or profited from the illegal conduct.

## III. FACTS

### A. LPG

LPG was, prior to its 2023 bankruptcy filing, a California corporation with its principal offices at 17542 East 17th Street, Suite 100, Tustin, CA 92780. Defendant Daniel S. March was LPG's sole officer and director. (Attachment 1 [Corporation Statement of Information from California Secretary of State website]) Defendant March was also its managing and sole shareholder. His relationship with LPG began in November 2019. (Attachment 2 [Nov. 22, 2022 Declaration of Daniel S. March], ¶2; Attachment 3 [§341 transcript from LPG bankruptcy at which Defendants March and Diab testified], p. 13)

Defendant Tony Diab is a disbarred attorney. (Attachment 4; Attachment 3, pp. 181-82) He was in charge of managing LPG's marketing companies, lead generators, mail, payment processors,

call centers, credit reporting vendors, and investor relationships. (Attachment 2, ¶7; Attachment 3, pp. 15-16) He was frequently present at LPG's headquarters, where he was referred to as "Admin" rather than by name and had a name plate on his desk, "I don't work here." (Attachment 5 [Dec. 16, 2022 Declaration of Russ Squires], ¶21) Diab admits being referred to as "Admin," although he can recall nothing else about the operations of LPG. Attachment 6 [Defendant Tony Diab's Answers to Plaintiff's First Set of Discovery], p. 4, ¶26)

At times Diab was paid by LPG directly, as an independent contractor. At other times an entity he owned, Defendant Vulcan Consulting Group, LLC, was paid for his services. (Attachment 3, pp. 16-18) During 2021, Diab received $60,000 to $80,000 directly from LPG and $200,000 to $250,000 from Vulcan. (Attachment 3, pp. 18-19) During 2022, he received $480,000 through another entity, Strategic Consulting Solutions, most of which was reinvested in LPG. (Attachment 3, p. 21) Money was funneled through Vulcan and Strategic Consulting because of Diab's disbarment. (Attachment 3, pp. 20, 180)

LPG obtained funding through merchant cash advance companies. The merchant cash advance company would purchase the receivables that LPG's clients owed it, at a discount. (Attachment 3, pp. 150-52). LPG also sold receivables to Validation Partners, LLC on two occasions (Attachment 3, p. 153; Attachment 5, ¶¶5-13; Attachment 7 [Accounts Receivables Purchase Agreement between Validation Partners and LPG])

The marketing companies located and "onboarded" clients for LPG (Attachment 3, p. 153). There were scores of these companies. (Attachment 3, p. 154) They would sell LPG's services and in at least some cases have the clients sign the LPG legal services agreement. (Attachment 3, pp. 153-55) In exchange, LPG would pay them either a flat fee, or a percentage of the client's debts, or a percentage of the revenue stream from the client. (Attachment 3, p. 156)

During 2022 LPG had a gross annual income of $155 million, or about $13 million per month. (Attachment 3, p. 79) Expenses were slightly in excess of receipts. (Attachment 3, p. 80)

## B.    LPG's Clients and Services

Plaintiff Carolyn Beech was one of more than 67,000 clients of LPG. A stipulation entered into by LPG in this case prior to its bankruptcy filing stated that there were 67,001 class members (70,498 throughout the United States minus 3,497 in Georgia). (Attachment 8) Mr. Diab testified that at its peak LPG had about 67,000 clients (Attachment 3, pp. 42, 135-36).

Each client signed a legal services agreement providing from one to 72 monthly or semimonthly payments. (Attachment 3, p. 43) The average was 27-29 months. Attachment 5 [Declaration of Russ Squires of December 16, 2022], ¶5) On each payment date, LPG would automatically have the client's payment debited from their deposit account. (Attachment 3, p. 44) The debits were carried out by a dozen payment processors. (Attachment 3, p. 44)

In late 2021, LPG solicited Plaintiff Carolyn Beech for a "debt forgiveness" program. To induce her to purchase its services, LPG provided Ms. Beech and other consumers with a document entitled "Smarter Path to Debt Relief Services." (Attachment 9) This a standard form document, as indicated by the markings showing it was on LPG's website, https://lpglaw.com.

The "Smarter Path to Debt Relief Services" document suggested that LPG could provide useful services to a consumer if the consumer answered the following questions in the affirmative: (1) "Has your credit score already been negatively impacted?" (2) "My credit report was damaged and needs to be worked on by a knowledgeable lawyer." A consumer reading the material would understand from it that LPG could improve one's credit score and repair credit damage.

LPG also used a document entitled "Your Lawyers for Debt Resolution to Regain Financial Freedom" (Attachment 10), which was on LPG's website. This document again inquires, "My credit report was damaged and needs to be worked on by a knowledgeable lawyer" (DEF00000127) and "Has your credit score already been negatively impacted?" (DEF00000124) It also asks, "Is there anything I can do to get negative items off my credit?" (DEF00000128) A consumer reading the material would understand from it that LPG could improve one's credit score and repair credit damage.

Ms. Beech signed a Legal Services Agreement (Attachment 11, DEF00000001-11) This is a standard form document LPG regularly uses, with some variation (Attachment 3, pp. 69-71; Padnos Declaration [summarizing contents of 100 files produced by LPG], Attachment 12, ¶3). The services to be provided include "Dispute the legal validity of the debts identified below" and "Assist you in removing erroneous or inaccurate information reported in connection with the debts identified below." (Attachment 11, DEF00000001)

The Legal Services Agreement includes an Electronic Payment Authorization (DEF00000008) and a Preauthorized Checking and ACH Authorization form (DEF00000009-10). These documents allowed LPG to periodically pay itself from Ms. Beech's bank account. It also includes a "Creditor Information" document (DEF00000005).

The only written disclosure of cancellation rights which LPG provided clients who entered into a Legal Services Agreement are those within the Legal Services Agreement itself. (Padnos Declaration, Attachment 12, ¶6)

Under the debt forgiveness program, LPG would negotiate settlements of Ms. Beech's delinquent debts, amounting to $11,493.00; and Ms. Beech would pay $282.93 / month for 24 months, or a total of $6,790.32. (Attachment 11, at DEF00000005 and DEF00000007)

The actions which LPG took on behalf of Ms. Beech and other clients were as follows:

o    LPG created a document entitled "Creditor Information" (Attachment 11, DEF00000005) for all clients who entered into a Legal Services Agreement. Each "Creditor Information" document is supposed to be filled in with the creditors and debts with respect to which LPG will provide services to the particular client.

o    LPG then sent "Dispute of Account" documents in the form represented by Attachment 13, DEF00000031 - DEF00000032, for each creditor and debt listed on a client's "Creditor Information" document. These disputes, signed by Mr. March, are filled with legalese but do not articulate any reasonable basis for contending that the client does not owe a debt or that the reporting of the debt to credit bureaus is not accurate. They demand "verification that my client

incurred the obligation you assert" and state that "my client disputes the validity of the debt you allege because my client did not incur the obligations you assert. Upon a review of my client's records, it appears that you have not complied with the Fair Credit Billing Act, Fair Debt Collection Practices Act, Truth in Lending Act, and Credit CARD Act of 2009." There are no particulars as to how the addressee failed to comply. The disputes demand numerous records and items of information, and assert that if the addressee fails to respond "my client will treat this debt as invalid and any further attempts to collect upon this debt will be considered a violation of such laws and will trigger legal action on behalf of my client."

     o     LPG also sent "Demand to Cease and Desist Further Communications" documents in the form represented by Attachment 14, DEF00000033. These were sent for each creditor and debt listed on a client's "Creditor Information" document, for all clients who entered into a Legal Services Agreement.

     o     Finally, LPG sent standard form documents to each of the major consumer reporting agencies (credit bureaus), Equifax, Experian and Trans Union for each creditor and debt listed on a client's "Creditor Information" document, with respect to all clients who entered into a Legal Services Agreement. (Attachment 15, DEF00000034; DEF00000061; DEF00000078) These letters, which purport to have the client's typed signature under a power of attorney, state that "I adamantly deny liability for the above-referenced account," assert that "I DO NOT OWE the account," that "the balance listed is the WRONG AMOUNT," and that the addressee "CANNOT COLLECT THAT ACCOUNT." They demand that the credit bureaus delete from the consumer's credit report any "tradeline" referring to the debt that was the subject of the letter.

Deletion of the "tradeline" would improve the consumer's credit.

A sample of 100 random files produced by LPG shows that all files contained "Legal Services Agreements" with "Creditor Information" documents, and that most contained multiple letters in the series represented by Appendices 13-15. (Padnos Declaration [Attachment 12], ¶¶3-6)

Defendant Jayde Trihn confirms that the Legal Services Agreement, "Creditor Information"

document, "Demand to Cease and Desist Further Communications," and letters to credit bureaus were standard form documents regularly used by LPG (Defendant Jayde Trihn's Responses and Objections to Plaintiff's First Set of Discovery [Attachment 16], answers to requests for admissions nos. 1, 15, 16, 17, 18)

### C. Involvement of Various Defendants

In February and March 2023, after LPG began having financial difficulty, about 15,000 LPG clients were transferred to Oakstone Law Group. (Attachment 3, p. 48) This is another California corporation. (Attachment 3, p. 49) The receivables owed by these clients had been sold to an investor called PECC Corporation. (Attachment 3, p. 49) Oakstone paid 20% of the revenues from these clients to LPG and kept 80%. Defendant Jayde Trihn was listed as "head attorney" for Oakstone (Attachment 17), although she now claims this was done without her consent.

Validation Partners, LLC purchased receivables from LPG or marketing affiliates. (Attachment 3, p. 144; Attachment 7 [Accounts Receivables Purchase Agreement between Validation Partners and LPG]; Attachment 5 [Declaration of Russ Squires of December 16, 2022], ¶¶6-7, 11, 14) Validation Partners spent nearly $77 million to purchase over 40,000 client accounts with a total value of over $400 million. (Attachment 5, ¶¶7, 11) Validation Partners also loaned LPG $3,835,045. (Attachment 5, ¶12; Attachment 18 [Unsecured Promissory Note between LPG and Validation Partners)

Russ Squires and Wes Thomas were both managers of Validation Partners, LLC. (Attachment 3, p. 145) Squires was also the Chief Executive Officer [Attachment 5, ¶3) Wes Thomas also owned an entity called StratCap, which was an owner of Validation Partners, LLC (Attachment 3, p. 149)

### IV. CLASSWIDE EVIDENCE SHOWS THAT LPG IS A CREDIT REPAIR ORGANIZATION

The CROA defines a "credit repair organization" (15 U.S.C. §1679a(3)) as a "person who uses any instrumentality of interstate commerce or the mails to sell, provide, or perform any service, in return for the payment of money or other valuable consideration, for the express or implied

purpose of – (i) improving a consumer's credit, credit history, or credit rating, or (ii) providing

advice or assistance to any consumer with regard to any activity or service described in clause (i)."

As noted above, LPG demanded that credit bureaus delete "tradelines" for each of its clients.

Deleting the "tradeline" for a delinquent debt would improve the consumer's credit. The series of

form letters LPG sent (Appendix 15) was a key part of the services it provided. LPG is therefore a

credit repair organization – its services seek to improve its clients' credit, credit histories and credit

ratings.

A company which attempts to delete adverse information from consumers' credit reports is

a credit repair organization. *Spencer v. King Fin. Repair, LLC*, 3:20cv803, 2022 U.S. Dist. LEXIS

118421, at *2, 2022 WL 2496209 (W.D. Ky. July 6, 2022); H.R. Rep. No. 103-486, at 63 (1994)

(Credit repair "businesses, through advertisements and oral representations, lead consumers to

believe that adverse information in their consumer reports can be deleted or modified regardless of

its accuracy."), cited with approval in *Zimmerman v. Puccio*, 613 F.3d 60, 70 (1st Cir. 2010). A key

characteristic of the organizations regulated by CROA is that they "attempted to remove all negative

information from consumers' credit reports, regardless of its accuracy. *Rannis v. Recchia*, 380 F. App'x

646, 649 (9th Cir. 2010). The usual method is by "inundating credit reporting agencies with letters

that falsely alleged that various items on credit reports were incorrect." *Id.; FTC v. Gill*, 265 F.3d 944,

952 (9th Cir. 2001). There is no exemption for attorneys who perform such services. *Rannis v.

Recchia, supra*, 380 F. App'x at 649; *FTC v. Gill, supra.*

The form documents and this conclusion apply to all class members. Even if LPG undertook

to provide credit repair services for a few clients but did not do so, this does not affect its status as a

credit repair organization, as the statutory definition is alternative – one who "sells" services is

covered, as is one who "provides" or "performs" such services.

## V.    CLASSWIDE EVIDENCE SHOWS THAT LPG VIOLATED THE CROA

The evidence shows that LPG violated the CROA with respect to all of its clients. Thus,

liability can be established on a classwide basis.

## A. Charging Before Services Completed

15 U.S.C. §1679b(b) provides that "[n]o credit repair organization may charge or receive any money or other valuable consideration for the performance of any service which the credit repair organization has agreed to perform for any consumer before such service is fully performed." This prohibition was included in the CROA because of repetitive instances in which credit repair organizations obtained payments toward credit repair services, the consumers discontinued such services (often when the creditors with whom debts were to be negotiated filed lawsuits), and the credit repair organizations obtained money in excess of any benefit to the consumer. The practice was considered inherently unfair and deceptive.

Fully performed means just that – the services must be completed prior to payment. Billing consumers on a regular basis before the complete performance of services is a violation. *FTC v. Gill*, 265 F.3d 944, 949-50 (9th Cir. 2001). *A fortiori*, taking the consumers' money on a regular basis before the complete performance of services is a violation.

Defendant LPG violated §1679b(b) by debiting consumer accounts before its services were fully performed. Plaintiff's Legal Services Agreement provides for payments over 24 months, beginning December 20, 2021, the month after execution (Attachment 11, DEF00000007) and months before the form letters demanding removal of "tradelines" were sent out (Attachment 15).

As part of the Legal Services Agreement, clients signed an Electronic Payment Authorization (DEF00000008) and a Preauthorized Checking and ACH Authorization form (DEF00000009-10). These documents allowed LPG to pay itself monthly, starting before its key services were performed.

LPG clients typically make payments over 27-29 months. LPG pays "marketing affiliates" a percentage of these payments and sold receivables to Validation Partners and other "investors." (*Id.*) It is thus clear that LPG collects money from its clients before its services are fully performed, and that this violation was committed with respect to all members of the class.

## B.    Failure to Make Required Disclosures

The CROA provides that a credit repair organization must provide consumers with certain written disclosures in its contracts. 15 U.S.C. §1679c(a) requires provision of a written statement informing the consumer of their rights under the Fair Credit Reporting Act and the CROA. 15 U.S.C. §1679c(b) provides that "the written statement required under this section shall be provided as a document which is separate from any written contract or other agreement between the credit repair organization and the consumer or any other written material provided to the consumer."

The text of the required disclosure is in 15 U.S.C. §1679c(a) and is as follows:

"Consumer Credit File Rights Under State and Federal Law

"You have a right to dispute inaccurate information in your credit report by contacting the credit bureau directly. However, neither you nor any 'credit repair' company or credit repair organization has the right to have accurate, current, and verifiable information removed from your credit report. The credit bureau must remove accurate, negative information from your report only if it is over 7 years old. Bankruptcy information can be reported for 10 years.

"You have a right to obtain a copy of your credit report from a credit bureau. You may be charged a reasonable fee. There is no fee, however, if you have been turned down for credit, employment, insurance, or a rental dwelling because of information in your credit report within the preceding 60 days. The credit bureau must provide someone to help you interpret the information in your credit file. You are entitled to receive a free copy of your credit report if you are unemployed and intend to apply for employment in the next 60 days, if you are a recipient of public welfare assistance, or if you have reason to believe that there is inaccurate information in your credit report due to fraud.

"You have a right to sue a credit repair organization that violates the Credit Repair Organization Act. This law prohibits deceptive practices by credit repair organizations.

"You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it.

"Credit bureaus are required to follow reasonable procedures to ensure that the information they report is accurate. However, mistakes may occur.

"You may, on your own, notify a credit bureau in writing that you dispute the accuracy of information in your credit file. The credit bureau must then reinvestigate and modify or remove inaccurate or incomplete information. The credit bureau may not charge any fee for this service. Any pertinent information and copies of all documents you have concerning an error should be given to the credit bureau.

"If the credit bureau's reinvestigation does not resolve the dispute to your satisfaction, you

may send a brief statement to the credit bureau, to be kept in your file, explaining why you think the record is inaccurate. The credit bureau must include a summary of your statement about disputed information with any report it issues about you.

"The Federal Trade Commission regulates credit bureaus and credit repair organizations. For more information contact:

"The Public Reference Branch
"Federal Trade Commission
"Washington, D.C. 20580".

Thus, one paragraph of the required disclosure is a notice that "You have the right to cancel your contract with any credit repair organization for any reason within 3 business days from the date you signed it." However, the only disclosure LPG made of cancellation rights is the statement in the last two sentences of the six sentences on the fourth page of its Legal Services Agreement. It follows that the statutorily-required notice was not provided to any LPG client, and that LPG violated 15 U.S.C. §1679c with respect to all members of the class.

## C. Failure to Provide Cancellation Rights

The CROA, at 15 U.S.C. §1679d(4), requires credit repair organization to include, in the contract between them and a consumer, "a conspicuous statement in bold face type, in immediate proximity to the space reserved for the consumer's signature on the contract, which reads as follows: 'You may cancel this contract without penalty or obligation at any time before midnight of the 3rd business day after the date on which you signed the contract. See the attached notice of cancellation form for an explanation of this right.'"

Under 15 U.S.C. §1679e, a credit repair organization must provide a consumer a separate notice of a consumer's cancellation right. Again, LPG's only disclosure of cancellation rights is a statement in the last two sentences of the six sentences on the fourth page of the LPG Legal Services Agreement that "You, the client, may cancel this Agreement at any time by submitting three days' written notice of cancellation by mail, email or fax, and shall not be responsible for any payments due after the date of cancellation. A payment due within three days of the date of written cancellation shall be processed and shall not be refunded." There is no separate notice of right to

-10-

cancel.

The statement is not that required by the CROA, and a statement on the fourth page of a legal document is certainly not bold or conspicuous. Consequently, LPG violated the CROA with respect to all members of the class.

### D. Relief

The CROA provides that any contract found not to be in compliance with the CROA "shall be treated as void" and "may not be enforced by any Federal or State court or any other person." 15 U.S.C. §1679f(c). The CROA also provides for damages in 15 U.S.C. §1679g, including "any amount paid by the person to the credit repair organization," punitive damages, and attorney's fees.

Return of the funds paid to LPG is a measure of damages that is simple to administer, based on LPG's own records (now in the hands of its Chapter 11 Trustee) or if necessary records provided by class members.

### E. Persons Liable for Violations

The CROA broadly bars "any person" from "engag[ing], directly or indirectly, in any act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of the services of the credit repair organization." 15 U.S.C. §1679b(a)(4). The defendants in the amended are persons who directed the commission of LPG's violations of the CROA, and therefore directly engaged in fraud and deception, or were indirectly involved in the same by virtue of obtaining a financial benefit from LPG's course of business. Persons that direct commission of CROA violations or obtain benefit of CROA violations are liable. *Zimmermann v. Cambridge Credit Counseling Corp.*, 529 F. Supp. 2d 254, 279-280 (D. Mass. 2008), *aff'd under name of Zimmerman v. Puccio*, 613 F.3d 60, 74 (1st Cir. 2010); *Greene v. CCDN, LLC*, 853 F. Supp. 2d 739, 753 n.15 (N.D. Ill. 2011). The parties who directed or benefitted from LPG's illegal conduct are liable to Plaintiff and the class.

## VI.    REQUIREMENTS FOR CLASS CERTIFICATION

A class action must satisfy all Rule 23(a) factors and at least one subsection of Rule 23(b).

"Under Rule 23(a), every putative class first must satisfy the prerequisites of 'numerosity,

commonality, typicality, and adequacy of representation.'" *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256,

1265 (11th Cir. 2009). Rule 23(a) is satisfied where:

(1)    the class is so numerous that joinder of all members is impracticable;

(2)    there are questions of law or fact common to the class;

(3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)    the representative parties will fairly and adequately protect the interests of the class.

Under Rule 23(b)(3), certification is proper where:

(3)    the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A)    the class members' interests in individually controlling the prosecution or defense of separate actions;

(B)    the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C)    the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D)    the likely difficulties in managing a class action.

Each of the requirements is satisfied here.

### A.    Numerosity

Fed. R. Civ. P. 23(a)(1) requires that the class be "so numerous that joinder of all members is

impracticable." The "sheer number of potential class members may warrant a conclusion that Rule

23(a)(1) is satisfied." *LaBauve v. Olin Corp.*, 231 F.R.D. 632, 665 (S.D.Ala. 2005); *accord, Pederson v.*

*Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d

620, 624 (5th Cir. 1999). A class of 40 establishes numerosity. *Cox v. American Cast Iron Pipe Co.*, 784

F.2d 1546, 1553 (11th Cir.1986); *Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir. 1972); *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326, 1333 (7th Cir. 1969); *Cheny v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D.Fla.2003); *Hale v. AFNI, Inc.*, 264 F.R.D. 402, 404-05 (N.D.Ill. 2009).

In the present case, there are about 67,000 class members. A class of that size clearly satisfies the numerosity requirement. The classes are so numerous that joinder of all members is not practicable.

### B.    Commonality and Predominance

Fed. R. Civ. P. 23(a)(2) requires that there be a common question of law or fact. Rule 23(b)(3) requires that the questions of law or fact common to all members of the class predominate over questions pertaining to individual members.

Rule 23 does not require that all questions of law or fact be common, but only that some questions are common and that they predominate over the individual questions." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1254 (11th Cir. 2004); *accord, Unger v. Amedisys Inc.*, 401 F.3d 316, 320 (5th Cir. 2005); *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 325 (S.D.Fla.1996).

These requirements are generally satisfied when a plaintiff alleges that"[d]efendants have engaged in a standardized course of conduct that affects all class members." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 687 (S.D.Fla.2004); *Agan v. Katzman & Korr, P.A.*, 222 F.R.D. 692, 697 (S.D.Fla.2004); *In re Amerifirst Sec. Litig.*, 139 F.R.D. 423, 428 (S.D.Fla.1991).

The court's inquiry is typically focused on "whether there are common liability issues which may be resolved efficiently on a class-wide basis." *Brown v. SCI Funeral Servs. of Fla.*, 212 F.R.D. 602, 606 (S.D.Fla.2003). Issues that are subject to generalized proof and applicable to the whole class must predominate over the issues involving individualized proof. *Kerr v. City of W. Palm Beach*, 875 F.2d 1546, 1558 (11th Cir. 1989). To conduct this inquiry, the Court must consider the cause of action and "what value the resolution of the class-wide issue will have in each member's underlying cause of action." *Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1234 (11th Cir. 2000).

The authorities hold that cases dealing with the legality of standardized documents or

business conduct are generally appropriate for resolution by means of a class action because the document or conduct is the focal point of the analysis. "A sufficient nexus is established if the claims or defenses of the class and the class representatives arise from the same event or pattern or practice and are based on the same legal theory." *Kornburg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984).

As set forth above, the commonality and predominance requirements are satisfied here because this case turns on the legality of standard form documents and standard practices. LPG entered into standard form contracts with each client. The contracts provided for a series of payments starting promptly after execution, rather than after completion of all services. LPG undertook to send a series of form documents for each debt of each client. The documents first purported to dispute the clients' debts and then, based on the dispute, demanded removal of the debts from the clients' credit reports.

Plaintiff contends that undertaking or attempting to remove debts from clients' credit reports makes LPG a credit repair organization as defined in the CROA, and that the form contracts fail to comply with the disclosure requirements and compensation restrictions of the CROA. These contentions apply with equal force to everyone who signed a contract with LPG.

C.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3) A claim is typical if it arises from the same practices that give rise to the claims of other class members and his or her claims are based on the same legal theory. *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002); *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985); *Kornburg v. Carnival Cruise Lines, Inc., supra*, 741 F.2d at 1337.

In the instant case, typicality is inherent in the class definition. Each of the class members has been subjected to the same practices and signed the same standard form documents as Plaintiff.

## D. Adequacy of representation

Rule 23(a)(4) requires that the Plaintiff will fairly and adequately represent the class members. Rule 23(g) requires that the Court appoint class counsel. The Court must consider (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class. Counsel must be adequate to represent the class, Rule 23(g)(2), and "must fairly and adequately represent the interests of the class." Rule 23(g)(4).

"To adequately represent a class, a named plaintiff must show that she possesses the integrity and personal characteristics necessary to act in a fiduciary role representing the interests of the class, and has no interests antagonistic to the interests of the class." *In re Ins. Mgmt. Solutions Group, Inc.*, 206 F.R.D. 514, 516 (M.D.Fla. 2002); *accord, Stirman v. Exxon Corp., supra*, 280 F.3d 554, 563 (5th Cir. 2002); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987).

Plaintiff understands the obligations of a class representative, and has retained experienced counsel, as is indicated by Attachments 19-20, which sets forth counsel's qualifications. There is no antagonism between the interests of the named Plaintiff and those of the class. Neither Plaintiff nor Plaintiff's counsel have any interests which might cause them not to vigorously pursue this action.

## E. Rule 23(b)(3) -- Superiority

Rule 23(b)(3) also requires that "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." The court is required to determine the best available method for resolving the controversy in keeping with judicial integrity, convenience, and economy. *Hurwitz v. R.B. Jones Corp.*, 76 F.R.D. 149 (W.D.Mo. 1977). It is proper for a court, in deciding the "best" available method, to consider the ". . . inability of the poor or uninformed to enforce their rights, and the improbability that large numbers of class members would possess the initiative to litigate individually." *Haynes v. Logan Furniture Mart, Inc.*, 503 F.2d 1161, 1165 (7th Cir. 1974).

In this case there is no better method available for the adjudication of the claims that might

be brought by each individual putative class member. Most putative class members are likely

unaware their rights are being violated, and most cannot afford to bring individual cases. The special

efficacy of the consumer class action has been noted by the courts and is applicable to this case:

> A class action permits a large group of claimants to have their claims adjudicated in a single lawsuit. This is particularly important where, as here, a large number of small and medium sized claimants may be involved. In light of the awesome costs of discovery and trial, many of them would not be able to secure relief if class certification were denied . . . .

*In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 732 (N.D. Ill. 1977) (citations omitted).

Another court noted:

> Given the relatively small amount recoverable by each potential litigant, it is unlikely that, absent the class action mechanism, any one individual would pursue his claim, or even be able to retain an attorney willing to bring the action. As Professors Wright, Miller and Kane have discussed, in analyzing consumer protection class actions such as the instant one, 'typically the individual claims are for small amounts, which means that the injured parties would not be able to bear the significant litigation expenses involved in suing a large corporation on an individual basis. These financial barriers may be overcome by permitting the suit to be brought by one or more consumers on behalf of others who are similarly situated.' 7B Wright et al., §1778, at 59; *see e.g., Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 809 (1985) ('Class actions . . . may permit the plaintiff to pool claims which would be uneconomical to litigate individually.') The public interest in seeing that the rights of consumers are vindicated favors the disposition of the instant claims in a class action form.

*Lake v. First Nationwide Bank,* 156 F.R.D. 615, 628-629 (E.D.Pa 1994).

Class certification will provide an efficient and appropriate resolution of the controversy.

*Zanni v. Lippold,* 119 F.R.D. 32 (C.D.Ill.1988).

Return of the funds paid to LPG is a measure of damages that is simple to administer, based

on LPG's own records (now in the hands of its Chapter 11 Trustee). Beech has filed a proof of

claim with the LPG bankruptcy. Beech is not seeking damages against LPG via this motion against

the non-bankruptcy defendants. Beech is merely seeking a determination under CROA to hold the

non-bankruptcy defendants accountable.

## VII. CONCLUSION

The proposed class meets the requirements of Rules 23(a) and (b)(3). Plaintiff respectfully requests that this Court certify this action as a class action.

Respectfully submitted,

*/s/ Jason Graeber*
Jason Graeber

Jason Graeber
250 Beauvoir Road, Suite 4C
Biloxi, MS 39501
(228) 207-7117
jason@jasongraeberlaw.com

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## CERTIFICATE OF SERVICE

Daniel A. Edelman certifies that on January 24, 2024, this document was filed by ECF, causing a copy to be sent to all counsel of record.

In addition, copies were mailed to:

Tony M. Diab
20101 SW Cypress St.
Newport Beach, CA 92660

Daniel Marsh
17291 Irvine Blvd., Suite 101
Tustin, CA 92780-2966

Jayde Trinh
2128 W. Cherry Drive
Orange, CA 92868-1927

/s/ Daniel A. Edelman
Daniel A. Edelman

T:\38577\Pleading\Plaintiff's Memorandum in Support of amended motion for class cert vs. new defendants_Pleading.WPD